**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ENZO COSTA<br>Saint Elizabeths Hospital<br>1100 Alabama Avenue SE<br>Washington, DC 20032 | ~~Case~~ |
| VINITA SMITH<br>Saint Elizabeths Hospital<br>1100 Alabama Avenue SE<br>Washington, DC 20032 | |
| WILLIAM DUNBAR<br>Saint Elizabeths Hospital<br>1100 Alabama Avenue SE<br>Washington, DC 20032 | |
| STEFON KIRKPATRICK<br>Saint Elizabeths Hospital<br>1100 Alabama Avenue SE<br>Washington, DC 20032 | **No.** |
|       on behalf of themselves and all persons<br>      similarly situated, | **~~COMPLAINT~~1:19- cv-3185 (RDM)** |

                      Plaintiffs Petitioners,

      v.

BARBARA J. BAZRON, Director
Department of Behavioral Health
in her individual capacity
64 New York Avenue, NE - 3rd Floor
Washington, DC 20002

MARK J. CHASTANG, Chief
Executive Officer, Saint Elizabeths Hospital
in his official and individual capacity
1100 Alabama Avenue, SE
Washington, DC  20032

DISTRICT OF COLUMBIA
c/o Attorney General of the District of Columbia
441 4th Street, NW
Washington, DC 20001,

                      Defendants Respondents.

### FIRST AMENDED CLASS ACTION COMPLAINT AND PETITION FOR WRIT OF HABEAS CORPUS

(For declaratory and injunctive relief—unconstitutional conditions at Saint Elizabeths Hospital)

### Introduction

1. ~~A hospital without~~For the third time in recent years, the District of Columbia's Department of Behavioral Health has failed to protect the health of the vulnerable patients entrusted to its care at Saint Elizabeths Hospital, the District's public psychiatric hospital, in light of recognized and life-threatening dangers.  Indeed, four St. Elizabeths patients have died of COVID-19 as of April 15, 2020.

2. COVID-19, a highly communicable and potentially fatal virus, is spreading rapidly around the world, in the United States, and in the District of Columbia. As of April 15, 2020, there were 605,390 cases and over 24,000 deaths attributable to COVID-19 reported in the United States.[1] The District of Columbia has reported 2,350 cases of COVID-19 and at least 81 deaths, as of April 15, 2020.[2] The World Health Organization ("WHO") estimates that as of April 15, 2020, there ae 1,991,562 confirmed cases, 130,885 confirmed deaths, and 213 countries, areas, or territories with confirmed cases.[3]

---

[1] CTRS. DISEASE CONTROL & PREVENTION, *Cases in the U.S.* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited April 16, 2020).

[2] GOV'T. D.C., *Coronavirus Data*, https://coronavirus.dc.gov/page/coronavirus-data (last visited April 16, 2020).

[3] *See* WORLD HEALTH ORG., *Coronavirus disease (COVID-19) Pandemic,* https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited April 16, 2020),

3.        The virus is also spreading rapidly among patients at Saint Elizabeths Hospital. As of April 1, 2020, there were 5 positive cases of COVID-19 among Saint Elizabeths Hospital staff and 1 positive case among patients. By April 16, 2020, the Department of Behavioral Health reported that four Saint Elizabeths Hospital patients have died of coronavirus, and 32 patients and 47 staff at the Hospital have tested positive for COVID-19.

4.        Patients at Saint Elizabeths Hospital are at a heightened risk of contracting, and are, in fact, dying from COVID-19 because of Defendants' failure to follow professional guidance and appropriately plan and manage the facility during this global pandemic.

5.        Despite clear guidance from the Centers for Disease Control (CDC), the D.C. Department of Health, and the Mayor's orders, Defendants-respondents (hereafter simply "Defendants") are not ensuring that patients at Saint Elizabeths Hospital are properly protected from the risk of contracting COVID-19.  Specifically:

- Patients at Saint Elizabeths Hospital are unable to properly practice social distancing.

- Symptomatic patients are not tested at all, or not tested in a timely matter.

- Symptomatic patients are not medically isolated from other patients who reside in their Unit.

- Known or suspected cases of COVID-19 have generally not been transferred to other facilities where they can receive appropriate treatment.

- Patients who test positive for COVID-19 are not quarantined from other patients.

- The Hospital has continued to be open for new admittances.

Defendants' lack of emergency planning and poor crisis management has caused the rapid and deadly spread of COVID-19 at Saint Elizabeths Hospital.

6.       This is not the first time that Defendants' lack of emergency planning and poor crisis management also placed hundreds of patients at risk.  As recently as October 2019, Defendants discovered that the Saint Elizabeths Hospital water ~~is not really a hospital.~~ supply was toxic and shut off the water to the Hospital for 28 days.

7.       Plaintiffs petitioners (hereafter simply "Plaintiffs") Enzo Costa, Vinita Smith, Stefon Kirkpatrick, and William Dunbar are ~~all patients at Saint Elizabeths Hospital, the District's psychiatric hospital ("Saint Elizabeths" or the "Hospital").  They are four~~ four of approximately 270 ~~individuals~~patients with mental health disabilities at Saint Elizabeths Hospital~~.  Plaintiffs and other similarly situated patients are currently subject to unconstitutional and inhumane conditions that shock the conscience.  Saint Elizabeths Hospital has been~~ who were left without safe, running water ~~since~~from September 26, 2019~~, exposing these vulnerable patients~~ to October 24, 2019 and thereby exposed to irreparable harmful physical, emotional, and mental health consequences.  ~~Although there are reports that the water is being turned back on (see ¶34 below), this is not the first time that government officials have promised that the water will restored during this current crisis.  It is also~~They still reside there and now face the threat of contracting COVID-19 as a consequence of Defendants' failure to take appropriate precautionary measures.

~~1.~~8.       The 2019 water outage was the second time in three years that Saint Elizabeths Hospital ~~has~~ experienced a major and extended water outage.

~~2.~~9.       The extended water outage ~~is~~ directly ~~impacting~~impacted necessary patient medical care.  Defendants closed the Treatment Mall, the location at the Hospital where

treatment planning meetings are held and patients receive group therapy, art therapy, and music therapy, and they ~~have~~ curtailed or suspended a wide variety of therapy and other forms of psychiatric care on which Plaintiffs and members of the class ~~demand~~depend and need to manage and maintain their mental health.  Patients ~~are~~were confined to their units and their rooms and ~~are~~were unable to attend regularly scheduled therapy.  Patients ~~cannot~~could not access other forms of routine medical care.

    ~~3.~~10.      Unhygienic conditions ~~are~~were pervasive to the point where they ~~are endangering~~endangered patient health.  As a result of the extended water crisis, patients at Saint Elizabeths Hospital, all of whom are committed to the District's care and custody, ~~are enduring~~endured inhumane, unsafe, and medically dangerous conditions that ~~risk the~~risked their health, mental health, and safety.   Patients ~~cannot~~could not shower, wash their hands, or use the toilets regularly.  Fecal matter, urine, and menstrual blood ~~are accumulating~~accumulated in the bathrooms.  Patients ~~are~~were only allowed to shower on a limited schedule~~, and must shower~~ outside in dirty and portable showers which ~~are~~were inaccessible to the many patients with mobility disabilities.

    ~~4.~~11.      ~~This Class Action Complaint challenges the Defendant's decision to keep Saint Elizabeths operating during this extended water crisis without adequate protections for patients.~~  Despite the fact that there ~~is~~was no safe, running water in September and October of 2019, Defendants ~~are continuing~~continued to admit new patients ~~at~~to Saint Elizabeths Hospital and to keep patients at Saint Elizabeths Hospital rather than transferring them to other appropriate facilities or discharging them to community-based care where appropriate. Defendants ~~are~~did not ~~providing~~provide appropriate care and safety for Plaintiffs and other similarly situated patients in violation their due process rights and rights under federal law.

Defendant's conduct in continuing to commit Plaintiffs ~~in~~to a facility with no safe, running, water is so egregious as to shock the conscience.

12.       The original Class Action Complaint filed in this action challenged the Defendants' failure during the October 2019 extended water crisis to provide adequate protections for patients.

13.       Although Defendants turned the water back on in October 2019, they have not only failed to take adequate steps to avoid another predictable health crisis but have yet again fostered conditions to exacerbate the dangers to patients in their care.

14.       Defendants' conduct in admitting new patients, failing to properly test or isolate symptomatic and exposed patients, failing to quarantine patients with COVID-19, and failing to take other medically necessary precautionary measures is so egregious as to shock the conscience.

## Subject Matter Jurisdiction & Venue

~~5.~~15.       The Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343 because this action presents federal questions and seeks to redress the deprivation of rights under the Fifth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2241.

~~6.~~16.       Venue is proper in this District under 28 U.S.C. §~~1391~~1 391(b)(2) because all of the events giving rise to the claims took place in this District.

~~7.~~17.       Declaratory relief is authorized by 28 U.S.C. § 2201.  A declaration of law is necessary and appropriate to determine the parties' respective rights and duties.

~~8.~~18.       Injunctive relief is authorized by 28 U.S.C. § 2202.

## Parties

9.19.        Enzo Costa is thirty-eight years old and is a patient at Saint Elizabeths Hospital in Unit 1C.  He is diagnosed with schizophrenia, dystonia, schizo-affective disorder, and anti-social personality disorder.  He is indefinitely, involuntarily civilly committed to the District's care.

10.20.        Vinita Smith is a fifty-sixseven years old and is a patient at Saint Elizabeths Hospital in Unit 1F.  She is diagnosed with schizo-affective disorder that requires medication and therapy.  She is indefinitely, involuntarily civilly committed to the District's care.

11.21.        Stefon Kirkpatrick is thirty years old and is a patient at Saint Elizabeths Hospital in Unit 2C.  He is diagnosed with psychosis disorder.  Mr. Kirkpatrick has displayed symptoms of COVID-19 infection, but his request to be tested was denied and he has not been medically isolated.  He is indefinitely, involuntarily civilly committed to the District's care.

12.22.        William Dunbar is thirty years one year old and is a patient at Saint Elizabeths Hospital in Unit 2A. He is diagnosed with paranoia schizophrenia.  He is indefinitely, involuntarily civilly committed to the District's care.

13.23.        Plaintiffs bring this action for class-wide injunctive relief and for a class-wide writ of habeas corpus on behalf of themselves and other similarly situated patients at Saint Elizabeths Hospital.

14.24.        The named Plaintiffs and the members of the Plaintiff Class are persons with a disability or perceived to have a disability, as that term is defined in the Americans with Disabilities Act ("ADA"), and are entitled to the protections of the ADA. 42 U.S.C. §12102(2)(A).

15.25.	Defendant District of Columbia ("the District") owns and operates Saint Elizabeths Hospital, and is responsible for the services and supports provided to patients at Saint Elizabeths Hospital.  Saint Elizabeths Hospital is the District's only public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. Saint Elizabeths Hospital also provides mental health evaluations and care to patients committed by the courts.

16.26.	The District of Columbia is a public entity as that term is defined in the ADA. 42 U.S.C. § 12131(1).

17.27.	Defendant Barbara Bazron is the Director of the Department of Behavioral Health, the District agency that oversees Saint Elizabeth.  She is sued in her individual capacity.

18.28.	Defendant Mark Chastang is the Chief Executive Officer of Saint Elizabeths Hospital.  He is sued in his individual and official capacity.

29.	Mark Chastang is Plaintiffs' immediate custodian, exercising day-to-day control over Plaintiffs' physical custody.

## Statement of Facts

### ~~Contaminated Water at~~ Saint Elizabeths Hospital

19.30.	Saint Elizabeths Hospital is the District's public psychiatric facility and serves individuals with mental illness who need intensive inpatient care. Saint Elizabeths Hospital is the District's only public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. Saint Elizabeth'sElizabeths Hospital also provides mental health evaluations and care to patients committed by the courts.

20.31.          Patients at Saint Elizabeths Hospital are entitled to a dignified, respectful and supportive environment and generally accepted standards of individualized treatment, continuity of care, professionalism, and health and safety.

21.32.          Saint Elizabeths Hospital has an average of 270 patients per day and approximately 700 employees.  On April 14, 2020, the patient population was 237.

33.          Saint Elizabeths Hospital patients are housed in one of 11 units, or houses. The units consist of bedrooms and common spaces.  Some of the bedrooms are single occupancy and some of the bedrooms are double occupancy.

34.          Saint Elizabeths Hospital patients are committed to the care of the District. Patients may be committed in one of three ways.  Patients may have civil legal status, meaning that they are committed voluntarily, or may be civilly committed, or may be committed on an emergency basis.  Patients may also be committed after being adjudicated in criminal court as not guilty by reason of insanity ("NGI").  Patients may also be committed to Saint Elizabeth's for forensic reasons, because they are awaiting a hearing to determine their competency to stand trial or to have their competency restored.  Patients may be transferred from DC correctional facilities or other area hospitals.

35.          Defendants have the authority to release any patients who are civilly committed or who are committed to the Hospital voluntarily.

36.          Defendants have the authority to evaluate and recommend release or continued commitment for patients who are criminally committed or who are committed because of their NGI status.

**The 2020 COVID-19 Pandemic**

37.        COVID-19 is the disease caused by the SARS-CoV-2 virus that has ~~not~~ caused a global pandemic.

38.        The CDC estimates that as of April 15, 2020, there are 605,390 confirmed cases and 24,282 confirmed deaths in all 50 states, the District of Columbia, Guam, Puerto Rico, the Northern Mariana Islands, and the U.S. Virgin Islands.[4]

39.        COVID-19 is highly contagious. COVID-19 is thought to survive for three hours in the air in droplet form that can be inhaled or transferred to surfaces, up to twenty-four hours on cardboard, up to two to three days on plastic and steel.[5]

40.        Due to the highly contagious nature of COVID-19, data and statistical modeling show that absent intervention, the rate of COVID-19 infections has grown exponentially.[6]

41.        People in all age brackets are at risk of serious illness and death from COVID-19.[7]

42.        Although only about "one person in six becomes seriously ill" from COVID-19, the virus causes excruciating pain to those who become seriously ill. One

[4] CTRS. DISEASE CONTROL & PREVENTION, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. (last visited April 16, 2020).

[5] Neeltje van Doremalen et al., Correspondence, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENGLAND J. MEDICINE, March 17, 2020, https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

[6] Kenneth Chang, *A Different Way to Chart the Spread of Coronavirus*, N.Y. TIMES, March 20, 2020 ("Unconstrained, the coronavirus spreads exponentially, the caseload doubling at a steady rate.").

[7] CTRS. DISEASE CONTROL & PREVENTION, *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020* tbl. (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w.

respiratory physician explained that the lungs "become filled with inflammatory material" and "are unable to get enough oxygen to the bloodstream."[8]

43.        The virus leads to acute respiratory distress syndrome, in which fluid displaces the air in the lungs. The sensation of that illness is akin to being drowned.[9] In more serious forms, the individual can experience excruciating pain, days or weeks of fever and chills, uncontrollable diarrhea and inability to keep down food or water, and extremely labored breathing requiring oxygen therapy.[10] The most severe forms — of which symptoms such as vomiting and diarrhea are thought to be early signs — require hospitalization and often artificial ventilation to preserve life. The artificial ventilation process is highly invasive and many who have undergone the process describe it as psychologically traumatic. Some patients are placed in medically induced comas for such treatment. Some do not survive.

44.        Emerging medical research also demonstrates that, in addition to the short-term risk of death posed by COVID-19, contracting the virus can lead to other serious long-term medical conditions, including cardiovascular disease and permanent reduction of lung function.[11]

---

[8] Graham Readfearn, *What Happens to People's Lungs When They Get Coronavirus*, GUARDIAN, April 14, 2020, *available at* https://www.theguardian.com/world/2020/apr/15/what-happens-to-your-lungs-with-coronavirus-covid-19.

[9] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, PROPUBLICA, March 21, 2020, available at https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[10] Leah Groth, *Is Diarrhea a Symptom of COVID-19? New Study Says Digestive Issues May Be Common With Coronavirus*, HEALTH, March 20, 2020.

[11] Tian-Yuan Xiong et al., *Coronaviruses and the Cardiovascular System: Acute and Long-Term Implications*, EURO. HEART J., 231 (2020).

45.           Because of these short-term and long-term dangers, treating COVID-19 requires a team of health care providers, including nurses, respiratory therapists, and intensive care physicians.[12]

46.           As of April 10, 2020, the available data from the CDC to date shows that, in total, 20.7 to 31.4 percent of people who tested positive for COVID-19 require hospitalization, 4.9 to 11.5 percent require admission to the ICU, and 1.8 to 3.4 percent die.[13]

47.           The WHO estimates that the COVID-19 mortality rate is between three and four percent. The CDC estimates that the COVID-19 mortality rate in the United States was 6.9 percent during week 14 (ending April 4, 2020) of the outbreak in the United States.[14] By comparison, the mortality rate of seasonal influenza is well below 0.1 percent.[15]

48.           There is no vaccine to prevent COVID-19.[16]

### Risk of Infection at Saint Elizabeths Hospital

49.           Medical and mental health professionals have consistently urged that individuals with mental health disorders require "priority attention" in this kind of emergency.

---

[12] Pauline W. Chen, *The Calculus of Coronavirus Care*, N.Y. TIMES, March 20, 2020.

[13] *Id.*

[14] CTRS. DISEASE CONTROL & PREVENTION, *CovidView: A Weekly Surveillance Study of of U.S. COVID-19, Mortality*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html#mortality (last visited April 16, 2020).

[15] WORLD HEALTH ORG, CORONAVIRUS DISEASE 2019 (COVID-19) SITUATION REPORT-46 p. 2 (2020).

[16] CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2020: How to Protect Yourself and Others*,  https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited April 16, 2020).

50.        Mental health disorders like those experienced by Plaintiffs can increase the risk of infections, including pneumonia, a leading cause of hospitalization and death among those infected with COVID-19.[17]

51.        Congregate settings like Saint Elizabeths Hospital enable and facilitate the rapid spread of COVID-19 infection.  People live, eat, and sleep in close proximity. In such environments, infectious diseases that are transmitted via the air or touch are more likely to spread. This therefore presents an increased danger for the spread of COVID-19 once it has been introduced into the facility.

52.        To the extent that patients are housed in close quarters, unable to maintain a six-foot distance from others, and sharing or touching objects used by others, the risks of spread are greatly, if not exponentially, increased as already evidenced.

53.        Because people — including staff and contractors—constantly cycle in and out of Saint Elizabeths Hospitals facilities, there is an ever-present risk that new carriers will bring the virus into the facility.

54.        The spread of COVID-19 at St. Elizabeths Hospital could have a devastating impact on public health far beyond the Hospital's walls. Staff who enter and leave the facility could transmit the virus to the broader community and demands for intensive care beds and ventilators could overwhelm local hospitals and health care providers. It is essential at this time that all steps are taken to reduce infection and to "flatten the curve" to ensure that our health care system does not collapse.

---

[17] *See* Hao Yao, et al., *Patients with mental health disorders in the COVID-19 epidemic*, The Lancet, Vol. 7 Issue 4 at e21 (April 1, 2020), *available at* https://doi.org/10.1016/S2215-0366(20)30090-0.div.

55.        Nursing homes are similar congregate settings.  In Maryland, Gov. Larry Hogan is sending "strike teams" to nursing homes that are at high-risk of COVID-19 because of the heightened danger to residents.  These strike teams will administer rapid tests; ensure isolation of suspected COVID-19 cases and quarantine of confirmed COVID-19 cases; determine equipment needs; and provide on-site care and medical assessment.[18]  Maryland's response underscores the public and individual health imperatives for immediate and decisive action for persons confined to congregate settings and provides a model for implementing such protective actions.

**Defendants' Knowledge of COVID-19 Risk**

56.        It is the policy of the District of Columbia at this time to require social distancing and to prohibit people gathering in groups. The Mayor has issued a series of Executive Orders that carry the force of law and include criminal penalties for those who do not follow these basic public health practices.  The Mayor's orders relied, in part, on the following findings:

> This Order is issued based on the increasing number of confirmed cases of COVID-19 within Washington, DC, and throughout the metropolitan Washington region. Scientific evidence and public health practices show that the most effective approach to slowing the community transmission of communicable diseases like COVID-19 is through limiting public activities and engaging in social distancing. … Medical and public health experts agree that COVID-19 is easily transmitted and it is essential that its spread be slowed to protect the ability of public and private health care providers to handle the expected influx of ill patients and safeguard public health and safety. …. Because of the risk of the rapid spread of the virus, and the need to protect all members of Washington, DC, and the region, especially residents most vulnerable to the virus, and local health care providers and emergency first responders, this Order requires the temporary

---

[18] Editorial Board, *Nursing homes are in the pandemic's crosshairs. They can't be neglected.* WASHINGTON POST April 13, 2020, available at https://www.washingtonpost.com/opinions/nursing-homes-are-in-the-pandemics-crosshairs-they-cant-be-neglected/2020/04/13/7341919a-7db0-11ea-a3ee-13e1ae0a3571_story.html

closure of the on-site operation of all non-essential businesses and implements a prohibition on large gatherings.[19]

57.          On February 28, 2020, Mayor Bowser ordered the activation of the District's Emergency Operations Center to coordinate responses to COVID-19, requiring Defendants to "remind their staff and constituencies" of "basic infection practices," including to "[w]ash hands with soap and water" or an "alcohol-based hand sanitizer," to "[a]void close contact with people who are sick," and to "[c]lean and disinfect frequently touched objects and surfaces."[20] The Executive Order specifically requires that "[a]ll relevant District agencies shall review their copy of the District Response Plan to evaluate the potential impacts of COVID-19 on emergency roles and responsibilities and take necessary steps to ensure continued performance."[21]

58.          On March 13 and 17, Plaintiffs wrote to Defendants inquiring about Defendants' plans and preparations for the COVID-19, including a specific request that Defendants evaluate every patient for community placement.

59.          Despite these clear indicia of emergency, Defendants did not take sufficient precautions.

60.          The Department of Behavioral Health issued guidance in March 2020 indicating that the Saint Elizabeths Hospital would remain open during the COVID-19 crisis and that the Department was encouraging precautions to limit the spread of the virus at Saint Elizabeths Hospital.

---

[19] GOV'T. D.C., *Mayor Bowser Issues Stay-At-Home Order*, https://mayor.dc.gov/release/mayor-bowser-issues-stay-home-order (last visited April 16, 2020).

[20] D.C. Mayor's Order 2020-35 §10(a).
[21] D.C. Mayor's Order 2020-035, §3(a).

61.	On March 18, 2020, Defendants reported that they began to screen visitors and staff for symptoms of COVID-19 by asking screening questions and taking temperatures.

62.	On March 18, 2020, Defendants reported that they implemented their Emergency Preparedness Plan ("EPP") to address COVID-19 on March 12, 2020. Defendants have not shared their EPP or any other response plan publicly, and to date, have not produced it in discovery.

63.	On March 18, 2020, Defendants also reported that as of that day, visitation was restricted, incoming patients were being screened for flu-like symptoms, and staff were advised to stay home if they were feeling sick.

64.	Following public reports on April 1 that a patient and five staff members at Saint Elizabeths Hospital had tested positive for COVID-19, Plaintiffs sent a follow-up letter to Defendants requesting an update and information about Defendants' response and reiterating the request that Defendants evaluate every patient for community placement and take aggressive steps to protect patients who remain in the Hospital.  On April 9, Plaintiffs sent a further follow-up letter.  Defendants have acknowledged receipt but not otherwise responded to either letter.

65.	On April 15, the Mayor issued Mayor's Order 2020-063 which requires health care facilities, including Saint Elizabeths Hospital, to take steps for managing the COVID-19 pandemic.[22]  The Order details steps the facility must take to, among other things, maintain social distancing among residents, restrict visitors from entering the facility, manage symptomatic staff, quarantine or isolate symptomatic or exposed patients, and develop a

---

[22] D.C. Mayor's Order 2020-063.

continuity of operations plan.[23] This guidance is inadequate and, to date, Defendants have come woefully short of meeting these steps.

**Defendants' Failure to Protect Patients at Saint Elizabeths Hospital Are Putting Plaintiffs At Heightened Risk of Contracting COVID-19**

66.     The CDC issued guidance on COVID-19 Infection Prevention and Control in various congregate settings. Although the CDC does not have guidance specific to psychiatric facilities, it has issued guidance on comparable congregate long-term care settings like nursing homes[24] and for health care settings.[25]

67.     The CDC recommends that, upon learning of the COVID-19 pandemic, facilities should immediately: educate and train health care personnel and facility-based staff on infection prevention and control measures; educate residents and families about COVID-19; provide hand hygiene supplies; provide tissues and masks; make Personal Protective Equipment (PPE) available; and frequently disinfect high-touch surface areas and shared resident equipment.[26]

---

[23] *Id.*

[24] CTRS. DISEASE CONTROL & PREVENTION, *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes* https://www.cdc.gov/coronavirus/2019-ncov/hcp/long-term-care.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhealthcare-facilities%2Fprevent-spread-in-long-term-care-facilities.html (lasted visited April 16, 2020).

[25] CTRS. DISEASE CONTROL & PREVENTION, *Healthcare Infection Prevention and Control FAQs for COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-faq.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Finfection-control%2Finfection-prevention-control-faq.html (last visited April 16, 2020).

[26] CTRS. DISEASE CONTROL & PREVENTION, *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes,* https://www.cdc.gov/coronavirus/2019-ncov/hcp/long-term-care.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-

68.          The CDC recommends that facilities should evaluate and manage residents with symptoms of respiratory infection, including asking residents to report symptoms, testing residents for fever and symptoms, and implement practices to prevent the spread of infection from symptomatic people.[27]

69.          When there has been an outbreak of COVID-19 in the community surrounding the facility, but not yet in the facility, the CDC recommends that, in addition to the guidelines for symptomatic individuals: residents with suspected COVID-19 should be isolated by being placed in a private room with their own bathroom, and the facility should implement practices to prevent and control the spread of the virus, including canceling communal dining and all other group activities.[28]  The CDC guidance also recommends that if the "facility cannot fully implement all recommended precautions" residents with "known or suspected COVID-19 . . . should be transferred to another facility that is capable of implementation" and that "while awaiting transfer, symptomatic residents should wear a facemask (if tolerated) and be separated from others."

70.          When there has been sustained transmission in the community or when there are cases in the facility, the CDC recommends, in addition to the isolation procedures, transfer of symptomatic patients, and termination of group activities that: facilities implement universal use of facemasks for health care professionals; consider the use of gown, gloves, eye protection, and N95 respirators for all staff; encourage patients to remain in their rooms and

---

ncov%2Fhealthcare-facilities%2Fprevent-spread-in-long-term-care-facilities.html (lasted visited April 16, 2020).

[27] *Id.*

[28] *Id.*

when they leave their rooms, encourage them to wear a face mask and perform social distancing by staying six feet away from others; and "cohorting,"[29] or grouping, ill residents with dedicated health care professionals.[30]

      71.      In correctional facilities, which are similar congregate settings, the CDC recommends medical isolation of positive or presumed positive COVID-19 patients in the following manner:[31]

      a.      As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.

      b.      Individuals' movement outside the medical isolation space should be limited to an absolute minimum.  Patients should be provided medical care and meals inside isolation spaces.  Individuals should be assigned a

---

[29] Cohorting is defined by the CDC as the practice of grouping together patients who are colonized or infected with the same organism to confine their care to one area and prevent contact with other patients.  See CTRS. DISEASE CONTROL & PREVENTION, *Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings* (2007), *available at* https://www.cdc.gov/infectioncontrol/guidelines/isolation/prevention.html.

[30] CTRS. DISEASE CONTROL & PREVENTION, *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes,* https://www.cdc.gov/coronavirus/2019-ncov/hcp/long-term-care.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhealthcare-facilities%2Fprevent-spread-in-long-term-care-facilities.html (lasted visited April 16, 2020).

[31] CTRS. DISEASE CONTROL & PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (lasted visited April 16, 2020).

dedicated bathroom.  Individuals should be excluded from all group

activities.

    c.     Ensure that the individual is wearing a face mask at all times when outside

of the medical isolation space, and whenever another individual enters and

provide clean masks as needed.

    d.     Masks should be changed at least daily, and when visibly soiled or wet.

72.          The CDC recommends that facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible.[32]

73.          The CDC recommends that cohorting of COVID-19 positive or symptomatic patients should only be practiced if there are no other available options.[33]  If cohorting is necessary the CDC recommends[34]:

    a.     Only individuals who are laboratory confirmed COVID-19 cases should

be placed under medical isolation as a cohort. Do not cohort confirmed

cases with suspected cases or case contacts.

    b.     Unless no other options exist, do not house COVID-19 cases with

individuals who have an undiagnosed respiratory infection.

    c.     Ensure that cohorted cases wear face masks at all times.

74.          Every possible effort must be made to separate infected or potentially

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

infected individuals from the rest of the incarcerated population. Individuals believed to have been exposed to COVID-19, but who are not yet symptomatic, and those believed to be infected with COVID-19 and potentially infectious should be segregated from others.  Any individual who must interact with those potentially or likely infected with COVID-19 must utilize protective equipment as directed by public health authorities.

75.	Patients who require testing, based on public health recommendations and the opinion of a qualified medical professional, should be tested for COVID-19.  The CDC recommends prioritizing testing for symptomatic patients in long-term care facilities so that those who are at highest risk of complication of infection are rapidly identified and appropriately triaged.[35]

76.	Once a facility has an outbreak of COVID-19, symptomatic patients should be presumed positive for COVID-19 and treated accordingly.

77.	As discussed in ¶121, the CDC also recommends that facilities prepare for staffing shortages as a result of the virus.[36]

**Defendants Are Not Adequately Implementing Social Distancing or Distribution of Masks or Other Essential Hygiene Practices**

78.	Ms. Smith, Mr. Costa, Mr. Dunbar, and Mr. Kirkpatrick all report that it is impossible for patients at Saint Elizabeths Hospital to maintain six feet of distance between themselves and other people in the Hospital.

---

[35] CTRS. DISEASE CONTROL & PREVENTION, *Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (lasted visited April 16, 2020).

[36] CTRS. DISEASE CONTROL & PREVENTION, *Strategies to Mitigate Healthcare Personnel Staffing Shortages*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/mitigating-staff-shortages.html (last visited April 16, 2020).

79.         Defendants have not provided masks or personal protective equipment to all patients or instructed or required patients to wear masks in a manner consistent with public health guidelines.  Patients who have masks are unable to replace them with clean masks in a manner consistent with public health guidelines.

80.         Patients are instructed to remain on their Units but patients share common areas like medicine distribution centers, laundry facilities, lounges, and cafeterias.  Defendants are not ensuring that Unit bedrooms and bathrooms are cleaned and sanitized regularly. Defendants are not ensuring that Unit facilities are adequately stocked with soap and hand sanitizer.

81.         Defendants have instructed Ms. Smith to remain on her Unit, which houses up to 27 people.

82.         Patients in Ms. Smith's Unit use the same common spaces.  They eat dinner together in groups of up to ten people.  They all use the same lounge area and laundry room. It is not possible for her to maintain six feet of distance from other patients in her Unit.

83.         Defendants have not provided Ms. Smith with a mask.  Most patients on her Unit do not wear masks.

84.         On or around April 1, 2020, Defendants instructed Mr. Kirkpatrick to remain on his Unit, which houses 26 men.

85.         Patients in Mr. Kirkpatrick's Unit all use the same common spaces, including the dining hall, laundry room, and lounge.  It is not possible for him to maintain six feet of distance from other patients in his Unit.

86.         Mr. Kirkpatrick has a single room, but at least six patients in his Unit are residing in a room with another patient.

87.　　　　Mr. Kirkpatrick has symptoms of COVID-19, as alleged in ¶ 21 and ¶102. Despite these symptoms, Defendants have not provided Mr. Kirkpatrick with a mask to wear. Some, but not all, patients on his Unit are wearing masks.

88.　　　　On or around April 1, 2020, Defendants instructed Mr. Costa to remain on his Unit, which houses 15 men as of April 14, 2020.

89.　　　　Patients in Mr. Costa's Unit all use the same common spaces like the lounge area and the laundry room.  It is not possible for him to maintain six feet of distance from other patients in his Unit.

90.　　　　Patients in Mr. Costa's Unit are all eating in the same dining room and eat in groups of 2-3 patients at a time.  Even with these limited numbers, there is not enough space for the diners to maintain six feet of distance from other patients during meals.

91.　　　　Defendants provided Mr. Costa with a mask and instructed Mr. Costa how to use it.  Defendants do not require Mr. Costa or other patients in his Unit to wear a mask.  Mr. Costa is wearing a mask because he fears that other patients in his Unit may have COVID-19.

92.　　　　One patient on Mr. Costa's unit is symptomatic for COVID-19.  This patient remains housed in Mr. Costa's unit and is self-quarantining in his room.

93.　　　　Defendants have instructed Mr. Dunbar to remain in his Unit, Unit 2A. Mr. Dunbar has a single room.

94.　　　　Patients in Mr. Dunbar's Unit are using the same common space.

95.　　　　Defendants have provided Mr. Dunbar with a single mask.  Mr. Dunbar must use the same mask every day.  This is an unsafe practice, as handling a contaminated mask simply transfers the virus to one's fingers.

**Defendants Have Not Adequately Implemented Testing, Quarantine and Isolation Procedures**

22

96. There is no COVID-19 testing taking place on-site at the Hospital. Patients are only being tested for COVID-19 once they are symptomatic of the virus.  Patients who have been exposed to the virus but are asymptomatic are not being tested.

97. Defendants are not segregating all of the patients who are COVID-19 positive from other patients at the Hospital. Patients who have tested positive for COVID-19 are housed in close quarters and share common areas with patients who are showing no symptoms and patients who have potentially unexposed to the virus.

98. Defendants are not segregating patients who are symptomatic and asymptomatic of COVID-19.  Patients who have symptoms of COVID-19 such as fevers and respiratory distress are housed in close quarters and share common areas with patients who are showing no symptoms.

99. Defendants are not segregating patients who are have been exposed to COVID-19 positive staff and patients from asymptomatic and/or unexposed patients.  Patients who have been exposed to COVID-19 are housed in close quarters and share common areas with patients who are showing no symptoms.

100. Defendants have created one quarantine unit at the Hospital.  This quarantine unit can only house seven patients.  Patients on this Unit are given masks daily but no other personal protective gear.  Bedrooms and bathrooms on this Unit are not regularly cleaned and sanitized.

101. The first confirmed case of COVID-19 at the Hospital was April 1, 2020. Defendants did not begin to use auxiliary space within the Hospital to segregate asymptomatic, symptomatic, exposed, and COVID-19-positive patients until on or about April 15, 2020.  As of

April 15, 2020, patients who are symptomatic, exposed, or COVID-19-positive are still housed in close quarters with shared common spaces with asymptomatic and/or unexposed patients.

102.     Mr. Kirkpatrick was symptomatic of coronavirus.  Mr. Kirkpatrick had a fever and respiratory symptoms, including cough and shortness of breath.  Mr. Kirkpatrick also reported loss of taste and smell, which is a symptom of COVID-19.

103.     After Mr. Kirkpatrick reported his symptoms on or about April 4, 2020, Defendants did not provide Mr. Kirkpatrick with a test to determine if he was COVID-19 positive.

104.     Defendants did not treat Mr. Kirkpatrick as a patient suspected or presumed positive for coronavirus.  Mr. Kirkpatrick was not isolated from other patients, nor was he transferred to another facility.  Defendants did not instruct Mr. Kirkpatrick to self-quarantine within his Unit.

105.     Defendants did not instruct Mr. Kirkpatrick to wear a mask or take other preventive measures to stop the spread of his illness.  Mr. Kirkpatrick's symptoms improved but he was not tested for COVID-19 and does not know if he had the virus.

106.     Mr. Dunbar's Unit, Unit 2A, has had four patients test positive for COVID-19.  Two COVID positive patients were rehoused in the quarantine unit and two COVID positive patients remained on Unit 2A with asymptomatic and potentially unexposed patients.

107.     The COVID-19 positive patients who remain housed in Unit 2A are interacting with other, asymptomatic and potentially unexposed patients in the common areas where they watch television or get refreshments.

108.     Despite being exposed to COVID-19 positive patients in his Unit, Mr. Dunbar has not been tested for COVID-19 or segregated from other patients.

24

**Defendants Are Depriving Patients of Essential Mental Health Care**

109.        There has been severe curtailment of mental health care and Defendants are failing to provide the mental health care that is essential for patient's well-being.

110.        Patients are not receiving the same or functionally equivalent mental health care that they received prior to the COVID-19 pandemic.  Defendants have closed the Treatment Mall, suspended group therapy, and suspended anger management classes and most competency restoration classes.  There are some individual therapy sessions, competency classes, and evaluations occurring virtually.

111.        Defendants have not taken steps to systematically compensate of the loss of group therapy or necessary classes or provided alternative or modified treatment plans, for example by using teletherapy or virtual therapy.

112.        Ms. Smith, Mr. Costa, Mr. Dunbar, and Mr. Kirkpatrick normally receive group therapy.  None of them has received group therapy or a telephonic or other remote substitute for the past few weeks.

113.        Mr. Costa normally receives individual therapy but has not received individual therapy or a telephonic or other remote substitute since Defendants ordered him to remain on his Unit.

114.        Mr. Dunbar has not received any therapy, or a telephonic or other remote substitute, aside from a single treatment team meeting, since Defendants ordered him to remain in his Unit.

115.        Ms. Smith has received only one therapy session via telemedicine with her usual therapist since Defendants ordered her to remain in her Unit.

116.         When patients with psychiatric needs do not receive appropriate mental health services, it becomes more likely symptoms will be exacerbated and patients will experience regression and damage to their mental health.

**Defendants' Staffing Shortage**

117.         The total number of staff members employed at Saint Elizabeths Hospital is approximately 700. Large numbers of staff are not reporting to work.

118.         On March 31, 2020 Defendants reported that 5 staff members tested positive for COVID-19 and another 22 staff members were not reporting to the hospital because they were quarantined due to possible exposure to COVID-19.

119.         By April 16, 2020, 47 staff members were positive for COVID-19 and another 23 were in quarantine due to possible exposure to COVID-19, for a total of 70 staff members absent from the hospital.

120.         Mr. Dunbar reports that his unit, Unit 2A, is short-staffed.

121.         The CDC has issued Guidance on Strategies to Mitigate Healthcare Personnel Staffing Shortages including the recommendations that, at minimum, healthcare facilities must understand their staffing needs and the minimum number of staff needed to provide a safe work environment and patient care and be in communication with local healthcare coalitions, federal, state, and local public health partners to identify additional health care personnel, when needed.[37]

122.         Despite multiple requests from Plaintiffs' Counsel, Defendants have provided no evidence that they are following the CDC's guidance.

---

[37] CTRS. DISEASE CONTROL & PREVENTION, *Strategies to Mitigate Healthcare Personnel Staffing Shortages*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/mitigating-staff-shortages.html (last visited April 16, 2020).

**The Hospital's Response to COVID-19 is Similar to Its Response to the 2019 Extended Water Outage**

123.         The Hospital's approach to COVID-19 is similar to its approach to the extended water crisis when Saint Elizabeths Hospital did not have safe, running water ~~since~~from at least September 26, 2019 to October 24, 2019.  During that period, the water supply at Saint Elizabeths Hospital was either completely turned off or limited for sewage use only.

124.         Plaintiffs are at a continuous risk due to the lack of appropriate emergency plans.  They are all indefinitely, involuntarily committed to the District's care and will likely be committed at Saint Elizabeths Hospital for all or most of their lives.  For example, Ms. Smith has been committed to Saint Elizabeth's for approximately 17 years.

125.         The failure to develop a plan to deal with health emergencies has caused Plaintiffs and the plaintiff class remain at risk of further irreparable harm.  Fears at the time of the water outage that Defendants' wrongful behavior would likely recur have come to pass.

126.         The October 2019 water contamination was the second time in three years that Saint Elizabeths Hospital has experienced an extended water outage.  Defendants' response to this second extended water outage indicates that they do not have an appropriate Emergency Water Supply Plan to manage extended water outages at Saint Elizabeths Hospital.~~.~~  Defendants' current and ongoing failure to provide the most basic protections against COVID-19 for its patients and staff reflects that it continues to lack an appropriate plan to deal with health emergencies.

127.         The extended water outage and its effects caused a clear risk to the health and safety of Saint Elizabeths Hospitals patients, including Plaintiffs and class members.  The extended water outage and its effects created an unreasonable risk of traumatizing patients and exacerbating symptoms of mental illness.

128.	The conditions at Saint Elizabeths Hospital during the 2019 water outage, as described below, caused long lasting, if not permanent, damage to patients and their efforts at recovery.

129.	The conditions at Saint Elizabeths Hospital during the 2019 water outage, as described below, violated professional standards of care and treatment.

**Water Outage Allegations As of October 23, 2019 (Initial Complaint, Dkt. 1)**

130.	The allegations in this section reflect the conditions as of the filing of Plaintiffs' initial Complaint in this matter on October 23, 2019.

22.131.	Saint Elizabeths has not had safe, running water since at least September 26, 2019. Since September 26, 2019, the water supply at Saint Elizabeths has been either completely turned off or has been limited for sewage use only.

23.132.	Despite the extended water outage and the inability to provide appropriate, required medical care and therapy, as described below, Saint Elizabeths is still accepting new patients.

24.133.	The extended water outage and its effects cause a clear risk to the health and safety of Saint Elizabeths' patients, including Plaintiffs and class members.  The extended water outage and its effects creates an unreasonable risk of traumatizing patients and exacerbates symptoms of mental illness.

25.134.	The current conditions at Saint Elizabeths, as described below, will result in long lasting, if not permanent, damage to patients and their efforts at recovery.

26.135.	The current conditions at Saint Elizabeths, as described below, violate professional standards of care and treatment.

27.136.       On September 26, 2019, the D.C. Department of Behavioral Health ("DBH") received preliminary lab results for a water quality test of Saint Elizabeths showing evidence of pseudomonas and legionella bacteria in the facility's water supply.

28.137.       Legionella bacteria is known for causing Legionnaires' disease, which can lead to severe infections in people with weakened immune systems.  According to the ~~Centers for Disease Control and Prevention~~CDC, one out of four people who contract Legionnaires' disease in a healthcare setting dies because of it.

29.138.       Pseudomonas bacteria can lead to severe infections for people with weakened immune systems.

30.139.       In response to the bacteria found in the water supply, DBH reportedly implemented its "water emergency protocol" and turned the water off completely.  Upon information and belief, the water has been turned on occasionally and for limited purposes since September 26, 2019 but at no point has Saint Elizabeths had safe, running water.

31.140.       At the end of September, Plaintiffs Ms. Smith, Mr. Costa, Mr. Kirkpatrick, and Mr. Dunbar were abruptly told by staff that the water would be shut off because there was a water problem.

32.141.       Upon information and belief, DBH hired contractors to flush Saint Elizabeths' water system with chlorine, but testing following the "super chlorination" of the water system continued to show legionella within the facility's water system.

33.142.       According to Plaintiff Mr. Costa, as of 4:00 p.m. on October 23, 2019, the water remained shut off at Saint Elizabeths and upon information and belief, DBH has not given a precise date that it will be turned back on.

34.143.　　At 5:45 p.m. on October 23, 2019, Councilmember Vincent Gray tweeted that he had been informed by an unnamed source that "all bacteria has been eliminated" from the water system at St. Elizabeths Hospital and that "the process has already begun to restore full water service to the hospital." ‐According to Vincent Gray's tweets, the "toilet are fully operational" and "[F]aucet heads are being reconnected now and that process should be fully completed by tomorrow [October 24, 2019]." ‐Vincent Gray has shared no supporting documents, water tests, or information from DBH or Saint Elizabeths Hospital on Twitter.

35.144.　　Each of the previous dates DBH communicated to patients, their attorneys, or the public for when DBH expected to have safe running water has not been met.

36.　　This is the second time in three years that Saint Elizabeths Hospital has experienced an extended water outage. ~~Defendants' response to this second extended water outage indicates that they do not have an appropriate Emergency Water Supply Plan to manage extended water outages at Saint Elizabeths Hospital.~~

145.　　Defendants' response to this second extended water outage indicates that they do not have an appropriate Emergency Water Supply Plan to manage extended water outages at Saint Elizabeths Hospital.

37.146.　　Plaintiffs are all indefinitely, involuntarily committed to the District's care and will likely be committed at Saint Elizabeths for all or most of their lives.‐ For example, Ms. Smith has been committed to Saint Elizabeth's for approximately 17 years.

38.147.　　As discussed below, the extended water outage at Saint Elizabeths that plaintiffs continue to suffer is irreparably harming the Plaintiffs and plaintiff class. Furthermore, even if the clean water is restored in the near future, Plaintiffs and the plaintiff class will remain at risk of further irreparable harm until the Defendants remediate conditions at Saint Elizabeths,

provide adequate mental health services to meet the current needs of patients, and establish an appropriate Emergency Water Supply Plan. Thus, even if the current crisis is ameliorated, Plaintiffs will still be at risk of further irreparable harm. It is also far from clear that the wrongful behavior cannot be expected recur.

**Defendants Are Depriving Patients of Essential Medical and/or Mental Health Care**

39.148.          The extended water outage at Saint Elizabeths has prevented patients from receiving appropriate and necessary care, including medical care, psychiatric care, and therapy, creating an imminent risk of irreparable harm.

40.149.          Because of the extended water outage, Defendants closed the Treatment Mall. Patients remain on their locked wards and are not receiving appropriate group therapy, art therapy, or exercise.

41.150.          Staff, including psychologists and psychiatrists, are not regularly attending work because of the water crisis, forcing cancelations of patient team meetings and other appointments.

42.151.          Defendants have severely curtailed or suspended the psychiatric care on which patients depend. Patients at Saint Elizabeths, including Plaintiffs, are receiving fewer services, and less of the services they are still receiving, than normal. The minimal services they are receiving are not appropriate or tailored to their needs.

43.152.          DBH has not explained how it is appropriately dispensing medication, particularly those medications that need to be suspended in water. DBH has not made any statement about how they are addressing patients' medication side effects that are related to the lack of adequate water or that need water in response, such as dry mouth and dehydration.

44.153.          In addition to depriving patients of psychiatric care necessary on an ongoing basis, Saint Elizabeths' staff are failing to provide other types of health care. Upon

31

information and belief, staff are not performing routine checks of new patients for lice, bacteria, and other infections.

45.154.        Patients have no access to dentistry and podiatry care that is typically available at Saint Elizabeths.

46.155.        Ms. Smith has had a toothache but cannot go to the dentist.

47.156.        Mr. Costa's ward administrator, psychologist, psychiatrist, and therapist have all missed work during the time period while the water was shut off and have not been able to convene his team meetings. Mr. Costa has been unable to talk to his psychiatrist about switching one of his medications since the water outage occurred.

48.157.        Mr. Costa has not been able to access behavioral therapy, anger management classes, group therapy, art therapy, or the gym since Defendants closed the Treatment Mall.

49.158.        Mr. Costa normally gets 40 hours per week of therapy but Defendants are providing him with just 2 hours per day (10 hours per week) currently. The little therapy he is receiving is inappropriate: it is a competency restoration group but Mr. Costa is already competent.

50.159.        Because there was no water, Defendants have not provided Mr. Kirkpatrick with group therapy.

51.160.        Defendants cancelled a Narcotics Anonymous meeting that both Mr. Kirkpatrick and Mr. Dunbar attend because there was no water.

52.161.        Defendants have not provided Mr. Dunbar with group therapy or the opportunity to exercise since the water was shut off.

**The District is Depriving Patients of Essential Hygiene and Endangering Patient Safety**

32

53.162.        Without safe, running water, patients and staff cannot flush the toilets regularly, wash their hands, shower, wash clothing, or drink from the water fountains. Patients at Saint Elizabeths are using bottled water, hand sanitizers, and personal care body wipes to care for their basic hygiene. Patients are permitted limited use of temporary portable showers and toilets. Clothes and linens are only washed periodically and must be sent outside of the facility to be cleaned.

### Toilets

54.163.        Patients and staff cannot regularly and routinely flush the toilets at Saint Elizabeths. Saint Elizabeths has more than 70 operating bathrooms when the facility has running water. A limited number of toilets within the facility are in use when the water is turned off. These toilets must be flushed manually by pouring water into the tanks. Staff are only flushing the toilets twice per day, leading to the accumulation of feces, urine, and menstrual blood. The toilets are overflowing and human waste is flowing onto the floors in some bathrooms. There are also a limited number of port-a-potties outside the facility which were not provided until after the water had been shut off for some time.

55.164.        Ms. Smith did not have access to port-a-potties for several days after the water was shut off. While she was awaiting port-a-potties, she used the indoor toilets. Staff would flush those toilets twice per day. The indoor toilets were disgusting and unclean. There were menstrual products all over the bathroom.

56.165.        Mr. Costa's unit, Unit 1C, normally has six toilets. Unit 1C houses 26 men. Currently all of the men on his unit must use one toilet. That toilet is flushed manually by pouring water into the tank only once a day. The toilets back up and the smell from the toilets is "disgusting, pungent, sour, and strong."

57.166.        Mr. Costa did not have access to a port-a-potty until about a week after the water was shut off. The port-a-potties are outside and about 200 yards from his unit. The port-a-potties are not clean and they smell.

58.167.        Mr. Kirkpatrick's unit has an average of two usable toilets for approximately 25 people. The toilets do not have running water and are flushed by staff or patients. There is a buildup of feces on the toilet and floor. The bathroom smells.

59.168.        Mr. Kirkpatrick did not have access to a port-a-potty until about 2-3 weeks after the water was shut off.

60.169.        Mr. Dunbar's unit, Unit 2A, only has 2 usable toilets for approximately 27 people. The smell of the toilets is so nasty and strong that it makes Mr. Dunbar want to vomit. Mr. Dunbar is able to secure day passes to temporarily leave the facility and during this time he tries holds his solid waste until he can use toilets outside of Saint Elizabeths grounds.

### Showers

61.170.        Patients cannot use the indoor showers at Saint Elizabeths. Patients have to bathe in portable outdoor showers. DBH secured eight portable showers for Saint Elizabeths' entire patient population. The portable showers are clogged and dirty. The patients have to stand outside in groups and take showers in rotation because they have to travel back inside the facility as a group. There is no privacy in the showers.

62.171.        Before the outdoor showers arrived, Ms. Smith had to use wipes to clean herself because she was not permitted to shower indoors. She does not like using the wipes and does not feel clean using the wipes.

63.172.        Ms. Smith is only permitted to use the outdoor showers on Mondays, Wednesdays and Fridays, rather than showering every day. She is not allowed to use the showers when it is raining.

64.173.        Mr. Costa did not have access to a shower until about a week after the water was shut off. On his unit, only 8 individuals are permitted to use the portable showers per day. His unit can use the portable showers on Mondays, Wednesday, and Fridays, which means that he is only able to shower one time per week.

65.174.        One time that Mr. Costa was permitted to shower, the water was cold. After he showered he had to stand outside in the cold temperatures while waiting for everyone to finish showering. He got a headache as a result.

66.175.        When Mr. Costa does not have access to a shower, he has the options to clean himself with sanitary wipes or a five gallon bucket of soapy water and a wash rag. The wipes make his skin uncomfortable. Washing with a bucket is degrading and Mr. Costa has not used that option because it makes him feel like he is treated like an animal.

67.176.        Mr. Kirkpatrick used a portable shower and had to stand outside in the cold while others finished showering. He got sick after using the portable shower, experiencing chills and a migraine.

68.        Mr. Dunbar did not have access to a portable shower for several days after the water was shut off. When he was able to access a portable shower, the water kept turning on and off.

69.177.        The portable showers are not accessible for patients who use wheelchairs and with other mobility issues. The portable showers have steps up to them. The portable showers have narrow passageways inside. Many older patients are unable to use them.

70.178.        Ms. Smith's knee gave out one day while walking up the stairs to the shower.

71.179.        Upon information and belief, the portable showers are being overseen by male security guards only. Many women at Saint Elizabeths are survivors of sexual assault and do not feel safe using the portable showers. As a result, some of the women have not showered for more than four weeks.

### Other Essential Hygiene Needs

72.180.        Ms. Smith cannot wash her hands. She must use bottled water to brush her teeth and is not always given enough water to brush her teeth. She has not washed her hair in three weeks. She cannot do laundry in the hospital and when her cloths were sent out to the laundry, some of them went missing. She currently only has one clean outfit to wear. Ms. Smith's unit has been unusually cold while the water has been shut off. Ms. Smith's unit smells like dead rats.

73.181.        Mr. Costa cannot use the faucets to wash his hands, brush his teeth, or shower. The dirty toilets have attracted bugs and mosquitos that are biting him and others on his unit.

74.182.        Mr. Kirkpatrick cannot use the water. He cannot do laundry and does not have access to a washer-dryer. He does not know when he will be able to do laundry or obtain clean clothes again.

75.183.        Mr. Dunbar cannot use the water and has to use bottled water to drink and to brush his teeth. Because the conditions in the bathrooms are so dirty and unhygienic, he does not feel comfortable using the bathrooms or cleaning his teeth. Some of the closed bathrooms in his unit have signs indicating that they are quarantined because of a bacterial infection. He has had his laundry sent out only once in the last three weeks. When his clothes were returned some had shrunk and they still felt dirty.

76.184.          Mr. Dunbar is permitted to leave the facility on a day pass approximately two times per month. He normally spends time with his family. Because of the unsanitary conditions, he worries about bringing home bacteria and spreading it to his family.

**The District is Depriving Patients of a Safe and Therapeutic Environment**

77.185.          The lack of water has caused a tense and stressful environment among patients and staff. Patients are confined to their units during the day instead of receiving therapy and recreation. Staff are not regularly reporting for work.

186.          Patients, including Ms. Smith and Mr. Costa, are unable to leave their units and rooms to receive treatments or recreate. As a result, they and other patients are sleeping and dozing during the day.

187.          There has been an increase in fights and physical aggression between patients following the water outage.

188.          There has been an increase in the use of seclusion and restraint of the patients following the water outage.

**In the Absence of Adequate Emergency Plans, the District is Denying Patients Essential Medical and/or Mental Health Care and Essential Hygiene and Endangering Patient Safety**

189.          During the COVID-19 pandemic and the extended water outage at Saint Elizabeths Hospital, patients did not receive appropriate and necessary care, including medical care, psychiatric care, and therapy, creating an imminent risk of irreparable harm.

190.          During both the COVID-19 and the extended water outage crises, Defendants closed the Treatment Mall and failed to provide appropriate alternative or virtual therapies.

191.        During both the COVID-19 and the water outage crises, staff, including psychologists and psychiatrists, were not regularly attending work, forcing cancelations of patient team meetings and other appointments.

192.        During both the COVID-19 and the water outage crises, Defendants severely curtailed or suspended the psychiatric care on which patients depend.  Patients at Saint Elizabeths Hospital, including Plaintiffs, receive fewer services, and less of the services they did receive, than normal.  The minimal services they receive are not appropriate or tailored to their needs.

193.        During both the COVID-19 and the water outage crises, Defendants failed to provide patients, including Plaintiffs, with essential hygiene.  During the COVID-19, as discussed above, many patients at Saint Elizabeths have not been provided with masks, and continue to be housed in a manner inconsistent with social distancing and medical isolation protocols.  During the water crisis, patients and staff could not flush the toilets regularly, wash their hands, shower, wash clothing, or drink from the water fountains.  Patients were permitted only limited use of temporary portable showers and toilets.  Clothes and linens were only washed periodically and had to be sent outside of the facility to be cleaned.

194.        During both crises, the crisis caused a tense and stressful environment among patients and staff.   Patients were confined to their units during the day instead of receiving therapy and recreation.  Staff were not regularly reporting for work and patients did not have adequate staff to care of them.

78.195.        A restrictive psychiatric hospital setting like Saint Elizabeths Hospital must be safe, calm, predictable in its routine, and responsive to each individual's needs for treatment in order to achieve its goals of preventing and ameliorating harm.

79.196.        An environment that is chaotic, unpredictable, and unsafe, in which patients are not receiving individualized, continuous, intensive treatment risks traumatizing people further and exacerbating the psychiatric needs that were the basis for their admission.

80.197.        Delays in treatment of psychiatric illness in a psychiatric facility that restricts self-determination and integration into community-based settings, like Saint Elizabeths Hospital, can result in feelings of isolation, hopelessness, and despair; and increased stress and anxiety.

81.        Patients, including Ms. Smith and Mr. Costa, are unable to leave their units and rooms to receive treatments or recreate.  As a result, they and other patients are sleeping and dozing during the day.

82.1.        There has been an increase in fights and physical aggression between patients following the water outage.

83.1.        There has been an increase in the use of seclusion and restraint of the patients following the water outage.

198.        Segregation of individuals with disabilities should be an option of last resort under the best of circumstances as confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

199.        As described in this First Amended Complaint, patients, including Plaintiffs, are not receiving recommended therapy and treatment due to COVID-19 and are at high risk of contracting a highly communicable, potentially fatal infection.  Plaintiffs are at a continuous risk due to the lack of appropriate emergency plans.  To the extent that

hospitalization was defensible prior to the COVID-19 crisis, Defendants cannot justify the failure to evaluate and place patients in the community with appropriate supports.

200.        As described in this First Amended Complaint, patients, including Plaintiffs, did not receive recommended therapy and treatment due to the extended water crisis and were subject to horrific unsanitary conditions.  Plaintiffs are at a continuous risk due to the lack of appropriate emergency plans.  To the extent that hospitalization was defensible prior to the extended water outage, Defendants cannot justify the failure to evaluate and place patients in the community with appropriate supports.

201.        Defendants provide a wide array of services in the community to meet the needs of Plaintiffs. Services include diagnostic/assessment services, counseling, medication, intensive day treatment and crisis/emergency services. Individualized behavioral health services are supported by rehabilitation programs, peer supports, supportive employment opportunities, housing assistance and a range of community housing alternatives to facility-based care. These services are being provided by Defendants during the COVID-19 crisis and could be provided to patients, including Plaintiffs, in the community.[38]

**The District Bears Responsibility for the Conditions at ~~St.~~Saint Elizabeths Hospital**

~~84.~~202.        As the director of DBH, the agency that oversees Saint Elizabeths Hospital, Defendant Bazron has the authority to "[s]upervise and direct the Department" and "[e]xercise any other powers necessary and appropriate to implement the provisions of this chapter." D.C. Code § 7-1141.04.

---

[38] Department of Behavioral Health, *Adult Service*, DC.GOV, https://dbh.dc.gov/service/adult-services (last visited April 16, 2020).

~~85.~~203.      These powers make Defendant Bazron the final policymaking authority with respect to responding to emergencies at ~~St.~~Saint Elizabeths Hospital.

~~86.~~204.      Defendant Bazron is responsible for the fact that, during the water crisis and COVID-19 crisis, Saint Elizabeths Hospital has continued admitting and housing patients in unsafe conditions without adequate protections.

~~87.~~205.      During the water crisis, Defendant Bazron informed reporters that she and her team were "very, very involved in making sure that we got the [water] problem solved."

~~88.~~206.      During the water crisis, Defendant Bazron further demonstrated her responsibility for Saint ~~Elizabeths'~~Elizabeths Hospital's decision to keep patients in dangerous conditions without adequate protections by explaining and defending that approach to the public through multiple statements to journalists.

~~89.~~207.      For example, Defendant Bazron told reporters that DBH had procured "an extensive supply of bottled water" but had continued admitting patients and declined to move patients to other locations.  Defendant Bazron also endorsed DBH's response to the water outage, stating that "[t]hings are really moving very smoothly.

~~90.~~208.      ~~Additionally, Defendants displayed deliberate indifference to the risk that the response to the conditions at St. Elizabeths would result in constitutional violations.  By shutting off the water at that~~By shutting off the water at the facility, Defendants knew or should have known that they would drastically curtail access to showers, toilets, clean clothing, and medical care, and create disorder that could exacerbate patients' mental health disabilities.  The ~~policy~~policies Defendants adopted in response to ~~this risk was~~these risks were not reasonably calculated to prevent ~~it.~~the harms that Plaintiffs have alleged.

209.        Defendants' inactions and specifically their failures to train and/or supervise Hospital staff to ensure that the harms to Plaintiffs described in the Initial Complaint (realleged above at ¶¶130-188, 208) were prevented or ameliorated, caused those harms and amounted to deliberate indifference because these harms were the obvious and likely consequence of Defendants' inactions.

210.        Defendants are displaying deliberate indifference to the risk that patients face from the COVID-19 pandemic.  Defendants knew or should have known that failing to test symptomatic patients for COVID-19, failing to transfer patients with known or suspected COVID-19 to other facilities, failing to isolate symptomatic and exposed patients, failing to quarantine COVID-19 positive patients, and failing to create an environment where social distancing is possible would result in the rapid spread of COVID-19 at Saint Elizabeths Hospital. Defendants knew or should have known that this posed an unreasonable risk of serious infection and death among the patient population.   The policies Defendants adopted in response to this risk was not reasonably calculated to prevent it, and did not in fact prevent it.

211.        Additionally, Defendants, by failing to supervise and/or train staff to ensure that they took full and appropriate precautionary measures, are displaying deliberate indifference to the risk that the response to the conditions at Saint Elizabeths Hospital will result in constitutional violations. Defendants' failures are subjecting patients to the obvious and likely risk of contracting COVID-19, which places Plaintiffs in serious danger of severe illness or death.

**CLASS ACTION ALLEGATIONS**

91.212.        The named Plaintiffs bring this suit on their own behalf and on behalf of all current Saint Elizabeths Hospital patients and all patients who will be admitted in the future

while the ~~water is shut off~~hospital operates without a sufficient emergency preparedness plan that protects patients from an unreasonable risk of harm.

~~92.~~213.        This class is so numerous that joinder of all members in impractical.  Saint Elizabeths Hospital has ~~approximately 270~~2370 patients currently.  Because the population changes on a daily basis, it is inherently fluid and the class also includes future members whose ~~names~~identities are not known at this time.  Fed. R. Civ. P. 23(a)(1).

~~93.~~214.        There are questions of law and fact common to all class members, including but not limited to the Defendants' deprivation of the class members' substantive due process rights, the Defendants' failure to provide constitutionally safe and humane conditions to class members and the Defendants' failure to provide appropriate medical care to class members, and the District's violation of the class members' rights under the Americans with Disabilities Act.  Fed. R. Civ. P. 23(a)(3).

~~94.~~215.        The named Plaintiffs will fairly and adequately represent the interests of the class.  They possess a strong personal interest in the subject matter of the lawsuit and are represented by experienced counsel with expertise in class action litigation in federal court. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.  Fed. R. Civ. P. 23(a)(4).

~~95.~~216.        Defendants have acted or refused to act on grounds generally applicable to the class in that Defendants' policies and practices of violating the Plaintiffs' constitutional rights have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole. Fed. R. Civ. P. 23(b)(2).

## NECESSITY FOR EMERGENCY INJUNCTIVE RELIEF

~~96.~~217.        The Defendants have acted and, as of the time of filing, continue to act in violation of the law as described above. The named Plaintiffs and the class they seek to represent

43

do not have an adequate remedy at law. As a result of the policies, practices, acts, and omissions of the Defendants, the named Plaintiffs, and the class they seek to represent, have suffered, are suffering, and will suffer serious, imminent, irreparable physical, mental, and emotional injuries. Such serious injuries are continuing and likely irreversible.

**FIRST CLAIM FOR RELIEF:**

(Claim under 42 U.S.C. § 1983 and 28 U.S.C. § 2241 for violation of the Fifth Amendment—Due Process)

97.218.         The Fifth Amendment's Due Process Clause protects individuals in the District of Columbia from government conduct that deprives them of their constitutional rights because it is "so egregious that it may fairly be said to shock the contemporary conscience."

98.219.         Individuals who are committed to the District's custody, like the named Plaintiffs and other class members, have a protected constitutional right under the Due Process Clause of the Fifth Amendment to be housed in humane conditions and, to have the District take reasonable steps to guarantee their care and safety, and to have adequate medical care, including mental health care.

220.         Defendants' actions are deprivingand inactions have repeatedly deprived class members of humane conditions by failingtheir constitutionally protected rights to providereasonable care and safety.  These instances have included when, as alleged in

   a.     Paragraphs 2-5, 7, 14, 37-126, 189-199, and 201, Defendants failed to create and implement an appropriate Emergency Preparedness Plan that allowed Plaintiffs to practice social distancing, remain separate from persons who were COVID-19 symptomatic or COVID-19 positive, restricted visitor and new patients, and appropriately and quickly tested symptomatic individuals.

~~.~~b.     Paragraphs 6-13 and 123-184, Defendants failed to maintain an appropriate Emergency Water Supply Plan after the first extended water outage, which caused Defendants to cut off running water ~~which deprives them~~and deprive Plaintiffs of basic sanitation including sanitary toileting, safe and sanitary showers, and clean clothes and linens~~, as alleged in Paragraphs 22 and 53 through 76 and by failing to maintain an appropriate Emergency Water Supply Plan after the first extended water outage, as alleged in Paragraph 36,  Defendants' actions and inactions shock the conscience and deprive class members of their constitutionally protected rights.~~.

~~100.    Individuals who are committed to the District's custody, like the named Plaintiffs and other class members, have a protected constitutional right under the Due Process Clause of the Fifth Amendment to be afforded adequate medical care, including mental health care.~~ Defendants' actions and inactions shock the conscience.

~~101.~~221.     Defendants' actions in unilaterally ~~ceasing or~~ altering medical care at Saint Elizabeths Hospital during the COVID-19 crisis, as alleged in Paragraphs ~~26~~189-199 and ~~39 through 52, departs~~201, and during the 2019 water crisis, as alleged in Paragraphs 9, 127, 132, 134-135, 147-161, 189-201, depart from professionally accepted standards and/or appropriate professional judgement, and deprive class members of their constitutionally protected rights.

~~102.~~222.     ~~-~~Defendants' policies, practices, acts, and/or omissions have placed and will continue to place the named Plaintiffs and the members of the class they seek to represent at

an unreasonable risk of harm as alleged in Paragraphs 1, 24, 28, 29, 38, and 39. 7, 10-11, 37-77, 78-108, 127-148, 189, 195, 199-200, and 209-211.

223.	There is no reasonable justification for the Defendants' actions.

103.224.	Plaintiffs are entitled to injunctive relief and/or a writ of habeas corpus to relieve them from unconstitutional confinement.

## SECOND CLAIM FOR RELIEF:

(Claim against the District of Columbia under 42 U.S.C. § 12131 et seq. for violation of the Americans with Disabilities Act)

104.	Plaintiffs re-allege the allegations in all preceding paragraphs as though fully set forth herein.

105.225.	The named Plaintiffs and the Plaintiff Class are individuals with disabilities within the meaning of the ADA. Their impairments substantially limit one or more major life activities, including caring for oneself, concentrating, and thinking.

106.226.	As adults who have been determined to require intensive inpatient care to support their recovery from serious and persistent mental illness by the District, the named Plaintiffs and the Plaintiff Class are qualified to participate in Defendants' behavioral health programs and services. 42 U.S.C. § 12131(2).

107.227.	The District of Columbia is a public entity as defined by Title II of the ADA. 42 U.S.C. § 12131(1).

228.	The District of Columbia isDefendants have discriminated against Plaintiffs by repeatedly failing to reasonably modify its system to avoid discrimination, including but not limited to by (i) failingreduce the segregation of Plaintiffs with disabilities from their communities of non-disabled peers during emergencies that threaten the physical and mental

46

health and safety of Plaintiffs and undermine the clinical justification for such confinement. These instances have included when, as alleged in

a.      Paragraphs 2-5, 7, 14, 37-126, 189-99, 201, and 210, during the COVID-19 crisis, they failed to cease intakes and (ii) failing to, conduct individual assessments of patients to determine whether other options exist existed in lieu of continued placement at Saint Elizabeths Hospital, and (iii) failing failed to take appropriate action for Plaintiffs and other class members, including relocating within the District those patients for whom it is was appropriate or providing reasonably modified services for those for whom relocating is was not appropriate. 28 C.F.R. § 35.130(b)(7).

b.      The Paragraphs 6-13 and 123-184, during the 2019 extended water outage, they failed to cease intakes, conduct individual assessments of patients to determine whether other options existed in lieu of continued placement at Saint Elizabeths Hospital, and failed to take appropriate action for Plaintiffs and other class members, including relocating within the District of Columbia is those patients for whom it was appropriate or providing reasonably modified services for those for whom relocating was not appropriate. 28 C.F.R. § 35.130(b)(7).

229.      Defendants have discriminated against class members by repeatedly utilizing methods of administration, including but not limited to restricting that deprive Plaintiffs of equal access to the benefits of the mental health services provided by Defendants that other individuals in the community are receiving. These instances have included when, as alleged in

47

a.      Paragraphs 109 and 111-115, during the COVID-19 crisis, Defendants failed to provide for alternative treatment, such as teletherapy, virtual therapy, telephonic therapy or another remote substitute.

b.      Paragraphs 9, 20, 110-115, 132, 149, 157-161, 185, 189, 194, 199-200, and 229, during the first extended water outage Defendants curtailed individual psychotherapy, stopped or curtailed group therapy, stopped competency classes, restricted all access to the Treatment Mall and thereby ~~preventing~~prevented planning team meetings and ~~suspending~~suspended art and music therapy, vocational training, exercise, and socialization; ~~providing inappropriate and diminished group therapy sessions; restricting~~restricted patient movement to the patient's unit;, intermittently ~~shutting~~shut off the water; inappropriately ~~restricting~~restricted toilets and shower use, ~~providing~~provided inaccessible portable showers; and ~~suspending~~suspended medically necessary services such as dentistry and podiatry ~~as alleged in ¶¶ 25, 30, 35, 36, 37, 40, 49, 65, and 73 above, that~~.

There is no reasonable justification for these failures.

~~109.~~230.      These failures have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' behavioral health programs with respect to the Individual Named Plaintiffs and the Plaintiff Class.  28 C.F.R. § 35.130(b)(3)(ii).

~~110.~~231.      Defendants' policies, practices, acts, and/or omissions violate the Americans with Disabilities Act.  42 U.S.C. § 12131.

**PRAYER FOR RELIEF**

Based on the foregoing, Plaintiffs request that the Court:

232.        Certify this case as a Class Action pursuant to Fed. R. Civ. P. 23(b)(2);

233.        Designate undersigned counsel as attorneys for the certified class;

111.234.    Declare that Defendants violated Plaintiffs' rights under the Fifth

Amendment to the U.S. Constitution;

112.235.    Declare that Defendants violated Plaintiffs' rights under the Americans

with Disabilities Act;

113.236.    OrderEnter injunctive relief and/or writs of habeas corpus requiring

Defendants, their agents, employees, and all persons acting in concert with or on behalf of

Defendants to cease their unconstitutional and unlawful practices, including:

    a.    During any extended water outage, immediate cessation of Immediately

        cease admissions atto Saint Elizabeths to the greatest extent

        possibleHospital;

    b.    Within 48 hours during any extended water outage,, conduct individual

        assessmentsIssue a writ of habeas corpus ordering Respondent Chastang

        to release a sufficient number of patients by the Medical Director with

        input from the patients' treatment team, his/her attorney, and/or other

        supportive decision makers as determined by patient choice to assess the

        effects of the current conditions and determine whether other options exist

        in lieu of continued placement at Saint Elizabeths;

    c.    Implement recommendations from the assessments immediately:

        i    The assessment team must consider a full range of available

            alternative treatment options, including discharge to a community

            setting.

    ii  ~~Under no circumstances should an individual be transferred to a~~

      ~~jail or nursing home.~~

    iii  ~~To the extent continued placement at Saint Elizabeths' Hospital is~~

      ~~the only reasonable option,~~enable the remaining patients ~~must~~

      ~~receive medical care and therapy as scheduled and specific steps~~

      ~~should be taken~~to practice adequate social distancing and to ~~ensure~~

      ~~that each patient has timely and complete access~~enable the staff to

      ~~sanitation, clean water, safely prepared meals, and other basic~~

      ~~requirements for health, safety, and privacy.~~

~~d.~~a.  ~~Conduct independent testing to ensure that the water is safe for all uses;~~

e.  ~~Sanitize all Saint Elizabeths~~ maintain the hospital ~~facilities~~;

f.  ~~Restore sanitation services and other services that were discontinued or~~

   ~~delayed during the extended water outage;~~

~~g.~~b.  ~~Immediately resume providing all medical and~~in safe and healthy

   condition, including the provision of all necessary mental health treatment

   ~~services, including but not limited to opening the Treatment Mall and~~

   ~~providing all previously available services~~;

c.  Immediately take all actions within their power to reduce the patient

   population at Saint Elizabeths Hospital;

d.  Within 48 hours, conduct individual assessments of patients by the

   Medical Director with input from the patients' treatment team, his/her

   attorney, and/or other supportive decision makers as determined by patient

   choice to assess the effects of the current conditions and determine

whether other options exist in lieu of continued placement at Saint Elizabeths Hospital.  The assessment team must consider a full range of available alternative treatment options, including discharge to a community setting and under no circumstances should an individual be transferred to a jail or nursing home;

e.     Implement recommendations from the assessments immediately;

f.     Ensure sufficient space to follow all professional guidance on social distancing, quarantining, and isolation for infected or suspected COVID-19 patients, including by creating auxiliary facilities and residents at the Hospital at other District facilities or private facilities that can safely house patients.

g.     To the extent continued placement at Saint Elizabeths Hospital is the only reasonable option, for the patients who remain at Saint Elizabeths Hospital, provide appropriate COVID-19 intervention and care at the Hospital with teams of medical professionals and infection experts who can:

          i     Develop, update, and implement best practices for reducing the infection rates at Saint Elizabeths Hospital, including providing appropriate and accessible guidance to staff and patients;

          ii     Administer rapid COVID-19 tests for anyone displaying known symptoms of COVID-19 or who has been exposed

to someone with known symptoms or who has tested positive for COVID-19;

iii     Ensure segregation of confirmed and suspected COVID-19 cases;

iv     Determine equipment needs and immediately provide masks for any individual displaying or reporting COVID-19 symptoms or exposure until they can be evaluated by a qualified medical professional or placed in quarantine;

v      Ensure that each patient has timely and complete access to essential hygiene;

vi     Provide on-site care and medical assessment, including medical care and therapy that is appropriate for their needs;

vii    Frequently communicate to patients to provide information about COVID-19, reducing the risk of transmission, and any changes in policies or practices;

viii   To the extent continued placement at Saint Elizabeths Hospital is the only reasonable option, patients must be properly quarantined and segregated per public health guidelines to prevent COVID-19 infection;

h.     Develop a staffing contingency plan that includes employing sufficient qualified temporary staff to ensure adequate infection control and that patients receive necessary treatment and care in light of staffing shortages;

i. Immediately resume providing all medical and mental health treatment services as per CDC Guidelines;

h.j. Conduct individual assessments of patients by the Medical Director with input from the patients' treatment team, his/her attorney, and/or other supportive decision makers as determined by patient choice to assess the effects of the stress and trauma of living withouthaving experienced weeks safe, running water in the conditions described above, the impact of the current COVID-19 pandemic, and the repercussions Defendants' deprivation of appropriate mental health services has had on patients' mental health status and determine if changes to individual patients' treatment plans are needed;

i.k. Implement any changes and recommendations from the individualized assessments immediately;

l. Develop and adopt an appropriate Emergency Preparedness Plan with input from community members and the District's protection and advocacy organization

m. Frequently sanitize all Saint Elizabeths Hospital facilities;

n. Conduct independent testing to ensure that the water is safe for all uses;

j.o. Conduct regular, independent testing to ensure that the water is safe; and

k. Appoint an independent monitor to advise the parties and the court about the implementation of any injunctive relief.

l.p.    Order Defendants to develop and adopt an appropriate Emergency Water Supply Plan with input from community members and the District's protection and advocacy organization.; and

114.1.    Certify this case as a Class Action pursuant to Fed. R. Civ. P. 23(b)(2);

115.1.    Designate undersigned counsel as attorneys for the certified class;

q.    Appoint an independent monitor with medical expertise to ensure compliance with these conditions, and provide the monitor with unfettered access to medical units, confidential communication with individuals in and out of quarantine, and surveillance video of public areas of the facilities;

116.237.    Award to Plaintiffs their reasonable attorney's fees and costs, as provided by law; and

117.238.    Grant the Plaintiffs such other relief as the Court deems just.

Dated October 23April 16, 2019

Respectfully submitted,

/s/ Arthur B. SpitzerJohn A. Freedman

John A. Freedman (D.C. Bar No. 453075)
Tirzah S. Lollar (D.C. Bar No. 497295)
Brian A. Vaca (D.C. Bar No. 888324978)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Arthur B. Spitzer (D.C. Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005 20004
(202) 942-5000
John.Freedman@arnoldporter.com
Tirzah.Lollar@arnoldporter.com
(202) 457-0800

54

aspitzer@aclude.org
Brian.Vaca@arnoldporter.com

Kaitlin Banner (D.C. Bar No. 1000436)
Margaret Hart (D.C. Bar No. 1030528 )
Hannah Lieberman (D.C. Bar No. 336776 )
Jonathan Smith (D.C. Bar No. 396578 )
Maria Morris*
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL
RIGHTS AND URBAN AFFAIRS
700 14th Street, NW, Suite 400
Washington, DC 20005
Phone: (202) 319-1000
Fax: (202) 319-1010
kaitlin_banner@washlaw.org
margaret_hart@washlaw.org
hannah_lieberman@washlaw.org
jonathan_smith@washlaw.org
maria_morris@washlaw.org

*Admitted to practice law in Alabama, New York, and
California. Practicing under the supervision of DC Bar
members.


Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
Michael Perloff (D.C. Bar No. 1601047)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org
aspitzer@acludc.org
mperloff@acludc.org

John A. Freedman (D.C. Bar No. 453075)
Tirzah S. Lollar (D.C. Bar No. 497295)
Emily Reeder (D.C. Bar No. 252710)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C.  20004
(202) 942-5000
John.Freedman@arnoldporter.com
Tirzah.Lollar@arnoldporter.com