**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ENZO COSTA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> *Defendants*. | No. 1:19-cv-3185 (RDM) |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR A TEMPORARY RESTRAINING ORDER**

Since Plaintiffs filed this motion on April 18, just four days ago, the number of patients and staff at Saint Elizabeths Hospital infected with COVID-19 has continued to climb. As of April 20, there were 100 individuals (59 staff and 41 patients) who were COVID-19 positive, up from 84 when this motion was filed—a nearly 20% increase in just two days. And tragically, there are now six patients and two staff members who have died.

One would never know this from the Defendants' opposition brief. ("Opp."). The brief and the five supporting declarations are more notable for their internal inconsistencies and conspicuous omissions than for what they say. For all they profess to the Court that all is well— or as well as it can be—Defendants do not address critical questions that go to the heart of the rampant and escalating COVID-19 outbreak at St. Elizabeths. These questions include:

- Why have Defendants failed to implement all relevant aspects of CDC Guidance on isolation and quarantine? For example, the CDC recommends individuals with "suspected COVID-19 . . . should ideally be placed in a private room" not "cohosted" in a ward with other "suspected patients." But that is not what Defendants are doing. *See* Yu Decl. (ECF 42-5) ¶ 5 (describing "cohorting" of "patients suspected of having COVID-19 and awaiting test results").

- Why haven't Defendants acknowledged or implemented the most important aspect of the CDC Guidance—that if the "facility cannot fully implement all recommended precautions" residents with "known or suspected COVID-19 . . . should be transferred to another facility that is capable of implementation"?

- When did Defendants implement the protections identified, and why weren't they implemented earlier? The Defendants acknowledge that the introduction of universal mask usage by staff was on April 21, Opp. 12, and the daily screening questionnaire for patients was implemented on April 20, Opp. 9—both after this motion was filed—but they conspicuously don't address (i) when they established the "Persons Under Investigation" ward (2TR), (ii) when they established the second quarantine ward (2A), (iii) when they started testing "any patient exhibiting COVID-19 symptoms," or (iv) when they started providing patients with access to face masks. Opp. 9-12.

- How widespread is the problem? The opposition brief and declarations are silent on how many COVID-positive patients are actually quarantined in the two quarantine units, and how many suspected cases are in the PUI unit. And despite offering conclusory assurances that patients are receiving appropriate medical care, they are silent on how many patients have actually received their individual therapy via telemedicine, when that began, or how other suspended services are being replaced. ECF 42-2 ¶ 12.

And importantly, Defendants have not addressed why, in light of all of their measures, COVID-19 has nonetheless spread so extensively in Saint Elizabeths—and what Defendants have done since it was clear that their measures were not working?

Defendants accompany this deficient factual proffer with a materially erroneous statement of law that purports to impose legal burdens on Plaintiffs that are inapplicable to the Plaintiffs here. They fail to discuss the line of cases concerning when conditions of confinement amount to a Due Process violation, including *Helling v. McKinney*, 509 U.S. 25, 33 (1993), which is the leading Supreme Court case holding that individuals, even convicted individuals, may not be subjected to "a condition of confinement that is . . . very likely to cause serious illness and needless suffering." They similarly ignore the fundamental holding in *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) that "[t]he State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution." They are wrong to suggest that Plaintiffs must

demonstrate "deliberate indifference." Opp. 24-30. And they are equally wrong about the Americans with Disabilities Act.

The measures adopted by the Defendants have not worked to date, and given that they did not implement key measures until after this motion was filed, and the ongoing failure to fully adopt CDC Guidance, there is no reason to think they will work in the future. What they are doing is simply not up to the task at hand. And the outbreak is worsening rapidly, including additional deaths since this case was filed.

Plaintiffs are thus in urgent need of relief. This Court should order the Defendants to fully implement the measures necessary to protect this critically vulnerable population and save lives.

**1.** ***The Serious Shortcoming in Defendants Approach Have Caused Irreparable Harm to Plaintiffs.*** Defendants do not dispute that the violation of Plaintiffs' constitutional rights, their exposure to COVID-19, and deprivation of the essentials of mental health care are each, as a matter of law, sufficient to establish irreparable harm. *See* Mot. 26-28; Opp. 19-21. Instead, Defendants contend that Plaintiffs do not face these harms as a matter of fact, because, according to Defendants, "Saint Elizabeths is already taking the overwhelming majority of the measures plaintiffs request." Opp. 20. But the evidence Defendants have proffered shows the exact opposite: the measures Defendants report taking are not sufficient to protect the patient population. This is evident both from the rapidly mounting number of cases at the Hospital and from a close read of Defendants' brief and supporting declarations on a number of key issues.

a. *Isolation and Quarantine*: Defendants state that they "isolate and quarantine individuals appropriately" and that "patients are already appropriately housed in isolation units, PUI units, and general housing units based on the likelihood of whether they have contracted the virus." Opp. 20. Elsewhere, Defendants state that they have "implemented cohorting" including housing

3

confirmed cases together in two units, and housing "patients awaiting test results" in the PUI. Opp. 10. This is confirmed by Ms. Tu, St. Elizabeths Infection Control Coordinator. *See* Tu Decl. (ECF 42-5) ¶ 5.

There are several glaring problems with this approach. First, it squarely contravenes CDC Guidance for individuals who have tested positive. For the individuals who are confirmed cases, the CDC Guidance provides that confirmed cases "ideally . . . should not be cohosted with other infected individuals" and "facilities should make every possible effort to place . . . confirmed COVID-19 cases under medical isolation individually."[1] *See also* Stern Supp. Decl. ¶ 6. The CDC also warns that "cohorting should only be practiced if there are no other available options."[2] As Dr. Stern explains, the CDC is operating from a harm reduction protocol. Stern Supp. Decl. ¶ 4. The recommendation to practice cohorting as a last resort does not mean it is the CDC's recommended practice. Defendants do not explain whether they are unable to follow the CDC recommendations, or why they are engaging in this last resort option. This cohorting leaves patients at heightened risk. Stern Supp. Decl. ¶ 6.

Second, Defendants' approach contravenes CDC Guidance for individuals who are *suspected* (but not confirmed) to have COVID-19. The CDC is clear that these individuals should not be "cohorted" *at all*. Rather, the CDC says that when "cohorting" is used, it is to be used only to "isolate multiple laboratory-confirmed COVID-19 cases together as a group," and for COVID-positive patients only "if there are no other available options."[3] Similarly, the CDC warns that "only individuals who are laboratory confirmed COVID-19 cases should be placed under medical

---

[1] CTRS. DISEASE CONTROL & PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[2] *Id.*
[3] *Id.*

isolation as a cohort."[4]  In contrast, suspected cases should be placed "under medical isolation individually."[5]  Stern Supp. Decl. ¶¶ 6, 7.  Defendants and their Infection Control Coordinator do not appear to appreciate the distinction in the CDC Guidance between the isolation procedures for known and suspected cases.  Under Defendants' plan as described, **patients awaiting testing who turn out to be negative** *are exposed to patients who turn out to have a COVID-19 positive result* **and are then** *released back to their units after being exposed to COVID-19 positive patients*.  Thus, Defendants' medically-irrational precautions end up placing COVID-negative patients at greater risk: placing these patients in a cohort together with potentially COVID-positive exposes them—and everyone else at Saint Elizabeths—to an unreasonable and unconstitutional risk, in violation of sound medical practice and common sense.  Stern Supp. Decl. ¶¶ 6, 7.

Third, at no point do Defendants explain their practice with respect to patients who may have been exposed, or who have had close contact with confirmed COVID-19 patients, but who are currently asymptomatic. According to the CDC Guidance, patients who fall into this category should be medically isolated, meaning that they are confined for fourteen days, ideally in a single room, to determine whether they develop symptoms of the disease.[6]  The preferred practice is to quarantine exposed individuals separately because "[c]ohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected."[7] Not quarantining exposed patients unnecessarily heightens the risk that virus will spread. Stern Supp. Decl. ¶ 8.  Defendants do not even acknowledge that this category of patients exists.  Where are they being housed?  What care are they receiving?

---

[4] *Id.*
[5] *Id.*
[6] CTRS. DISEASE CONTROL & PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[7] Id.

Fourth, to the extent the Defendants are receiving new patients, they are not adequately isolating or quarantining those patients. Defendants report that that they are screening new admissions to ensure those individuals do not have COVID-19 symptoms. Candilis Decl. (ECF 42-1) ¶¶ 8-9. Defendants are not quarantining patients admitted from the street, Superior Court, or Department of Corrections; these patients should be quarantined for fourteen days.[8] *See* Stern Supp. Decl. ¶ 10.

In addition to the obvious deficiencies and gaps in Defendants' approach, there are significant discrepancies between Defendants' statements concerning current practices and what patients and their attorneys report. For example, the Defendants report there are "two dedicated isolation units" and "one PUI unit." Opp. 10.[9] One of the units identified (Unit 2A) is Plaintiff Dunbar's unit; until last week, patients were housed together regardless of their COVID-19 status; patients who were exposed but asymptomatic were moved to the gym without being tested. Dunbar Decl. ¶¶ 6. As of Tuesday April 21, 2020, the day Defendants filed their opposition brief, patients housed on the PUI unit received confirmation that they are COVID-19 positive and had yet to be moved to an "isolation" unit. Truettner Supp. Decl. Another patient is awaiting test results but is housed with positive patients, and not the PUI unit. Mason Supp. Decl. ¶ 4. As of last week, patients who were confirmed positive and patients who were symptomatic were housed together on Unit 2A. Barkenow Decl. ¶¶ 4-6. And, as Plaintiffs demonstrated in their motion, as of April 15, 2020, confirmed positive patients were not in isolation units, calling into question when, and

---

[8] CTRS. DISEASE CONTROL & PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[9] The Defendants also report that another unit was converted on April 15 "to facilitate the cohorting process." Opp. 10. It is not clear whether this is the PUI unit or an isolation unit. It should also be noted that the source cited for this information (Gontang Declaration ¶ 7) says nothing about a new unit..

whether, Defendants began implementing the policies they describe. *See* Guzman Decl. ¶3; Mason, Decl. ¶4.

In addition, there is a gaping, unexplained disconnect between the numbers of positive and suspected cases Defendants have reported and their ability to house these patients in the three quarantine/isolation units. For example, on April 12, the Defendants reported that 144 patients were in quarantine or isolation,[10] far exceeding the bed count for the three units. And on April 19, Defendants reported 74 patients "in quarantine or isolation due to exposure to or symptoms consistent with COVID"[11] a total far surpassing the number of beds in the PUI unit. *See* Gontang Decl. (ECF 42-2) ¶ 6 ("each unit at the Hospital generally houses no more than 27 patients"). And what happened to the 70 patients who were taken out of quarantine between April 12 and April 19? Were they released back to non-quarantine units? Were they all tested and found to be negative? *Cf.* Tu Decl. (ECF 42-5) ¶ 11 ("The Hospital has tested 31 patients since April 6, 2020").

These discrepancies are troubling. In light of the obvious gaps and problems with what Defendants say they are doing, all of the Defendants' assertions should be regarded with skepticism. But even if the Court concludes that these problems are not enough to warrant immediate relief and factual disputes must be resolved, the Court should appoint an independent expert to tour and assess the Hospital's practices immediately.

---

[10] Dist. Of Columbia, Dep't of Health and Human Services, *Human Services Agency COVID-19 Case Data*, https://coronavirus.dc.gov/page/human-services-agency-covid-19-case-data
[11] *Id.*

b. *Screening and Testing*: The CDC provides that "residents with suspected COVID-19 should be prioritized for testing,"[12] and Defendants aver several times that they follow CDC guidelines in conducting tests and evaluating patients for testing. Opp. 9, 20.  But there is a fundamental disconnect between the number of tests Defendants report conducting and the number of suspected COVID-19 cases.  Ms. Tu reports that St. Elizabeths only started testing on April 6 and has tested 31 patients since that date.  *See* Tu Decl. (ECF 42-5) ¶ 11.  But the Hospital reported that on April 12, there were 144 patients "in quarantine or isolation due to exposure to or symptoms consistent with COVID-19."[13]  Is it really the case that the Hospital has only tested one out every four patients suspected or exposed to the virus?

Additionally, Defendants' briefing overstates their own evidence. Although Defendants report that they now daily screen patients for symptoms doing a temperature check and a questionnaire, Opp. 9, the record source cited (paragraph 14 of the Tu Declaration) says nothing about patient screening, only screening for staff and visitors.  *See* Tu Decl. (ECF 42-5) ¶ 14.

c. *Distribution of Masks*: Defendants' brief and the supporting declarations do not address the CDC standards regarding masks. CDC Guidance provides that, when individuals are isolated because they are confirmed or suspected COVID-19 cases, the facility should "ensure that the individual is wearing a face mask at all times when outside of the medical isolation space," make sure "masks should be changed at least daily," and "ensure that cohorted cases wear face masks at

---

[12] CTRS. DISEASE CONTROL & PREVENTION, *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/long-term-care.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhealthcare-facilities%2Fprevent-spread-in-long-term-care-facilities.html.

[13] Dist. Of Columbia, Dep't of Health and Human Services, *Human Services Agency COVID-19 Case Data*, https://coronavirus.dc.gov/page/human-services-agency-covid-19-case-data

all times."[14]  The CDC Guidance also recommends that "symptomatic residents should wear a facemask (if tolerated)" and that when there are COVID-19 cases in a congregate facility residents "should wear a cloth face covering or face mask "[15]  As Defendants acknowledge, the DC Department of Health promulgated guidance on April 14 that all residents of long-term care facilities should wear a mask or facing covering whenever they are out of their room or when someone enters their room. Opp. 11.  But there is nothing in Defendants' papers to suggest there is any effort to enforce these standards in any of the three isolation/quarantine cohorts or other patients.  Instead, Defendants' declarations say only that masks may be requested from the nurse's station, Bivins Decl. (ECF No. 42-6) ¶ 8; Pontes Decl. (ECF No. 42-4) ¶ 13—a far less aggressive strategy than the CDC recommends.  Indeed, one of Defendants' declarants admits that "some patients choose to wear masks, others do not."  Pontes Decl. (ECF No. 42-4) ¶ 13. This tepid approach to masks is consistent with Plaintiffs' evidence that Defendants have not provided masks to *all* patients or instructed or required patients to wear masks in a manner consistent with public health guidelines. FAC ¶¶ 79, 83, 87, 91, 95; Costa Decl. ¶ 7; Dunbar Decl. ¶ 5d; Smith Decl. ¶ 9; Guzman Decl. ¶ 3b-c; Rose Decl. ¶ 5; Mason Decl. ¶ 4a.

    d. *Social Distancing*: The CDC Guidance is clear that when there are COVID-19 cases in a congregate facility, residents should "perform social distancing (stay at least 6 feet away from others)."[16]  As detailed in the opening brief, numerous Plaintiffs and others report there is a lack of social distancing, that common areas continue to be used, and that it is impossible for patients

---

[14] CTRS. DISEASE CONTROL & PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[15] CTRS. DISEASE CONTROL & PREVENTION, *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/long-term-care.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhealthcare-facilities%2Fprevent-spread-in-long-term-care-facilities.html..
[16] *Id.*

at Saint Elizabeth to maintain six feet of distance between themselves and other people in the Hospital. Mot. 12 (citing FAC ¶ 78, 82, 85, 89, 94; Costa Decl. ¶ 4; Dunbar Decl. ¶ 5; Smith Decl. ¶¶ 5-6. Guzman Decl. ¶ 3b; Rose Decl.¶ 10; Mason Decl. ¶ 4a-b). Defendants' vague and lackluster response that "staff do as much as they can to ensure patients practice social distancing safely," Opp. 11, provides essentially no rebuttal to Plaintiffs' evidence. Apparently "as much as [staff] can" do in this regard is not very much, and certainly not enough according to the CDC. Defendants offer no rebuttal to Plaintiffs' requested relief to create auxiliary facilities to allow for proper social distancing.

    e. *Mental Health Care*: Defendants' argument that regarding psychiatric care "much . . . remains unchanged during the COVID-19 emergency," Opp. 12, is not supported by any of the Defendants' declarations. Dr. Gontang, the Chief Clinical Officer, confirms that "all group therapy has been suspended," Gontang Decl. ¶ 11, and he does not acknowledge or address most of the types of treatment Plaintiffs discussed in their declarations, including the closing of the Treatment Mall, and the suspension of anger management and most competency restoration classes. Mot. 15 (discussing FAC ¶¶ 109-115; Smith Decl. ¶ 10; Costa Decl. ¶¶ 9-10; Dunbar Decl. ¶ 7).

    While Dr. Gontang's declaration suggests that the Hospital has been making teletherapy more available to facilitate individual therapy, his declaration states that for patients "each patient unit has a shared computer." Gong tang Decl. ¶ 12. In other words, eleven computers total, or one for about every 20 patients. This is clearly not sufficient. Jones Supp. Decl. ¶ 4. Perhaps for this reason, while Dr. Gontang reports that "in the last 30 days, the Hospital has used its telehealth technology to conduct . . . individual therapy," his declaration is silent on the number of patients who have received teletherapy or the number of teletherapy sessions conducted. Gontang Decl. ¶ 13. This does not come close to rebutting the Plaintiffs' specific evidence regarding the

curtailment of their treatment. FAC ¶¶ 112-15; Costa Decl. ¶¶ 9, 10; Dunbar Decl. ¶ 7; Smith Decl. ¶ 10.

Defendants' declarations are also remarkably vague with regard to how they are modifying patients' treatment plans in light of the pandemic and the resulting changes to patients' routine, environment, and care. Jones Supp. Decl. ¶ 3. Defendants' declarations do not suggest that they are planning for appropriate recreation consistent with COVID-19 restrictions, providing additional supports to manage anxiety and grief as patients in the Hospital become ill and die, or relieving the added burden and stress on patients as they are confined to their Unit. Jones Supp. Decl. ¶ 5. Even if Defendants were implementing all of the mental health care they described, it would be insufficient. See Jones Supp. Decl. ¶ 3. As Plaintiffs' expert explains, it is critical that Saint Elizabeths provide as safe, secure, predictable environment as possible and offer patients continuity of care. Jones Decl. ¶12. Defendants are obviously not doing so.

2. ***Plaintiffs are Likely to Succeed on the Merits***. As discussed above, as a factual matter, Plaintiffs are likely to succeed because Defendants' response does not comply with CDC Guidance or other medical (or common sense) standards for responding to the COVID-19 pandemic.

With regard to the legal standards, Defendants are wrong on several key issues of law.

a. *Fifth Amendment Violations*. Defendants fail to discuss the conditions of confinement line of cases following *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (individuals may not be subjected to "a condition of confinement that is . . . very likely to cause serious illness and needless suffering."). As a threshold matter, Defendants attempt to ratchet up the standard for a due process violation regarding non-criminal detainees by arguing that the objective standard of *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). is limited to the excessive force context and "deliberate indifference" is required. Opp. 23 n. 11. Quite the contrary: As Judge Kollar-Kotelly ruled on

11

Sunday in the cases concerning COVID-19 conditions at the D.C. Jail: "Based on the pertinent reasoning of *Kingsley* and the persuasive authority of other courts, the Court concludes that pre-trial detainee Plaintiffs Phillips and Smith do not need to show deliberate indifference in order to state a due process claim for inadequate conditions of confinement. As such, under the due process clause, pre-trial detainee Plaintiffs Phillips and Smith are likely to succeed on the merits by showing that the Defendants knew or should have known that the jail conditions posed an excessive risk to their health." *Banks v. Booth*, No. 1:20-cv-849-CKK, ECF No. 51 (Apr. 20, 2020) (amended opinion issuing temporary restraining order requiring improvements to conditions of confinement), at *11-12. The Court there relied on decisions from three federal courts of appeals and another decision from this Court. *See id.* (discussing *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016); *United States v. Moore*, No. 18-198-JEB, 2019 WL 2569659, *2 (D.D.C. June 21, 2019)). This conclusion is *a fortiori* in a psychiatric hospital setting where patients' constitutional liberty interests in security require the District to provide reasonable protection from harm. *Youngberg*, 457 U.S. at 315-16. Moreover, in order to secure these liberty interests, individualized treatment must be provided to give patients "a reasonable opportunity to be cured or to improve [their] mental condition." *Donaldson v. O'Connor*, 493 F.2d 507, 520 (5th Cir. 1974), vacated on other grounds, *O'Connor v. Donaldson*, 422 U.S. 563 (1975).

Defendants set up and knock down the straw man of a negligence standard, Opp. 24-25, but Plaintiffs nowhere argue that Defendants are liable because they were negligent. Indeed, *Kingsley* explicitly addressed how its objective standard answers a different question than whether the defendant acted intentionally or negligently "with respect to the bringing about of certain physical consequences in the world." 135 S. Ct. at 2472–73. Plaintiffs do not argue that Defendants

*accidentally* forgot to set up an appropriate system of precautionary measures against the COVID-19. Instead, plaintiffs argue that the set of measures that Defendants *intentionally* chose were objectively unreasonable in that they subjected Plaintiffs to an "excessive risk to their health." *Banks*, *supra*.

Defendants concede that Plaintiffs can prevail in the alternative by showing that Defendants did not exercise the appropriate professional judgment. Opp. 30. Under this standard, "this Court will judge the defendants' liability based on whether they have exercised competent professional judgment." *LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991).

Ultimately, whether judged under the *Kingsley* test as interpreted in *Banks*—that "Defendants knew or should have known that the jail conditions posed an excessive risk to their health"—or the "competent professional judgment" standard, Plaintiffs have shown that Defendants are violating their constitutional right to humane conditions of confinement.

b. *Americans with Disabilities Act Violations*: Plaintiffs are likely to succeed on their claim under the ADA and are entitled to emergency injunctive relief. The ADA requires that persons with disabilities be provided services in the least restrictive setting consistent with their needs. 28 CFR § 35.130(d).[17] Segregation in an institution is only justified where it is essential to meet the person's treatment needs and there is no appropriate community setting. *Brown v. District of Columbia*, 928 F.3d 1070, 1077 (D.C. Cir. 2019) (citing to *Olmstead v. LC by Zimring,* 527 U.S. 581 (1999)). Where, as here, an individual is institutionalized in a dangerous environment and

---

[17] *See also* 28 C.P.R. § 41.51(d) ("[r]ecipients [of federal financial assistance] shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons"). The "most integrated setting appropriate to the needs of qualified individuals with disabilities" means "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. § 35 app. A. at 572 (July 1,2010) (Preamble to Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services (July 26, 1991)).

essential mental health care is diminished provided, the balance of considerations must shift in favor of community-based and integrated treatment options. See, E.g., Youngberg at 317 (A person in state custody for a disability has a constitutional right to treatment); *O'Connor v. Donaldson*, 422 U.S. 563, 95 S. Ct. 2486 (1975)(Confining a person with mental illness who is no longer a threat to himself or others is unconstitutional even if the State seeks to protect the person from less desirable living conditions.);

Defendants rely heavily on the fact that their treating professionals have "evaluated" all St. Elizabeths patients (Gontang ¶¶ 7-9) and rely on dicta from *Olmstead v. LC by Zimring* and *Brown v. District of Columbia* when they assert that community placement is appropriate only where "the State's treatment professionals have determined community placement is appropriate." Opp. 34. This reliance is flawed in several ways.

*First*, Dr. Gontang's declaration does not say that the patients evaluated could not be served in a community setting based on their evaluation, but instead that it was his belief that there were inadequate community resources to serve these patients. Gontang Decl. ¶¶ 10, 13-16. This turns the analysis on its head. The first question is whether supports and services would permit the person to be served in the community and only then is it relevant whether the provision of services would fundamentally alter the District's programs. 28 CFR § 35.130(7)(i). To the extent that the Defendants are making an argument through the backdoor that provision of services in the community work be a fundamental alteration of their programs or services it is also unavailing. Dr. Gontang has not demonstrated that he is qualified to assess the community services available nor has he offered any indication that available services were reviewed for individual patients. His general observations on the available community resources are of only limited utility to the inquiry of whether any individual may have community resources available. Moreover, the District

already has a broad range community-based services, including Assertive Community Treatment Teams, Intensive Day Treatment, Crisis Intervention, Intensive Community Intervention and other services.[18] The District also has a constellation of supportive housing options for persons with disabilities.[19] Expanding access would not fundamentally alter the District's programs. Department of Justice guidance on the integration mandates notes "Public entities have the burden to show that immediate relief to the plaintiffs would effect a fundamental alteration of their program. Budgetary shortages are not, in and of themselves, evidence that such relief would constitute a fundamental alteration."[20]

*Second,* the ADA regulations require that: "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR § 35.130(d). A government treating professional is not, as defendants suggest, the sole gatekeeper on whether a person is in the most integrated setting. *M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 12 (D.D.C. 2019) (Because *Olmstead* "did not state that a determination by a State's own professionals is the only way that a plaintiff may establish" community placement is warranted.)( citing *Steimel v. Wernert*, 823 F.3d 902, 915-16 (7th Cir. 2016) (whether community based treatment was appropriate could be demonstrated by allegations that the state had previously allowed plaintiffs more community interaction).

Defendants' reliance on *Seth v. District of Columbia* to assert that Plaintiffs must show that the discrimination was based on—or solely based on—the plaintiff's disability, is also misplaced. Opp. 36. *Seth* addressed an entirely different issue – whether the District had an obligation to

---

[18] Dist. of Columbia, Dep't of Mental Health Services, *MHRS Services*, available at
https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/MHRSServices.pdf
[19] Dist. of Columbia, Dep't of Mental Health Services, *Supportive Housing Strategic Plan, 2012-2017*, available at https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/webpage.%202012-2017%20Supportive%20Housing%20Strategic%20Plan.pdf
[20] Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v.L.C.* https://www.ada.gov/olmstead/q&a_olmstead.htm

accommodate a prisoner in federal custody and for which the District had no obligation to assume custody. *Seth v. District of Columbia*, Civil Action No. 18-1034 (BAH), 2018 WL 4682023, at *10 (D.D.C. Sept. 28, 2018), Am. Comp. ¶¶ 19-22. There can be no dispute that the Plaintiffs are confined to the hospital because of their disability and no other reason.

As defendants admit, the sole reason for placing patients in St. Elizabeths is for mental health treatment. Opp. 4 ("Saint Elizabeths Hospital…[is] for individuals with serious and persistent mental illness requiring intensive inpatient care to support their recovery."). To the extent that the conditions in the Hospital create an unreasonable danger of COVID-19 infection and the very treatment that they have been committed to receive is curtailed, institutionalization of at least some members of the Plaintiff class in Saint Elizabeths Hospital is no longer reasonable.

**3. *The Remaining Factors Favor Plaintiffs*.**  Finally, Defendants' arguments regarding the public interest and balance of harms all rely on the premise that Defendants are responding appropriately to the crisis and indeed that they are "already doing most of what plaintiffs seek." Opp. 38. Because this premise is incorrect, as demonstrated above, these factors favor Plaintiffs, not Defendants.

\* \* \*

The record evidence before the Court, combined with the relentless and grim escalation of the crisis at the Hospital, shows overwhelmingly that Defendants' practices and failures are exposing Saint Elizabeths patients to grave risk and are badly out of step with appropriate medical guidance and implemented only after this motion was filed in an apparent rush in the face of a scheduled hearing.  The temporary restraining order should be granted.

Dated:  April 22, 2020                                   Respectfully submitted,

/s/ John A. Freedman
John A. Freedman (D.C. Bar No. 453075)

Tirzah S. Lollar (D.C. Bar No. 497295)
Brian A. Vaca (D.C. Bar No. 888324978)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com
Tirzah.Lollar@arnoldporter.com
Brian.Vaca@arnoldporter.com

Kaitlin Banner (D.C. Bar No. 1000436)
Margaret Hart (D.C. Bar No. 1030528)
Hannah Lieberman (D.C. Bar No. 336776)
Jonathan Smith (D.C. Bar No. 396578)
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street, NW, Suite 400
Washington, DC 20005
Phone: (202) 319-1000
Fax: (202) 319-1010
kaitlin_banner@washlaw.org
margaret_hart@washlaw.org
hannah_lieberman@washlaw.org
jonathan_smith@washlaw.org

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org
aspitzer@acludc.org
mperloff@acludc.org