UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENZO COSTA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BARBARA J. BAZRON, *et al.*, <br><br> *Defendants*. | Civil Action No. 19-3185 (RDM) |

**MEMORANDUM OPINION**

This case is brought by three patients indefinitely and involuntarily civilly committed to the District of Columbia's care and housed at Saint Elizabeths Hospital ("Saint Elizabeths" or "Hospital"), a public psychiatric facility, and a putative class of Saint Elizabeths patients. Dkt. 50. Plaintiffs bring claims against the District of Columbia and two employees of Saint Elizabeths in their individual capacities (and in one case, also in his official capacity), alleging that Defendants' response to the COVID-19 pandemic has fallen short of their constitutional obligations to ensure that Plaintiffs and the putative class members are held in safe conditions. Before the Court is Plaintiffs' motion for a temporary restraining order ("TRO"), which is opposed. Dkt. 39. For the reasons explained below, the Court will grant the motion in part and defer it in part.

**I. BACKGROUND**

**A.    Saint Elizabeths, and COVID-19**

Saint Elizabeths is the District of Columbia's "only public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to

support their recovery." Dkt. 50 at 7 (Am. Compl. ¶ 25); Dkt. 39-2 at 2 (Jones Decl. ¶ 7).  Saint Elizabeths generally admits three categories of patients: (1) civilly committed patients, including those committed voluntarily and involuntarily; (2) pre-trial patients being detained to determine their competency to stand trial or to have their competency restored; (3) and post-trial patients who have been adjudicated not guilty by reason of insanity.  *See* Dkt. 39-1 at 14; Dkt. 42-1 (Candilis Decl. ¶ 3).  The Hospital has the capacity to house 292 patients in 12 different units and has an average population of 275 patients.  Dkt. 42-2 at 3 (Gontang Decl. ¶ 6).  The "patients are housed in one of 11 units[] or houses," with each unit consisting of "bedrooms and commons spaces."  Dkt. 50 at 8 (Am. Compl. ¶ 33).  "Each unit at the Hospital generally houses no more than 27 patients, and has bedrooms, common living areas, bathrooms and showering facilities, and dining areas."  Dkt. 42-2 at 3 (Gontang Decl. ¶ 6).  The twelfth unit, the Therapeutic Learning Center ("2TR"), is generally used to conduct group therapy, art therapy, music therapy, treatment planning meetings, and other forms of congregate activities.  Dkt. 50 at 4 (Am. Compl. ¶ 9).  According to Defendants' counsel, the current population has been reduced to approximately 200 patients due to the pandemic.  Apr. 24, 2020 Hrg. Tr. (Rough at 31).

       The COVID-19 pandemic is, by now, well-known to all, and the Court will only briefly recount its history and impact as it relates to this motion.  COVID-19 a highly infectious disease that has caused a global pandemic, prompting the President and governors across the nation to declare states of emergency.  *See United States v. Harris*, No. 19-cr-356, 2020 WL 1503444, at *2 (D.D.C. Mar. 27, 2020).  The Mayor of the District of Columbia has ordered the closure of all nonessential business and has issued a stay-at-home order, and both Congress and the D.C. Council have passed various forms of emergency legislation.  *See, e.g.*, Mayor's Order 2020-054 (Mar. 30, 2020).

The Centers for Disease Control and Prevention ("CDC") has issued guidance to help long-term care facilities ("LCTFs") mitigate the spread of the virus and to "keep patients and residents safe[.]" CDC, Coronavirus Disease 2019 Nursing Homes & Long-Term Care Facilities ("CDC, LTCF Guidance"), at 1 (Apr. 2, 2020), available at https://tinyurl.com/yaaj8kk6 (last accessed Apr. 23, 2020); *see* Dkt. 55-1 (CDC, Preparing for COVID-19: Long-term Care Facilities, Nursing Homes, Apr. 15, 2020); CDC, Key Strategies to Prepare for COVID-19 in Long-term Care Facilities (LTCFs) ("CDC, LTCFs Key Strategies") (Apr. 15, 2020), available at https://tinyurl.com/y95jrlcx (last accessed Apr. 23, 2020). Although the LTCF guidance is targeted at nursing homes and similar facilities, all agree that it provides relevant guidance for Saint Elizabeths. *See* Dkt. 42-2 at 3 (Gontang Decl. ¶ 5) ("Saint Elizabeths is unique among healthcare facilities in that it is foremost a psychiatric treatment facility but also houses pre- and post-trial patients and shares similarities with long-term care nursing facilities."); Dkt. 42 at 10–11 (citing to LTCF guidance and recommendations as the standards the Hospital has conformed its practices and policies to). The CDC has also issued recommendations for health care settings more generally, which the long-term care facility resources incorporate by reference. *See, e.g.*, Dkt. 54-1 (CDC, Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings); Dkt. 54-2 (CDC, Discontinuation of Transmission-Based Precautions and Disposition of Patients with COVID-19 in Healthcare Settings (Interim Guidance)). Finally, the CDC has issued guidance regarding managing the pandemic at correctional and detention facilities. *See* Dkt. 55-2 (CDC, Interim Guidance on Management of Coronavirus Disease 2019 ((COVID-19) in Correctional and Detention Facilities). Each party has, at times, pointed to portions of that guidance in support of it positions.

As relevant here, the CDC recommends that long-term care facilities actively screen all residents and anyone entering the building for fever and symptoms.  CDC, LCTF Key Strategies.  To prevent the spread of the virus, "group activities and communal dining" should be canceled, social distancing should be enforced among residents, and residents should "wear a cloth face covering . . . whenever they leave their room or are around others." *Id.*  If a resident is symptomatic, the facility should isolate him and implement appropriate "transmission-based precautions." *Id.*  Those precautions include isolating patients who are suspected of having or who have tested positive for COVID-19 "in private rooms with the door closed and with private bathrooms (as possible)." Dkt. 54-1 at 2.  If the patient is COVID-19 positive, she should remain in isolation until either (1) fever has subsided "without the use of fever-reducing medications," the patient experiences "[i]mprovement in respiratory symptoms," and the patient has received "at least two consecutive" negative tests at least "24 hours apart," or (2) "[a]t least 3 days (72 hours) have passed *since* recovery" (meaning "resolution of fever without the use of fever-reducing medications and improvement in respiratory symptoms ") and "[a]t least 7 days have passed *since first symptoms appeared*." Dkt. 54-2 at 3 (emphasis in original).  A patient who has not tested positive but who is "suspected of having COVID-19" may instead be released "upon having negative results from" one test, but, if "a higher level of clinical suspicion . . . exists," the facility must "consider maintaining [medical isolation]" and performing "a second test." *Id.* at 4.

**B.     Procedural History**

Plaintiffs, Enzo Costa, Vinitia Smith, and William Dunbar, are three patients who are indefinitely and involuntarily civilly committed to the District's care and housed at Saint

4

Elizabeths. Dkt. 36-1 at 6–7 (Am. Compl. ¶¶ 19–22).[1] Plaintiffs originally brought this putative class action in October 2019, asserting due process and Americans with Disability Act ("ADA"), 42 U.S.C. §12131 *et seq.*, claims relating to a September 2019 water outage at Saint Elizabeths that interrupted their recommended therapy and subjected them to allegedly unhealthy conditions. Dkt. 1. In light of the ongoing COVID-19 crisis, Plaintiffs filed an emergency motion seeking leave to amend their complaint, and, after conducting a hearing and providing Defendants with the opportunity to file an opposition brief, the Court granted that motion. *See* Dkt. 48; Dkt. 36; Dkt. 40; Minute Entry (Apr. 17, 2020).

According to the amended complaint, Saint Elizabeths has failed to protect the health and safety of its patients from the virus by departing from applicable CDC guidelines in several key ways. Most pressingly, Plaintiffs alleged that the Hospital was not testing all symptomatic patients; not segregating patients who have been exposed or potentially exposed to the virus from other residents; *see* Dkt. 50 at 21–25 (Am. Compl. ¶¶ 78–108); and "cohorting" patients who have tested positive or are suspected of having the virus in groups rather than medically isolating them in private rooms, *see* Apr. 22, 2020 Hrg. Tr. (Rough at 4–5). As of April 23, 2020, 111 individuals associated with the Hospital (68 staff and 43 patients) have tested positive for the virus, and, tragically, seven patients and two staff members have died. Dkt. 53; Dkt. 58; Apr. 22, 2020 Hrg. Tr. (Rough at 3) (indicating that, as of this morning, one of the named plaintiffs has tested positive). Thus, the Hospital's mortality rate is magnitudes higher than the mortality rate for the District as a whole. *See* Dkt. 53 at 3; Apr. 22, 2020 Hrg. Tr. (Rough at 45).

---

[1] The Court dismissed the claims of a fourth named plaintiff, Stefon Kirkpatrick, pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii). *See* Dkt. 43; Minute Order (Apr. 22, 2020).

Plaintiffs also challenge the adequacy of Defendants' response to the virus on several other scores, including that the Hospital is not adequately enforcing social distancing, *see* Dkt. 46 at 9–10; not taking steps to ensure that the patients receive the mental health care they require (such as by providing remote substitutes for group and individual therapy); not updating mental health treatment plans to account for pandemic-related stress, *see* Dkt. 50 at 25–26 (Am. Compl. ¶¶ 109–16); not maintaining adequate staffing levels; *id.* at 26–27 (Am. Compl. ¶¶ 117–22); continuing to admit new patients; failing adequately to screen and to quarantine newly admitted patients; and discriminating against Plaintiffs and the putative class members in violation of the ADA by failing to release eligible patients into community-based programming, *see id.* at 46 (Am. Compl. ¶ 228).  Overall, Plaintiffs allege that the Hospital's inadequate response to the COVID-19 pandemic, like Defendants' response to the September 2019 water outage, has fallen short of its obligation to ensure that Plaintiffs and other patients at the hospital are held in humane conditions and continue to receive appropriate mental health treatment.  *See id.* at 27–28 (Am. Compl. ¶¶ 123–29); Dkt. 1.

On April 22, 2020, the Court held a telephonic hearing on the pending motion for a temporary injunction.  Given the ongoing and escalating emergency at the Hospital, the Court asked counsel for Plaintiffs to identify the actions that, in their view, need to be redressed "on the most pressing basis."  Apr. 22, 2020 Hrg. Tr. (Rough at 63).  Counsel indicated that the top priority was that the Hospital follow CDC guidance on "properly quarantining and isolating" patients, meaning that the Hospital should "stop cohorting suspected people" and that it should, instead, place patients who have tested positive, who are suspected of having the virus, or who have been exposed to the virus in private rooms for 14 days (or earlier under the appropriate guidelines), rather than placing them in group settings.  *Id.* (Rough at 43–47).  Counsel also

stressed the importance of following CDC guidelines recommending that persons in quarantine or isolation make appropriate use of face masks. *Id.* (Rough at 49). Finally, counsel emphasized that the Hospital should test all symptomatic patients. *See id.* (Rough at 44).

Recognizing both the need for expedition and the expertise of the Hospital's medical and psychiatric staff and the parties' experts, the Court directed that the parties meet and confer within 24 hours regarding these top priority issues and file a joint status report within hours of their meeting, notifying the Court whether the parties agree or disagree on these issues and explaining the basis for any disagreement. *Id.* (Rough at 65). The Court further directed that the parties include their medical and psychiatric experts in those discussions. As the Court understood the parties' respective positions, all agreed that the Hospital should follow CDC guidelines. Thus, the goal of the conferral process was to determine whether there are any pressing areas where the Hospital is not doing so and to identify any disagreements between the parties regarding what the guidelines require or what the Hospital is doing.

On April 23, 2020, the parties file the required joint status report. Dkt. 53. As reflected in that report, the parties now agree that individuals who have tested positive or who are suspected of having COVID-19 "should be housed in their own rooms with bathrooms, and their movements outside their rooms should be kept to a minimum." *Id.* at 2. The parties were also able to resolve a confusion over their different uses of the term "cohorting." Dkt. 53 at 7. But several points of disagreement remain. Most notably, the parties disagree about (1) whether a patient who has been exposed to someone who has tested positive for the virus, but who is not symptomatic, should be medically isolated, and (2) whether medically isolated patients should be released to the general population after only one negative test. *Id.* at 4. Plaintiffs also have

7

lingering concerns about the adequacy of the Hospital's policies regarding social distancing, mask use, and the provision of psychiatric care during the crisis. *Id.*

The next day, the Court held another telephonic hearing to address the urgent issues as to which the parties still disagreed. Counsel for the plaintiffs identified two. The first is Defendants' "practice[] of keeping together in the same units patients who have and have not been exposed" to the virus, and the second is the Hospital's practice of releasing positive or suspected patients back into the general population after a single negative test. *See* Apr. 24, 2020 Hrg. Tr. (Rough at 2). As to the first issue, counsel for the Plaintiffs stressed that the matter is not merely abstract and that one of the named plaintiffs had been placed in a "congregate setting" with other patients that "may have been exposed" and that (as the parties learned early this morning) he has now tested positive for the virus. *Id.* (Rough at 2–3). When the Court asked counsel for the Defendants whether the Hospital agreed that sound "professional judgment means that [a person exposed to the virus] ought to be closely monitored and . . . *should be isolated to the extent practicable*," he responded that "the Hospital would agree with that [proposition], [and] . . . that's exactly what they're doing." *Id.* (Rough at 35–36) (emphasis added).

As to the second issue, counsel for the Plaintiffs conceded that there is no "guidance saying two clean tests [are needed] for people who are exposed" and that the "heart of the dispute" was whether persons who are "suspected" of having the virus—that is, those who are symptomatic—should be released from isolation after a single negative test. *Id.* (Rough at 36–37). In Plaintiffs' view, CDC guidance recommends that those suspected of having virus (like those with positive test results) remain in isolation until they receive two negative tests, at least 24 hours apart. *Id.* (Rough at 37–38). Defendants disagree and take the position that the

applicable CDC guidance requires only one negative test result before "the quarantined individual should be released from quarantine restrictions." *Id.* (Rough at 41). Counsel for Defendants reported, however, that the Hospital has acquired on-site testing capacity that "should make [the double-test] approach" feasible to implement and that his understanding is that there are ample supplies for testing. *Id.* (Rough at 42–43). That equipment, which Counsel reported would be imminently placed in use, will provide results within approximately fifteen minutes. *See* Apr. 22, 2020 Hrg. Tr. (Rough at 17).

## II. LEGAL STANDARDS

A TRO is "an extraordinary form of relief." *Banks v. Booth*, No. 20-cv-849, 2020 U.S. Dist. LEXIS 68287, at *7 (D.D.C. Apr. 19, 2020). A TRO is analyzed using the same "factors applicable to preliminary injunctive relief," and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* (quoting *Sibley v. Obama,* 810 F. Supp. 2d 309, 310 (D.D.C. 2011)). To obtain a TRO, a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted). Before the Supreme Court's decision in *Winter v. NRDC*, 555 U.S. 7 (2008), courts in this circuit applied a "sliding-scale" approach under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Since *Winter*, the D.C. Circuit has hinted on several occasions that "a likelihood of success is an

independent, free-standing requirement," *id.* at 393 (quotation omitted), but it "has not yet needed to decide th[e] issue," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). "In light of this ambiguity, the Court shall consider each of the [four] factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome." *Banks*, 2020 U.S. Dist. LEXIS 68287, at *7.

### III. ANALYSIS

**A.     Likelihood of Success On The Merits**

The Court first considers whether Plaintiffs have established a likelihood of success on the merits. For present purposes, the relevant question is whether Defendants' response to the COVID-19 pandemic violates Plaintiffs' rights under the due process clause of the Fifth Amendment.

To start, the Court concludes that the operative standard is the one set forth in *Youngberg v. Romeo*, 457 U.S. 307 (1982). In *Youngberg*, "the Supreme Court held that the State [or, in this case, the District of Columbia] has an affirmative duty to ensure the safety and general well-being of an involuntarily committed mental patient." *Harvey v. D.C.*, 798 F.3d 1042, 1050 (D.C. Cir. 2015). Civilly committed persons have a constitutional right, protected by the due process clauses of the Fifth and Fourteenth Amendments, in the government meeting that obligation. *Youngberg*, 457 U.S. at 319. To determine if that right has been violated, a court must balance the plaintiff's interests "against any relevant state interests, including fiscal constraints and administrative burdens." *LaShawn A. v. Dixon*, 762 F. Supp. 959, 994 (D.D.C. 1991), *aff'd and remanded sub nom. LaShawn A. by Moore v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993) (citing *Youngberg*, 457 U.S. at 321). To assess whether the government has met its obligation, the Court must consider "whether [it has] exercised professional judgment in choosing what action

to undertake." *Id.* "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Youngberg*, 457 U.S. at 323).

Defendants concede, and Plaintiffs agree, that courts have generally applied *Youngberg*'s "professional judgment" standard to cases concerning civilly committed psychiatric patients. *See* Dkt. 42 at 31 (citing *Jordan v. District of Columbia*, 161 F. Supp. 3d 45, 57 (D.D.C. 2016), *aff'd*, 686 F. App'x 3 (D.C. Cir. 2017)). Plaintiffs also rely on the line of cases analyzing the substantive due process rights of pre-trial detainees, arguing that they can establish a constitutional violation if "the Defendants knew or should have known that the [Hospital] conditions posed an excessive risk to [Plaintiffs'] health." Dkt. 46 at 12 (quoting *Banks v. Booth*, No. 1:20-cv-849-CKK, ECF No. 51 (Apr. 20, 2020)). To the extent Plaintiffs argue that the pre-trial detainee standard governs because the proposed class includes pre-trial detainees, that contention is premature. Although Plaintiffs have filed a motion to certify a class consisting of all persons confined at the Hospital, including pre- and post-trial detainees, the Court need not rule on that motion at this point in the litigation. The alleged violations impact or threaten to impact each of the named plaintiffs and the requested relief, which is Hospital-wide, is necessary to redress their risk of serious injury. If Plaintiffs, instead, mean that the standard also applies to civilly committed individuals, they have cited no authority for that proposition and, under the pressing time constraints of this motion, the Court has found none. In any event, as a practical matter and on the fact of this case, there is little difference between the two standards. *See Porter v. Illinois*, 36 F.3d 684, 688 (7th Cir. 1994), *abrogated on other grounds*, *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, (2002) ("[P]rofessional judgment, like

recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct.").

Applying the *Youngberg* test, Defendants argue that "Plaintiffs cannot point to any decisions that were not based on professional judgment" because Saint Elizabeths has exercised appropriate judgment in deciding how to respond to the pandemic. Dkt. 42 at 37. Plaintiffs respond that the Hospital has failed properly to implement relevant CDC guidance and that the Hospital's departures violate their constitutional rights. To be sure, Plaintiffs acknowledge that the Hospital is now following many CDC recommendations, but they assert that this new-found conformity happened only after they filed the motion for a TRO. Dkt. 53 at 3. And, more importantly, they contend that the Hospital is still failing to follow CDC guidance in at least two critical respects: First, the Hospital is releasing persons suspected of having the virus from medical isolation after only one negative test, rather than the recommended two tests. *See* Apr. 24, 2020 Hrg. Tr. (Rough at 45) ("The rub of what we're concerned about is the idea that people who are suspected could be cleared with one test."). Second, the Hospital is not isolating individuals who have been exposed to the virus, thus risking that those individuals infect other non-exposed patients or that they come into contact with other exposed individuals who are now carrying the virus. Dkt. 53 at 4.

As an initial matter, the Court observes that, although decisions made by professionals are "presumptively valid" under *Youngberg*, it is unclear whether that presumption applies here. Defendants have not identified the person or persons who have decided to implement these policies, and so the Court cannot say with any certainty that they satisfy the definition of "professional" articulated in *Youngberg*. To be sure, there is evidence in the record that the Hospital's COVID-19 response is being overseen by medical professionals, including Dr.

Richard Gontang, the Chief Clinical Officer, *see* Dkt. 42-2, Martha Pontes, the Chief Nurse, *see* 42-4, and Yi-Ling Elaine Tu, the Infection Control Coordinator, 42-5. But, even assuming, that the decisions are entitled to the presumption of validity, Plaintiffs have offered compelling evidence (on the extremely expedited schedule governing their motion for a TRO) that the challenged practices substantially depart from accepted professional standards.

According to Defendants, the Hospital has already addressed the first pressing issue that Plaintiffs raise—the alleged failure to isolate patients exposed to the virus—by treating all units as "quarantined." *See* Dkt. 53-2 at 2 ("Currently, all units other than isolation units and PUI units are under quarantine"); Apr. 24, 2020 Hrg. Tr. (Rough at 13–14). The problem with that assertion is that Defendants' implementation of the quarantine does not satisfy CDC standards. The CDC recommends that long-term care facilities "[e]nforce social distancing among residents," "[e]nsure all residents wear a cloth face covering . . . whenever they leave their room or are around others," and, if the virus "is identified in the facility, restrict all residents to their rooms[.]" CDC, LCTFs Key Strategies. Plaintiffs have offered ample evidence that the Hospital has taken a less demanding approach to enforcing social distancing and mask use, that common spaces are open, and that patients are not remaining in their rooms to the extent practicable. *See, e.g.*, Dkt. 39-6 at 1 (Costa Decl. ¶¶ 4–5); Dkt. 39-9 at 1–2 (Guzman Decl. ¶ 3); Dkt. 39-10 at 1 (Rose Decl. ¶ 5). As Plaintiffs' counsel put it, the Hospital is "not insisting that [patients] stay in their rooms to the extent practicable, they're not shutting down common areas or common facilities for this population. Mask use is still intermittent. Social distancing enforcement is still intermittent." Apr. 24, 2020 Hrg. Tr. (Rough at 9). Much of Defendants' own evidence is consistent with Plaintiffs' narrative. Staff for the Hospital attest, for example, that, although there is enough space "for each patient to practice social distancing if he or she chooses to do

13

so," it "is difficult to enforce without impinging on patient autonomy." Dkt. 42-2 at 5 (Pontes Decl. ¶ 10). Defendants also attest that, although "[a]ll patients have access to face masks," "[s]ome . . . choose to wear masks, others do not." *Id.* at 6 (Pontes Decl. ¶ 6). And they assert that, although patients "in quarantine units are encourage to stay in their rooms as much as possible," they are "not prohibited from using common areas." Dkt. 53-2 at 2.

       The Court is cognizant that there may be sound medical reasons why some of these measures should not be stringently enforced in the context of a psychiatric hospital and that the (fast evolving) record is not developed on this point. Counsel for the Defendants has noted on multiple occasions that the Hospital must balance the unique mental health needs of the patients confined at the Hospital, and the Court understands that need. Nor is it the Court's place to micromanage the Hospital's hour-by-hour and patient-by-patient medical and psychiatric decisions. But Defendants have offered no explanation why patients who have been exposed to the virus are not more closely monitored to ensure that they are isolated to the extent consistent with patient health and well-being. Defendants acknowledge that persons who have been exposed should be closely monitored and placed in "a separate observation area," Dkt. 53-3 at 2, and that accepted professional judgment is that such persons should be isolated to the extent practicable. Apr. 24, 2020 Hrg. Tr. (Rough at 35–36). And yet the evidence currently before the Court indicates the Hospital is not robustly implementing those measures. As Plaintiffs' counsel indicated, this is not a mere abstract disagreement; the risks to Plaintiffs are immediate and manifest. If exposed to a contagious patient, Plaintiffs may—and in one case, already has—contract the virus.

       The Hospital's policy of "immediately" returning patients suspected of having the virus to the general population after a single negative test result is also contrary to accepted

professional standards. *See* Dkt. 42-3 at 29; Dkt. 53 at 4; *id.* at 11 ("If the test results are negative, the patient is returned to the general housing unit."). As a threshold matter, the parties disagree about the relevant CDC guidance. Defendants say that the guidance applicable to healthcare settings should govern, Dkt. 54-2, while Plaintiffs posit that CDC guidance directed at detention facilities sets forth the operative standard, Dkt. 55-2. In Plaintiffs' view, the latter is more apt because the Hospital is a congregate setting where patients are involuntarily detained; by contrast, in a typical hospital setting, patients may voluntarily depart and self-quarantine at home. *See* Apr. 24, 2020 Hrg. Tr. (Rough at 7).

The Court need not decide this issue, however. Even assuming that the guidance Defendants rely upon is the operative one, they are not following it. Although that guidance states that a patient suspected of having the virus can be released "upon having negative results from at least one test," it also says that, if there is a "higher level of clinical suspicion," it is recommended that the patient remain in isolation and that a "second test" be performed. Dkt. 54-2. That guidance is consistent, moreover, with the expert testimony offered by the Plaintiffs. Plaintiffs offer declarations from Dr. Marc Stern, a "board-certified internist specializing" and former Assistant Secretary of Health Care for the Washington State Department of Corrections. Dkt. 39-3 at 1 (Stern Decl. ¶ 1). Dr. Stern attests that symptomatic patients should not be released from isolation "based solely on one [negative] test" because "[t]here is a high rate of false negatives and decisions should be made based on a full clinical evaluation of the patient." Dkt. 46-2 at 2 (Stern. Suppl. Decl. ¶ 7). Defendants have offered no evidence that they are evaluating patients who have received a negative test for "clinical suspicion" prior to release, and Defendants own evidence shows that they are releasing patients "immediately" to the general housing units after a single negative test. Dkt. 42-3 at 29. Nor have Defendants explained why

all symptomatic patients at the Hospital do not meet the higher-level-of-clinical-suspicion benchmark, given the large percentage of infected patients and staff at Saint Elizabeths. Indeed, out of a total patient population of between 200 and 275, at least 42 patients have tested positive to date, along with at least 68 staff members. Even under the guidance relied upon by Defendants, the Hospital's protocol for returning symptomatic patients to the general population is not consistent with CDC standards.

The Court acknowledges that additional development of the record might show that Defendants are taking sufficient precautions not evident on the current record. The Hospital's response, moreover, is evolving as the crisis continues to evolve, and, indeed, the Hospital has indicated that it is increasing its testing capacity and has expressed an intention to abide by the CDC guidelines. On the current record, however, the Court finds that Plaintiffs have established a likelihood of success on the merits with respect to the two priority issues that it raises for purposes of this emergency motion.

**B.     Irreparable Harm**

Plaintiffs contend that the deprivation of constitutional rights, even for minimal period of time, "unquestionably constitutes irreparable injury." Dkt. 39-1 at 34 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). And, Plaintiffs further point to the imminent risk to their health, which also constitutes an irreparable injury. Defendants do not dispute either point and, instead, argue that Plaintiffs will not suffer irreparable injury because "Saint Elizabeths is already taking the overwhelming majority of the measures [P]laintiffs request." Dkt. 42 at 25. But Plaintiffs have continued to pursue the issues addressed in this opinion precisely because Saint Elizabeths has declined to modify its protocols even after meeting and conferring with Defendants to discuss their concerns. Given the gravity of

Plaintiffs' imminent risk of injury, and the pressing need to act to prevent that risk, the Court finds that Plaintiffs have satisfied the irreparable harm requirement for issuance of a temporary restraining order. *See AlJoudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) ("Facing requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger.")

**C.     Balance of Hardships and Public Interest**

The Court moves to the final factors to be considered in granting a temporary restraining order—the balance of the equities and the public interest. In this case, where the government is a party to the suit, the harm to defendants and the public interest merge and "are one and the same, because the government's interest is the public interest." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original). The Court finds that the public interest weighs in favor of granting temporary injunctive relief.

As a starting point, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks omitted). Beyond protecting Plaintiffs' rights, ordering Defendants to take precautions to lower the risk of infections for Plaintiffs also benefits the public health. As the record in this case demonstrates, continued spread of the virus at Saint Elizabeths threatens the health and lives of patients and staff.

Of course, the Court recognizes that there is also a "public interest in permitting the government discretion to carry out its authorized functions," *Banks*, 2020 U.S. Dist. LEXIS 68287, at *48, and that interest is acute where medical and psychiatric staff must make prompt, individualized, and informed decisions about the health and well-being of their patients. But here, the burden on that interest is minimal. Defendants have already expressed a desire to

follow the CDC guidelines, and the Court's order will simply require them to make good on that aspiration. Nor is this a case where the ordered relief will require the Defendants to expend resources acquiring means to comply with the order. Just a few days ago, Defendants received a "rapid test machine" that will "facilitate more testing." Dkt. 53-2 at 2. Moreover, by mitigating the spread of infection, "Defendants actually lessen the healthcare burden that they will be facing in the weeks and months to come." *Banks*, 2020 U.S. Dist. LEXIS 68287, at *48. Finally, the Court will tailor its order to ensure that it does not interfere with the ability of medical and psychiatric professionals to make decisions on-the-spot about the health and well-being of their patients. The Court, accordingly, finds that the balance of the equities and the public interest weigh in favor of granting injunctive relief.

## CONCLUSION

For the reasons explained above, the Court will grant in part and defer in part Plaintiffs' motion for a temporary restraining order.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 25, 2020