**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ENZO COSTA, *et al.,*

                Plaintiffs,

    v.

BARBARA BAZRON, *et al.,*

                Defendants.

---

Civil Action No. 19-3185 (RDM)

**REPORT SUBMITTED BY *AMICUS CURIAE* PATRICK CANAVAN PSY.D.**
**PURSUANT TO MAY 1, 2020 ORDER**

Pursuant to the May 1, 2020 Consent Order issued in the above-captioned matter, *Amicus Curiae* Patrick Canavan, PsyD submits the following report for the Court's consideration.

## I.  INTRODUCTION

On May 1, 2020,  this Court appointed Ronald Waldman, MD,  Joan Hebden, and Patrick Canavan, PsyD as *amici* to provide specific information to the Court regarding COVID-19 prevention and management and mental health services at Saint Elizabeths Hospital.  Dr. Waldman and Ms. Hebden were ordered to address 16 specific questions relating to infection control and management, and the undersigned was ordered to address seven questions relating to mental health care at the Hospital.[1]  On May 7, 2020, *amicus* participated in a teleconference with the Court and the parties and provided a summary of his preliminary findings, which are explained in greater detail below.

---

[1] *See* May 1, 2020 Order, Attachment A.

This report describes the methodology *amicus* relied upon to conduct this assessment, a brief overview of Saint Elizabeths Hospital, and *amici's* findings and recommendations related to the questions delineated in the May 1, 2020 Order.[2]  During this review, defendants were responsive to requests for documents and quickly provided staff for interviews, including some that occurred on weekends and in the evenings.  They arranged for interviews with individuals in care which were essential to complete this review.  The defendants also arranged for remote access to the Hospital's electronic health record which facilitated my review and analysis.  The managers and staff were forthcoming and frank in their assessments.  These efforts are made more remarkable given the significant and rapidly changing challenges the Hospital is facing as it addresses the COVID-19 outbreak.

## II.  METHODOLOGY

*Amicus* utilized multiple strategies to obtain as complete information as possible given the Court's time frame to address the specific questions posed by the Court.  Structured phone interviews were conducted with the Department of Behavioral Health (DBH) Director and Saint Elizabeths Hospital's Chief Executive Officer, Medical Director, Chief Clinical Officer, Directors of Psychology, Social Work and Rehabilitation Services, Clinical Administrators and Recovery Advocate Director, Positive Behavioral Support[3] Director, Therapeutic Learning Center Director, Incident Investigations Manager, and Consumer Affairs Chief.  In addition,

---

[2]  Amicus was assisted by Maura Gaswirth, a licensed independent clinical social worker with an extensive mental health background who conducted interviews and reviewed medical records; she was the Director of Social Work at Saint Elizabeths from 2010-2016; Mark Jordan, who has expertise fact-finding in the context of institutional reform litigation who reviewed documents, participated in interviews and conducted data analysis, and Janet Maher, an attorney specializing in mental health law who was the DOJ Compliance Officer from 2007 to 2014 and Performance Improvement Director at Saint Elizabeths from 2013 to 2016.  Ms. Maher participated in interviews and reviewed documents.

[3]  Positive Behavioral Support (PBS) is a behavior management system used to understand what drives an individual's challenging behavior and what benefit the individual receiving secondary to the behavior.  Under PBS, a system of rewards is used to reinforce the individual's positive behavior.

*Amicus* was onsite at Saint Elizabeths Hospital on May 5th and May 6th, 2020; five units were visited, and video conferencing interviews and numerous off-unit staff interviews were conducted.[4]  Based upon the advice of Ms. Hebden, and consistent with the Court's Order, *Amicus* did not visit units designated as isolation units where active COVID-19 cases are housed, but instead interviewed clinical staff from these units by videoconference.  *Amicus* also reviewed electronic health records of 29 individuals in care[5] and analyzed data from the information management system maintained by the Hospital.[6]  In-person interviews (and, in a few cases, phone interviews) also were conducted with direct care clinical staff representing all disciplines including nursing, social work, psychiatry, psychology, clinical administrators, and rehabilitation therapies and Therapeutic Learning Center (TLC) clinicians.[7]  Finally, in-person or video conference interviews with multiple individuals from seven units including several of the named plaintiffs were completed.  In total, 18 individuals in care, 32 clinical staff and 13 managers were interviewed.

---

[4]  The May 1, 2020 Order specifically provided that inspections should made using existing video camera monitors to the extent possible, but that *amici* could visit units if they deemed necessary.  Units visited by this *Amicus* included 1D, 1E, 1F, 2A, and 2C. The status of the units at the times of visits were as follows: 1D (no known exposure unit); 1E (no known exposure unit); 1F (known exposure; post-quarantine); 1G (known exposure, quarantined);  2A (no known exposure unit) and 2C (post-quarantine).  However, it should be noted that the infection control related designation of a unit may change as frequently as daily.

[5]  The Hospital refers to those who are admitted and receiving services at the Hospital as individuals in care and I will use that terminology in this report.

[6]  Datasets included Hospital admission and discharges between March 15, 2020 and May 5, 2020; Housing assignments for all Hospital patients since March 15, 2020; Daily Census reports from March 15, 2020 to May 1, 2020; List of COVID-19 tests ordered by name, order date, testing date, test result, and housing unit; Schedule of Treatment Activities by day, by unit and by discipline since March 1, 2020; Data regarding groups scheduled, held, and attendance at the TLCs from February 1, 2020 to February 29, 2020; Data reflecting hours of mental health treatment per week since March 1, 2020, by discipline; Seclusion and restraint data since January 1, 2020 by patient name, unit, intervention type and time in restraint or seclusion; Data relating to STAT/PRN medication usage by patients since January 1, 2020, including patient, type of medication, order type, and whether administered voluntarily or involuntarily; Report of Unusual Incidents including date, category, description of incident, severity, from January 1, 2020 to May 1, 2020 and the Hospital's Schedule A.

[7]  As used in this report, Rehabilitation Services encompasses recreation therapy, vocational rehabilitation, occupational therapy, education therapy, chaplain services and the creative arts therapies which include art therapy, music therapy, and dance therapy.  Rehabilitation Services also includes barber and cosmetology services.   The Therapeutic Learning Center staff includes Licensed Professional Counselors, group therapists, substance abuse counselors, and program administrators and support.

### III.  HOSPITAL OVERVIEW

On May 1, 2020, the Hospital had a total of 209 individuals in care on its census,

compared with 268 on March 12, 2020, which is about the time the first positive COVID-19

case was identified at the Hospital.  As reflected in the chart below, admissions to the Hospital

have significantly decreased, which, combined with a substantial increase in discharges, has

brought the census to historic lows.



The Hospital operates 12 units, with five located on what is known as the Transitional

Side, and seven on the Intensive Side.[8]  Census on the units as of *Amici*'s visits ranged from a

---

8  The designations "Transitional" and "Intensive" reflect both location of a housing unit and differences in security
levels among units served by them.  Individuals in care assigned to the Transitional side are generally more
psychiatrically stable, often have privileges and are in programming that reflects their ability to handle more

low of nine to a high of 24.  Units include geriatric units, forensic and civil mixed units, forensic pre-trial admissions units, and long-term units.  Some units are coed.  During the COVID-19 outbreak, the Hospital also has used the Therapeutic Learning Centers and the Seclusion Suite as temporary isolation or quarantine space.

Since the COVID-19 outbreak, units have also been designated for Infection Control purposes as Isolation Airborne Precaution units (COVID-19 positive cases or Persons Under Investigation cases), or Universal Personal Protective Equipment (PPE) Droplet Precaution units (no known exposure, either known exposure in the past 14 days but not COVID-19 positive, or post-quarantine).  The unit designation, census and unit assignments of individuals in care have change frequently in response to the ever-changing requirements of infection control and prevention.

Hospital policy requires that each individual in care have a current treatment plan, called the Individual Recovery Plan (IRP), which includes goals, objectives and interventions and which is updated at regular intervals.  The IRP is updated at regularly defined intervals. Interventions reflect actions of staff designed to support the individual in care in reaching his or her objectives and goals.  Under Hospital policy, the target number of hours of active treatment is 15-20 hours per week depending on the individual in care's clinical condition.[9]  In general, the Hospital provides treatment through various modalities including but not limited to medication, individual and group therapies, and recreational and socialization activities.  Nursing interventions are also a significant aspect of the treatment provided.  This is discussed in more detail in the findings section below.

---

challenging groups and activities.  Individuals on the Intensive side include those in pre-trial status in criminal cases, new admissions and more long-term individuals who are not yet stable.

[9]  Interdisciplinary Recovery Planning (IRP) for Inpatient Services , Policy Number 102.00 at III.C.3.a.vi.

## IV.  FINDINGS RELATED TO MENTAL HEALTH CARE[10]

**Question 17:  Are the Hospital and the Department of Behavioral Health periodically evaluating patients for discharge to a community placement in light of the COVID-19 outbreak?**

The Hospital and the Department of Behavioral Health (DBH) are evaluating the discharge readiness of individuals in care and are continuing efforts to discharge individuals from the Hospital, but changes in the discharge planning process, housing shortages and community providers' fears relating to accepting individuals from the Hospital as a result of the COVID-19 outbreak are contributing to delays in effecting discharges.

The discharge planning process for individuals in care begins upon admission and is an ongoing focus of treatment.  As part of the treatment planning process, all disciplines must complete or update their assessments before each treatment plan, and, in the context of discharge planning, the social worker plays a primary role in gathering information and updating the progress toward discharge in his or her assessment.  Further, each treatment plan must specify individualized discharge criteria, and include the anticipated place of discharge or level of care needed upon discharge, current barriers to discharge, and measurable interventions to address the barriers; the treatment plan must also specify the person responsible for delivering the intervention and the timeframe for completion of the interventions.[11]  In support of the discharge goal, the Hospital convenes multiple groups in the TLCs and on the unit which focus on preparing the individual for discharge.  Because access to housing and subsidies is funded and determined by DBH, the Hospital works closely with DBH to achieve discharges.

---

[10]  In Attachment A to the May 1, 2020 Order, the Court posed seven questions related to mental health care which are numbered from 17- 23.  For convenience of the Court and parties, amicus will use this numbering system in this Report.  Additionally, *Amicus* will summarize in each section how the situation has changed since the COVID outbreak.

[11]  IRP Policy Number 102 at III.C.5, *supra* at 9.

Pre-COVID Process.  Prior to the COVID-19 outbreak at the Hospital,  a "ready for discharge" list was maintained by the Hospital and DBH to monitor closely discharge planning and progress.  An individual was placed on the list when the treatment team determined that the individual had progressed sufficiently such that the treatment team could identify the level of care and housing needs for the individual when discharged.  This "ready for discharge list" was updated regularly by social work staff as individuals' psychiatric needs stabilized, type of housing needs changed, legal status was updated, and services needed in the community evolved.  The ready for discharge list included (and still includes) the individual in care's recommended level of care in the community, a brief description of efforts to discharge, and barriers to outplacement which allowed the Hospital and DBH to identify issues and address them systemically or individually depending on the problem.  The Hospital's Social Work Director held bi-weekly meetings with DBH central office staff to review the ready for discharge list and address barriers to discharge.  These meetings provided structured, ongoing communication and close monitoring and kept the key players focused on discharging those for whom hospitalization was no longer needed.  In addition, before the COVID-19 outbreak, Core Service Agency (CSA)[12] case managers were more actively involved in planning, including coming to the hospital to engage with clients 30 days prior to discharge.  Individuals in care also were able to visit potential housing sites to interview with providers and to see if they liked where they might live.

Post- COVID-19 Process.  Once the COVID-19 outbreak occurred, the "ready for discharge" list continued to be maintained and updated.  However, the biweekly meetings with

---

[12] Core services agencies are community providers who provide case management and treatment services.  Each individual in the community receiving services is linked to a CSA who take over the management of treatment upon discharge.

DBH were suspended (mid-March) and communication with the Department is now limited to phone and email, rather than in person.  CSA's and Assertive Community Treatment (ACT) teams no longer provide in-person treatment or follow-up, and TLC discharge-related groups have been terminated.  Individuals in care are not being taken to see housing options, and do not have the opportunity to interview with a provider in person.  Consequently, there have been delays recently in discharging individuals in care.  As of May 6, 2020, there were 56 individuals in care on "ready for discharge" list.[13]

### a. Are there barriers to timely and appropriate discharge being addressed?

Identification of appropriate housing in the community has been and continues to be a significant barrier.  While there are many types of housing in the community, there are shortages in many of the particular types of housing needed by those ready for discharge.  In other cases, there is no bed available to address the particular needs of the individual ready for discharge, such as the need for a first-floor room, or a male or female only home.  Housing has long been a barrier due to scarce resources, and in the past two years, adequate funding for more staff and resource intensive housing options has not been available.  Additionally, funding for the early involvement of community case managers which supports continuity of care and discharge planning is not available unless the individual in care is within 30 days of discharge.[14]

Discharge also has become more difficult now as many housing providers are reportedly afraid to accept individuals from Saint Elizabeths due to COVID-19 concerns.  Thus, in addition to the stigma associated with mental illness, Saint Elizabeths' individuals in care now have the

---

[13] The housing types required for those currently on the "ready for discharge list" include nursing home (14 individuals); supported rehabilitation residence (ten individuals); intensive residence (three individuals); supported residence (18 individuals); single room occupancy (three individuals); Department of Disability Services housing (two individuals); apartment (one individual); and for the remaining individuals, planning is on hold for clinical reasons.

[14] Until 2017, CSA staff could work with hospitalized individuals for up to 90 days prior to discharge.  This additional time allowed for CSA workers to develop rapport with their new clients and learn their preferences.

added stigma of potential COVID-19 exposure.  Additionally, telephone interviews are less effective than in person interviews for the few housing slots available, fewer community providers are even willing to talk to hospitalized individuals about services or housing due to the outbreak and thus the Hospital has had fewer acceptances since mid-March.  It should be noted that there also have been fewer placements for individuals in care going to their own apartments since the COVID-19 outbreak as landlords tell social workers that they are leery of accepting referrals from Saint Elizabeths.  This is likely to remain problematic for the foreseeable future.

### b.  How frequently is the Hospital discharging patients?

In an effort to reduce the census at the time the outbreak started, DBH and the Hospital worked with the courts to discharge as many misdemeanant pre-trial individuals as possible.  Additionally, concerted efforts were made to address those on the "ready for discharge list."  Between March 15, 2020 and May 2, 2020, there were 57 non-death related discharges, which included 39 individuals with a forensic pretrial legal status, 15 with a civil legal status and two with a forensic post-trial legal status.[15]  Two of the forensic pretrial individuals returned to the jail, and the remaining pretrial individuals were released to shelters (16), group home (one) or returned home to family or another setting (22).  The 15 individuals with a civil legal status and the two forensic post-trial individuals were placed in housing in the community.[16]

This number of discharges is a significant accomplishment, although the number of discharges involving non-pretrial forensic individuals has decreased noticeably since the middle of April.

---

[15] One of the forensic post-trial patients was discharged twice during this period.
[16] These individuals were discharged to nursing homes (3); home or self (5), and other (9) including one to a DDS placement, which is extremely difficult even in non-pandemic periods.

**Discharge Related Recommendations**: As noted above, there has been several barriers to discharge and new challenges have emerged because of COVID-19.

Recommendation # 1:  The DBH should immediately begin a program to educate community providers about COVID-19 to calm fears over housing or serving Saint Elizabeths individuals in care.

Recommendation # 2:  Hospital staff and DBH staff should immediately restart meeting twice a week via video conferencing to review and update the "ready for discharge" list and address any new barriers that have been highlighted because of COVID-19, so DBH can engage community providers and identify strategies to mitigate concerns.

Recommendation # 3:  DBH should provide a short-term subsidy or other supports to providers who accept individuals in care from Saint Elizabeths in the near future.

Recommendation # 4:  DBH should expand housing options for older individuals in care or those who need higher levels of care such as nursing home or intensive residence, as well as individuals in care who have suffered from COVID-19 who may experience lingering effects and thus may be in need more intensive community supports.

**18.  What mental health services is the Hospital providing to patients in light of the COVID-19 outbreak, and how are they being provided?  What has changed in light of the COVID-19 outbreak about how the Hospital is providing mental health services?**

PreCOVID-19 outbreak.  In general, prior to the COVID-19 outbreak, Saint Elizabeths provided a full range of behavioral health services to individuals in care tailored to their individual needs.  Treatment was driven by the individual's IRP goals and objectives, and identification of interventions appropriate to those goals was prioritized jointly by the individual and the treatment team from a range of services, which included but were not limited to, individual and group therapies, socialization and recreational activities, psychological evaluation

10

and testing, medication management and education, discharge planning, substance abuse
evaluation and treatment, and competency restoration.

The linchpins of the Hospital treatment delivery were its three Therapeutic Learning
Centers (TLC).  Individuals were scheduled for groups that met the individual's psychiatric,
psychological and physical health needs.[17]  The Transitional TLC operated five days a week and
was a full-day program operating two-hours in the morning and two-hours in the afternoon.  The
Intensive TLC operated two programs, including a half day program five days a week in the
morning for forensic post-trial and female individuals in care residing on the Hospital's Intensive
side, with afternoon programming held on the units.  In the afternoon, the Intensive TLC
operated a half-day program for pretrial forensic individuals in care focusing on competency
restoration, with on-unit programming in the morning.  Group curricula was modified to meet the
needs of those with cognitive limitations or other special needs.  Groups were led by all
disciplines including psychiatrists, psychologists, social workers, creative arts therapists,
substance abuse counselors, nurses and chaplains.  Treatment teams provided supports to
individuals in care between their scheduled groups and activities and held community meetings,
and the Hospital provided a range of evening and weekend recreational and enrichment activities
for individuals in care.  Additionally, approximately 56 individuals in care participated in
individual therapy, generally once per week, with sessions lasting from 30 minutes to one hour.
Competency restoration was included in the TLC programming and was supplemented on the
unit by Nursing staff.

---

[17] Group therapies offered in the TLCs included substance abuse treatment, dialectical and cognitive behavioral
therapies, psychiatric and psychology groups such as anger and stress management, medication education,
nutritional education, health education, enrichment activities, music, art, occupational, education, vocational and
recreational therapies, competency restoration, and community integration.

<u>Post COVID-19 outbreak</u>.  After the COVID-19 outbreak, treatment planning was modified dramatically so that individuals in care, treatment team members and other interested parties could safely participate.  The Hospital began using video teleconferencing[18] to conduct IRP meetings.  Generally, treatment plan conferences now are held with only the clinical administrator (or another treatment team member) and the individual in care physically together, and other members of the team participate remotely via video teleconference or phone.  This has allowed IRP meetings to proceed, but staff have reported that it has impacted participation of some key participants, as some family members, attorneys and community case managers have not been able to participate due to complicated scheduling and use of new technology, and that some individuals in care have had a harder time adjusting to the new method of treatment planning.

The provision of treatment has also changed.  Beginning March 9, 2020, Treatment Services began limiting outside trips taken by TLC participants due to COVID-19 concerns.  Then, beginning March 17, 2020, the TLCs closed due to the risk of cross-contamination, and have not reopened.[19]  In late March, TLC and Rehabilitation Services developed schedules for on-unit programming to begin after the "Spring vacation" was scheduled to end, with limited and identified staff who would be dedicated to a particular unit, but that plan was not approved by the Hospital administrative leaders and, as a result, no group therapies have been provided by Rehabilitation or TLC staff since mid-March.[20]  Rehabilitation and TLC staff have occasional

---

[18] This system is also used for court hearings, and occasionally for family and lawyer visits.
[19] The closure initially included moving up a planned "Spring vacation" closure, but the closure became permanent.
[20] Managers explained that the decision was prompted by an effort to restrict staff entering units to treatment team members only who work on the unit and that there were concerns about identifying space that would allow fewer than 10 individuals to participate while maintaining the six feet distance requirement.  An inconsistency is noted, however, in that there is substantial evidence that nursing staff are often moving from one unit to another, shift to shift, and that individuals in care are frequently transferred from one unit to another, sometimes multiple times in a week.

contact with individuals in care who reach out to them by phone, and they play an important role in supporting clinicians on the unit with supplies and handouts, but there has not been coordinated treatment delivery due to the administrative leadership decision.  Approximately 34 licensed, board-certified or accredited clinicians are currently not involved in direct care treatment but are assigned to perform non-clinical work in the Hospital.

Treatment now largely consists of less structured interventions by nursing and unit clinical staff who do frequent "check ins" with individuals in care.  Each unit continues to have psychiatry, nursing, social work and clinical administrator services available to the individual in care.  It is noted that some treatment team staff are located on the unit, others come to unit as needed or engage via video teleconference or by phone.

Some of these same treatment team staff, while covering their own unit, also are covering vacant positions or for colleagues who are out of work due to COVID-19.[21]  DBH provided a May 9, 2020 list of positions available for hiring to the Hospital that includes 22 vacant positions.  Hospital staff indicate that as of February 1, there were 27 clinical positions available. It appears that five clinical positions were taken from the Hospital just before the COVID-19 outbreak occurred.  This loss of positions directly impacts patient care.

For the most part, staff are not conducting group therapy.  Competency restoration is continuing on a one-to-one basis with psychology staff, but no psychological testing is occurring, and staff are educating and reinforcing behavior around COVID-19.  Individual therapy is continuing either through in-person, phone or through video/teleconferencing, although a number of individuals in care have elected to suspend therapy until it can be held in person.  The Positive Behavioral Support team is available to bring supplies and equipment to units, but they are not

---

[21] It is also noted that other treatment team positions are currently vacant or filled but unavailable due to medical or other reasons.

going on the units.  Chaplain services, especially to those affected by deaths of their long-time friends, are offered in shorter visits on fewer occasions due to infection control concerns.[22]

Both the Psychology and Treatment Services departments have created and distributed activity packets to individuals in care.  The packets include activities, puzzles, quizzes, sudoku, origami games, brain games, breathing guides, tips for stress reduction/tolerance strategies, meditation and other similar activities.  The Psychology Department developed a video about COVID-19 that is available to individuals in care on the Hospital's internal television channel. In addition, Psychology staff are developing a manual for individuals in care to prepare them for a planned telehealth roll out and upcoming groups.  The manual will include exercises and activities for individuals in care to use between groups.  In addition, during a visit on 1D, *Amicus* observed unit staff introducing recreational activities that were fun, involved multiple individuals in care who maintained social distance and were geared to the cognitive ability and language capacity of the participants.

Despite these efforts, multiple individuals in care interviewed reported very little, if any, treatment is occurring and that there is little for them to do on the units other than watch TV.[23] All those interviewed reported they felt supported by staff who were willing to respond to requests for help.  One individual requested access to computer games and specific video games

---

[22]  Transfers between units according to COVID-19 status has also made it more difficult to continue consistent clinical interactions between treatment teams and their individuals in care.  Under the Hospital's current protocol, which is a marked difference from prior policy, when an individual is transferred to a new unit for COVID-related reasons, the sending treatment team remains responsible for the individual, but access to that team by the individual in care becomes challenging as in some cases access it is done via video conferencing or telephone.  This disruption in known supports can be very disorienting for individuals whose psychiatric condition is also challenged by the anxiety, sadness and loneliness that characterizes the COVID-19 pandemic or for those who fear or do not like using technology.  Clinical staff are also challenged by monitoring their individuals, who remain in their care despite being housed elsewhere for COVID-19 purposes.

[23]  For example, one individual described his day as getting up, eating breakfast, getting medicine, sleeping until noon, and watching TV.  Another reported spending most of the time in his room, singing and taking many showers to keep clean from COVID-19.  Yet still another reported being monitored by nursing two to three times a day, eating meals, watching TV, being provided medication and snacks, and going to the recreation yard occasionally. None mentioned treatment.

to help pass the time.  Another mentioned that he preferred to read in Spanish and was provided with books in the Spanish language by his treatment team.

Data reflecting treatment both before and after the COVID outbreak confirm what was learned from interviews and observations: that between February 2020 and April 2020 there has been a dramatic *decrease* in the provision of mental health services at the Hospital.  In February 2020 alone, there were 1396 group sessions scheduled, and 1220 were held at the TLCs.[24]  These groups accounted for 8018 hours of scheduled treatment.  Data further show that 168 individuals in care attended 5982 hours of group treatment in February 2020, for an average of over two hours of group per day per individual in care.[25]  In contrast, data provided by the Defendants reflecting treatment since April 1st show a significant decrease, with fewer than 100 hours of treatment scheduled compared with the almost 6000 hours just two months earlier.[26]

**Scheduled Treatment Hours By Discipline April 1, 2020 to April 30, 2020**

|                        | Grand Total |
|------------------------|-------------|
| Psychology             | 72:20:00    |
| Psychiatry             | 10:00:00    |
| Clinical Administrator | 8:50:00     |
| Chaplain               | 4:20:00     |
| Social Work            | 1:40:00     |
| Unit                   | 1:40:00     |
| TX Mall                | 0:50:00     |
| **Grand Total**        | **99:40:00** |

[24] Data from TLC Scheduling System, February 2020.  During February some groups were cancelled primarily due to the federal holiday and celebrations of Black History month and patient birthdays.  Despite these cancellations, February totals still dwarf group treatment hours since April 1.

[25] *Id.* There was an average of 36 hours of group treatment per patient in February 2020 over 17.5 days of scheduled group treatment in the TLCs.

[26] As noted, the data reflecting February 2020 was provided by the defendants and is from a scheduling database that tracks groups scheduled, groups held and groups attended, but does not reflect individual therapy sessions held. The data for April was taken from a document titled "Self-reported Data for Individual Therapy and Check-ins," which was also provided by the defendants. This latter document includes hours of individual therapy provided whereas the report of February 2020 treatment does not appear to include that data, making the discrepancy in scheduled treatment hours even greater.  We were able to use this data to calculate hours scheduled but were unable to compare data as to hours attended and average patient treatment hours due to the way the April data was presented; based upon interviews, we believe the April data may be underreporting "check-in" hours.

15

The data on individual therapy show only a slight decline in services.  Prior to the COVID-19 outbreak, approximately 53 individuals in care were provided in person individual therapy with psychologists or psychology trainees; sessions range from 30 minutes to one hour and are usually scheduled to take place once a week, although therapists are available at other times to support individuals in crisis.  As of May 1, 2020, data show that 53 unique individuals in care are scheduled for 56 individual therapy sessions; of those, however, therapy for nine individuals (17 percent) is "on hold" for a variety of reasons (i.e., individual in care choosing to wait until "in- person" therapy is available, the individual in care has difficulty using teleconferencing or the unit lacks the capacity for teleconferencing, or individual in care has been ill).  Two individuals in care are new referrals and therapy started last week.  Of the 44 therapy sessions involving the remaining 42 individuals in care, eight involve therapy provided in person, 18 by phone, 13 by video conferencing.[27]  The creative use of alternatives to in-person therapy has allowed most therapy individuals in care uninterrupted treatment.

*Amicus* also conducted record reviews to assess how the changes were affecting treatment planning and documentation.  A review of 29 records[28] showed that 100 percent of treatment plans were completed on a timely basis.  However, most treatment plans do not include updated interventions that are reflective of what is now being provided or available to individuals in care.  Indeed, 90 percent of the IRPs reviewed (25 of 28) [29] incorporated TLC and unit groups that are no longer operating; only ten percent (three of 28) included updated interventions that

---

[27]  Three therapy session are now being held by phone due to active COVID diagnosis but would usually be held in person, and two are now by phone due to COVID-19 diagnosis but would otherwise be by video conferencing due to COVID-19

[28]  This is a 14 percent (29 of 206 individuals) sample size.

[29]  One case reviewed was a new admission and the IRP was not yet due.

accurately portrayed interventions actually being provided.  In progress notes, therapeutic progress notes, and social work updates, there were periodic references to changes to treatment and discharge planning, but it was not consistent.  Additionally, given the numerous transfers of individuals in care without updates to the IRPs by the receiving units, it is difficult to ascertain what interventions are actually being provided on the new unit.

Recognizing the need to modify treatment service delivery in the near term, the Hospital continues to plan a limited telehealth program on each unit to allow for remote group therapy. This program has been delayed for several reasons; initially there were delays in obtaining agreement for the program due to funding issues, which have now been resolved.  The latest delays were caused because of the failure to deliver needed equipment; *Amicus* was informed the equipment was shipped to another jurisdiction.  As planned, treatment will be provided via one large touchscreen monitor with cameras on audio/visual carts.  The telehealth program will allow for clinical groups, including some led by off unit TLC and Rehabilitation Services staff, to be held on the unit but with the group leader working remotely.  As currently planned however, each unit will get only one cart to render the device mobile and secure, which will significantly limit the number of groups that can be held.[30]  While this would be an expansion of treatment services as compared to what is available now, this would not be equivalent to the pre-COVID treatment program.

Saint Elizabeths' main modality of treatment delivery is through groups sessions ("groups").  Given the social distancing requirements dictated for safety during the COVID-19 outbreak it is clear that during this time fewer people can be in any group at a given time.

---

[30]  To be ready for this, managers have measured the public areas on the unit and have identified two areas in which space will allow for small groups on the unit; one will accommodate groups with up eight members and one up to 10 members.

Groups may need to be of shorter duration and with greater frequency (e.g. three 45-minute groups per week as opposed to two-hour groups per week).  Given that groups will be conducted using technology, staff and individuals in care will require training to use and engage appropriately.  To ensure this plan is implemented, there must be enough staff to ensure that the technology is working and used in a safe manner.

**Mental Health Services Related Recommendations**:

Group therapy is an important and proven treatment modality that provides numerous benefits for participants.  It helps an individual in care realize that there are other people who have similar issues and is useful in the development of interpersonal skills.  In addition, the members of the group who have similar concerns can support each other and may offer support to address a particular problem that an Individual can use to respond effectively to their own situation.  It also provides a degree of socialization for individuals.  It is for these reasons that treatment at Saint Elizabeths has been heavily focused on group therapies.  Unfortunately, group therapies have all but been eliminated during the current COVID-19 outbreak.

Recommendation # 5:  The Hospital should develop - and have the capacity to implement immediately - alternative methods of providing group treatments as conditions change in the short-, medium- and long-term that allow for reduction or tightening of social distancing.  The Hospital's current plan for telehealth is one such approach, which should be implemented as quickly as possible, but is insufficient to address the potential long-term implications of COVID-19 response.  The implementation of any staffing plan should be consistent with the Infection Control principles as outlined by the *amici.*

Recommendation # 6:  The Hospital should expand on unit treatment via telehealth by purchasing the IT equipment for individuals, units and clinicians as recommended in the technology-related section below.

Recommendation # 7:  While the Hospital shifts to telehealth treatment modalities for the immediate future, clinical leadership should develop a step-by-step plan to return to the TLCs, including what equipment and staff resources are needed, and how the units will continue to utilize telehealth options in the meantime or as circumstance warrant.

Recommendation # 8:  DBH should restore all vacant positions available to the Hospital on February 1, 2020 and these should be prioritized for recruitment and hiring.   The Hospital should evaluate its staffing to determine if it has sufficient staffing to provide adequate number of hours and types of treatment given that more groups may be required to implement social distancing.

Recommendation # 9:  The Hospital should implement the "SEH Telehealth Plan" so that Rehabilitation Services and Treatment Services staff can provide clinical care on the units as soon as units are COVID-free, or otherwise determined to satisfy Infection Control requirements, and continuing until such time as regular TLC and treatment venues can safely open.

Recommendation # 10: The Hospital needs to reduce the high number of inter-unit transfers as soon as possible and reconsider the requirement that the home treatment team follow the individual in care who has been transferred.

**19.  What technological assistance, such as computer and/or iPad or tablet is available to patients for teletherapy and other mental health treatment and how frequently can patients access it?**

There has been access to technology provided to individuals in care, although it remains very limited.  Each unit has access to a video conference monitor with camera which connects through the District's video conference platform to off-unit treatment team members for IRP

meetings, court hearings and sometimes family or lawyer calls.  On some units, individuals are not able to use the device because it is not easily portable and is set up in a non-COVID (clean) area of the unit.  Individuals in care on some units are able to use these for individual therapy with his or her therapist; almost 30 percent (13) of individuals in care with individual therapists are using technology to continue their treatment.  However, the equipment is not always readily available to the individuals in care, as it is located in a room behind a locked door, so individuals in care are required to engage unit staff to obtain the device.  As noted above, the planned teletherapy plan has not yet been implemented. Currently, individuals in care are not permitted to use personal phones or electronic devices such as iPad or tablets on the unit.

**Technology Assistance Related Recommendations:**

Individuals in care are fairly isolated at this time, and this is in part due to the limited access individuals in care have to technology.  Interviews with individuals in care revealed little social interaction and much time spent watching TV and napping.

Recommendation # 11:  The Hospital should immediately procure iPads or similar devices for each individual in care at St. Elizabeths.  The device should be capable of video conferencing for individual and group treatment, accessing group resources, and communicating with family and lawyers.  Training for staff and individuals in care on the use of the device should be provided.

Recommendation # 12:  The Hospital should immediately procure laptops or similar devices for each clinician who treats individuals in care.  The device must be capable of video conferencing for any clinical activity the clinicians provide, including remote access to the electronic health record and other Hospital IT systems.  The devices must be camera- and Wi-Fi-ready.

Recommendation # 13:  The Hospital should immediately evaluate all treatment areas and residential areas for Wi-Fi capacity, so that the above technology can be utilized in all areas of the Hospital including rooms housing individuals in care.

Recommendation # 14:  The Hospital should immediately procure 12 additional video conferencing devices and suitable AV carts so that two different group activities can occur on each unit simultaneously.  This will allow for a greater number of individuals in care to participate in group therapies or other activities.

**20.  What opportunities to meaningfully engage individuals in isolation or quarantine is the Hospital providing, including socialization and recreation?**

There have been very limited opportunities available for socialization and recreation. All weekend and evening activities have been cancelled as of March 16, 2020, and the closure of the TLCs has further limited these opportunities.  Units have scheduled time for the recreation yard, but not all are using the time and there is no mingling of units.  First floor units have access to their courtyards, and individuals reported using these courtyards as weather conditions permit.  Two second floor units have access to a small courtyard, but using it requires individuals to use off-unit hallways and the movement to the yard is quite staff-intensive.

Isolation and feeling locked down was a common complaint expressed by the majority of the individuals who were interviewed.  While most individuals in care could state their understanding of the reasons for social-distancing, they described the long isolation periods as daunting or with resignation.  When asked if they would like to have access to their family, lawyer, and other natural community supports, the answer was universally affirmative.

**Socialization and Recreation Related Recommendations**:

Currently, each unit has scheduled access to the recreation yard (one unit at a time) and those units on the first floor also have access to the courtyards off each first-floor unit. Recreational and socialization opportunities are extremely limited.

Recommendation # 15: The Hospital should consider other alternatives for increased socialization such as use of video conferencing for individuals in care across units or virtual parties so that individuals can connect with their peers for other units.

Recommendation # 16:  The Hospital should expand visitation opportunities beyond the current, limited hours, and to other areas within the facility, including outside areas such as non-unit courtyards or the recreation yard by still practicing and adhering to social distancing protocols.

### 21. Has COVID-19 affected the Hospital's response to patient incident reports, including the time within which the Hospital responds?

Overall, unusual incidents are below where they were earlier in the year other than those involving  medical emergencies.  This likely reflects the significantly lower census, but the overall reduction is impressive.  Indeed, data below shows a marked decrease in unusual incidents beginning in March 2020, when the census began to decline.

A review of incidents involving physical assaults, aggressive behavior and psychiatric emergencies likewise shows a significant decline.  From January 2020 through April 2020, the rate of incidents in these categories declined by 32 percent.  Specifically, in January 2020 the rate of unusual incidents per 1000 individual in care days in these categories was 10.28 which dropped to 6.37 in April 2020.[31]  See chart below.

---

[31] Notably, a recent serious assault resulted in the hospitalization of a staff member.

Physical Assaults, Aggressive Behavior, and Psychiatric Emergencies Documented on Saint Elizabeths Campus, by Month and Location
January 1, 2020 - April 30, 2020

Category   (Multiple Items)

| Month | | 1A | 1B | 1C | 1D | 1E | 1F | 1G | 2A | 2B | 2C | 2D | Admission Suite | SEH - Other | TLC- Intensive | TLC- Transitional | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | | 1 | 1 | 9 | 18 | | 25 | | 1 | 6 | 1 | 21 | 1 | 1 | | | 85 |
| Feb | 3 | | | 16 | 21 | 3 | 11 | 2 | 1 | 4 | 3 | 11 | | 1 | 1 | 2 | 79 |
| Mar | | 1 | | 7 | 37 | 5 | 8 | 1 | 1 | 6 | 2 | 9 | | | | | 77 |
| Apr | | | | 6 | 13 | 4 | 5 | 6 | 1 | 1 | 2 | 6 | | | | | 44 |
| **Total** | **3** | **2** | **1** | **38** | **89** | **12** | **49** | **9** | **4** | **17** | **8** | **47** | **1** | **2** | **1** | **2** | **285** |

| | | Rate Per 1,000 Patient Days | Change in Rate |
|---|---|---|---|
| January | 85 | 10.28 | |
| February | 79 | 9.85 | -4.2% |
| March | 77 | 9.34 | -5.2% |
| April | 44 | 6.37 | -32% |

In contrast, and not surprisingly, the rate of unusual incidents involving medical emergencies *increased* 132 percent between January 2020 and April 2020, from 1.57 incidents of medical emergencies per 1000 individual-in-care-days in January, to 5.07 incidents of medical emergencies in April 2020.  The rate increased began in February 2020 and has continued to rise since then.  See chart below.

23

Medical Emergencies Documented on Saint Elizabeths Campus, by Month and Location
January 1, 2020 - April 30, 2020

Category   (Multiple Items)

| Month | 1A | 1B | 1C | 1D | 1F | 2A | 2B | 2C | 2D | 2TR | SEH - Other | TLC- Transitional | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | 5 | | | 1 | | 1 | 2 | | 3 | | | 1 | 13 |
| Feb | 1 | 5 | 1 | 1 | | 2 | 2 | | | | | 4 | 16 |
| Mar | 5 | 1 | 1 | 2 | | 4 | | 2 | 2 | | | 1 | 18 |
| Apr | 5 | 17 | 1 | 1 | 2 | 4 | 1 | | 1 | 1 | 1 | 1 | 35 |
| Total | 16 | 23 | 3 | 5 | 2 | 11 | 5 | 2 | 6 | 1 | 1 | 7 | 82 |

| | | Rate Per 1,000 Patient Days | Change in Rate |
|---|---|---|---|
| January | 13 | 1.57 | |
| February | 16 | 1.99 | 26.9% |
| March | 18 | 2.18 | 9.5% |
| April | 35 | 5.07 | 132% |

There is no evidence that unusual incidents are not being reported or that there are unusual delays in reporting.   The Hospital's Incident Investigations Manager or one of his investigators continue to conduct investigations into incidents, although interviews are now by phone rather than in person.  Investigators have laptops and remote access to the electronic health record and the video cameras within the facility.  Investigation reports are proceeding in the usual course.  In fact, it appears that the overall decrease in unusual incidents overall, especially in key categories reflective of violence, has positively impacted the reporting and investigations into unusual incidents in accordance with Hospital policy.

**22. How many patients have been restrained or secluded on a daily basis since March 11, 2020?  How does that compare to the Hospital's pre-COVID-19 average use of restraint and seclusion, taking into account the reduced patient census?  Who is reviewing the use of seclusion, restraint and the consideration of less restrictive measures?**

Incidents of seclusion and restraint are down significantly since January 2020 as is the number of unique individuals restrained or secluded.  As Table 1 below shows, the rate of seclusion or restraint has declined since January 2020 and as Table 2 shows, the number of unique individuals restrained or secluded likewise has declined.

| Table 1: SECLUSION OR RESTRAINT EPISODES PER 1000 PATIENT DAYS | |
|---|---|
| January 2020 | 8 episodes |
| February 2020 | 7 episodes |
| March 2020 | 6 episodes |
| April 2020 | 4 episodes |

| Table 2: UNIQUE INDIVIDUALS RESTRAINED OR SECLUDED, BY MONTH JANUARY 2020 TO APRIL 2020 | |
|---|---|
| January 2020 | 20 individuals |
| February 2020 | 25 individuals |
| March 2020 | 14 individuals |
| April 2020 | 14 individuals |

Staff interviewed indicated that the lower overall census, especially the decrease in the number of pretrial individuals in care, the more limited opportunities for individuals to interact, the enforcement of social distancing, and the presence of treatment team clinicians on the unit has contributed to fewer incidents of restraint or seclusion.

As of the writing of this report it remains unclear who is reviewing incidents of restraint or seclusion and the Medical Director confirmed that he is not reviewing incidents. *Amicus* was advised that Treatment team debriefing after restraint and seclusion incidents have occurred but *Amicus* has been unable to verify this at this time.

Additionally, it should be noted that a long-term seclusion suite on 1D was found to be in use during *Amicus*' visit. The door was locked from the outside but opened from the inside without a key. Two Behavioral Health Techs (BHTs) were in the suite with the two individuals in care. We were provided with an email from DC Health authorizing the use of the suite for purposes of medical isolation for one individual in care during the current outbreak, but it does not appear from that document that DC Health authorized use for more than one particular individual in care. The Hospital needs to clarify with DC Health if it intends to use this area

beyond the limited scope of permission provided to date.  In addition, the Hospital is only now developing a Medical Isolation suite policy and Nursing Procedure.

**Use of Restraint and Seclusion Related Recommendations:**

Recommendation # 17:  The Medical Director, Chief Clinical Officer and Chief Nurse should immediately begin to review all incidents of restraint and seclusion to ensure they are being used appropriately and in compliance with the policy.

Recommendation # 18:  The Hospital should develop a Medical Isolation suite policy and nursing procedure that ensures that it is used safely, rarely, and strictly for declared medical isolation purposes.  It should require levels of observation consistent with the use of seclusion and restraint, within the recently revised CMS guidelines.

### 23. What access do Individuals In Care have to the use of the telephone and is their privacy respected?

At this time, all individuals in care on a unit share a phone located in the dayroom close to the nursing station, so there is limited privacy.  This has not changed since the COVID-19 outbreak. However, if the individual in care needs to talk with his or her lawyer, staff may facilitate use of the video conferencing equipment or use a treatment team member's desk or cellphone, so the individual has privacy.  This is a very labor-intensive request, given treatment team members responsibilities, the need to ensure safe infection control practices for the equipment and the non-patient care space, and requires staff involvement in arranging lawyer calls which would otherwise be at the discretion of the individual in care.

**Phone Availability Related Recommendation:**

Recommendation # 19: The Hospital should procure personal phones for individuals in care to use for family and lawyer contacts or permit individuals to procure their own and allow them to use them.


## VI.  CONCLUSION

The current COVID outbreak at the Hospital has changed the lives of every individual in care at the Hospital.  Connections to staff and other individuals have been broken, they have lost peers to the virus and they must manage their anxiety without the benefit of many therapies upon which they were dependent.  The effect on these individuals will likely be long lasting and the Hospital must be ready to address the effect for the long term.

Staff at Saint Elizabeths have responded in remarkable ways to this pandemic.  They come to work despite the risks, and those who are not directly treating Individuals In Care are eager to do so.  Staff are interacting with individuals in care in caring and creative ways and making exceptional effort to meet the challenges posed by the COVID-19 outbreak. It is important that their voices be heard as the Hospital moves forward.


Respectfully,


_____

Patrick J. Canavan, PsyD
*Amicus Curiae*

Mental Services Report
May 11, 2020