# Civil Action No. 19-3185 (RDM)

## *Amici curiae* : Assessment of COVID-19 Prevention and Management

## Saint Elizabeths Hospital (SEH)

# Introduction

On May 1, 2020, *amici* Ronald Waldman, MD, MPH and Joan Hebden, MS, RN were appointed to provide the court with an assessment of the SEH COVID-19 risk assessment and the strategies deployed to mitigate viral transmission among the patients and staff. In the wake of the order, *amici* collected information and analyzed data obtained through the facility's general counsel and conducted interviews with executive and managerial staff with responsibility for the health and safety of SEH patients and staff. On May 7, 2020, *amici* participated in a teleconference with the Court and the parties and provided a preliminary summary of findings, which are explained in greater detail below. At the conclusion of the teleconference, the Court directed *amici* to include in this report recommendations regarding issues that *amici* have identified.

This report describes the methodology *amici* relied upon to conduct their assessment, and *amici's* findings and recommendations related to the questions delineated in the May 1, 2020 order. Throughout this one-week investigation, the defendants have fully cooperated and actively facilitated *amici's* work, have made themselves available on short notice on every day of the week, and after traditional office hours. The requested information was produced on abbreviated timelines. *Amici* acknowledge and appreciate the efforts the defendants have made to cooperate with and expedite their review.

The assessment of the COVID-19 prevention and management plan focused on the questions delineated in the May 1, 2020 order which addressed how the facility currently is 1) minimizing the chance of exposure to SARS-CoV-2 (the virus that causes COVID-19 infection) among patients and staff, 2) cohortation of infected, quarantined and no known exposure patients, 3) adherence to recommended infection control precautions, including hand hygiene and use of personal protective equipment (PPE), 4) managing and monitoring of healthcare personnel (HCP), 5) training and education of HCP and patients, and 6) environmental hygiene. In addition, *amici* assessed communication and collaborative partnering by the facility with the District of Columbia (DC) Department of Behavioral Health (DBH) and Department of Health (DOH). An on-site assessment was performed by Joan Hebden on May 5, 2020 with the use of video cameras to visualize HCP and patient movement, use of PPE, and environmental cleanliness on a COVID unit and a quarantine unit.

As of the date of the filing of this report on May 11, 2020, SEH continues to experience ongoing transmission of SARS-CoV-2. As recently as May 9, 2020, real-time polymerase chain reaction (RT-PCR) tests from six inpatients not housed on COVID units and one staff member were reported to be positive for viral RNA.

Knowledge concerning the epidemiology of SARS-CoV-2 transmission dynamics in long-term care facilities is rapidly evolving and official guidelines issued by the US Centers for Disease Control and Prevention (CDC) have been regularly updated and will undoubtedly continue to be. The recommendations in this report are based on the current situation and are likely to need revision within weeks of their issuance. The recommendations do not take into account the current availability of supplies and equipment, reagents, nasopharyngeal swabs, staffing required to implement them or budgetary considerations.

## Methodology

Following the issuance of the May 1, 2020 order, *amici* composed a list of SEH personnel with executive oversight, operational and/or administrative responsibility for the IPC program and requested telephone interviews. The contact information of representatives from the Centers for Disease Control (CDC) and DC Department of Health (DCDOH) Division of Epidemiology who conducted a survey of SEH on April 17, 2020 was requested in order to obtain a written report of findings and recommendations. There was no response received from the CDC survey leader and *amici* was informed by the DCDOH epidemiologist that a written report of that survey was not made available and verified that an official outbreak investigation was not being conducted by DCDOH, although consultation was being provided.

Telephone interviews were conducted with the following SEH executive, administrative and/or operational staff: 1) Chief Nursing Executive (CNE) who has a strategic role and performs census management in collaboration with the Chief Clinical Officer and is the direct report for the Infection Control Coordinator, 2) Director of Medical Affairs who provides physician oversight for the IPC program, 3) Physician and supervisory nurse practitioner responsible for the Occupational Health program, 4)Assistant Director of Nursing (ADON) who is responsible for supervision of the

nurse managers, nurse staffing and nursing education, 5) Director of Hospital Operations who is responsible for supply and equipment procurement and the environmental services staff, 6) Infection Control Coordinator who has direct responsibility for ensuring deployment of the COVID-19 risk assessment/preparedness plan and reporting to public health authorities, 7) DBH Performance Improvement and Compliance officer who serves as the SEH Risk Manager and collates testing data on HCP who have been identified to be infected or exposed to COVID-19 and the return to work status of these HCP, and 8) a nurse manager and behavioral health technician from both a COVID unit and a non-COVID unit. These individuals provided information that is reflected in this report.

An announced on-site visit was conducted by Ms. Hebden on May 5, 2020, which included an introductory meeting with the Chief Executive Officer, Director of Medical Affairs, CNE, ADON, Infection Control Coordinator, and the DBH General Counsel. A review of the unit census and status as of midnight of May 4, 2020 was conducted. *Amici* was informed that the DC Forensic Lab was on-site conducting SARS-CoV-2 testing on several patient units. Remote observation of patient and staff movement, use of PPE, and disinfection of equipment and surfaces on a COVID unit and a quarantine unit was performed using video cameras that are strategically placed on the units. *Amici* was escorted to a COVID unit by the CEO and ADON to observe unit entry, signage and PPE availability in the foyer, which is a non-patient area for HCP's to don and doff PPE and perform hand hygiene. *Amici* did not enter the patient unit but was able to observe HCP's in PPE and the physical distancing and wearing of masks by patients. *Amici* was also escorted to the Therapeutic Learning Center (TLC) which consists of classrooms with hallway bathrooms and has been approved by CMS and DCDOH for use as a patient area. There were no patients on the side of the TLC observed by the *amici* although there were three patients under investigation who were court-ordered pre-trial admissions on the other side.

## Background

Saint Elizabeths Hospital is the District of Columbia's public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. Saint Elizabeths also provides mental health evaluations and care to patients committed by the courts. The hospital can support a census of 296 patients and has a workforce of 786 staff members. Patient admissions occur through civil commitment (voluntary or involuntary), forensic (court ordered criminal competency evaluation), and criminal court determination of not guilty by reason of insanity (NGI). The type of admission status, patient age, patient sex and psychiatric diagnosis are factors which are considered when determining patient placement in the facility. Since April, 2020, an additional factor for patient placement has been infection with or exposure to COVID-19. *Amici* were informed that the first case of COVID-19 at SEH was identified on March 20, 2020 but obtaining the SARS-CoV-2 test and the results was delayed until April 1, 2020.

SEH has made a remarkable effort to cohort patients who have known infection with COVID-19, placement of patients who have been exposed to a patient(s) or HCP(s) with a positive test into quarantine, segregation of patients under investigation (PUI) that are identified through twice daily monitoring to have a potential symptom of COVID-19 and segregation of pre-trial, court mandated patient admissions.  Due to delays in determining the viral status of all patients and HCPs, along with the unavoidable mobility of HCP into the community, maintaining the integrity of these units has proven to be challenging.

As of May 11, 2020, the census at SEH is 199 patients with 14 locations being utilized.  Based on available data, there are 57 COVID-19 asymptomatically infected patients representing a 29% infectivity rate.  These patients are on the following COVID units:

- 1A – 23 patients
- 1B – 18 patients
- 2TR – 11 patients: NOTE: This unit was opened August 2019 and has 7 single bedrooms with individual bathrooms and was originally designated for patients with medical conditions transitioning back from acute care.  SEH received a waiver from CMS to increase census to 14 patients (double room occupancy) due to the COVID-19 situation.
- TLC – 5 patients: NOTE: Although there are available beds on 1A and 1B, these patients were not deemed suitable for placement on those units.

On May 4-5, 2020, patient testing was conducted on 7 Quarantine units (1C, 1D, 1E, 1F, 1G, 2C, 2D) that had a defined ending date to their quarantine period based on the time of the last exposure of the last patient admitted to the unit.  Of the 87 patients that agreed to testing, 6 new positive patients were identified on two different units, 13 tests are pending and 21 patients refused. Unit 1D had 2 of the new positive patients with a quarantine period that ended April 29, 2020 representing new transmission without a defined exposure. Unit 1G had 4 of the new positive patients, representing 25% of the census, with a quarantine period that was to end on May 18, 2020.  It has also been identified that a behavioral health technician who worked on 1G on May 4, 2020 has tested positive and is symptomatic. It appears likely that there will be additional cases on this unit with the recommended testing of patients and HCP's detailed in Appendix A. The majority of patient refusals appear to be on Units 2C and 2D which house long-term patients.

Units 2A and 2B, which currently house 36 patients, represent potential units for non-COVID status and clearance for new admissions pending repeat testing as recommended in Appendix A.

Unit 1D Safety Suite is being used to house patients that are pre-trial SARS-CoV-2 negative admissions that require a 14-day quarantine period. This area has two rooms with a door separating them from the rest of the 1D unit.

A section of the TLC is being used for inpatients that develop COVID-19 symptoms identified during the twice daily temperature and symptom screening being performed and there is a test-based strategy used for clearance of these patients – see Appendix A Section 2.

SEH is a congregate healthcare setting and it is not surprising that the introduction of SARS-CoV-2 into the facility resulted in viral transmission among patients and HCPs. Community prevalence and the limited access to testing were and remain contributing factors. As evidenced by the findings set out below, the COVID-19 pandemic has presented formidable challenges for the facility and has had a significant impact on operations.

## Findings and Recommendations

| Topic | Observation | Recommendations |
|---|---|---|
| **Minimizing exposure – reducing facility risk** | <ul><li>Suspended visitation on March 16</li><li>Appropriate signage on designated entry door</li><li>Temperature screening and symptom checklist must be completed prior to building entry</li><li>Aggressive source control measure in place with universal masking requirement – initiated April 15; facemask offered by screening personnel</li><li>Hand hygiene station with alcohol-based sanitizer, tissues and gloves at entry door</li></ul> | <ul><li>If there are anticipated shortages of facemasks, facemasks should be prioritized for HCPs and visitors offered cloth masks.</li></ul> |

| | | |
|---|---|---|
| **Implementation of Transmission-Based Precautions – COVID units and PUI unit** | • HCPs wearing N95 respirators (fit-testing conducted by outside vendor) at all times when on the unit and adding a face shield, gown and gloves for direct contact with patients. Powered air-purifying respirators (PAPRs) and hoods are available for HCPs who could not be fit-tested or prefer this device.<br>• Signage regarding the proper donning and doffing of PPE posted in the foyer of the units and HCPs were trained by the Infection Control Coordinator and the ADON. Audit data for April and May 2020 provided to *amici* indicated that the use of PPE is 100%.<br>• Gowns and gloves are being changed between patients on the PUI unit. | • Include face shield as universal PPE as the shield will prevent contamination of the N95 AND prevents the touching of eyes by the HCPs<br>• **COMMENT**: N95 respirators and PAPR's are in short supply for acute care facilities where patients with moderate to severe illness with COVID-19 are being treated. CDC recommends that this type of PPE be reserved for HCPs performing aerosol-generating procedures.  As these procedures are not performed at SEH, in the event that *amici* recommended reuse of N95s cannot be adhered to, facemasks should be worn. |
| **Implementation of Standard Precautions on quarantine units** | • HCP are wearing masks at all times on the units and adding a face shield and gloves for direct contact with patients. | • Include face shield as universal PPE as the shield will prevent contamination of the N95 AND prevents the touching of eyes by the HCPs |
| **Hand Hygiene** | • Observed HCP on COVID unit removing gloves between performing vital signs on several patients without using alcohol sanitizer<br>• Hand hygiene audit data provided to *amici* revealed compliance to be <80%<br>• Observed **non-alcohol** sanitizer on the table where temperature screening is | • *Amici* made an immediate request for removal of all non-alcohol sanitizer from the building entry and patient units to the CEO, Director of Operations and ADON on May 5, 2020 and received confirmation that this was performed.<br>• **COMMENT:** SEH has historically used **non-alcohol** sanitizing product for patients and around patients due to the risk that |

| | | |
|---|---|---|
| | performed at building entry and use by both a HCP and patient on the COVID unit<br>• Adequate soap supplies observed | alcohol products might be ingested. As a result, the procurement of alcohol-based sanitizer in larger quantities has been difficult. Example: Obtaining small individual bottles of sanitizer for HCPs to carry with them has not been possible. Recommend that obtaining these smaller bottles be prioritized.<br>• Increase the visibility of signage regarding the proper application of alcohol sanitizer and soap and water hand hygiene technique on each unit and at unit entry.<br>• Increase the monitoring of hand hygiene practice to a minimum of 30 observations per week per unit.<br>• Recommend use of an observation tool dedicated to hand hygiene which delineates the activities that require it be performed e.g. before donning PPE, after glove removal |
| **Re-use of PPE – face shields, gowns, N95s, PAPR hoods** | • Face shields are being re-used and disinfected after each removal with a product that is on the EPA list of products with an emerging viral claim. Replaced only if damaged.<br>• Reuse of supplied surgical gowns  - HCPs being provided with a packet of several gowns, spraying the gown with alcohol, allowing to dry and folding up into a large paper bag with their name along with their face shield. Discarded if soiled or damaged.<br>• Reuse of N95s – HCP provided with a fit-tested N95 which is placed in a small paper bag with their name.  Discarded if soiled or damaged and replaced. | • Obtain face shields with more coverage of the face – to chin.<br>• *Amici* could not find any literature supporting the spraying of surgical gowns with alcohol and reuse. Recommendation made to discontinue this practice and assign one gown per work shift to HCPs was complied with by the leadership.<br>• **COMMENT:** SEH attempted to increase the supply of cloth gowns which could be laundered from their linen vendor and were unsuccessful.  The supply of surgical gowns – which are not required in this setting and are in short supply in acute care settings – came from the DC stockpile. |

| | | |
|---|---|---|
| | | • *Amici* recommends the procurement of cloth gowns or an alternative to cloth gowns, such as long-sleeved lab coats, be prioritized.<br>• *Amici* recommends that the CDC guidance for reuse of N95s be adopted – https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/decontamination-reuse-respirators.html |
| **Patient adherence to Standard Precautions and physical distancing** | • Observations of both a COVID and quarantine unit revealed patients sitting in common areas with a 6-feet distance and wearing masks; patients can wear either a cloth mask or facemask<br>• One patient in a wheelchair on the geriatric unit was without a mask in the hallway; *amici* informed that the HCPs are continually reminding this patient<br>• SEH has posted social distancing signage and placed "Do Not Sit Here" on couches in common areas to remind patients to sit apart | • Continue to educate patients about why they are wearing masks – COVID and for my safety. |
| **HCP assignments** | • Staffing has been challenging due to absenteeism (some related to COVID infection confirmed by positive testing at DC testing sites)<br>• Nursing staff are not being moved to another unit within the same shift unless testing results on their assigned patients require movement to another unit<br>• There are staff that work overtime and may be assigned to a different unit for the overtime shift | • Recommend that contractual nursing and environmental services staff be assigned to one unit consistently, if possible |
| **Environmental hygiene** | • *Amici* observed cleanliness of the units and bathrooms when on-site | • Recommend that as part of the environmental rounds conducted by the |

|  |  |  |
|---|---|---|
|  | <ul><li>*Amici* was provided with a list of all disinfectants used in the facility and verified that the products were on the EPA approved list and it was confirmed that adequate cleaning supplies are available</li><li>Cleaning frequency has been increased: every bathroom is cleaned twice per day, shower rooms daily and as needed</li><li>High-touch surfaces in hallways, e.g. handrails, telephones, chair and couches are being disinfected hourly</li><li>Contractual staff have been obtained and trained on cleaning protocols</li></ul> | Infection Control Coordinator and environmental services supervisors that knowledge of disinfectant contact times be assessed. |
| **Reduction of patient census** | <ul><li>SEH is currently has reduced census by 33%</li></ul> | <ul><li>Continue reduction of patient census – see APPENDIX A Section 1</li></ul> |
| **Patient cohorting guidance** |  | <ul><li>See APPENDIX A Section 2</li></ul> |
| **Traffic** |  | <ul><li>See Appendix Section 3</li></ul> |
| **Testing** |  | <ul><li>See Appendix Section 4</li></ul> |

## Specific Directives to the Court

1) The Court should order the immediate implementation of a point prevalence survey (PPS) of all patients and all staff who have access to the St. Elizabeths Hospital patient units.  Testing can be conducted over a period of days and performed using any FDA-approved real-time polymerase chain reaction testing platform for detection of SARS-CoV-2.  Any patient with a positive test result should be transferred to COVID+ units within the hospital. Any staff with a positive test should be excluded from the facility until "return to work" criteria are fulfilled. <u>In addition, the Court should order repeat testing of all patients and staff who have negative test results no later than one week after the initial test.</u>

2) The Court should order the DC Government to assign a dedicated individual with appropriate epidemiological skills to oversee and be responsible for the collation and analysis of all testing data, and all data pertaining to infection prevention and control policies and procedures.  This individual would work with on-site personnel already responsible for these functions and would, based on the data, advise SEH administrators regarding any indicated changes in policy and other appropriate courses of action.

3) The Court should order the DC Department of Behavioral Health, responsible parties at St. Elizabeths Hospital, and all other relevant authorities to implement the elements of infection prevention and control, census reduction, cohorting, traffic control, and testing stipulated in the above report.

# Appendix A – Sections 1-5

# References:

https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html

National Fit Testing Services
www.nationalfittestservices.com

https://www.cdc.gov/coronavirus/2019-ncov/hcp/hand-hygiene.html

https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2

https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/decontamination-reuse-respirators.html

https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-risk-assesment-hcp.html

Respectfully submitted,

*Amicus Curiae*

Ronald J. Waldman MD, MPH

Department of Global Health

Milken Institute School of Public Health

The George Washington University

ronwaldman@gwu.edu

202-374-2364

Joan Hebden MS, RN, CIC, FAPIC

President – IPC Consulting Group LLC, Baltimore, Maryland

Research Coordinator – University of Maryland School of Medicine, Division of Epidemiology and Public Health

Jhebden1302@comcast.net

410-804-8620

May 11, 2020