**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ENZO COSTA, *et al.*,

     *Plaintiffs*,

v.

DISTRICT OF COLUMBIA, *et al.*,

     *Defendants*.

No. 1:19-cv-3185 (RDM)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS..............................................................................................2

     1.    Saint Elizabeths Hospital and Its Patients .............................................2

     2.    The 2020 COVID-19 Pandemic and Its Threat to Saint Elizabeths ......................2

     3.    Conditions at Saint Elizabeths Hospital Before and After the TRO......................4

          a.  Medical Isolation and Quarantine Procedures....................................................4

          b.  Screening and Testing..................................................................................5

          c.  Distribution of Masks .................................................................................6

          d.  Psychiatric Treatment during the Outbreak ....................................................7

ARGUMENT.................................................................................................................8

     1.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims ..........................10

          a.  The Defendants Have Substantially Departed from Accepted Professional Judgments in Their Efforts to Control and Prevent COVID-19 Infections......12

          b.  The Defendants Have Substantially Departed from Accepted Professional Judgment in Their Provision of Mental Health Care ......................................25

     2.    Plaintiffs Will Suffer Irreparable Harm Unless Defendants Are Enjoined from Following a Policy that Will Allow them to be Housed in Unconstitutional Conditions in the Future....................................................................................33

     3.    Enjoining Defendants from Failing to House and Treat Involuntarily Committed Persons in Constitutionally Adequate Conditions Will Not Substantially Injure Defendants or Others............................................................................................35

     4.    A Preliminary Injunction  Will Serve the Public Interest. ..................................36

REQUESTED REMEDY ..............................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) .......................................................................................9

*Banks v. Booth*,
    No. CV 20-849(CKK), 2020 WL 1914896 (D.D.C. Apr. 19, 2020) ...................................10

*Brown v. District of Columbia*,
    928 F.3d 1070 (D.C. Cir. 2019) ................................................................................. 31, 32

*Brown v. Plata*,
    563 U.S. 493 (2011) ............................................................................................. *passim*

*Chatman-Bey v. Thornburgh*,
    864 F.2d 804 (D.C. Cir. 1988) (en banc) ...........................................................................9

*Darnell v. Pineiro*,
    849 F.3d 17 (2d Cir. 2017) ...............................................................................................11

*Feliciano v. Gonzales*,
    13 F. Supp. 2d 151 (D.P.R. 1998) ....................................................................................23

*Gordon v. Holder*,
    632 F.3d 722 (D.C. Cir. 2011) ...........................................................................................8

*Gray Panthers Project Fund v. Thompson*,
    273 F. Supp. 2d 32 (D.D.C. 2002) ...................................................................................34

*Harvey v. District of Columbia*,
    798 F.3d 1042 (D.C. Cir. 2015) .......................................................................................10

**Helling v. McKinney*,
    509 U.S. 25 (1993) .............................................................................................. *passim*

*Hernandez v. County of Monterey*,
    110 F. Supp. 3d 929 (N.D. Cal. 2015) .............................................................................24

*Hudson v. Hardy*,
    424 F.2d 854 (D.C. Cir. 1970) ...........................................................................................9

*Hutto v. Finney*,
    437 U.S. 678 (1978) .................................................................................................. 9, 37

*Jackson v. Indiana,*
   406 U.S. 715 (1972) ...................................................................................28

*Joy v. Healthcare CMS,*
   534 F. Supp. 2d 482 (D. Del. 2008) ..........................................................24

*Kingsley v. Hendrickson,*
   135 S. Ct. 2466 (2015) ...............................................................................10

*Lamprecht v. F.C.C.,*
   958 F.2d 382 (D.C. Cir. 1992) ...................................................................36

*LaShawn A. v Dixon,*
   762 F. Supp. 959 (D.D.C. 1991) ................................................................11

*M.J. v. District of Columbia,*
   401 F. Supp. 3d 1 (D.D.C. 2019) ...............................................................31

*Mays v. Dart,*
   No. 20 C 2134, 2020 WL 1987007 (N.D. Ill. Apr. 27, 2020) .................34

*Milliken v. Bradley,*
   433 U.S. 267 (1977) ...................................................................................37

*Mills v. District of Columbia,*
   571 F.3d 1304 (D.C. Cir. 2009) .................................................................33

*O'Connor v. Donaldson,*
   422 U.S. 563 (1975) ...................................................................................30

*Olmstead v. LC by Zimring,*
   527 U.S. 581 (1999) ..............................................................................31, 32

*Shimon v. Dep't of Corr. Servs. for N.Y.,*
   No. 93-cv-3144 (DC), 1996 WL 15688 (S.D.N.Y. Jan. 17, 1996) .........24

*Steimel v. Wernert,*
   823 F.3d 902 (7th Cir. 2016) .....................................................................31

*U.S. Dep't of Justice v. Daniel Chapter One,*
   89 F. Supp. 3d 132 (D.D.C. 2015) ......................................................2, 9, 34

*United States v. Ore. State Med. Soc.,*
   343 U.S. 326 ...............................................................................................10

*United States v. W.T. Grant Co.,*
   345 U.S. 629 (1953) ............................................................................2, 9, 34

iii

**\*\*Youngberg v. Romeo,**
  457 U.S. 307 (1982) .................................................................................................. *passim*

## Constitutional Provisions & Statutes

Fifth Amendment .................................................................................................... 10, 11

Eighth Amendment ..................................................................................................5, 4

42 U.S.C. § 1983 ........................................................................................................9

Americans with Disabilities Act .......................................................................... *passim*

28 CFR § 35.130(d) ..................................................................................................31

District Human Rights Act. D Code § 2-1402.21(a).................................................32

## Other Authorities

CTRS. DISEASE CONTROL & PREVENTION, *Cases in U.S.,* ...........................................2

CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019,*
  *Decontamination and Reuse of Filtering Facepiece Respirators* .....................................7, 22

CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Hand*
  *Hygiene Recommendations* ...................................................................................22

CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Interim*
  *Guidance on Management of Coronavirus Disease 2019 in Correctional and*
  *Detention Facilities* ..........................................................................................4, 16

CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Interim*
  *Infection Prevention and Control Recommendations for Patients with*
  *Suspected or Confirmed Coronavirus Disease 2019 in Health Care Settings* .......................16

CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Preparing*
  *for COVID-19: Long-Term Care Facilities, Nursing Homes* .....................................4, 16, 18

CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Testing for*
  *Coronavirus in Nursing Homes* ............................................................................5, 20

Dist. of Columbia Dep't of Human Human Servs., *Human Services Agency*
  *COVID-19 Case Data*......................................................................................3, 4, 13

U.S. Substance Abuse and Mental Health Services Administration, *Interim*
  *Considerations for State Mental Hospitals*.............................................................7, 18

Hao Yao, et al., *Patients with mental health disorders in the COVID-19 epidemic* .....................3

## **INTRODUCTION**

Patients at Saint Elizabeths remain at heightened and unnecessary risk from COVID-19. As the Court-appointed *amici* warned three days ago, "as of the date of the filing of this report on May 11, 2020, [the Hospital] continues to experience ongoing transmission of SARS-CoV-2." ECF 81 at 2.  *Amici* identified numerous areas in which Defendants, despite earnest efforts, failed to comply with professional standards of care, including the Centers for Disease Control and Prevention ("CDC") Guidelines.  This violates the Constitution.

*Amici* have also confirmed that there has been an extraordinary curtailment of mental health care at the facility—including a 98% drop in the amount of treatment provided. ECF 78 at 5, 15. *Amici* also report that the Hospital has failed to implement its plan for telehealth or other alternative treatment, and 90% of individual plans include treatments that the Hospital has suspended. *Id.* at 16-18.  This fails to comply with professional standards and violates the Constitution.

While Defendants have reduced the patient population, *amici* report that as of May 6, there are over 50 patients on the "ready for discharge" list.  ECF 78 at 8.  The continued detention of patients the Hospital has deemed "ready for discharge," where such patients face heightened risk of exposure to COVID-19, fails to comply with professional standards, and violates the Constitution and the Americans with Disabilities Act ("ADA").

This Court should convert the Temporary Restraining Order (ECF 83) into a Preliminary Injunction.  While the Hospital has modified certain practices in response to this lawsuit, these measures have not been enough.  Even if Defendants had fully complied with CDC Guidance— which they have not—or the terms of the TRO, the "court's power to grant injunctive relief survives discontinuance of the illegal conduct, and because the purpose is to prevent further violations, injunctive relief is appropriate when there is a cognizable danger of recurrent violation."

*U.S. Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016). It is for this reason that courts around the country have recognized that temporary orders protecting individuals in congregate settings from substandard conditions must be extended.

## STATEMENT OF FACTS

### 1.  Saint Elizabeths Hospital and Its Patients

Saint Elizabeths Hospital is the District's only public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. ECF 59 at 1-2; ECF 81 at 3.  It also provides mental health evaluations and care to patients committed by the courts.  ECF 81 at 3.  Prior to the COVID-19 crisis, Saint Elizabeths had an average patient population of 275, ECF 59 at 2, which has now been reduced to approximately 199.  ECF 81 at 4.  It has 786 staff.  ECF 81 at 3.

### 2.  The 2020 COVID-19 Pandemic and Its Threat to Saint Elizabeths

As the Court is well aware, the COVID-19 pandemic is a serious threat to public health. ECF 59 at 2, ECF 39-1 at 6-9.  The CDC estimates that as of May 13, 2020, there are 1,364,061 confirmed cases and 82,246 confirmed deaths in all 50 states and the District of Columbia.[1] COVID-19 is highly contagious.  Declaration of Dr. Marc Stern, M.D., M.P.H. ("Stern Decl.") (ECF 39-3) ¶ 8; Declaration of Dr. Johnathan L. Golob, M.D. ("Golob Decl.") (ECF 39-4) ¶ 13.

Medical and mental health professionals have consistently made clear that individuals with mental health disorders require priority attention in this kind of emergency.  Golob Decl. (ECF 39-

---

[1] CTRS. DISEASE CONTROL & PREVENTION, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. (last visited May 14, 2020).

4) ¶ 14.  Mental health disorders like those experienced by Plaintiffs can increase the risk of infections, including pneumonia, a leading cause of hospitalization and death among those infected with COVID-19.[2]  Congregate settings like Saint Elizabeths enable and facilitate the rapid spread of COVID-19 infection.  Stern Decl. (ECF 39-3) ¶ 13; Golob Decl. (ECF 39-4) ¶ 13.

When patients are housed in close quarters, the risks of spread are greatly, if not exponentially, increased.  Stern Decl. (ECF 39-3) ¶ 12; Golob Decl. (ECF 39-4) ¶ 14.  Because people — including staff and contractors — constantly cycle in and out of Saint Elizabeths and some new patients are being admitted (as required by orders of the D.C. Superior Court), there is an ever-present risk that new carriers will bring the virus into the facility.  5/7 Tr. 7, 24-25 (risk from new admissions), 11 & 24 (risk from staff); ECF 81-1 at 1-2 (new admissions), 5 (staff).

On April 1, 2020, one patient and five staff members at St. Elizabeths were confirmed to be COVID-19 positive.[3]  As of April 16, 2020, when the Plaintiffs filed their amended complaint seeking relief related to the COVID-19 outbreak at the Hospital, at least 33 patients, as well as at least 51 of the hospital's staff, had tested positive for COVID-19, and at least four patients had died after contracting COVID-19. *See* ECF 39-1 at 11 & n. 30-31.

After expedited proceedings, the Court found that the conditions at the Hospital violated Plaintiffs' due process rights and therefore issued a Temporary Restraining Order on April 25, 2020.  ECF 59 & 60.  The TRO required discrete changes to Defendants' practices regarding isolation and release from isolation, as well as reporting on compliance efforts. ECF 60.  The Court

---

[2] *See* Hao Yao, et al., *Patients with mental health disorders in the COVID-19 epidemic*, The Lancet, Vol. 7 Issue 4 at e21 (Apr. 1, 2020), https://www.thelancet.com/pdfs/journals/lanpsy/PIIS2215-0366(20)30090-0.pdf.

[3] Dist. of Columbia Dep't of Human Servs., *Human Services Agency COVID-19 Case Data*, https://coronavirus.dc.gov/page/human-services-agency-covid-19-case-data (last accessed May 14, 2020).

then appointed as *amici curiae* three experts to investigate and report to the Court about conditions at the Hospital. ECF 68. In response to the experts' reports (ECF 78, 81 & 81-1) and with the numbers of cases and of deaths among the patient population rising even after the TRO was entered, on May 11 the Court extended and expanded the TRO to require further testing and the reduction of staff movement among different treatment units. ECF 82 & 83.

As of May 13, 2020, at least 79 patients, as well as at least 84 staff, had tested positive for COVID-19.[4] An additional 56 patients were reported to be in quarantine due to exposure or symptoms consistent with COVID-19.[5]  At least 13 patients and one staff member have died after contracting COVID-19.[6]

### 3.    Conditions at Saint Elizabeths Hospital Before and After the TRO

#### a.    Medical Isolation and Quarantine Procedures

When there are COVID-19 cases in a congregate facility, the CDC recommends grouping ill residents with dedicated health care professionals, ECF 81-1 at 4-5, and medically isolating patients who may have been exposed.[7]  When Plaintiffs moved for a TRO, Saint Elizabeths had established only one unit with seven beds to quarantine COVID-19 patients.  Guzman Decl. (ECF 39-9) ¶ 3a.  While that motion was pending, it established a second COVID-19 positive unit, and a "Patients Under Investigation" unit.  Tu Decl. (ECF 42-5) ¶ 7.  As this Court found, however, Defendants' quarantining practices and their standard for determining when to release individuals

---

[4]  Dist. of Columbia Dep't of Human Servs., *Human Services Agency COVID-19 Case Data*, https://coronavirus.dc.gov/page/human-services-agency-covid-19-case-data (last accessed May 14, 2020).

[5] *Id.*

[6] *Id.*

[7] CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019 Nursing Homes & Long-Term Care Facilities*, ECF 55-1; CTRS. DISEASE CONTROL & PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), ECF 55-2.

from isolation did not satisfy CDC standards. ECF 59 at 13-16.  The resulting risk to Plaintiffs was "immediate and manifest." ECF 59 at 14.

The Hospital currently has four COVID positive units, seven additional quarantine units, a "Patients Under Investigation" unit, and two units for patients not suspected of having been exposed to COVID-19.  ECF 81-1 at 2-4.  As *amici* note, there is considerable evidence that Defendants are still not satisfying CDC standards and "maintaining the integrity [of the known infection, exposed, and symptomatic patients] has proven to be challenging."  ECF 81 at 4.  As Dr. Waldman summarized on May 7, the Hospital's efforts to quarantine and group individuals with similar status after the TRO had been executed "obviously imperfectly."  May 7 Tr. 8.  *See also* Ex. 1 (Decl. of Ieshaah Murphy ("Murphy Decl.") ¶ 4 (describing "Client A" using the communal bathrooms and watching TV and playing video games with other residents while awaiting COVID-19 test results, which turned out to be positive).

### b.    Screening and Testing

As discussed in the Court's May 11 order, the CDC guidance for nursing homes states that "the first step of a test-based prevention strategy should ideally be a point prevalence survey (PPS) of all residents and all HCP [health care professionals] in the facility."[8] *See* ECF 82 at 6-7.

When Plaintiffs moved for a TRO, patients were not being tested for COVID-19, even when they displayed characteristic symptoms of the virus, and Defendants reported having conducted only 31 tests.  Costa Decl. (ECF 39-6) ¶ 13; Dunbar Decl. (ECF 39-7) ¶ 8; Smith Decl. (ECF 39-8) ¶¶ 8, 11; Tu Decl. (ECF 42-5) ¶ 11; Murphy Decl, ¶ 4.

---

[8] CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Testing for Coronavirus in Nursing Homes*, ECF 55-1.

Since the TRO was entered, Defendants conducted 87 tests of patients quarantined on the seven quarantine units on May 4-5.  ECF 81 at 4.  Twenty-one patients on these units refused testing.  *Id.*  The Hospital has not been ensuring that staff are tested; rather that testing staff at the facility as part of the virus management strategy, the Defendants have referred staff who choose to be tested to external testing sites.  May 7 Tr. 21-22.  *Amici* report that only 100 of the 786 staff have been tested.  ECF 81-1 at 3, 6.

In extending and expanding the TRO on May 11, the Court found that Defendants' failure to test staff and failure to limit staff's movements among the treatment units contravened CDC guidance and failed the professional judgment standard. ECF 82 at 6-8.

### c.     Distribution of Masks

When there are cases in a facility, the CDC recommends that the facility should implement universal use of facemasks for health care professionals, encourage patients to remain in their rooms, and encourage patients to wear face masks and perform social distancing when they leave their rooms.[9]

As the Court recognized in granting the TRO, at the time Plaintiffs filed for the TRO, Defendants had not provided masks to all patients or instructed or required patients to wear masks in a manner consistent with public health guidelines. ECF 59 at 13-14.  *Amici* reported that Defendants implemented a "universal masking requirement" on April 15, ECF 81 at 5, and that most patients and all staff were observed as complying. ECF 81 at 6, 8.  *Amici* also noted, however, that the staff's reuse of masks was not in accordance with CDC guidance and presented a

---

[9] *Id.*

"contamination risk."  May 7 Tr. 30, 34.  The CDC guidance provides that when masks are reused there should be "a minimum of five days between each [mask] use."[10]

### d.    Psychiatric Treatment during the Outbreak

Guidance from the federal Substance Abuse and Mental Health Services Administration ("SAMHSA") provides that state psychiatric hospitals like Saint Elizabeths should take steps to address the psychological impact of quarantine and the disruptions the COVID-19 virus may cause, including preserving health care system functions and taking steps to provide alternatives to in-person and group therapy consistent with CDC guidelines on infection control and increased psychological screening with "utilization of clear clinical indications and, when applicable, validated psychiatric screening instruments."  Ex. 2 (SAMHSA COVID-19 Interim Considerations for State Psychiatric Hospitals at 3-4).[11]

Prior to the TRO, Plaintiffs reported there had been severe curtailment of mental health care, including closing the Treatment Mall, suspended group therapy, suspended anger management classes and suspension of most competency restoration classes.  Smith Decl. (ECF 39-8) ¶ 10; Costa Decl. (ECF 39-6) ¶ 9; Dunbar Decl. (ECF 39-7) ¶ 7.

---

[10] CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Decontamination and Reuse of Filtering Facepiece Respirators*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/decontamination-reuse-respirators.html.

[11] U.S. Substance Abuse and Mental Health Services Administration, *Interim Considerations for State Mental Hospitals*, https://www.samhsa.gov/sites/default/files/covid19-interim-considerations-for-state-psychiatric-hospitals.pdf. The SAMHSA guidelines recommend that facilities "preserve healthcare system functioning" and "be aware of the psychological impact of quarantine and major disruptions to everyday life…Patients at mental health facilities are vulnerable both to the infection itself, but also to worsening anxiety, mood, or psychosis during this time. Given the uncertainty and rapid change associated with the virus, anxiety and distress should be anticipated."

Regarding mental health care, Defendants have claimed "much . . . remains unchanged during the COVID-19 emergency," ECF 42 at 12, and "each patient unit has a shared computer" to enable teletherapy.  Gongtang Decl. (ECF 42-2) ¶ 12.

To the contrary, *amici* report that "Between February 2020 and April 2020 there has been a dramatic decrease in the provision of mental health services at the hospital." ECF 78 at 15 (noting that hours of reported treatments fell from 6000 in February to less than 100 in April—a 98% drop).  *Amici* found that the Hospital's plans for "a limited telehealth program" have "been delayed," ECF 78 at 17, and that, even when implemented, the provision of "technology provided to individuals in care" will remain "very limited" because "each unit will get only one cart . . . which will significantly limit the number of groups which can be held."  *Id.*  Plaintiffs have been directly impacted by the decreases in mental health services.  Plaintiffs have not participated in the therapies ordered by their individual plans, including Dialectic Behavior Therapy, Anger Management, Community Training, or Women's Coping, since the TLC was closed.  Ex. 3 (Second Declaration of Vinita Smith ("Smith 2nd Decl.")) ¶ 7, Ex. 4 (Second Declaration of Enzo Costa ("Costa 2nd Decl.)) ¶¶ 12-13; Ex. 5 (Second Declaration of William Dunbar ("Dunbar 2nd Decl.")) ¶¶ 16-17.  *See also* Murphy Decl. ¶ 4.

## ARGUMENT

To obtain a preliminary injunction, the moving party must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

8

The Court has authority to order relief to remedy unconstitutional conditions, including by release. The writ of habeas corpus, which "cuts through all forms and goes to the very tissue of the structure," *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 807 (D.C. Cir. 1988) (en banc) provides authority for release and also to order remedies for unconstitutional conditions of confinement, as "[h]abeas corpus tests not only the fact but also the form of detention." *Aamer v. Obama*, 742 F.3d 1023, 1033 (D.C. Cir. 2014) (quoting *Hudson v. Hardy*, 424 F.2d 854, 833 n. 3 (D.C. Cir. 1970)) (internal quotation marks omitted). The court's remedial authority under 42 U.S.C. § 1983 is "broad, for breadth and flexibility are inherent in equitable remedies." *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15 (1971)).

The Hospital has made certain modifications to its practices since Plaintiffs filed for a TRO. While these measures have slowed the spread of COVID-19, they are not enough.  As *amici* noted, the Hospital "continues to experience ongoing transmission of SARS-CoV-2."  ECF 81 at 2.  And this Court found just three days ago that Defendants have continued to fail to exercise professional judgment consistent with CDC guidance in key respects. ECF 82 at 6-8.

While Defendants have repeatedly cited their modifications as reasons why injunctive relief should not be granted, ECF 42 at 1, 20; Apr. 22 Tr. 20; Apr. 24 Tr. 23-24 and ECF 74 at 6, 10, the "court's power to grant injunctive relief survives discontinuance of the illegal conduct, and because the purpose is to prevent further violations, injunctive relief is appropriate when there is a cognizable danger of recurrent violation." *U.S. Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016).  "In the context of seeking injunctive relief, once a violation is demonstrated, all that need to be shown is that there is some reasonable likelihood

of future violations, and past unlawful conduct is highly suggestive of the likelihood of future violations." *Id.* "It is the duty of the court to beware of efforts to defeat injunctive relief by protestations of repentance and reform . . . ." *United States v. Ore. State Med. Soc.*, 343 U.S. 326, 333 (1952).

### 1.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims

In issuing the TRO, the Court found that "Plaintiffs have established a likelihood of success on the merits with respect to the two priority issues"—quarantining practices and releases from medical isolation—raised at that stage. ECF 59 at 16.  In extending the TRO, the Court found "the hospital's pre-TRO efforts fell short in the specified respects, *see* Dkt. 59, and no new evidence suggests that the Court's finding was incorrect."  ECF 82 at 5-6.  Plaintiffs remain substantially likely to prevail on the merits.

None of the patients at Saint Elizabeths are serving time after criminal conviction.  Under the due process clause of the Fifth Amendment, "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015); *Banks v. Booth*, No. CV 20-849(CKK), 2020 WL 1914896 at *6 (D.D.C. Apr. 19, 2020).  Pretrial detainees can demonstrate that they have been "punished" if the actions taken against them are objectively unreasonable. *See Kingsley*, 135 S. Ct. at 2473.  The government also "has an affirmative duty to ensure the safety and general well-being of an involuntarily committed mental patient." ECF 59 at 10 (citing *Harvey v. District of Columbia*, 798 F.3d 1042, 1050-51 (D.C. Cir. 2015)).  Due process standards for civil detainees, like those for pretrial detainees, are higher than those for individuals convicted of crimes: "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than

10

criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). Among the most basic rights of civil and pretrial detainees are the right to adequate medical care, *Youngberg*, 457 U.S. at 324 (1982), and reasonable safety in confinement, *see Helling v. McKinney*, 509 U.S. 25, 33 (1993) (holding that even convicted individuals may not be subjected to "a condition of confinement that is . . . very likely to cause serious illness and needless suffering."). The right to medical care includes the right to mental health care. *See Brown v. Plata*, 563 U.S. 493, 506 (2011).

If the Court finds that the conditions at the Hospital have been objectively unreasonable and/or fail to ensure Plaintiffs' safety and well-being, then Plaintiffs and putative class members— all of whom are civil or pretrial detainees—have made out a Fifth Amendment claim regardless of Defendants' subjective intent. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) ("[T]he Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm."). Liability exists "when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." ECF 59 at 11 (quoting *LaShawn A. v Dixon*, 762 F. Supp. 959, 994 (D.D.C. 1991) (in turn quoting *Youngberg*, 457 U.S. at 323).

Here, the record evidence—in the form of the findings presented by *amici*, sworn affidavits from residents in Defendants' custody, from attorneys and investigators from PDS who have witnessed first-hand the conditions of Defendants' facilities, and expert declarations—amply demonstrates that Plaintiffs and putative class members are facing a "substantial risk" of serious harm that is unconstitutional because they are exposed to a "serious, communicable disease."

11

*Helling*, 509 U.S. at 33, and because Defendants have failed to provide adequate mental health care that comports with applicable standards of professional judgment. *Youngberg*, 457 U.S. at 314, 323; ECF 59 at 11.

As identified by *amici* and the record evidence, and held by this Court, ECF 59 & 81, Defendants unconstitutionally failed and continue to fail to protect the health and safety of Plaintiffs from the risk of COVID-19 in several critical areas, all of which represent substantial departures from accepted professional judgments. *Amici* and the record evidence have also established that there has been an unconstitutional curtailment of mental health care, that patients systemically are not receiving the care prescribed in their treatment plans, and that the Hospital is continuing to detain more than 50 people on the "ready to release" list even though keeping them in the Hospital exposes them to an unnecessary risk of contracting COVID-19, deprives them of adequate mental health care and violates their rights under the Americans with Disabilities Act to receive treatment in the most integrated setting appropriate to their needs.

> **a.** **The Defendants Have Substantially Departed from Accepted Professional Judgments in Their Efforts to Control and Prevent COVID-19 Infections.**

Defendants have unconstitutionally failed to protect the health and safety of Plaintiffs in several key areas, all of which represent substantial departures from accepted professional judgments: (i) medical isolation and quarantine of patients; (ii) the stall in the effort to reduce patient census; (iii) cross-contamination by staff; (iv) inadequate testing and virus tracking; and (v) failure of Hospital staff to follow basic hygienic practices.

The interplay among these failings—each of which is well-supported by the record and is discussed separately below—helps to explain the continued increase in COVID-19 cases at the Hospital.

Since the TRO was entered on April 25, the number of confirmed cases among patients has continued to climb—from 46 to 79, and the number of patients who have died has doubled—from 7 to 14.[12]  The following chart tracks the spread of COVID-19 among Hospital patients.



The circumstances of the post-TRO new cases reflect that (i) the isolation and quarantine measures have not complied with critical aspects of professional standards of care—as *amici* have found, ECF 81 at 4—leading to continued risk of exposure to patients in the "Patients Under Investigation" unit, ECF 81-1 at 3; (ii) the failure to continue to take measures to reduce head

---

[12] Dist. of Columbia Dep't of Human Servs., *Human Services Agency COVID-19 Case Data*, https://coronavirus.dc.gov/page/human-services-agency-covid-19-case-data (last accessed May 11, 2020).

count, which undermines the effectiveness of other preventive measures, ECF 81-1 at 1-2; *see also* ECF 78 at 10 (Dr. Canavan's recommendations to facilitate reductions in head count); (iii) there has been potential cross-contamination by staff who work on both COVID-19 positive or suspected units and other units, ECF 81 at 4; May 7 Tr. 11; (iv) Defendants failed to implement a comprehensive testing regime to determine appropriate quarantine of patients in wards based on their status (positive, symptomatic/suspected, exposed, or otherwise) and otherwise track the virus spread, ECF 81 at 3-4 & ECF 81-1 at 5-7; and (v) preventive hygienic measures have been insufficient, May 7 Tr. 30, 34; ECF 81 at 6 ("hand hygiene audit data . . . revealed compliance to be <80%," ongoing use of non-alcohol sanitizer).  In particular, since the TRO was entered:

- On April 30, Defendants reported new cases from individuals who had been housed in the TLC unit, which is a makeshift unit converted from a classroom. This unit had been considered COVID-negative.  When testing occurred, 12 of the 17 patients tested positive.  ECF 66.

- On May 7, *amici* reported learning of two new positive cases from Unit 1D, a unit that previously had no known exposure.  May 7 Tr. 4.  This unit had a "quarantine period that ended April 29, 2020" and the positive cases "represent[ed] new transmission without a defined exposure."  ECF 81 at 4.  Thus a*mici* had reason to believe that the exposed individuals "may very well have been infected by staff and not by other patients."  May 7 Tr. 11.

- On May 8, Defendants reported 4 new cases from Unit 1G.  Again, there had not been prior cases on this unit.  *Amici* have identified a potential source of exposure as Hospital staff ("a behavioral health technician") who worked on the unit on May 4, and has subsequently tested positive.  ECF 81 at 4.

- The fact that patients on the "PUI" unit "whose test results are negative are returned to the unit from which they were placed on PUI status" was also identified as a problem because such individuals may be "exposed" while in PUI and then infect their prior unit.  ECF 81-1 at 3-4.

- Head count has not dropped appreciably since entry of the TRO.  Based on Defendants' census data, there were 200 patients on April 29 (the first day

14

reported), and 193 on May 13 (the latest day reported).[13]  *Amici* noted that the number of discharges "has decreased notably since the middle of April," ECF 78 at 9.

Because of their likely contribution to continued spread of the disease in recent days and because of the Hospital's failure to comply with CDC standards, each of the five conditions Plaintiffs have identified warrants continued injunctive relief, including both continuation of the relevant provisions of the TRO through the end of the COVID-19 crisis, and expansion of the conditions to comply with the recommendations of *amici*.

(i)   The Hospital's Isolation and Quarantine Policies:   Defendants have failed to adequately isolate or quarantine patients, thus exposing them to an increased risk of contracting COVID-19.  Prior to the filing of this suit, the Hospital was housing individuals with COVID-19 symptoms together with non-symptomatic individuals.  Costa Decl. (ECF 39-6) ¶ 6; Dunbar Decl. (ECF 39-7) ¶¶ 5(a-b), 6; Tu Decl. (ECF 42-5) ¶¶ 7-8; April 20 Tr. 30; Murphy Decl. ¶ 4.  In and of itself, the Hospital's failure to isolate and quarantine individuals with the virus or suspected of having the virus violated Plaintiffs' constitutional rights.  *Cf. Helling,* 509 U.S. at 34 (exposing individuals to "infectious maladies" violates the Eighth Amendment).  Indeed, it was through Defendants' practices of housing exposed and symptomatic individuals together that Plaintiff Dunbar, who had tested negative for COVID-19 as recently as March 18, tested positive on April 24.  4/24 Tr. 3-5;  *see also* Dunbar Decl. (ECF 39-7) ¶¶ 5(a) (noting that he had been housed with four individuals who tested positive, two of whom remained on the unit after receiving positive tests), Dunbar 2nd Decl. ¶¶ 3-5.

---

[13] Defendants' reporting of the census numbers does not include patients who have been admitted to area hospitals. Defendants have reported seven fatalities and two new admissions since the TRO was entered.  Defendants also reported 5 releases on May 13.

Despite clear guidance from the CDC, Defendants only started a practice of "treating all units as quarantined" after the TRO motion was filed. ECF 59 at 13. As the Court noted in entering the TRO, even as revised, the Defendants' practices still did "not satisfy CDC standards." *Id.* (noting record evidence that "the Hospital has taken a less demanding approach [than the CDC recommends] to enforce social distancing and mask use, that common areas are open, and that patients are not remaining in their rooms to the extent practicable.").

As *amici* note, there is considerable evidence that Defendants are still not satisfying CDC standards for separating known, symptomatic, and exposed patients. ECF 81 at 4. One basis for the TRO was Defendants' failure to follow CDC guidance regarding quarantine, ECF 59 at 13-14, and as Dr. Waldman summarized on May 7, the Hospital's efforts to quarantine and group individuals with similar status even after the TRO had been executed "obviously imperfectly." May 7 Tr. 8.

(ii) Persistent Patient Head Count and "Ready to Discharge" List: CDC guidance recommends measures to reduce the population of congregate settings,[14] and *amici* emphasize that reduction of the number of patients is important because "one of the best ways to continue to move toward the elimination of the SARS-CoV-2 from the environment is to reduce the number of potential hosts. This would allow for physical distancing to be practiced to a much more

---

[14] *See, e.g.,* CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 in Health Care Settings*, ECF 54-1 ("If hospitalization is not medically necessary, home care is preferable if the individual's situation allows"); CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Preparing for COVID-19: Long-Term Care Facilities, Nursing Homes*, ECF 55-1 (if "a facility cannot fully implement all recommended infection control precautions, residents [with known or suspected COVID-19] should be transferred to another facility that is capable of implementation"); CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities*, ECF 55-2 ("explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak")

effective extent, for better surveillance to be conducted in order to ensure appropriate implementation of infection control measures, and for individual attention to be paid to personal hygiene practices (masking, hand washing/sanitizing, etc.) of patients." ECF 81-1 at 1. They therefore urge the Hospital to "reduce patient census to the extent possible," ECF 81-1 at 1, and have recommended specific measures to facilitate discharge. ECF 78 at 10.

Amici noted that the Hospital had released 57 patients since mid-March, which was a "significant accomplishment." ECF 78 at 9; ECF 81 at 3-4. But many of these patients were released only pursuant to court order and not because of the Defendants' own initiative. See Ex. 6 (Superior Court May 8 Order).[15] Consistent with this, amici noted, that the number of discharges "has decreased noticeably since the middle of April," ECF 78 at 9, and that as of May 6, "there were 56 individuals in care on [the] 'ready to discharge' list." ECF 78 at 8.[16]

Amici have recommended a number of concrete steps to reduce the patient census. ECF 78 at 10 (including facilitating discharge planning meeting, subsidizing housing providers, and educating community providers); see also Ex. 7, Third Declaration of Elizabeth Jones ("Jones 3rd Decl.") ¶¶ 8-11. As part of preliminary injunctive relief, the Court should order Defendants to periodically report on whether they are following these recommendations and their efforts to further reduce the patient census. Jones 3rd Decl. ¶11(b).

---

[15]The Order states in relevant part: "At the time of PDS' initial filing one month ago, the Department of Behavioral Health reported 45 individuals at St. Elizabeths Hospital held in competence proceedings on misdemeanor charges as well as 12 individuals held at the D.C. Jail in competence proceedings on misdemeanor charges. Since then, the Court has released six individuals based on the pleadings submitted and held approximately 40 hearings where the United States government, Department of Behavioral Health and Department of Corrections were present – the latter in the cases in which defendants were incarcerated at the jail. As of today, of the original 57 misdemeanant defendants who were incarcerated at either Saint Elizabeths Hospital or the jail, only eleven individuals are held. Of those eleven, the requests of two who sought release were denied while the remaining nine, through defense counsel, represented that they no longer sought release. Of that group of eleven, nine are held at St. Elizabeths Hospital and two are held at the D.C. Jail."

[16] On May 13, Defendants reported that they had released five patients (one conditionally).

(iii) <u>Contamination and Cross-contamination Risk from Staff</u>:  Prior to the COVID crisis, many Hospital staff worked with patients on multiple units, and that continued to be the case as of the *amici*'s report on May 11.  As the Court found, that is inconsistent with CDC Guidance, ECF 82 at 7-8, which provides that when a facility "dedicates space in the facility to care for residents with confirmed COVID-19" it should "assign dedicated [health care providers] to work only in this area of the facility."[17]

As the Court has noted, "*amici* emphasize that infection control requires reducing 'traffic within the hospital" and "were 'emphatic in saying that while in the past this has not been respected, there should be no mixing of staff between these units," and that "*amici* posit that staff is the most likely source of continued infection spread at Saint Elizabeths."  ECF 82 at 7. *Amici* have recommended that "HCP and other staff should be assigned daily to only one unit." ECF 81-1 at 5; s*ee also* ECF 81 at 8 ("contractual nursing and environmental services staff be assigned to one unit consistently, if possible."). As Dr. Waldman explained on May 7, the Hospital's failure to implement this Guidance is a critical route through which the virus has spread through the facility and "Staff really needs to – we need to pay a lot more attention to it."  May 7 Tr. 10-14.

As *amici* elaborated in their report: "The greatest impediment to interrupting transmission of virus within the facility is the re-introduction of virus from the outside community . . . The hospital has established acceptable daily screening procedure for all visitors and staff . . . but the presence of asymptomatic or pre-symptomatic carriers of the virus can easily go undetected."  ECF

---

[17] CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019 Nursing Homes & Long-Term Care Facilities*, ECF 55-2; see also Ex. 3 (Substance Abuse and Mental Health Services Administration*, Covid19: Interim Considerations for State Psychiatric Hospitals,* at 2)2.b https://www.samhsa.gov/sites/default/files/covid19-interim-considerations-for-state-psychiatric-hospitals.pdf).

81-1 at 5.  Consistent with this observation, since the original TRO was entered, the number of

positive cases among Hospital staff has increased from 69 to 84, as illustrated in the chart below.



In extending the TRO, the Court ordered the relief recommended by *amici*—that "to the extent

medically and psychiatrically practicable, health care personnel and other staff shall be assigned

to only one unit."  ECF 83 ¶ 3.  In entering preliminary injunctive relief, the Court should extend

these conditions through the duration of the COVID-19 crisis.

(iv) <u>Inadequate Testing</u>: Prior to the TRO motion, the Hospital was not timely or routinely

testing patients with COVID-19 symptoms, or individuals who had been exposed to COVID-19.

Costa Decl. (ECF 39-6) ¶ 13; Dunbar Decl. (ECF 39-7) ¶ 8; Smith Decl. (ECF 39-8) ¶¶ 8, 11; Tu

Dec. (ECF 42-5) ¶ 11; 4/22 Tr. 52-53.  For example, as *amici* note, it took the Hospital 12 days

(from March 20 to April 1) to test and receive results for the first suspected case of COVID-19.

ECF 81 at 3.  After the TRO motion was filed, the Hospital announced that it had received certain

19

testing units and planned to test the entire patient population, Apr. 22 Tr. 31, 32, Apr. 24 Tr. 18-19, but subject to the "policy of 'immediately' returning patients suspected of having the virus to the general population after a single negative test result"; as the Court has previously noted, that policy is "contrary to accepted professional standards," ECF 59 at 14-16, and ordered that Defendants conduct "clinical evaluations prior to releasing patients suspected of having COVID-19 (*i.e.*, symptomatic patients) from isolation, and if 'a higher clinical suspicion' for COVID-19 exists, [to] administer test-based criteria of two negative tests, at least 24 hours apart, prior to discontinuing isolation." ECF 60 ¶ 1. That order should be continued.

Since the Court ordered this relief, there have been two important disclosures by Defendants concerning the scope of testing that indicate testing has not been universal. First, during the May 7 call, *amici* reported that "there was not testing internally at the facility of any staff." May 7 Tr. 21. Second, on May 8, Defendants advised Plaintiffs for the first time that they had not tested all patients, and that slightly over 10 percent of the patient population (21 patients) had refused to be tested. ECF 81 at 4. Plaintiffs have a pending information request with the Defendants since May 10 on where these individuals are housed and what preventive measures have been taken, and may raise additional issues when this information is provided.

Beyond these issues, *amici* have concluded that the testing regimen adopted by Defendants does not comply with CDC guidance and is inadequate to protect the patient population. The CDC guidance for nursing homes states that "the first step of a test-based prevention strategy should ideally be a point prevalence survey (PPS) of all residents and all HCP in the facility."[18] However,

---

[18] CTRS. DISEASE CONTROL & PREVENTION, *Coronavirus Disease 2019, Testing for Coronavirus in Nursing Homes*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html.

as *amici* note, Defendants did not conduct widespread testing until May 4-5, ECF 81 at 4, and that testing was not a point prevalence survey, because it did not cover patients in the two non-quarantine "clear" units (2A and 2B), or Hospital staff.  ECF 81 at 4.

The Court has now acted, in part, upon *amici*'s recommendation, by ordering the Defendants to complete a baseline point prevalence survey by May 15 for staff and residents, and a second survey by May 22.  ECF 83 ¶ 4.  This decision was warranted.  As Dr. Waldman stated there needs to be "a much, much more aggressive testing strategy than has currently been in place . . . we're not just starting now, we're inheriting a situation that's been allowed to develop to where it is at this point."  May 7 Tr. 11-12; *see also* May 7 Tr. 22 (Ms. Hebden: "it would be ideal to sort of start from ground zero with . . . the point prevalence survey").

*Amici*'s recommendation went further to provide that the Court should order, beyond an initial re-test, "repeat testing of all patients and staff who have negative test results no later than one week after the initial test."  ECF 81 at 9; *see also* ECF 81-1 at 6; ECF 83 ¶.  In conjunction with ordering further injunctive relief, the Court should add this condition and extend it through the duration of the COVID-19 crisis.

*Amici* also recommend changes to the Hospital's testing protocols for the quarantine units (that testing "be done on a weekly basis until no patients have positive test results.  After all patients have tested negative ... a second test should be conducted 72 hours later").  ECF 81-1 at 3.  And *amici* recommend renewed focus on the "patients who refuse testing." ECF 81-1 at 7.  As noted above, once Defendants furnish the requested information for the patients who have refused testing, Plaintiffs may seek further relief regarding this population.

(v)  <u>Failure of Hospital Staff to Follow Basic Infection Control Practices</u>: Prior to filing the TRO, the Hospital's use of masks and other PPE was intermittent, as was direction to engage in "social distancing." As the Court noted, "Plaintiffs have offered ample evidence that the Hospital has taken a less demanding approach to enforcing social distancing and mask use, that common spaces are open, and that patients are not remaining in their rooms to the extent practicable."  ECF 59 at 13. *Amici* reported some progress on these measures. May 7 Tr. 26.  But *amici* also warned about several troubling aspects of the implementation of infection control:

- Ms. Hebden stated that there was a "concern about how [masks are] being reused, because I think they represent a higher risk, a contamination risk potentially . . . they have been putting them in a paper bag, and then they're reusing them until they're damaged or soiled.  Well, that is not in accordance with what the reuse of N95s would be as dictated by the CDC." May 7 Tr. 30, 34.  The CDC guidance provides that when masks are reused there should be "a minimum of five days between each use."[19]

- Ms. Hebden also stated that "we really have to up the hand hygiene of all the patients, particularly the patients on the COVID unit."  Noting that "the COVID units do not have individual bathrooms," she commented that "the bathrooms are not being cleaned every single time that a patient goes in there."  May 7 Tr. 38.

- *Amici* noted that the "hand hygiene audit data provided to *amici* revealed compliance to be <80%." ECF 81 at 6.  As Ms. Hebden observed, "I don't think their hand hygiene data I've seen is as good as it should be for the staff. . . I'm recommending there should be a use of a CDC observational tool for hand hygiene, which they can modify for their purposes."  May 7 Tr. 42.

- *Amici* also recommended the "removal of all non-alcohol sanitizer form [sic] the building entry and patient units." ECF 81 at 6.  The CDC specifically recommends use of alcohol-based hand sanitizers, warning that it "does not have a recommended alternative to hand rub products with greater than 60% ethanol or 70% isopropanol."[20]

---

[19] Ctrs. Disease Control & Prevention, *Coronavirus Disease 2019, Decontamination and Reuse of Filtering Facepiece Respirators*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/decontamination-reuse-respirators.html.

[20] Ctrs. Disease Control & Prevention, *Coronavirus Disease 2019, Hand Hygiene Recommendations*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/hand-hygiene.html.

In entering preliminary injunctive relief, the Court should order independent monitoring to ensure that Defendants are complying with *amici* recommendations and CDC guidance regarding hygiene practices for the duration of the COVID-19 crisis.

*       *       *

In sum, ample record evidence and expert reports demonstrate that Plaintiffs and patients at the Hospital face a substantial risk of contracting COVID-19 because of the failure to adhere to professional standards. In just under two months, there are already 163 confirmed cases of COVID-19 at the Hospital—84 staff and 79 patients. And, indeed, Plaintiff Dunbar has contracted the disease.

This risk is intolerable. *Cf. Helling*, 509 U.S. at 36 (asking "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."). The available data from the CDC show that of Americans generally who tested positive for COVID-19, nearly a third require hospitalization, many of those require admission to the ICU, and between 1.8 and 3.4 percent of people die. From a clinical and public health perspective, COVID-19 poses a risk of serious harm to anyone who contracts it. Dr. Golob explains that this severe risk extends not only to the elderly, but to "younger and healthier people" for whom "infection of this virus requires supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation."  Golob Decl. (ECF 39-4) ¶ 5.

The very failures of Defendants in this case have been found to constitute deliberate indifference—a more stringent requirement than Plaintiffs need to meet—in like cases. For instance, in *Feliciano v. Gonzales*, 13 F. Supp. 2d 151 (D.P.R. 1998), the Court found that the defendant's "inability . . . to properly isolate cases of active tuberculosis," the "insufficient

23

medical dormitory beds," the failure to "fully screen incoming inmates," and the failure to "provide for a sick call system that ensures access to care and that is capable of effectively handling emergencies" constituted deliberate indifference. *Id.* at 208–09. In other cases, the defendant's inability to "adequately quarantine or remove inmates and support personnel known to have active tuberculosis" was found to constitute deliberate indifference. *See Shimon v. Dep't of Corr. Servs. for N.Y.*, No. 93-cv-3144 (DC), 1996 WL 15688 at *1 (S.D.N.Y. Jan. 17, 1996). And in *Joy v. Healthcare CMS*, 534 F. Supp. 2d 482 (D. Del. 2008), the Court found that the plaintiffs stated a claim under the Eighth Amendment where the warden "was aware that inmates were not thoroughly screened for disease before going into general population and that Correctional Medical Services does not have a policy in place to examine inmates before placing them into general population." *Id.* at 485. As discussed above, the record is replete with Defendants' failure to meet professional standards in a wide swath of areas, including their failed quarantine policy, failure to properly isolate staff, and ineffective screening procedures.

Defendants' failure to protect Plaintiffs and the objective unreasonableness of their conduct can also be shown by reference to their failure to follow accepted standards. *Youngberg*, 457 U.S. at 321-22. The Court in *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015), explained that "known noncompliance with generally accepted guidelines for inmate health strongly indicates deliberate indifference to a substantial risk of serious harm." *Id.* at 943. Here, *amici's* findings make clear that Defendants are out of compliance in critical categories of the CDC guidelines for prevention and management of COVID-19 infection, including screening and testing policies, social distancing requirements, medical isolation and quarantine protocols, and hygiene practices. That Defendants efforts to prevent the spread of COVID-19 could qualify as

24

deliberate indifference leaves no doubt that Plaintiffs are likely to carry their lesser burden of showing that Defendants' approach substantially departed from accepted  professional judgment.

> **b.**     **The Defendants Have Substantially Departed from Accepted Professional Judgment in Their Provision of Mental Health Care**

As *amicus* Dr. Patrick Canavan reported, the COVID outbreak "has changed the lives of every individual in care at the Hospital. Connections to staff and other individuals have been broken, they have lost peers to the virus and they must manage their anxiety without the benefit of many therapies upon which they were dependent. The effect on these individuals will likely be long lasting and the Hospital must be ready to address the effect for the long term." ECF 78 at 27.  Patients in both units where Plaintiff Dunbar has been housed have died of COVID-19 in the last few weeks, and he is scared.  Dunbar 2nd Decl. ¶14.  While Dr. Canavan commended Hospital staff, he noted significant shortcomings in the provision of mental health care, particularly the systemic failure to provide therapy or therapy alternatives called for in patient treatment plans and by the continued detention of patients who have been deemed "ready to discharge."

(i)  Curtailment of Care:  Saint Elizabeths policy "requires that each individual in care have a current treatment plan, called the Individual Recovery Plan (IRP), which includes goals, objectives and interventions and which is updated at regular intervals …. [T]he target number of hours of active treatment is 15-20 hours per week depending on the individual in care's clinical condition."  ECF 78 at 5.  Saint Elizabeths' own emergency plan provides that care should be continued as much as possible during a public health emergency.  ECF 44 Ex. A at 9-10.  This is consistent with guidance.  Ex. 3 at 3 (Recommendation 4).

Prior to filing the TRO, each of the Plaintiffs complained about severe curtailment in their care, including the closing of the Treatment Mall, suspension of group therapy, anger management

classes, and competency restoration classes.  Smith Decl. (ECF 39-8) ¶ 10; Costa Decl. (ECF 39-6)¶ 9; Dunbar Decl. (ECF 39-7) ¶ 7.  Plaintiffs also noted that Defendants had not taken adequate steps to compensate of the loss of this treatment, for example by using teletherapy or virtual therapy. FAC ¶ 111.  Since the TRO was entered, Plaintiffs continue to report that they are not receiving appropriate mental health services.  Smith 2nd Decl. ¶¶ 6-7; Costa 2nd Decl. ¶¶ 11-13 ; Dunbar 2nd Decl. ¶¶ 15- 17.

Amici confirm that there has been a dramatic curtailment of mental health services.  As Dr. Canavan wrote, "[d]ata provided by the Defendants reflecting treatment since April 1st show a significant decrease, with fewer than 100 hours of treatment compared with the almost 6000 hours just two months earlier." ECF 78 at 15.  That represents a 98% drop.  Amici observed that multiple patients interviewed "reported very little, if any, treatment is occurring and that there is little for them to do on the units other than watch TV."  Id. at 14.  Amici also noted that 90 percent of the treatment plans reviewed contained treatment components "that are no longer operating." ECF 78 at 16.   And, they also noted that "[t]here has not been coordinated treatment delivery due to the administrative leadership decision . . . approximately 34 licensed, board-certified or accredited clinicians are currently not involved in direct care treatment but are assigned to perform non-clinical work in the Hospital," id. at 13, "no group therapies have been provided by Rehabilitation or TLC staff since mid-March,"  id. at 12, and that "group therapies have all but been eliminated during the COVID-19 outbreak," id. at 19, event though they are the "linchpin" of treatment at the Hospital.  Id. at 11.[21]   Plaintiff Smith has not been able to participate in

---

[21] As Amici notes, "Group therapy is an important and proven treatment modality that provides numerous benefits for participants. It helps an individual in care realize that there are other people who have similar issues and is useful in the development of interpersonal skills. In addition, the members of the group who have similar concerns can support each other and may offer support to address a particular problem that an Individual can use to respond

Women's Coping or Current Events group therapies. Smith 2nd Decl. ¶ 7. Plaintiff Costa has not had access to Dialectical Behavior Therapy, Music Experience, Leisure Skills, Recreational Education, Bible Study, Movement Meditations, or Anger Management. Costa 2nd Decl. ¶¶ 12-13. Plaintiff Dunbar has not had access to Community Training, Drug Education, Medication Education, or physical education classes. Dunbar 2nd Decl. ¶¶ 16-17.

Plaintiffs recognize that the crisis makes group therapy difficult; however, as *amici* and the Hospital's own policies make clear, patients must continue to receive adequate mental health services, even during public health emergencies. Seven weeks into the crisis, that is still not happening. As *amici* explain, the Hospital's intentions to provide alternative treatment remain largely unfulfilled. EFC 78 at 17-18. For example, Plaintiff Costa reports that the only group therapy he participates in currently is Music Group, which means only that patients choose three songs to listen to on YouTube in the unit lounge. Costa 2nd Decl. ¶ 13. Equally concerning, *amici* noted that the Hospital's plans for "a limited telehealth program on each unit to allow for remote group therapy" have "been delayed." ECF 78 at 17. *Amici* also stated that even when implemented, the provision of "technology provided to individuals in care" will remain "very limited" with "each unit will get only one cart . . . which will significantly limit the number of groups which can be held." *Id.*

According to Elizabeth Jones, a psychiatric hospital administrator with over thirty years of experience, the level of care described by *amici* "falls far short of what patients need to continue their recovery from the serious mental illness that necessitated admission to a psychiatric

---

effectively to their own situation. It also provides a degree of socialization for individuals. It is for these reasons that treatment at Saint Elizabeths has been heavily focused on group therapies. Unfortunately, group therapies have all but been eliminated during the current COVID-19 outbreak." ECF 78 at 18.

27

institution"; and is "a clear risk to health and safety."  The failure to provide appropriate care are a "drastic deterrents to treatment, recovery and timely discharge; risk traumatizing patients and exacerbating symptoms of mental illness; and inevitably will result in long lasting, if not permanent, damage to the individuals and their efforts at recovery." Jones 3rd Decl. ¶¶ 3-4. She concluded these circumstances violate professional standards of care and treatment." Jones 3rd Decl. ¶ 4.

A facility "that deprives [persons] of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 510-11 (2011).  And, it is well-settled that the state must provide treatment to confined individuals not convicted of a crime in accord with the purpose of confinement.  *See, e.g., Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed").  Under *Youngberg*, the state must provide civilly committed individuals with, among other things, adequate mental health care.  *See Youngberg*, 457 U.S. at 315-16, 324. Inadequate mental health care will violate a due process when it "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment."  *Id.* at 323.

Here, Defendants' actions are extraordinary departures from accepted professional judgment, practice, or standards, including their own guidelines and recommendations from the Hospital's own professionals.  *Amici* note that the Hospital policy is to implement treatment plans, known as Individualized Recovery Plans or IRPs,and to provide 15-20 hours per week of therapeutic services.  ECF 78 at 5.  As early as late March, the "TLC and Rehabilitation Services

28

[staff] developed schedules for on-unit programming to begin . . . with limited and identified staff who would be dedicated to a particular unit, but that plan was not approved by the Hospital administrative leaders and, as a result, no group therapies have been provided by Rehabilitation or TLC staff since mid-March."  ECF 78 at 12. Defendants are failing to provide treatment in accordance with the IRPs and, in fact, are barely providing any treatment at all.  ECF 78 at 15-17;  *see also* Smith Decl. (ECF 39-8) ¶ 10; Costa Decl. (39-6) ¶ 9; Dunbar Decl. ¶ 7; Smith 2nd Decl. ¶¶ 6-7, 11; Costa 2nd Decl. ¶¶ 11-13; Dunbar 2nd Decl. ¶¶ 15-17.   The Therapeutic Learning Centers, which are the "linchpin of the Hospital treatment delivery," ECF 78 at 12, are closed, and Defendants are failing to provide alternative services appropriate for the COVID-19 crisis. *Id.*

The curtailment of mental health treatment is not the result of professional judgment about the care Plaintiffs need, but rather the result of blanket closures of treatment areas and suspension of in-person therapy.  *See Youngberg*, 457 U.S. at 323.  There is nothing in the extensive record indicating that Defendants exercised professional judgment to determine that the 200 individuals committed to the District for intensive psychiatric treatment all of a sudden needed almost no services.  In fact, Defendants have failed to follow the professional judgment of the Hospital's treatment team, which recommended as early as late March a plan to provide comprehensive services to patients in their unit.  ECF 78 at 12.   The clinical staff and treatment teams have not updated patients' treatment plans to account for the effect of the COVID-19 crisis.  ECF 78 at 16.  Indeed, as Elizabeth Jones states, "patients simply are not receiving the services that their treatment teams determined were essential for recovery and acceptable alternative strategies have not been substituted."  Jones 3rd Decl. ¶ 5.  Even in light of the COVID-19 emergency,

29

Defendant's own policies and professional standards require an individualized assessment of the care patients need and a strategy for administering that care during the crisis. Defendant's own emergency plan prioritizes the delivery of services during the crisis. ECF 44 Ex. A.   The failure to provide adequate mental health services is no doubt a departure from professional judgment. *See Youngberg*, 457 U.S. at 323.

(ii)   Patient Head Count and "Ready to Discharge": As discussed above, the failure to reduce the patient census to the greatest extent possible has placed patients at a substantial and unconstitutional risk of contracting COVID-19.  Where, as here, an individual is institutionalized in a dangerous environment and essential mental health care is not provided, the balance of considerations must shift in favor of community-based and integrated treatment options. *See, e.g., Youngberg*, 457 U.S. at 317 (person in custody has a constitutional right to treatment); *O'Connor v. Donaldson*, 422 U.S. 563 (1975) (confining a person with mental illness who is no longer a threat to himself or others is unconstitutional even if the State seeks to protect the person from less desirable living conditions). The Defendants have identified patients ready for community placement. ECF 78; Ex. 8, Second Declaration of Wanda Rose ("Rose 2nd Decl.") ¶ 6.  Given the risks during the COVID-19 pandemic, keeping patients in the Hospital when the very treatment they were institutionalized to receive, intensive inpatient psychiatric care, is not taking place, is objectively unreasonable, fail to ensure plaintiffs' reasonable safety, and therefore violate due process.

The continued hospitalization of patients ready for release also violates their rights under the Americans with Disabilities Act.   As Dr. Canavan notes, discharge planning for patients should be an ongoing focus of treatment.   ECF 78 at 6.  The Hospital maintains a "ready for

discharge list" of patients for whom "the treatment team determined that the individual had progressed sufficiently such that the treatment team could identify the level of care and housing needs for the individual when discharged." ECF 78 at 7. As of May 6, "there were 56 individuals in care on [the] 'ready to discharge' list," ECF 78 at 7, but Defendants have substantially reduced their efforts at discharge planning and execution. ECF 78 at 8-9.

The ADA requires that persons with disabilities be provided services in the least restrictive setting consistent with their needs. 28 CFR § 35.130(d). Confinement in an institution is justified only where it is essential to meet the person's treatment needs and there is no appropriate community setting. *Brown v. District of Columbia*, 928 F.3d 1070, 1077 (D.C. Cir. 2019) (citing *Olmstead v. LC by Zimring,* 527 U.S. 581 (1999)). ADA regulations require that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR § 35.130(d).

Defendants must serve persons with disabilities in community settings where it has been determined that community placement is appropriate and the transfer from institutional care to a less restrictive setting is not opposed by the individual patient. *Brown*, 928 F.3d at 587. Defendants may rely on reasonable assessments of their own professionals in determining whether an individual "meets the essential eligibility requirements" for habilitation in a community-based program. *Olmstead,* 527 U.S. at 602. While the government treating professional is not the sole gatekeeper of whether a person is in the most integrated setting,[22] for the purposes of this

---

[22] See, *M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 12 (D.D.C. 2019) (because *Olmstead* "did not state that a determination by a State's own professionals is the only way that a plaintiff may establish" community placement is warranted) (citing *Steimel v. Wernert*, 823 F.3d 902, 915-16 (7th Cir. 2016) (whether community based treatment was appropriate could be demonstrated by allegations that the state had previously allowed plaintiffs more community interaction).

preliminary injunction, external evaluations are not necessary. The Defendants' treating professionals have determined that at least 56 patients at Saint Elizabeths "mee[t] the essential eligibility requirements," *Olmstead,* 527 U.S. at 602, for community placement by placing them on the "ready to discharge list." ECF 78 at 7. With rigorous and regular assessment, many others may be added to the "ready to discharge" list or may show their eligibility to receive community-based services in other ways. See Jones 3rd Declaration ¶¶ 8- 10. Defendants have failed to meet their obligations under the ADA to facilitate community placement for these eligible individuals; *amici* report that the Defendants have largely stopped discharge planning with community providers and have not appropriately modified their discharge practices to respond to the COVID-19 outbreak. ECF 78 at 7-10; Rose 2nd Decl. ¶ 6.

The housing barriers described by Defendants to *amici* to explain the backlog in community placements is insufficient to overcome Defendants' ADA obligations. *See Brown*, 928 F.3d at 1070.[23] *Amici's* recommendations to modify the District's program to increase the community placement of patients ready for release provide initial steps the District can immediately take to address the barriers to community placement:

> # 1: The DBH should immediately begin a program to educate community providers about COVID-19 to calm fears over housing or serving Saint Elizabeths individuals.

> # 2: Hospital staff and DBH staff should immediately restart meeting twice a week via video conferencing to review and update the "ready for discharge" list and address any new barriers that have been highlighted because of COVID-19,

---

[23] The burden is on the Defendants to show that a requested accommodation of community placement is unreasonable, even if it requires the modification of its programs or services. It is notable that *amici* concluded that "there also have been fewer placements for individuals in care going to their own apartments since the COVID-19 outbreak as landlords tell social workers that they are leery of accepting referrals from Saint Elizabeths." ECF 78 at 9. Rose 2nd Decl. ¶ 6. The refusal to rent to a person because of their disability is a clear violation of the District Human Rights Act. D Code § 2-1402.21(a). The Defendants cannot justify their inability to create a community placement based on the illegal conduct of landlords and the District's failure to enforce its human rights laws.

so DBH can engage community providers and identify strategies to mitigate concerns.

# 3: DBH should provide a short-term subsidy or other supports to providers who accept individuals from Saint Elizabeths in the near future.

# 4: DBH should expand housing options for older individuals in care or those who need higher levels of care such as nursing home or intensive residence, as well as individuals who have suffered from COVID-19 who may experience lingering effects and thus may be in need of more intensive community supports.

ECF 78 at 7-9.  See also Jones 3rd Decl. ¶ 11(b).

Put simply, failing to develop and implement a plan to facilitate the discharge and community placement of patients whom Defendants deem "ready to discharge" violates the ADA.

### 2. Plaintiffs Will Suffer Irreparable Harm Unless Defendants Are Enjoined from Following a Policy that Will Allow them to be Housed in Unconstitutional Conditions in the Future

In entering the TRO, this Court concluded that "Plaintiffs have satisfied the irreparable harm requirement for issuance of a temporary restraining order."  ECF 59 at 17.  This remains the case for the issuance of a preliminary injunction for two reasons.

First, for the reasons described above, Plaintiffs' constitutional and statutory rights are still being violated, and nothing more is needed to prove irreparable harm, because the deprivation of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury."  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *see generally Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts . . . must not shrink from their obligation to enforce the constitutional rights of . . . prisoners." (internal quotation marks and citation omitted)).

Second, as the Court noted, "the imminent risk to [Plaintiffs] health . . . also constitutes an irreparable injury."  ECF  59 at 16-17. Plaintiffs are individuals with serious mental illnesses,

involuntarily housed in a psychiatric hospital.  During the pandemic, they have been unnecessarily exposed to the coronavirus without adequate means to protect themselves, and Plaintiff Dunbar has tested positive.  4/24 Tr. 3-5.  In addition to the physical risks of COVID-19 exposure, every day, Plaintiffs are being deprived of the mental health care that is the purpose of their commitment to the hospital.  *Amici* observe that the curtailment of mental health care at Saint Elizabeths has changed the lives of patients at the Hospital for the worse:  "Connections to staff and other individuals have been broken, they have lost peers to the virus and they must manage their anxiety without the benefit of many therapies upon which they were dependent. The effect on these individuals will likely be long lasting[.]"  ECF 78 at 27.  *See also* Jones 3rd Decl. ¶ 4.

While Defendants have taken measures to reduce these risks, the Hospital "continues to experience ongoing transmission of SARS-CoV-2."  ECF 81 at 2.  Even if Defendants had successfully eliminated these risks—which they have not—the "court's power to grant injunctive relief survives discontinuance of the illegal conduct, and because the purpose is to prevent future violations, injunctive relief is appropriate when there is a cognizable danger of recurrent violation." *U.S. Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016); *cf. Gray Panthers Project Fund v. Thompson*, 273 F. Supp. 2d 32, 34 (D.D.C. 2002) (issuing permanent injunction even though the defendant acted "in compliance with the court's preliminary injunction").

Indeed, courts around the country considering substandard detention conditions in light of the COVID-19 pandemic have recognized that temporary orders must be extended to prevent backsliding. *See, e.g.*, *Mays v. Dart*, Case No. 20 C 2134, 2020 WL 1987007 at \*29 (N.D. Ill. Apr.

27, 2020) (converting TRO requiring improved response to COVID-19 at detention facility into preliminary injunction; court reasoned that "[a]lthough the Sheriff appears to have complied with the TRO . . . there is at least a possibility that [the Sheriff's actions] could slip to the wayside despite the Sheriff's best intentions, as he works to manage the complexities of the Jail during this public health crisis").

Given the continued spread of the virus at the Hospital and Defendants' repeated failure to adhere to CDC guidance and their own policies, injunctive relief to protect the patients from risks of COVID-19 exposure and the deprivation of mental health care is not only warranted but indispensable.

### 3. Enjoining Defendants from Failing to House and Treat Involuntarily Committed Persons in Constitutionally Adequate Conditions Will Not Substantially Injure Defendants or Others.

A preliminary injunction would impose no measurable harm on Defendants or third parties. When a government entity involuntarily commits persons to its custody, it has an obligation to provide for their essential needs and to protect them from danger. *Youngberg*, 457 U.S. at 324 (1982). Defendants are not harmed by meeting this obligation; in fact, Defendants have no legal right to confine Plaintiffs and others where they are exposed to a dangerous and life-threatening risk.

Nor would Defendants be harmed by an order requiring them to comply with the integration mandate under the ADA and facilitate community-based services for all patients who are eligible for discharge. Indeed, it is Defendants' affirmative obligation to do so when circumstances exist such that the isolation of individuals with disabilities is no longer justified.

35

4.          **A Preliminary Injunction Will Serve the Public Interest.**

As noted above, the public interest is served when constitutional and statutory rights are protected. ECF 59 at 17; *Simms*, 872 F. Supp. 2d at 105; *accord Lamprecht v. F.C.C.*, 958 F.2d 382, 390 (D.C. Cir. 1992) ("a [government] policy that is unconstitutional would inherently conflict with the public interest"). Here, the public interest would be vindicated by honoring Plaintiffs' constitutional and statutory rights and restoring basic standards of decency to the treatment of Plaintiffs and other patients at the Hospital. And, as long as departing residents are held in appropriate isolation, the risk to public health is much greater keeping them at Saint Elizabeths than transferring them elsewhere or letting them out.

## REQUESTED REMEDY

The Court should order injunctive relief of two sorts. First, it should order the Defendants to follow professional public health standards for controlling the spread of COVID-19 at Saint Elizabeths Hospital, including proper housing and infection control measures for patients, and including significantly reducing the patient population at the Hospital. Second, it should enjoin Defendants from further damaging Plaintiffs' mental health by failing to provide essential treatment. *Amici* have provided the Court with concrete, specific recommendations about what should be ordered, tied to professional standards and based on their undisputed expertise. ECF 78, 81, 81-1.

Although the basis for Defendants' constitutional violation is their failure to adhere to professional standards, and Plaintiffs request relief primarily aimed at rectifying those violations, this Court may order more than mere compliance with CDC and other relevant professional stanards, because, "[o]nce invoked, the scope of a district court's equitable powers ... is broad, for

36

breadth and flexibility are inherent in equitable remedies." *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (quoting *Milliken v. Bradley,* 433 U.S. 267, 281 (1977)).  Indeed, in *Hutto*, the Supreme Court approved a prophylactic remedy that required a halt to a practice that was not itself unconstitutional but was part of a "comprehensive" remedy to prevent future violations. *See id.* at 685-87. To similar effect is *Brown v. Plata*, 563 U.S. 493, 531-33 (2011), in which the Supreme Court affirmed a downsizing remedy in order to address unconstitutional conditions caused by overcrowding—even though the Constitution does not directly limit the number of people a state may incarcerate.

With these principles in mind, and with the goal of protecting Plaintiffs' health and safety by bringing the Hospital's practices into compliance with CDC and other professional standards, Plaintiffs request the following relief:

1)  The incorporation of current TRO directives, ECF 83, into a preliminary injunction. Defendants have failed to adhere to professional standards, and, as this Court noted, the public health crisis at the Hospital is ongoing.  ECF 82 at 6.  Even if Defendants could demonstrate full compliance with the TRO, which they cannot, "good faith and conscientious compliance with the Court's order does not demonstrate that extension of the order is unwarranted."   ECF 82 at 5. The Court should extend the first five paragraphs of ECF 83, regarding the treatment of exposed patients, the treatment of symptomatic patients, the assignment of staff, the point prevalence survey, and data management.

2)  Reduction of patient census.  Significant downsizing of Saint Elizabeths Hospital is the most effective way to prevent and control the spread of COVID-19 among the patients and to provide mental health care in the most integrated setting appropriate for patient needs.  ECF 81,

81-1; ECF 78; Jones Second Decl. (ECF 39-2) ¶¶8-10; Stern Decl. (ECF 39-3) ¶¶ 13-15; Jones

Decl. ¶¶ 17(a) & 17(j)(ii). To facilitate an orderly reduction consistent with the psychiatric needs

of the patients, the Court should order Defendants to:

> a. Evaluate <u>every</u> patient at least every 10 days to determine if they are "ready for
> discharge" under Hospital policies. *See* Jones Second Decl. (ECF 39-2) ¶ 11.
>
> b. Develop a detailed plan to ensure timely discharge from St. Elizabeths during the
> ongoing COVID-19 crisis that includes specific actions to incentivize
> community-based provider agencies to participate in planning and implementing
> discharges from St. Elizabeths; the provision of technical assistance; and
> resources for problem identification and remediation as discharge plans are
> implemented.  Jones Second Decl. (ECF 39-2) ¶ 11; ECF 78 at 10.
>
> c. Report biweekly to the Court and Plaintiffs on the results of the evaluations of
> patients for the "ready to discharge" list and the discharge of patients on the
> "ready to discharge" list.

3.   Provision of adequate mental health care.  All patients at Saint Elizabeths are, by

definition, in need of psychiatric care.  Yet during this crisis, Defendants have ceased providing

key components of that care and are not systematically providing alternatives that can be

implemented consistent with COVID-19 public health guidelines, such as virtual or telemedicine

alternatives.  *See generally* ECF 78.  To remedy this, and in line with *amici* recommendations, the

Court should order Defendants, by date certain, to "develop - and have the capacity to implement

immediately - alternative methods of providing group treatments as conditions change in the short-

, medium- and long-term that allow for reduction or tightening of social distancing."  ECF 78; s*ee*

*also* Jones Second Decl. ¶ 11.  Defendants should also be ordered by date certain to conduct individual assessments of each patient, with input from the patient's treatment team, the patient's attorney, and/or other supportive decision makers as determined by the patient, to determine the appropriate treatment plan given the COVID-19 crisis. Jones Second Decl. ¶ 11.  Finally, the Court should order that all treatment plans should be implemented with fidelity and be tracked by the appointed monitor (see below). *Id.*

In addition, the Court should order that Defendants immediately procure technology needed to implement patients' treatment plans in line with *Amici* recommendations, including iPads or similar devices for each patient, laptops or similar devices for each clinician who treats patients; and 12 additional video conferencing devices and suitable AV carts so that two different group activities can occur on each unit simultaneously.  ECF 78 at 20-21.

4.  Other relief.  To the extent not otherwise required by the Court's order, the Court should require Defendants to affirmatively consider implementing all recommendations of *amici*.  The Court should order Defendants to report to the Court within 10 days which recommendations they have adopted, which they plan to adopt with a timeline for adoption, and which they reject and the grounds for rejecting them.

5.  Independent Monitor. An Independent Monitor will be important to ensure compliance with the Court's Order. The Court should therefore appoint a Monitor, to be compensated by Defendants who should be authorized to conduct such factual investigations as are necessary to measure the Defendants' efforts at compliance with the preliminary injunction and Defendants' efforts to implement *amici* recommendations.  The Monitor should be authorized to have appropriate access to the Hospital, its patients, its staff, and its records. The Monitor should be

directed to file weekly reports until such time as the District reaches substantial compliance with all of the terms of the Preliminary injunction, and to file reports every 30 days thereafter.

    5. Reporting by the Defendants.  To permit the Court and the Plaintiffs to assess whether implementation of the injunction is effectively addressing the conditions at the Hospital, the Defendants should be required to provide to the Court, the Independent Monitor and the Plaintiffs a biweekly report that includes (i) the daily census of patients, (ii) the number of admissions, (iii) the number of patients assessed for changes to their treatment plans, (iv) the number of patients recommended for change in treatment, as well as any instance where the treatment has not been implemented, (iv) the number of patients the assessment team has assessed for placement on the "ready to discharge" list and the results of those evaluations (v), the number of patients discharged from the Hospital and where they were discharged to; (v) for any patients remaining in the facility, their COVID-19 status and their quarantine or isolation status, and (vii) summaries of all complaints reported to the Hospital's patient advocate.

## **CONCLUSION**

    For the foregoing reasons, the motion for preliminary injunction should be granted.


Dated:  May 14, 2020                    Respectfully submitted,

                                        /s/ John A. Freedman
                                        John A. Freedman (D.C. Bar No. 453075)
                                        Tirzah S. Lollar (D.C. Bar No. 497295)
                                        Brian A. Vaca (D.C. Bar No. 888324978)
                                        ARNOLD & PORTER KAYE SCHOLER LLP
                                        601 Massachusetts Avenue, N.W.
                                        Washington, D.C.  20004
                                        (202) 942-5000
                                        John.Freedman@arnoldporter.com
                                        Tirzah.Lollar@arnoldporter.com

Brian.Vaca@arnoldporter.com

Kaitlin Banner (D.C. Bar No. 1000436)
Margaret Hart (D.C. Bar No. 1030528)
Hannah Lieberman (D.C. Bar No. 336776)
Jonathan Smith (D.C. Bar No. 396578)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street, NW, Suite 400
Washington, DC 20005
Phone: (202) 319-1000
Fax: (202) 319-1010
kaitlin_banner@washlaw.org
margaret_hart@washlaw.org
hannah_lieberman@washlaw.org
jonathan_smith@washlaw.org

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org
aspitzer@acludc.org
mperloff@acludc.org