# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENZO COSTA, *et al.*,<br><br>            Plaintiffs,<br><br>v.<br><br>BARBARA BAZRON, *et al.*,<br><br>           Defendants. | Civil Action No. 19-3185 (RDM) |

## DECLARATION OF PHILIP CANDILIS, MD

I, Philip Candilis, MD, declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge acquired in the course of my official duties. I previously submitted a declaration in this matter [42-1].

2. I am the Director of Medical Affairs for Saint Elizabeths Hospital; I assumed the role of Director of Medical Affairs in late October 2017 and have served in this role continuously since. I am board-certified in both general and forensic psychiatry, and have practiced psychiatry for over 25 years.

3. As Director of Medical Affairs at Saint Elizabeths, I oversee medical and psychiatric care and am familiar with the Hospital's daily operations, including measures that protect patients and staff from COVID-19.

4. Since the closure of the Therapeutic Learning Centers (TLC) on March 17, 2020, the Hospital has continued to provide psychiatric care to all of our patients.

Each treatment team is covered by a licensed, board-certified psychiatrist (except under rare circumstances when a psychiatrist is awaiting certification) responsible for providing psychiatric care to the patients on that unit. When a patient first arrives at Saint Elizabeths, he or she is assigned to a housing unit and begins working with the treatment team on that unit. All patients may be prescribed medications for psychiatric and medical conditions, with our pharmacy data indicating that medication administration rates continue as before the pandemic.

5. Psychiatric care consists of psychiatric evaluations, the provision of medication, ongoing counseling, education, and support. Documentation audits reviewing these interventions have been clear that admission notes, 7-day, 30-day progress notes, consent forms, hospitalization certifications and re-certifications, and discharge summaries all continue at the same frequency and quality as before the pandemic. These documentations indicate that treatment from admission to discharge continues as before, encompassing regular meetings, consent discussions, and certification of the continued need for hospitalization.

6. In the course of clinical assessment, psychiatrists monitor patients for signs of anxiety, thought, and mood disturbance in the event their symptoms change in response to any stressors, including those arising from the pandemic. Pharmacy data provides assurance that "as needed" and urgent medication orders are down in the months of the pandemic. Restraint and seclusion episode rates are down as well. High rates would indicate patient and institutional strain and it is a positive sign that the numbers are down.

7. Because of the infection-control measures the Hospital has implemented to protect patients and prevent the spread of COVID-19, the Hospital has moved patients to different units when necessary to facilitate "cohorting" of COVID-positive patients together, and to isolate symptomatic patients who may have COVID-19. In general, to maintain the continuity of care, patients nevertheless continue working with the psychiatrist from their original treatment team even if they get moved to another unit. Hospital leadership determined that this continuity of care is important to limit disruption of treatment and maintain what are often long-standing relationships between psychiatrists and patients. The clinical stability this strategy offers maintains the patients' equanimity during a difficult but temporary move. Individuals in care are expected to return to their home units after they are medically cleared. Experienced clinicians do not want to undermine long-time treatment relationships at a time when change can be a serious clinical stressor.

8. Our clinical decisions to move individuals in care out of the CDC's category of Person Under Investigation (PUI) followed CDC guidance to use both testing and clinical judgment (what the CDC called "suspicion," at the time). I have reviewed the progress notes for the two individuals in care who were removed from PUI status prior to the Court's order on April 25, 2020, and returned to their units as COVID-negative. In addition to receiving one negative COVID test at the Hospital, each individual in care received a medical evaluation and assessment to rule out COVID suspicion prior to release from PUI status. This is in compliance with CDC guidance, which states, "ultimately, clinical judgement and suspicion of SARS-CoV-2

infection determine whether to continue or discontinue empiric 'Transmission-Based Precautions.'" Notably, both of these patients have been subsequently tested in the Hospital's multiple point of prevalence surveys and they remain COVID negative.

9. It is not the standard of care (or practice) for patients within a forensic psychiatric facility to have personal cell phones. It is Saint Elizabeths policy that individuals in care are not permitted to have a cell phone. In the forensic psychiatric setting, cell phones are commonly used to take photographs, make threats or weapons, to harass others, and to access inappropriate online content.

10. Psychiatrists continue to review each patient's behavior from the previous day by participating daily in morning rounds. This is the clinical multidisciplinary meeting among team members that begins the day and reviews any upcoming visits, treatments, or legal developments.

11. Psychiatrists continue to participate in regular interdisciplinary recovery plan meetings and development. These still occur once or twice weekly for the unit team to review each discipline's goals and expectations of treatment. Patients continue to attend in person.

12. Psychiatric management of patients continues as usual with in-person visits by psychiatrists using appropriate Personal Protective Equipment.

13. Documentation standards for admission, certifications, for progress notes, and discharge summaries are maintained as before COVID-19. Documentation includes Comprehensive Initial Psychiatric Assessment admission notes, consent forms, hospitalization certifications, 7-day and 30-day progress notes,

and discharge summaries. Requirements for psychiatric documentation have not been relaxed, as indicated by monitoring of the timeliness and quality of documentation.

14. Psychiatrists participate in Forensic Review Board meetings (*i.e.*, the meetings that assess readiness for privileges or discharge) as usual and continue to perform evaluations for involuntary psychiatric treatment (incapacity certifications, medication review officer reviews, involuntary medication panels) as well as periodic examinations and evaluations for civilly committed patients.

15. Daily Psychiatrist on Duty shifts have been covered without exception, as have overnight psychiatry call shifts (5:00 p.m. to 8:00 a.m., Monday through Friday, including weekends and Holidays).

16. During the May 5 and 6, 2020, visits to Saint Elizabeths Hospital, Dr. Canavan did not inquire about my individual review of restraint and seclusion incidents. In my role as Director of Medical Affairs, I regularly review patient records with multiple restraint and seclusion incidents to evaluate whether the treatment team is appropriately managing the behavioral challenges. For each individual in care, I dictate a progress note for the patient's medical chart acknowledging a review of these restraint and seclusion episodes and any next steps for providing feedback.

17. Civil admissions to Saint Elizabeths Hospital continue on a case-by-case basis, prioritized by review of the Medical Director and the Chief Executive Officer. All new admissions require a COVID-19 test, 14-day quarantine, a total of two negative tests before placement into a non-COVID-positive unit, and ongoing clinical

assessment. The most recent civil admission was on March 25, 2020, and the Hospital anticipates more requests from local hospitals for civil admissions in the coming weeks.

18. Absent any court orders, the Hospital will continue to follow the most recent CDC guidance on discharging patients from COVID-positive and PUI units. While the current guidance allows for symptom- and time-based strategies, it is the Hospital's policy to follow the test-based strategy. Under the test-based strategy, a patient will only be transferred off a COVID-positive unit after symptoms improve—if the patient was symptomatic—including resolution of fever without medication and improvement in respiratory symptoms, the patient receiving negative results from two tests administered at least 24 hours apart, and a clinical evaluation and assessment that the individual is no longer a risk. While CDC guidance permits a non-test based strategy to release an individual from a PUI unit, the Hospital will only release a patient from a PUI unit or room to a general unit after receiving negative results from two tests administered at least 24 hours apart and a clinical evaluation and assessment that COVID-19 is no longer suspected.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_May 18, 2020_____
DATED

Philip J. Candilis, MD, DFAPA
Director of Medical Affairs
Saint Elizabeths Hospital
Professor of Psychiatry, George Washington
University School of Medicine

6