# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENZO COSTA, *et al.*,<br><br>                Plaintiffs,<br><br>v.<br><br>BARBARA BAZRON, *et al.*,<br><br>                Defendants. | Civil Action No. 19-3185 (RDM) |

### DECLARATION OF ATIYA JACKSON

I, Atiya Jackson, declare and state as follows:

1. I am over the age of eighteen (18) years, am competent to testify to the matters contained in this declaration, and testify based on my personal knowledge acquired in the course of my official duties.

2. I am the Director of the Accountability Administration at the Department of Behavioral Health (DBH). I assumed this role in 2012 and have remained in this role continuously since then. In my position, I oversee mental health community residence facility (MHCRF) licensure, quality improvement, incident management and compliance monitoring. Through my position, I am aware of MHCRF operations, particularly as they relate to the COVID-19 emergency.

3. DBH licenses MHCRFs to provide community-based supervised care and a home-like environment to individuals with a principal diagnosis of mental illness who require twenty-four-hour on-site staff supervision, monitoring, and

assistance with activities of daily living. Each MHCRF is licensed to house a specified number of residents as reflected on its DBH license.

4. DBH has not relaxed MHCRF admission standards during the COVID-19 emergency. Consistent with Title 22-A, District of Columbia Municipal Regulations, Chapter 38, DBH expects that all MHCRF providers will fill all licensed MHCRF vacancies with qualified applicants, and that MHCRF providers consider applicants from Saint Elizabeths Hospital (SEH) equally to non-SEH applicants.

5. The DBH Office of Accountability has communicated directly with MHCRF operators who have expressed reluctance with admitting new residents from SEH. Following notice on May 1, 2020, that an MHCRF provider was refusing to admit any new residents during the COVID-19 emergency, I communicated directly with the provider on May 5, 2020, to explain the requirements in Mayoral Order 2020-63 to quarantine new admissions, and explained that the provider was not authorized to refuse to accept new residents. I explained that if the MHCRF provider refused to admit new residents, DBH would reduce his MHCRF license and the per diem contract amount to reflect the actual number of beds he was willing to fill in the MHCRF. DBH plans to follow-up with this provider the week of May 18, 2020. DBH had conversations with two other MHCRF providers who were reluctant to accept SEH admissions on May 1, 2020, May 7, 2020, May 9, 2020, May 14, 2020 and May 17, 2020.

6. DBH also issued a bulletin dated May 13, 2020, signed by DBH Director Dr. Barbara Bazron, to all providers explaining the requirements to accommodate

and quarantine new residents during the COVID-19 emergency. The bulletin is included as Attachment A.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

May 18, 2020  
DATED                                             ATIYA JACKSON

# ATTACHMENT 1



**District of Columbia
Department of Behavioral Health**

**Bulletin ID: 125**

**Bulletin Title: Guidance to Operators of Community-based Residences and Facilities to Comply with Mayor's Order 2020-063**

On March 11, 2020, Mayor Muriel Bowser issued Mayor's Orders 2020-45 and 2020-46, which declared a public emergency and a public health emergency in the District of Columbia in response to the novel coronavirus (COVID-19) pandemic.  In meeting the challenges and issues that have developed for vulnerable populations, the Mayor issued Mayor's Order 2020-063 (Mayor's Order), dated April 15, 2020, which establishes requirements for community-based residences to ensure the safety of residents and employees.  These requirements apply to residential providers that are licensed, certified and/or contracted by the Department of Behavioral Health (DBH). There are currently 96 Mental Health Community Residence Facilities (MHCRF) licensed by DBH pursuant to 22-A DCMR § 3800, 27 Substance Use Disorder (SUD) residential facilities certified by DBH pursuant to 22-A DCMR § 6300 and two DBH-contracted crisis bed facilities.

DBH is providing guidance to residential providers that outlines the requirements to comply with the Mayor's Order.[1]  Furthermore, Bulletin ID 125 shall serve as a DBH emergency policy that applies to all DBH-licensed MHCRF providers, DBH-certified SUD residential providers, and DBH-contracted crisis bed facilities.  This bulletin shall be effective immediately.

**Exclusion and Screening Protocols**

Residential providers must create and implement an exclusion and screening process, including the following:

1. Residential providers must exclude all non-essential visitors and non-essential personnel from entering the facility.  Only employees necessary to meet the facility's operational requirements and the following essential visitors shall be permitted to enter the facility:
    a. Hospice care workers;
    b. Emergency personnel;
    c. Lawyers or legal guardians approved for in-person visits with a client;
    d. Licensed, certified or registered healthcare professionals, including an allied health professional from whom services cannot safely and effectively be provided via telehealth;

---

[1]The full text of the Mayor's Order can be found at: https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/publication/attachments/MayorsOrder2020.063.pdf

      e. Individuals present for youth or emergency hearings held at a District government facility;
      f. Compassionate care visits for end of life care for an individual who does not have COVID-19, and
      g. Regulators, auditors, or court-appointed investigators.

2. Residential providers must maintain a daily log of employees and essential visitors who enter and exit the facility, including the time and date of entry and the purpose of the visit.
3. Residential providers must check the body temperature of each employee and essential visitor entering the facility. Anyone registering a temperature of 100.4 degrees Fahrenheit or above shall be prohibited from entering the facility.
4. Residential providers must screen each employee and essential visitor who enters the facility by asking the following questions:
    1. Do you currently have any COVID-19 symptoms?
    2. Have you been in contact with anyone recently diagnosed with COVID-19?

**Anyone who answers "yes" to either question must be prohibited from entering the facility.**
*Please note that emergency personnel are exempt from the screening questions.*

**Social Distancing Protocols**

Residential providers must ensure that residents, employees and essential visitors adhere to social distancing guidelines, including not shaking hands or engaging in any other unnecessary physical contact. Further, residential providers must cancel all group activities, except those required to address a medical need. Residential providers must ensure social distancing at mealtime by restricting all seating in communal dining areas, and allowing residents to pick up grab and go meals. If this is not feasible, the residential provider must ensure proper social distancing by spacing the residents at least six feet apart in communal dining areas or staggering mealtimes.

Residential providers must ensure social distancing in shared bedrooms by providing at least six feet of space between beds and having residents sleep head to toe.

To accommodate social distancing and proper visitor practices, residential providers must encourage and facilitate videoconference or telephone visits with residents for non-essential visitors. Additionally, residential providers must provide secure and private videoconference or telephonic communication platforms for telemedicine, lawyers and legal guardians.

Residential providers must provide all employees with a printed copy of guidance highlighting the requirements for hand washing and social distancing. If possible, employee workstations should be spaced at least six feet apart.

**Personal Hygiene, Personal Protective Equipment (PPE) and Cleaning Protocols**

Consistent hand hygiene is essential to reduce the spread of the coronavirus. Residents, employees and essential visitors must wash their hands for at least twenty seconds or disinfect their hands



P a g e | **2**

with an alcohol based hand sanitizer frequently throughout the day, including immediately upon entering the facility. To facilitate appropriate handwashing practices, residential providers must provide hand sanitizing products throughout the facility, including at the entry and exit. DC Health has developed posters on personal hygiene that the residential provider should display throughout the facility.[2]

To further facilitate employee hand hygiene, residential providers must ensure that all employees have consistent access to:
        a. Running water and soap;
        b. Tissues and lined trash receptacles that are frequently emptied;
        c. Store-bought alcohol-based hand sanitizer (containing at least sixty percent alcohol), and
        d. Disinfectant sprays or wipes.

Residential providers must follow DC Health guidance on masks and coverings for residents, staff and essential visitors.[3] Specifically, residential providers must provide face masks or coverings for all employees who provide direct individual care and for any employees who handle food or are involved in food preparation. If the residential provider is unable to obtain face masks, it should request masks from the Local Strategic Medical Supply. Residential providers must also provide cloth face coverings for residents. However, gloves, gowns, and face shields should be reserved for aerosolized procedures like nebulizer treatments and CPAP treatments. Residential providers should post DC Health guidance on masks and facial coverings throughout the facility.[4]

Residential providers must ensure that facilities are regularly cleaned and disinfected. High-touch surfaces and shared equipment (i.e. doorknobs, handrails, etc.) must be disinfected throughout the day. Residential providers shall clean and disinfect the facility pursuant to guidelines established by the Center for Disease Control (CDC).[5]

Residential providers must inform all employees in writing that they should not come to work if sick and of applicable paid leave provisions, if any.

---

[2]Please visit https://coronavirus.dc.gov/page/translated-materials-0 to access the posters in multiple languages.

[3]For more information, please visit: https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/images/DCHealth_Guidance_for_Essential_Non-Healthcare_Workers_on_How_to_Stay_Safe_In_The_Workplace.pdf

[4] A DC Health poster about face masks in multiple languages can be accessed at: https://coronavirus.dc.gov/page/translated-materials-0

[5] Please visit https://coronovaris.dc.gov for cleaning guidelines.



P a g e | 3

**Protocols for Suspected COVID-19 Cases**

Any employee who observes a resident displaying symptoms consistent with COVID-19 shall immediately notify their supervisor. Symptoms include the following:[6]
- a. Cough;
- b. Shortness of breath or difficulty breathing; or
- c. At least two of the following symptoms:
    - i. Fever;
    - ii. Chills;
    - iii. Repeated shaking with chills;
    - iv. Muscle pain;
    - v. Headache;
    - vi. Sore throat; or
    - vii. New loss of taste or smell.

If a resident is experiencing symptoms consistent with COVID-19, the residential provider must contact the resident's primary care physician, or 911 if the resident is experiencing a health emergency. The residential provider must follow the guidance of the resident's primary care physician and DC Health regarding COVID-19 testing. To schedule COVID-19 testing for an employee or to assist a resident, please contact the Testing Triage Center at (855) 363-03333. For Medicaid beneficiaries in need of transportation for testing, or transportation for medical appointments please contact the MTM reservation line at 1-866-796-0601. You may also email CO-DC@mtm-inc.net for any questions or concerns regarding MTM transportation.

A residential provider must follow DC Health quarantine and/or isolation guidance for suspected COVID-19 cases.[7] Further, a residential provider who suspects that an employee or resident may be COVID-19 positive must clean and disinfect the facility in accordance with CDC guidelines, as discussed above.

**Protocols for Confirmed COVID-19 Cases**

When a resident or employee tests positive for COVID-19, the residential provider shall institute quarantine and/or isolation measures in accordance with DC Health guidance. Residential providers should consult DC Health for the latest quarantine guidelines. However, at a minimum, a residential provider must ensure that the facility maintains separate quarantine units for (1) newly admitted individuals, who should be quarantined for fourteen days if feasible; and (2) individuals known or suspected to be COVID-19 positive. These groups should be kept separate from each other and the rest of the facility. If possible, the residential provider should designate a cohort of staff to care for COVID-19 positive residents. Further, the residential provider must ensure that the facility is cleaned and disinfected pursuant to CDC guidelines, as discussed above.

---

[6] For a current list of symptoms, please visit https://coronavirus.dc.gov.
[7] For current quarantine guidance, please visit https://coronavirus.dc.gov.



Any resident who shared a common area with a COVID-19 positive resident or employee should be screened through:
   a. A temperature check;
   b. A questionnaire regarding COVID-19 symptoms, and
   c. A COVID-19 test as soon as practicable.

Residential providers must report all confirmed COVID-19 cases among facility residents and employees as follows:
   a. Upon receipt of a positive COVID-19 test result for a resident or employee, the residential provider must notify the Core Service Agency (if applicable) of all residents in the facility. Absent a valid release of information, the residential provider shall not release any protected health information (PHI) under the Health Insurance Portability and Accountability Act (HIPAA), and shall only advise that someone in the facility tested positive for COVID-19.
   b. The residential provider shall notify DBH and DC Health when anyone in the facility tests positive for COVID-19, including submitting Major Unusual Report to DBH pursuant DBH Policy 480.1A.

Residential providers must permit any resident who left the facility for care at a community hospital for COVID-19 or any other approved reason to return to the facility.

Residential providers should be prepared to house residents with COVID 19. They should be able to appropriately isolate a resident with COVID from other non-infected residents. They should also be able to effectively quarantine a new resident away from other residents if there is a concern they were exposed to someone with COVID 19. If a resident is returning with a COVID-19 diagnosis they do have to remain in isolation until they are cleared using the two negative tests method.

**Continuity of Operations Plan**

Every facility must have an updated Continuity of Operations Plan (COOP) to provide for continued resident care if a large number of staff become sick or if the facility is evacuated. The COOP must also identify alternative locations within each facility or alternative licensed or certified facilities where quarantine and isolation functions can be carried out, where applicable and possible. Residential providers must provide updated COOPs to the Accountability Administration by 5:00 pm on May 15, 2020 for approval. For technical assistance, please contact Shannon Goodhue, Director, Disaster Behavioral Health and Support Collaborations.

**Enforcement**

DBH will enforce these provisions through frequent compliance checks and other mechanisms conducted by the Accountability Administration. Failure to comply with any provision of this bulletin shall result in the issuance of DBH sanctions against the facility. Please note that the



P a g e | **5**

Mayor's Order states that knowing violations of the Order may subject the individual or entity to civil, criminal, and administrative penalties authorized by law. Individuals should call 311 to report any suspected violations of any Mayor's Order related to the COVID-19 public health emergency.

**Resources**

For more information about COVID-19, including a list of symptoms, testing centers and the District's response, please visit https://coronavirus.dc.gov/.

For a list of COVID-19 DC Health Guidance Documents, please visit https://dchealth.dc.gov/page/health-notices.

For questions about this bulletin, please contact Atiya Jackson, Deputy Director, Accountability Administration, at Atiya.Jackson@dc.gov.

Barbara J. Bazron, Ph.D.
Director, DBH

_____ 05/13/2020
(Signature)                          (Date)

