# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENZO COSTA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BARBARA BAZRON, *et al.*, <br><br> Defendants. | Civil Action No. 19-3185 (RDM) |

## DECLARATION OF MARTHA PONTES, R.N.

I, Martha Pontes, R.N. declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge acquired in the course of my official duties. I previously provided a declaration in this matter [42-4].

2.      I am the Interim Chief Nurse Executive for Saint Elizabeths Hospital. I have worked at Saint Elizabeths Hospital since January 2009. I have served in a variety of roles, including Risk Manager, Assistant Director of Nursing, Director of Nursing Performance Improvement, and Interim Chief Nurse Executive.  I assumed the role of the Interim Chief Nurse Executive on April 13, 2020, and have served in this role continuously since.

3.      As the Interim Chief Nurse Executive, I am responsible for providing guidance, leadership and direction for all professional nurses and paraprofessional nursing staff within the framework of established psychiatric, medical and

administrative policies and procedures. This includes the responsibility for the planning, development, implementation, coordination, review and evaluation of all nursing service and nursing-related training programs. Through my position, I am aware of Saint Elizabeths Hospital operations on a daily basis to protect patients and staff from COVID-19.

4.      There are on average 230 nurses and Behavioral Health Technicians (BHT) reporting to work each day across three shifts over all of our patient units. Generally, there are 12 units, although during the COVID-19 emergency we have, when necessary, established one additional unit. Each nurse and BHT is assigned a base unit where they provide care for patients.

5.      I exercise professional judgment in considering the need to properly and safely staff each unit to ensure patients receive adequate care and treatment, the particular medical, psychiatric and security needs of each unit, and the unit's COVID-19 status, among other things. In limited circumstances, there may be a need to reassign a staff member to another unit to ensure adequate staffing for a particular shift. Normally, any reassignment would occur at the beginning of the shift before the staff member enters the patient care area. Once a shift begins, it is relatively rare that reassignment occurs, but I have determined it is permissible in the following circumstances to ensure safe staffing levels on all patient care units: (1) when a patient experiences a behavioral emergency that requires one-to-one staff supervision that could not otherwise be provided; (2) when another staff member suddenly falls ill or suffers an injury; (3) when a patient requires external hospitalization with one-

to-one staff supervision; and (4) when patient behavior creates a sudden change in the acuity and risk to others on a unit.

6.      The Hospital's Nursing Department considers the COVID-19 status of a unit in evaluating staff reassignments and approval of overtime. Whenever possible, staff will be assigned for overtime on the same unit they work their daily shift. The Nursing Department does not approve a staff member working on a COVID-positive unit to work overtime on a non-COVID-positive unit on the same day. When necessary to ensure adequate staffing, the Nursing Department may approve overtime for a staff member working on a non-COVID-positive unit to work on a different unit with the same COVID status or a COVID-positive status. After working overtime on a COVID-positive unit, a staff member is not allowed to return to his or her base unit until the next day and must pass through the daily employee screening before doing so. Before entering a patient care area on any unit, all staff are trained to conduct hand hygiene before and after donning the appropriate PPE according to the unit status. Similarly, staff leaving a unit must conduct hand hygiene and doff the PPE.

7.      The Nursing Department has prohibited all nursing staff from traveling to other units during their shift except when necessary for official purposes. Amid medical emergencies and psychiatric emergencies, for example, it may be necessary for staff to move between units to ensure the safety of patients and staff.

8.      The Hospital has a contract with a nurse staffing agency to provide supplemental staff during the COVID-19 emergency. Prior to the pandemic, the

3

Hospital had contracted with this agency to staff 15 certified nursing assistant (CNA) shifts and four registered nurse (RN) shifts on each weekend. The total pool from which to draw was nine CNAs and six RNs. The number of shifts that are now available has been expanded to include weekdays.

9.     As a result of the pandemic, a new and supplemental contract was awarded to another vendor to provide an additional 14 CNAs and 21 RNs, tripling the Hospital's contract staffing capacity.

10.    To ensure adequate safety and care of patients, the Hospital does not permit an entire unit to be staffed only by contract nursing staff.

11.    The Hospital's Nursing Training Department and Infection Control Coordinator have trained and continue to train all staff in proper donning and doffing of PPE. During all-staff video meetings three times a week, the Nursing leadership, Nursing Training Department, and the Infection Control Coordinator reinforce proper PPE use, hand hygiene, and infection control practices. On May 15 to 16, 2020, two epidemiologist experts from the Centers for Disease Control and Prevention (CDC), Zeshan Chisty and Samira Sami, and infection control experts from the D.C. Department of Health (DC Health) visited the Hospital and inspected several units. The CDC and DC Health representatives met with nursing and housekeeping leadership to discuss PPE and infection control. On May 16, 2020, the CDC provided three separate training sessions to Hospital staff on PPE use and hand hygiene. Approximately 80 staff took and passed a written test, and CDC evaluators observed

4

and provided feedback to staff donning and doffing PPE in real time. Additional training by the same team is scheduled to occur on Wednesday, May 20, 2020.

12.     The Hospital continues to provide face masks to patients.

13.     At my direction, the Hospital nursing staff continue to enforce social distancing and patient masking to the greatest extent possible. However, in light of the unique mental health needs of our patient population, I have worked with our Chief Clinical Officer and our Infection Control Coordinator to determine that enforcement of the Hospital's patient masking and social distancing policy must consider the unique mental health needs and capacities of individual patients. For example, if a patient is observed in a common area without a mask or sitting too close to another patient, a staff member will approach the patient and engage with him or her about wearing a mask in a way that is appropriate to the patient's individual needs. For some patients, this is a simple reminder to wear a mask or an offer to provide a new mask. If a patient refuses to wear a mask or practice social distancing, staff members will normally redirect the patient to his or her room or an empty area of the unit. In my judgment, the use of physical force or restraint in not an appropriate tool to enforce masking and social distancing because its use could be detrimental to the mental health of the patient. Based on my personal observations, the majority of patients continue to wear masks and practice social distancing when in common areas.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_05.18.00_
DATED

_[signature]_
MARTHA PONTES, R.N.

6