## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ENZO COSTA, *et al.*,

                *Plaintiffs*,

      v.

                             Civil Action No. 19-3185 (RDM)

BARBARA J. BAZRON, *et al.*,

                *Defendants*.

## <u>MEMORANDUM OPINION</u>

Plaintiffs Enzo Costa, Vinitia Smith, and William Dunbar, three patients who are indefinitely and involuntarily committed to the District of Columbia's care and housed at Saint Elizabeths Hospital ("Saint Elizabeths" or the "Hospital"), bring this action on behalf of themselves and a putative class of similarly situated persons. Plaintiffs allege that the District, the Director of the D.C. Department of Behavioral Health, and the Chief Executive Officer of the Hospital have violated the constitutional rights of patients at Saint Elizabeths by failing to ensure that they are housed in safe conditions in the face of the ongoing COVID-19 pandemic and by failing to provide them with adequate mental health treatment during the pandemic. *See* Dkt. 50. They further allege that Defendants have continued to detain patients deemed "ready for discharge" in violation of the Americans with Disability Act ("ADA"), 42 U.S.C. §12131 *et seq.* and the Constitution. Dkt. 87 at 6. On April 25, 2020, the Court granted Plaintiffs' motion for a temporary restraining order ("TRO") in part, Dkt. 59, and ordered that Defendants adopt certain infectious disease control and prevention measures and that they provide periodic reports to the Court, Dkt. 60. The Court later extended the TRO and expanded it in two respects relating to

infectious disease control and prevention.  Dkt. 83.  Plaintiffs now seek to convert the TRO into

a preliminary injunction and request that the preliminary injunction also include relief relating to

the Hospital's provision of mental health services and the discharge of patients.  Dkt. 87.

Defendants oppose the motion.  Dkt. 90.  For the reasons explained below, the Court will convert

certain aspects of the TRO into a preliminary injunction but will deny Plaintiffs' other requests

for preliminary relief.

## I.  BACKGROUND

The Court has recounted much of the relevant factual background and procedural history

at length in its earlier memorandum opinions, *see Costa v. Bazron*, 2020 U.S. Dist. LEXIS

73944, at *2–14 (D.D.C. Apr. 25, 2020) ("*Costa I*"); *Costa v. Bazron*, 2020 U.S. Dist. LEXIS

83565, at *2 (D.D.C. May 11, 2020) ("*Costa II*"), and will only summarize and add to that

background as necessary for the pending motion.

Saint Elizabeths is the District of Columbia's "only public psychiatric facility for

individuals with serious and persistent mental illness who need intensive inpatient care to

support their recovery."  Dkt. 50 at 7 (Am. Compl. ¶ 25).  "The [H]ospital can support a census

of 296 patients and has a workforce of 786 staff members."  Dkt. 81 at 3.  The named plaintiffs

in this case are three patients indefinitely and involuntarily committed to the District of

Columbia's care and housed at Saint Elizabeths.  *Id.* at 6–7 (Am. Compl. ¶¶ 19–22).  According

to counsel for Defendants, each of the named plaintiffs was committed following a verdict of not

guilty by reason of insanity, and each may be released only with a court order.  *See* May 22,

2020 Hrg. Tr. (Rough at 38).

The COVID-19 pandemic is, by now, well-known to all.  On March 20, 2020, Saint

Elizabeths "identified" the first case of COVID-19 at the facility "but obtaining the . . . test and

the [test] results [for that patient] was delayed until April 1, 2020." Dkt. 81 at 3.  On April 13, 2020, less than two weeks after the Hospital publicly reported the first case, it reported that "28 patients and 43 staff had tested positive for COVID-19," that "105 patients were in either isolation or quarantine," and that "four patients ha[d] died."  Dkt. 36 at 3.

Within days of that public report,[1] Plaintiffs moved for a TRO, asserting that the rapid spread of the virus at the Hospital was caused by, among other things, Defendants "failure to implement CDC Guidance regarding testing of symptomatic individuals, medical isolation of symptomatic individuals, [and] quarantine of persons who test positive for COVID-19."  Dkt. 36 at 3.  Plaintiffs also argued that the Hospital failed to comply with CDC guidance with respect to social distancing, mask use, and hygienic practices.  *See, e.g.*, Dkt. 39-6 at 1 (Costa Decl. ¶¶ 4–7); Dkt. 39-6 at 1–3 (Guzman Decl. ¶ 3a–c); *see also* Dkt. 42-5 at 5 (Pontes Decl. ¶ 10) (attesting that staff does "as much as they can to ensure patients practice social distancing," but reporting that it "is difficult to enforce without impinging on patient autonomy"); *id.* at 6 (Pontes Decl. ¶ 13) (attesting that patients have access to face masks upon request and that "[s]ome patients choose to wear masks, others do not").  Finally, Plaintiffs maintained that the Hospital had also fallen short in its provision of mental health services during the pandemic and, in particular, that the Hospital was not taking steps to ensure that the patients received the mental health care they require (such as by providing remote alternatives for group and individual therapy); was not updating mental health treatment plans to account for pandemic-related stress; and was not releasing eligible patients into community-based programming.  *See, e.g.*, Dkt. 39 at 33.

---

[1]  Although the motion for a TRO was filed on April 18, 2020, Plaintiffs had filed a motion for an emergency hearing two days prior, on April 16, 2020.  *See* Dkt. 36.

After expedited proceedings that focused on the most pressing issues, the Court granted Plaintiffs' motion for a temporary restraining order in part. Dkt. 59. Among other things, the TRO required Saint Elizabeths, "[t]o the extent medically and psychiatrically practicable," to isolate individuals who had been exposed to COIVD-19; to "conduct clinical evaluations prior to releasing patients suspected of having COVID-10 . . . from isolation" and, in cases involving heightened "clinical suspicion," to "administer test-based criterion of two negative tests . . . prior to discontinuing isolation;" and to report to the Court and Plaintiffs' counsel regarding compliance with these requirements. Dkt. 60. As the Court noted in its memorandum opinion, by April 23, 2020, forty-three Saint Elizabeths patients had tested positive for the virus and seven had died—a mortality rate magnitudes higher than the rate for the District as a whole. *See* Dkt. 80 at 48 (estimating that the Hospital's mortality rate was "40 times" that of the general population in the District).

Following the entry of the TRO, the Court appointed Dr. Ronald Waldman, Ms. Joan Hebden, and Dr. Patrick Canavan as *amici curiae* to conduct an investigation and to provide information to the Court relating to a list of questions relevant to Plaintiffs' claims. Dkt. 68. On May 11, 2020, the *amici* filed their reports with the Court, summarizing their findings and recommendations. Dkt. 78; Dkt. 81. That same day, the Court found that good cause existed to extend the TRO until May 22, 2020 because (1) the parties needed time to brief Plaintiffs' motion for preliminary injunction; (2) the public health crisis at the Hospital was ongoing; and (3) Defendants good faith efforts to comply with the TRO did not obviate the need for court-ordered relief. Dkt. 82. The Court further found that the TRO should be expanded to require Defendants to conduct "point prevalence surveys" ("PPSs") and to restrict cross-unit staff

movements—both CDC recommended measures that *amici* found the Hospital had yet to implement in important respects.

Plaintiffs now move to convert the TRO into a preliminary injunction and to include additional relief that goes beyond that included in the TRO. Dkt. 87. Defendants oppose Plaintiffs' motion. Dkt. 90. The Court heard oral argument on the motion earlier yesterday. To date, thirteen Saint Elizabeths patients and one staff member have died from the virus.

## II. LEGAL STANDARDS

"Preliminary injunctive relief is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Banks v. Booth*, No. 20-849, 2020 U.S. Dist. LEXIS 68287, at *15 (D.D.C. Apr. 19, 2020) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392, (D.C. Cir. 2011)). To obtain a preliminary injunction, a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted). Before the Supreme Court's decision in *Winter v. NRDC*, 555 U.S. 7 (2008), courts in this circuit applied a "sliding-scale" approach under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Since *Winter*, the D.C. Circuit has hinted on several occasions that "a likelihood of success is an independent, free-standing requirement," *id.* at 393 (quotation omitted), but it "has not yet needed to decide th[e] issue," *League of Women Voters of*

*U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). "In light of this ambiguity, the Court shall consider each of the [four] factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome." *Banks*, 2020 U.S. Dist. LEXIS 68287, at *7.

## III.  ANALYSIS

**A.      Likelihood of Success On The Merits**

The Court must first consider whether Plaintiffs have established a likelihood of success on the merits.

1.      *Due Process*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)). Involuntarily "committed persons have a constitutional right, protected by the due process clauses of the Fifth and Fourteenth Amendments, in the government meeting that obligation." *Costa I*, 2020 U.S. Dist. LEXIS 73944, at *16. In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Supreme Court held that because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," *id.* at 321–22, the "deliberate-indifference standard" applicable to prisoners' rights is not controlling in cases involving involuntarily committed persons, *id.* at 312 n.11. Instead, "the proper balance between the legitimate interests of the State and the rights of the involuntarily committed" is reflected by a "professional judgment" standard. *Id.* at 321. The parties agree that the *Youngberg* provides the applicable standard for assessing Plaintiffs' due

process claims.  *See* May 22, 2020 Hrg. Tr. (Rough at 13) ("We agree that it is the *Youngberg* standard.").

Under the *Youngberg* standard, "liability may be imposed only when the decision by the professional [constitutes] such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.  In assessing the choices made, it is not appropriate for a court to "specify which of several professionally acceptable choices should have been made," but, at the same time, the court must "make certain that professional judgment in fact was exercised." *Id.* at 321 (quotation omitted).  Although an involuntarily committed person need not show deliberate indifference to prevail, the *Youngberg* standard "requires more than simple negligence" on the part of the State.  *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996); *see also Patten v. Nichols*, 274 F.3d 829, 843 (4th Cir. 2001) (collecting cases holding that *Youngberg* requires more than negligence but less than deliberate indifference).  This deferential standard recognizes that judges are not "better qualified than appropriate professionals" to make decisions relating to the physical and mental health of patients and that, to the extent possible, "interference by the federal judiciary with the internal operations of . . . institutions [for involuntarily committed individuals] should be minimized."  *Youngberg*, 457 U.S. at 322.  In assessing whether a decisionmaker exercised professional judgment, moreover, the Court must apply the test in light of all of the relevant circumstances: here, the rapidly evolving demands on the decisionmakers but also the devastation caused at the Hospital by the virus.  The Court cannot treat the prevalence of the virus and the number of deaths it has caused at the Hospital as prima facie evidence of a failure to exercise professional judgment, nor can it ignore that troubling context.

Plaintiffs' due process claims fall into two general categories: (1) infectious disease control and prevention measures and (2) the provision of mental health care. The Court will consider each category in turn.

a.       *Infectious Disease Control and Prevention Measures*

The Court has already issued two opinions analyzing Defendants' infectious disease control and prevention measures and has concluded that their response has, at least in certain respects, substantially departed from accepted professional judgment. The present motion does not mirror Plaintiffs' motion for a TRO, however, in four respects.

First, Defendants now point to evidence of their compliance with the Court's orders and to improvements they have made in their efforts to stem the spread of the virus to suggest that injunctive relief is no longer warranted. *See, e.g.*, Dkt. 90 at 46 ("[T]he District's reports to the Court confirm the Hospital's continued compliance with the measures the Court has ordered."). Although the Court commends Defendants for implementing those measures, Defendants cannot claim that the need for an injunction is now moot because the Hospital has "ceased its wrongful conduct," *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497 (D.C. Cir. 1995), particularly where it did so following the entry of a TRO. A "'court's power to grant injunctive relief survives discontinuance of the illegal conduct,' . . . because the "'purpose . . . is to prevent future violations.'" *U.S. Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)). If compliance with the terms of a TRO were sufficient to defeat entry of a preliminary injunction, few—if any—cases would make it past the TRO stage. That is true even when, as here, a defendant has acted conscientiously and in good faith.

Second, Defendants point to new evidence regarding the Hospital's efforts to combat the spread of the virus, both before and after entry of the TRO.  In granting Plaintiffs' motion for a TRO, the Court acknowledged that "additional development of the record might show that Defendants are taking sufficient precautions not evident on the current record."  *Costa I*, 2020 U.S. Dist. LEXIS 73944, at *25.  Since the Court issued that opinion, the record has grown by hundreds of pages, including additional declarations and, importantly, the report of the Court-appointed *amici*.  The Court will discuss this evidence below in the context of each of the alleged deficiencies in the Hospital's response.

Third, relying on the reports and recommendations of the Court-appointed *amici*, Plaintiffs seek to expand the scope of the injunction in certain respects.  Those reports and recommendations, and the extraordinary efforts of *amici* more generally, have been of invaluable assistance to the Court and the parties.  The Court will address the additional measures recommended by *amici* below in the context of considering each of Plaintiffs' requests for relief.

Fourth, Defendants conceded at the TRO stage "that Saint Elizabeths should be doing what is consistent with CDC guidance," Dkt. 80 at 57, but they now offer a more nuanced position.  Although they maintain that the Hospital has, in fact, complied with CDC guidance in all material respects, they also contend that the *Youngberg* standard does not demand compliance with that guidance; rather, it requires only that the decisionmakers exercise professional judgment, which might not always track the guidance.  *See* Dkt. 90 at 25 ("[P]laintiffs are incorrect that a deficiency in care alone would establish a violation of their due process rights.").  In the abstract, Defendants are correct that the failure to follow CDC guidance does not mean that the Hospital failed to exercise professional judgment.  It is not difficult to imagine times, for example, when the CDC guidance might be incompatible with the vital needs of a patient

suffering from severe mental illness.  But given the extraordinary threat to life and safety posed by the rapid spread of the virus among the Hospital's patients, a failure to comply with significant CDC guidance raises the question why the guidance was not followed.  As noted above, thirteen patients (and one member of the staff) have died and 79 patients have been infected.  *See* Dkt. 87-1 at 9.  Although the population at the Hospital has declined over the past two months making mathematical precision difficult, roughly one out of every twenty patients has died and more than one out of every three patients have been infected.  Against this tragic backdrop, Defendants at least bear the burden of coming forward with some identified reason based in professional judgment for failing to comply with CDC COVID-19 guidance.  *See Youngberg*, 457 U.S. at 321 (observing that the Constitution requires that "courts make certain that professional judgment in fact was exercised").

Although Defendants are surely right that the "unfortunate circumstances" at the Hospital do not, standing alone, amount to a constitutional violation, *see* Dkt. 90 at 29–30 (arguing that there is no *res ipsa loquitor* principle for constitutional torts), the extraordinary circumstances at the Hospital inform the baseline professional judgment against which to measure Defendants' response.  At least with steps that could stem the spread of the virus at the Hospital, a failure to comply with the CDC guidance requires some explanation grounded in professional judgment.

With this context in mind, the Court now turns to the challenged decisions.

i.    Isolation and Quarantine Policies

The parties (and *amici*) agree that the Hospital is now following many of the CDC's recommendations regarding isolation and quarantine.  *See, e.g.*, Dkt. 81 at 14 (discussing the practices *amici* observed during on an on-site visit conducted on May 5, 2020 and remotely through video cameras).  But the parties draw different conclusions from the current state affairs.

In Plaintiffs' view, it was this litigation that led to the improved circumstances, and a preliminary injunction is necessary to protect their safety so long as the virus remains present at the Hospital. *See* 87-1 at 6–7 ("While the Hospital has modified certain practices in response to this lawsuit, these measures have not been enough."). Defendants disagree on two grounds. They first assert that there is no ongoing due process violation to remedy. Second, they contend that it was never the case that "Saint Elizabeths 'was housing individuals with COIVD-19 symptoms together with non-symptomatic individuals.'" Dkt. 90 at 31.

Defendants' first theory requires little discussion. To the extent Plaintiffs are correct and the Hospital failed to isolate symptomatic patients (who had not yet been tested) from non-symptomatic patients until ordered to do so, mere compliance with the existing TRO does not obviate the need for preliminary relief. *See Mays v. Dart*, No. 620-2134, 2020 U.S. Dist. LEXIS 73230, at \*94 (N.D. Ill. Apr. 27, 2020) (converting a TRO that directed a prison to implement measures to protect detainees from COVID-19 into a preliminary injunction even though it appeared that the defendant had complied with the TRO); *see also Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2003) ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."); *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275 (7th Cir. 2009) (recognizing that a district court has discretion to find that cessation is "not voluntary" where cessation occurs "only after a lawsuit has been filed").

Consideration of Defendants' second theory, however, requires an understanding of the factual record, as supplemented in the parties' most recent submissions. According to Plaintiffs, before they brought this suit, the Hospital was housing individuals with COVID-19 symptoms together with non-symptomatic individuals. Moreover, even after symptomatic (and exposed) patients were separated from non-symptomatic (and non-exposed) patients, the Hospital did not

quarantine symptomatic (and exposed) patients from one another.  Dkt. 87-1 at 20.  In support of this contention, Plaintiffs cite several declarations.  They cite to Enzo Costa's April 17, 2020 declaration, attesting that a "patient in [his] unit [was] symptomatic for COVID-19" yet was simply "self-quarantining in his room" in the unit.  Dkt. 39-6 at 1 (Costa Decl. ¶ 6).  They cite to William Dunbar's April 17, 2020 declaration, which attests that until April 15, 2020, two COVID-positive patients remained in his unit, with asymptomatic patients and potentially exposed patients, and continued to interact with other members of unit "in the common areas where they watch[ed] television or go water."  Dkt. 39-7 at 1 (Dunbar Decl. ¶ 5).  According to Dunbar, he was then transferred to the Therapeutic Learning Center ("TLC"), where a unit had been set up for exposed patients who were not symptomatic.  Dkt. 87-6 at 1 (Dunbar Supp. Decl. ¶ 4).  Dunbar further attests that patients were "not tested for COVID-19" before being transferred to the TLC and that it is his "understanding that most patients who had been moved from 2A to the TLC . . . ended up contracting COVID-19;" Dunbar himself contracted the virus after being transferred to the TLC.  *See id.* (Dunbar Supp. Decl. ¶ 5).

Plaintiffs also point to the declaration of Yi-Ling Elaine Tu, the Infectious Control Coordinator for Saint Elizabeths, who notes that the Hospital had established the Patients Under Investigation ("PUI") unit for patients who were suspected of having COIVD-19 and who were awaiting test results, but who makes no reference to quarantining within that unit—that is, taking steps to ensure that those suspected cases that were positive did not spread the virus to those suspected cases who were negative.  Dkt. 42-5 at 4 (Tu Decl. ¶¶ 7–8).  Finally, Plaintiffs point to Dr. Waldman's conclusion that, even after the TRO was issued, the Hospital had accomplished the cohorting of the patient population "reasonably well, but obviously imperfectly."  Dkt. 77 at 8.

In response, Defendants also invoke Tu's original declaration, which explained that the Hospital had, prior to issuance of the TRO, housed "all of the . . . known positive COVID-19 cases . . . in two specific units . . . and that patients that exhibits symptoms [were] referred to the Patients Under Investigation Unit (PUI)."  Dkt. 42-5 at 4 (Tu Decl. ¶ 7).  To this, Defendants now add a supplemental Tu declaration, which explains that the decision to house patients in the TLC was made "to minimize the transmission of COVID-19" and so that the Hospital could transform unit 2A into a "COVID-19 positive unit."  Dkt. 90-1 at 6 (Tu Suppl. Decl. ¶ 12).  She further attests that, prior to implementing that decision, she discussed it "via telephone and e-mail with Dr. Joel Selanikio from DC Health" and that, two days[2] after the measure was implemented, the CDC and DC Health visited Saint Elizabeths and "agreed with the Hospital's decision to move 17 asymptomatic patients from unit 2A to the [TLC] gymnasium."  *Id.*; *see also* Dkt. 90-2 at 4 (Selanikio Decl. ¶ 9) (attesting that he advised Tu that the Hospital could use the TLC to house asymptomatic patients "if necessary, to create a unit to cohort patients").  On April 24, 2020, a little over a week after the measure was implemented (and the same day the Hospital began receiving additional testing kits), "all patients on the TLC were moved back to a regular unit."  Dkt. 90-1 at 6 (Tu Supp. Decl. ¶ 12).  Finally, Defendants cite to Dr. Waldman's observation that the Hospital "has made a remarkable effort" to quarantine and isolate patients but that "[d]ue to delays in determining the viral status of all patients and [staff], along with the unavoidable mobility of [staff] into the community, maintaining the integrity of these units has proven to be challenging."  Dkt. 81 at 4.

---

[2]  Dunbar attests that he was moved to the TLC on April 15, Dkt. 39-7 (Dunbar Decl. ¶ 6), and Tu states that CDC and DC Health visited Saint Elizabeths on April 17, Dkt. 90-1 at 6 (Tu Supp. Decl. ¶ 12).

The flaw with Defendants' response is that it does not address the principal ground on which the Court issued a TRO relating to the Hospital's quarantining and isolation polices.  As the Court explained:

> According to Defendants, the Hospital has already addressed the first pressing issue that Plaintiffs raise—the alleged failure to isolate patients exposed to the virus—by treating all units as "quarantined." . . . The problem with that assertion is that Defendants' implementation of the quarantine does not satisfy CDC standards.  The CDC recommends that long-term care facilities "[e]nforce social distancing among residents," "[e]nsure all residents wear a cloth face covering . . . whenever they leave their room or are around others," and, if the virus "is identified in the facility, restrict all residents to their rooms[.]

Dkt. 59 at 13.  Most importantly, Defendants fail to explain what "professional judgment" would support housing individuals exposed to the virus in the same space, without isolating patients from one another *within that space* to prevent those who were positive from infecting those who were not.  *Cf.* Dkt. 55-1 at 6 (CDC LTCF Guidance) (instructing that "[i]f there are [COVID-19 positive] cases in the facility, [the facility should] restrict residents (to the extent possible) to their rooms except for medically necessary purposes"); *see also* Dkt. 39-3 at 3 (Stern Decl. ¶ 12) (declaration of Plaintiffs' expert, Dr. Marc Stern, indicating that the patients at the Hospital are "placed at an imminent and heightened risk from COVID-19," if, among other things, the Hospital fails "to place [a] person who ha[s] had close contact with [a] person suspected or proven to have COVID-19 in isolation in a timely manner"); *see also id.* at 5 (Stern Decl. ¶ 16) ("The Hospital must establish clinically effective quarantine for all individuals believed to have been exposed to COVID-19, but are not yet symptomatic[.]").

The only evidence that Defendants offer that might controvert the Court's prior findings that the Hospital had substantially departed from professional judgment by not isolating exposed patients from one another is the declaration of Dr. Joel Selanikio, an epidemiologist with approximately 25 years of experience who served as a consultant for the D.C. Department of

Health's "COVID-19 Response," Dkt. 90-2 at 2–3 (Selanikio Decl. ¶¶ 2,6).[3]  He attests that

based on his conversations with Tu, his "understanding of Saint Elizabeths infections control

measures, his own personal observations of the Hospital, and his conversations with CDC

personnel during his visit with them to the facility, he believes "that Saint Elizabeths practices

related to the cohorting, isolation, and quarantine of patients at that time complied with CDC and

DOH guidance." *Id.* at 4 ((Selanikio Decl. ¶ 11).  This conclusory assertion, however, neither (1)

refutes the premise that, before Plaintiffs moved for a TRO, the Hospital was not isolating

exposed patients from other patients nor (2) demonstrates that such an evidently perilous practice

was a product of professional judgment.  Indeed, Defendants' own representations suggest that

they only began treating all units "as though they are in quarantine" after Plaintiffs sought a

TRO.  *See* 55-1 at 6 (CDC guidance recommending that *all residents* be isolated once there is a

positive case); 53-2 at 2 (indicating, on April 23, 2020, that the Hospital had previously not

placed all units on quarantine but had now adopted that policy).

      The Court, accordingly, concludes that the foundation for its prior order relating to the

need to isolate exposed patients remains sound and that Plaintiffs have demonstrated a likelihood

of success on merits with respect to the need for this isolation (to the extent medically and

psychologically practicable).

---

[3]  Although the supplemental Tu declaration indicates that the Hospital was conducting some
isolation for *symptomatic* patients prior to the TRO, *see* Dkt. 90-1 at 5 (Tu Supp. Decl. ¶ 8)
(indicating that, as of March 30,2020, the Hospital was isolating two or three patients at a time in
separate rooms if they "exhibited potential COVID-19 symptoms"), it does not rebut Plaintiffs'
evidence that *exposed* patients were not being isolated.  It bears emphasis, moreover, that the
existing CDC guidance recommended that *all residents*, not merely symptomatic and exposed
patients, be isolated once there is a case of COVID-19 in the facility.  *See* 55-1 at 6.

ii.     Census Reduction

Plaintiffs next focus on the Defendants' purportedly deficient efforts to reduce the patient population, sometimes referred to as the "census." Neither party disputes that reducing the census is recommended by the CDC and that it is "one of the best ways to continue to move toward the elimination of the virus." Dkt. 81-1 at 1.  It is also undisputed that the Hospital has reduced the "census by 33%" since the pandemic began.  Dkt. 81 at 9; *see also* Dkt. 90-4 at 11 (Gontang Supp. Decl. ¶ 26) ("Since March 2019, the Hospital has successfully discharged 525 patients to the community.").  Despite that "significant accomplishment," Dkt. 78 at 9, Plaintiffs urge the Court to "order Defendants to periodically report on whether they are following . . . recommendations [made by the *amici*] and [on] their efforts to further reduce the patient census." Dkt. 87-1 at 22.

In support of their request, Plaintiffs contend that the bulk the patients that the Hospital discharged were released "only pursuant to court order[s]" in the patients' underlying proceedings and that "the number of discharges 'has decreased noticeably since the middle of April." *Id.* (quoting Dkt. 78 at 9).  In response, Defendants offer the declaration of Dr. Richard Gontang, "the Chief Clinical Officer for Saint Elizabeths." Dkt. 90-4 at 2 (Gontang Supp. Decl. ¶ 2).  He acknowledges that prior to the pandemic the Hospital met twice monthly with the Department of Behavioral Health ("DBH") regarding the discharge of patients but that those "meetings have been temporarily suspended while both DBH and Saint Elizabeths focus on COVID-19 pandemic response." *Id.* at 11 (Gontang Supp. Decl. ¶ 27).  He further reports, however, that the Hospital has continued to "work closely" with DBH to coordinate discharges and that the Hospital's discharge rate in March and April was "consistent with pre-COVID averages." *Id.*

As this evidence demonstrates, the discharge rate has "slowed" only relative to the Hospital's push to discharge a much-higher-than-usual number of patients at the onset of the pandemic. *See* Dkt. 78 at 4 (noting that "a substantial increase in discharges, has brought the census to historic low"). In any event, even if the discharge rate has slowed, that would be unsurprising given that "[d]ischarge has become more difficult" due to conditions surrounding the pandemic. *Id.* Indeed, guidance from the Substance Abuse and Mental Health Services Administration ("SAMHSA"), which Plaintiffs have offered in support of their motion, warns that in light of COVID-19 discharge planning may be "more difficult," and it recommends that treatment teams and staffs "should adjust with this expectation." Dkt. 87-3 at 4.

Given these circumstances, the Court concludes that Plaintiffs have not established a likelihood of success with respect to their challenge to Defendants' census reduction efforts.

iii.   Staff Cross-Contamination

As explained by the Court-appointed *amici*, one of "[t]he greatest impediments to interrupting transmission of virus within the facility is the re-introduction of virus from the outside community." Dkt. 81-1 at 5. When staff return to the community after work, they may be exposed to the virus; staff who then return to work and who are "asymptomatic or pre-symptomatic carriers of the virus," moreover, "can easily go undetected." *Id. Amici* emphasize that because of this risk effective infectious disease control requires reducing "traffic within the hospital"—specifically, that the Hospital must reduce staff movement between COVID positive and COVID negative units. Dkt. 77 at 10–11. *Amici* also underscore that the Hospital has "not respected" this measure in the past. *Id. Amici* therefore recommend the Court require Defendants to comply with the CDC's guidance that staff should "be assigned daily to only one unit" and, if staff work overtime, that they work "on the same unit they have been working [on]

17

throughout the day."  Dkt. 81-1 at 5; *see also* Dkt. 54-1 at 10 (CDC recommending that facilities assign dedicated HCP to COVID positive or suspected units, meaning "HCP are assigned to care only for these patients during their shift").  At the same time, *amici* recognize that a psychiatric hospital is prone to "violent incidents [that] occasionally . . . require a hospital-wide response from . . . staff that may require rapid intervention to take place on a patient unit to which they are not assigned." Dkt. 81-1 at 5.  In those circumstances, *amici* urge that "the physical safety of staff and patients should be considered the highest priority," even if it risks spreading the virus between units.  *Id.*

Against this backdrop, the Court has already concluded that the Hospital's unexplained failure to implement appropriate restrictions on staff assignments constituted a substantial departure from professional judgment.  *See* Dkt. 82 at 7–8; Dkt. 83 at 2.  Plaintiffs now request that the Court extend this order "through the duration of the COVID-19 crisis." Dkt. 87-1 at 24. Defendants, in turn, dispute that the "movement of staff across units runs afoul of CDC guidance." Dkt. 90 at 33.  Rather, they posit that the CDC guidance recommends only that facilities "should" have units for COVID-positive residents with dedicated staff and that the facilities should merely "consider creating a staffing plan" for those units.  *Id.* (quoting Dkt. 90-8 (the CDC Long-Term Care Facility Guidance Document)).  This argument misses the point.

Although the CDC recommendations may not mandate dedicated staff in all circumstances, *amici* have made clear that it is critically important to reduce cross-staff movement in the present context, and Defendants have offered no evidence that cross-staffing under these dire circumstances is a product of considered professional judgment.  *Amici*'s recommendation, moreover, was not merely an abstract suggestion about general best practices. Rather, after conducting an extensive and thorough assessment of conditions at the Hospital,

*amici* explained the reasons why staff are the most likely sources of reintroduction and further spread of COVID-19 at Saint Elizabeths.  *See* Dkt. 81-1 at 5.  Thus, even if CDC guidance does not *require* dedicated staff in all circumstances, *amici* have persuasively explained why it is essential in the present context.

Defendants own actions following the Court's order support the conclusion that the exercise of acceptable professional judgment requires restricting cross-unit staff movement.  In particular, Defendants have offered a supplemental declaration by Martha Pontes, "the Interim Chief Nurse Executive for Saint Elizabeths."  Dkt. 90-7 at 2 (Pontes Supp. Decl. ¶ 2).  She attests that she "exercise[s] professional judgment in considering the need to properly and safely staff each unit to ensure patients receive adequate care and treatment."  *Id.* at 3 (Pontes Supp. Decl. ¶ 4).  She also explains that "[o]nce a shift begins, it is relatively rare that reassignment occurs" but that she has "determined it is permissible in the following circumstances to ensure safe staffing levels" on all units: (1) "when a patient experiences a behavioral emergency that requires one-to-one staff supervision that could not otherwise be provided; (2) "when another staff member suddenly falls ill or suffers an injury;" (3) "when a patient requires external hospitalization with one-to-one staff supervision;" and (4) "when patient behavior creates a sudden change in the acuity and risk to others on a unit."  *Id.* at 3–4 (Pontes Supp. Decl. ¶ 5). She further attests that, whenever possible, "staff will be assigned for overtime on the same unit" but that, if "necessary to ensure adequate staffing," overtime may be approved "to work on a different unit with the same COVID status or COVID-positive status."  *Id.* at 4 (Pontes Supp. Decl. ¶ 6).

Three things are notable about the Pontes declaration.  First, it does not indicate—nor does any other evidence show—that the measures that Pontes attests are now in place were being

taken or even considered prior to this litigation.  Second, it offers no explanation about what prior policies existed or whether Defendants had exercised any professional judgment regarding the need to restrict staff movement.  Third, it supports the proposition that, when Saint Elizabeths staff *did* exercise professional judgment, it aligned with the recommendations set forth by the CDC and *amici*.  There is no evidence, however, that prior to this litigation a professional at Saint Elizabeths had exercised any considered judgment with respect to this issue.

The Pontes declaration does support a finding that the Hospital is *currently* exercising professional judgment with respect to cross-staffing.  The question, then, is whether the Hospital's past failure to do so warrants continued relief.  Based on *amici*'s observations, it appears that the Hospital's more cautious approach to cross-unit movement is a recent development.  Ms. Hebden testified, for example, that "[s]taff really needs to . . . pay a lot more attention to it" and that she "would like to be very emphatic in saying that while in the past this has not been respected, there should be no mixing of staff between these units."  Dkt. 77 at 11. Given this history, it appears that the Hospital's efforts to limit cross-staffing were, at least in part, a product of this litigation.  As a result, even if Defendants are now restricting staff movement, there is still a "cognizable danger of recurrent violation" sufficient to warrant further injunctive relief.  *Daniel Chapter One*, 89 F. Supp. 3d at 143–44.

Plaintiffs have demonstrated a likelihood of success on the merits with respect to cross-staffing.

iv.    Testing

Plaintiffs contend that the Hospital has failed to exercise professional judgment relating to testing in three respects.

First, Plaintiffs argue that Defendants' test-based release protocol was deficient prior to this litigation.  At the TRO stage, the Court agreed, finding that Defendants had not followed the CDC-recommended protocol for returning symptomatic patients to the general population.  Dkt. 59 at 16.  As the Court explained, Defendants had "offered no evidence that they [were] evaluating patients who ha[d] received a negative test for 'clinical suspicion' prior to release." *Id.* at 15–16.  In briefing the instant motion, however, Defendants have now offered evidence to fill that gap—the supplemental Tu declaration.  Tu now explains that her original declaration "did not fully state the Hospital's practice at the time."  Dkt. 90-1 at 5 (Tu Supp. Decl. ¶ 9).  At that time, she continues, "when a [patient under investigation's ("PUI")] result came back negative," a "general medical officer or nurse practitioner conducted a physical examination to rule out clinical suspicion of COVID-19 infection." *Id.*  "A patient would not automatically be released from PUI isolation if clinical suspicion was found." *Id.*  In light of this additional evidence, and in the absence of controverting evidence, the Court is no longer persuaded that the Hospital's release protocol was deficient.

Second, Plaintiffs contend that before they moved for a TRO "the Hospital was not timely or routinely testing patients with COVID-19 symptoms[] or individuals who ha[d] been exposed."  Dkt. 90 at 24.  Defendants, in turn, have offered persuasive evidence that this shortcoming was not the result of a lapse in professional judgment.  Dr. Selanikio attests, for example, that "[t]esting capacity for COVID-19 was severely limited through April 2020."  Dkt. 90-2 at 2–3 (Selanikio Decl. ¶ 8).  He also attests that Tu "often requested increased testing capability for patients in Saint Elizabeths that went beyond the minimum recommended by the CDC and DOH." *Id.*  Likewise, Tu attests that she requested that testing kits be made available and that the Hospital "received its first 20 test kits" on April 9, 2020 "through the District of

Columbia Department of Forensic Services." Dkt. 90-1 at 4 (Tu Suppl. Decl. ¶ 7). She also explains that, at that time, "DC Health recommended testing only patients with symptoms related to COVID-19 and who fit the criterion for testing, according to the then-current DC Health Notice." *Id.* at 4–5 4 (Tu Suppl. Decl. ¶ 7).

On the existing record, Plaintiffs' contention regarding the level of testing falls short in several respects. To start, although resource constrains generally cannot "excuse constitutional violations," *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989), Plaintiffs have offered no evidence that the shortage in tests was the result of a decision attributable to Defendants rather than a result of the nation-wide shortage in testing capacity. Absent such evidence, Defendants cannot be faulted for not conducting more extensive testing. *Cf.* Dkt. 92 at 12–13 (noting that on April 9, when the Hospital received 20 testing kits, it reported "142 patients who were symptomatic or exposed"). At oral argument, when the Court asked Plaintiffs' counsel about this, counsel argued that Defendants had other avenues for testing these patients, such as transferring them to local hospitals. *See* May 22, 2020 Hrg. Tr. (Rough at 15). But, even if that is right, it has no bearing on whether the Court should grant the preliminary injunctive relief Plaintiffs seek. The Hospital now has the capacity to test all patients on the premises, so there is no need to issue an injunction that would require transporting patients to local hospitals for testing. Nor is there any reason to believe that the Hospital will, in the future, fail promptly to test any symptomatic or exposed patient or that the Hospital obtained the in-house testing equipment only because of this lawsuit. Finally, Plaintiffs have not shown that any patients who satisfied the then-existing guidance for testing, which was evidently premised on the shortage of testing capacity, was not tested. The lack of adequate testing likely contributed to the early

spread of the virus at the Hospital.  There is no evidence, however, that Defendants were to blame.

Third, and finally, Plaintiffs request that the Court direct Defendants to adopt recurring PPS testing, which both the CDC and *amici* recommend.  As *amici* explain, the CDC recommends PPS testing both residents and staff in facilities with new, confirmed COVID-19 cases to control the spread of the disease.  *See* Dkt. 82 at 6–7; *see also* CDC, Testing for Coronavirus (COVID-19 in Nursing Homes (Apr. 30, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/hcp/nurding-homes-testing.html.  Initial and recurring PPS testing is important because undetected, asymptomatic patients and health care practitioners often contribute to the further spread of the virus.  *See* Dkt. 82 at 6.  After considering that evidence and *amici*'s detailed explanations about the critical need for PPS testing, the Court concluded that the failure to conduct PPS testing was likely a substantial departure from professional judgment.  *Id.* at 6–7.  As a result, the Court amended its TRO to direct Defendants to follow the PPS testing recommendation.  Dkt. 83.  Following an initial PPS, the Hospital identified twenty-one "employees who tested positive," Dkt. 91 at 3, at least seventeen of which were "asymptomatic," Dkt. 88 at 3.

Defendants do not dispute that *amici* have correctly identified the urgent need for PPS testing to stem the spread of virus as the Hospital; that the CDC also recommends PPS testing as part of a test-based infection control strategy; and that the initial PPS testing helped identify a significant number of asymptomatic, COVID-positive staff.  Defendants also do not claim that any resource constraints impede their ability to conduct additional PPS testing (although they may be unable to test staff on leave and staff who are working remotely).  *See* May 22, 2020 Hrg. Tr. (Rough at 34).  Instead, they note only that the CDC did not recommend PPS testing

until May 2, 2020.  *See* Dkt. 90 at 31.  But given the tragic circumstances at Saint Elizabeths, that does not explain why the Hospital waited over a week—and until after *amici* had impressed on the Court the critical need for PPS testing for staff—before beginning to test staff. Significantly, Defendants do not claim that they had planned on conducting PPS testing of staff before *amici* urged the Court to require that they do so, and, unlike with respect to other infectious disease control measures, Defendants have said nothing about their plans to continue periodic testing after the TRO expires.  *Cf.* Dkt. 90 at 47 (indicating that Defendants "intends to continue the first three items in [P]laintiffs' proposed order [even] . . . without Court-ordered relief"); Dkt. 87-10 at 2 (Proposed Order ¶ 4) ("Point Prevalence Surveys.").

As *amici* explained, the need for PPS testing—and, in particular, testing staff who have contact with the outside community—is essential to stemming the spread of the disease at the Hospital.  *Amici* further opined that, given the other measures that the Hospital has taken, the most likely source of the continued spread of the virus at Saint Elizabeths is staff.  *See, e.g.*, Dkt. 77 at 24 ("[W]e would expect that in light of the community prevalence of COVID-19 and the viral circulation, that we are going to potentially have introduction by staff.").  That opinion, moreover, proved prescient.  When the Hospital tested its staff, as *amici* urged, it identified twenty-one COVID-19 positive employees, who were then placed on leave; most (if not all) of these employees were asymptomatic.  *See* Dkt. 88 at 3; 93 at 3.  Without that testing, it appears likely that some of these staff members would have unwittingly spread the virus to patients at the Hospital, restarting the cycle of infection.

Notably, Defendants have offered no justification sounding in professional judgment for not periodically testing all patients (with the exception of those who refuse to participate) and all staff (who are not on leave or working from home) for the virus—at least while the crisis at the

Hospital continues.  The Court, accordingly, concludes that Defendants' delay in testing all staff and their lack of a plan to continue testing all patients and staff constitutes a substantial departure from professional judgment.

v.      <u>Staff Infection Control Practices</u>

The final infection control issue that Plaintiffs raise is a general concern about staff infection control practices.  Relying on Ms. Hebden's observations that the Hospital staff was not properly implementing infectious disease control in certain respects, Plaintiffs request that the Court "order independent monitoring to ensure that Defendants are complying with *amici* recommendations and CDC guidance regarding hygiene practices for the duration of the COVID-19 crisis."  Dkt. 87-1 at 28.  Although *amici* identified some shortcomings, the Court is unpersuaded that imposing the drastic step of appointing an independent monitor is warranted at this time.  There is evidence that the Hospital is making ongoing efforts to train staff about proper infection control measures.  Tu attests, for example, that just last week the CDC provided training sessions and that D.C Department of health has assigned an "advisor that will be making on-site visits."  Dkt. 90-1 at 8–9 (Tu Supp. Decl. ¶ 19).  She also indicates that "on an ongoing basis, . . . Nurse Educators will continue to offer the same training to all employees at the Hospital."  *Id.*  Tu also explains that due to a recent increase in the Hospital's supply of N95 masks the Hospital has now changed its "practices on respirator use," and staff is no longer reusing masks in the way that Hebden had flagged as an issue.  *Id.* at 8 (Tu Supp. Decl. ¶ 20).  Given these measures, the Court is not convinced that appointment of an independent monitor is currently warranted.  Should issues persist, Plaintiffs may renew this request.

b.    *Mental Health Treatment*

The next category of claims that Plaintiffs advance concern mental health treatment.  As Plaintiffs note and Defendants do not dispute, COVID-19 has had a significant impact on patient mental health, causing anxiety and stress to an already susceptible population.  *See generally* Dkt. 78 (discussing Saint Elizabeths provision of mental health care before and during the pandemic).  Plaintiffs contend that Defendants have not risen to the task of providing adequate mental health care in response to the pandemic.  *See* Dkt. 87-1 at 30–35.  They assert, moreover, that Defendants have not taken adequate steps to address the "blanket closures of treatment areas and [the] suspension of in-person therapy."  *Id.* at 34.  To remedy these shortcomings, Plaintiffs request that the Court order Defendants to "develop alternative methods" of providing group treatments; to procure "iPads or similar devices for each patient," along with other technology; and to "conduct an individual assessment" of each patient's mental health needs.  Dkt. 87-10 at 3–4 (Proposed Order).

As a threshold matter, Defendants argue that Plaintiffs lack standing with respect to their mental-health-services claims because they "have not argued that the mental health care of [the non-party patients] could cause any injury to them in particular, and the relief they request would require the Hospital to alter the individual treatment plans of nearly 200 patients who are not parties to this case."  Dkt. 90 at 37.  The Court must, accordingly, address standing before turning to the merits of these claims.

The "irreducible constitutional minimum of standing requires: (1) that the plaintiff have suffered an 'injury in fact'—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly

traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to speculative, that the injury will be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

At oral argument, the Court asked Plaintiffs to address their standing to assert claims relating to the Hospital's general mental-health-treatment practices, as opposed to practices directly affecting their personal interests.  In response, Plaintiffs asserted that there is a nexus between the provision of mental health care to non-party patients and the named Plaintiffs because the named Plaintiffs require group treatment.  In other words, Defendants' failure to develop alternative group treatment methods and failure to acquire the technology needed to implement such measures are causing Plaintiffs harm because their well-being depends on the availability of group therapy.  Assuming that the failure to provide alternative group therapy methods violates Plaintiffs' constitutional rights, which the Court must assume for purposes of assessing standing, *see Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1179–80 (D.C. Cir. 2015) (courts must assume the merits of plaintiff's claim in assessing standing), the nexus Plaintiffs have articulated is sufficient to establish standing, but only in a limited respect: Plaintiffs have standing under this theory but only to seek relief that might be required to remedy the Hospital's failure to provide the them with some form (perhaps by videoconference) of group treatment.

The theory Plaintiffs advanced at oral argument is not broad enough, however, to encompass the sweeping, Hospital-wide relief that they seek.  *Cf. Inmates of Occoquan v. Barry*, 844 F.2d 828, 841 (D.C. Cir. 1988) ("[O]nce a right is established the remedy chosen must be tailored to fit the violation.").  Plaintiffs have identified no theory of how Defendants' alleged

failure to take individualized mental health measures as to *every* patient at the Hospital, the vast majority of which are not currently parties to this case, even arguably causes Plaintiffs any injury, nor have they explained why Hospital-wide relief is needed to redress their asserted injuries.  Perhaps recognizing that they cannot establish standing to press the full breadth of their claim, Plaintiffs request that the Court provisionally certify a class.  Dkt. 92 at 19.  But because the parties have not briefed this issue, the Court concludes that it would be premature even to provisionally certify a class.[4]  If Plaintiffs want to move for provision class certification, they are free to do so.

Having concluded that Plaintiffs have standing to challenge any deficiencies in the mental health care that they are personally receiving (or not receiving), the Court concludes that they have failed to meet their burden of establishing a likelihood of success on the merits. Plaintiffs focus largely on the curtailment of care, "including the closing of the [TLC], suspension of group therapy, anger management, and competency restoration classes," and on the alleged failure of Defendants to "adequate steps to compensate of loss of this treatment, for example by using teletherapy or virtual therapy."  Dkt. 87-1 at 30–31.  Although the Court recognizes the pressing need to provide mental health care to Plaintiffs, it is not yet persuaded that Defendants' omissions violate constitutional proscriptions.

To begin, Plaintiffs do not dispute that Defendants' decision to shut down in-person group therapy was a sound professional decision, *see* May 22, 2020 Hrg. Tr. (Rough at 25), nor could they.  As Dr. Gontang explains, before the Hospital saw even its first infection, it decided "to suspend group therapy in the Therapeutic Learning Center," because it "would present

---

[4]  At oral arguments, the Court asked Plaintiffs whether they were aware of any cases in which a court had agreed to provisionally certify a class where plaintiffs raised that request solely in a reply brief, and counsel was unable to identify any such case.

unacceptable infection risks both from the movement of patients through the hospital and while congregated in the TLC." Dkt. 90-4 at 3 (Gontang Supp. Decl. ¶ 4). It is that decision, moreover, that is largely responsible for what Plaintiffs characterize as a "dramatic" reduction in providing *group* therapy. In addition, as *amici* report, there has been "only a slight decline" in *individual* therapy. Dkt. 78 at 16. Consistent with that observation, Plaintiff Dunbar attests that he has been unable to attend his usual group therapy sessions, which were held in the TLC, but has "had sessions with [his] therapist on the phone each Thursday." Dkt. 87-6 at 2 (Dunbar Supp. Decl. ¶¶ 15–17); *see also* Dkt. 87-5 (Costa Supp. Decl. ¶¶ 11–13) (similarly reporting that he is obtaining weekly therapy but that he has not attended in group therapy in the TLC).

Although much of the treatment that patients typically receive at the Hospital is not individualized, *see* Dkt. 78 at 11 (explaining that the TLC was a "linchpin[] of the Hospital's "treatment delivery"), Defendants have made efforts to develop alternative methods of providing group treatment. As Dr. Gontang explains, even before the first COVID-19 case at the Hospital was identified and weeks before Plaintiffs filed their motion for a TRO, Saint Elizabeths began to develop plans to continue group therapy, including an initial plan that "contemplated conducting smaller group sessions on individual units by both on-unit providers" and other staff." Dkt. 90-4 at 3 (Gontang Supp. Decl. ¶ 5). In addition, the Hospital developed a "telehealth plan, dated March 30, 2020," which has been "approved by Hospital Management," and which the Hospital has been working to implement. *Id.* at 3–4 (Gontang Supp. Decl. ¶ 6); *see also id.* (Gontang Supp. Decl. ¶ 7) (discussing how Dr. Gontang has worked with the Hospital's IT department); *see also* Dkt. 78 at 17 ("Recognizing the need to modify treatment service delivery in the near term, the Hospital continues to plan a limited telehealth program on each unit to allow for remote group therapy"). Although the telehealth program has not been

implemented due to funding and logistical hiccups, those issues have now been resolved.  *See id.*

The delays, moreover, must be understood in light the Hospital's "first priority . . . to protect

patients and staff from COVID-19."  Dkt. 90-4 at 5 ((Gontang Supp. Decl. ¶ 9).

All agree that the Hospital has failed to provide patients with all—or even a fraction—of

the psychiatric care that they received prior to the pandemic.  On the present record, however,

the Court cannot conclude that the Hospital has substantially departed from professional

judgment, understood in light of the enormous challenges posed by the pandemic and the health

crisis at the Hospital.  Undoubtedly more can be done—and needs to be done—to provide for the

mental health needs of a uniquely at-risk population.  If the Hospital fails in its current efforts to

provide telehealth or other forms of mental health care to Plaintiffs, they can return to the Court

to seek preliminary relief.  On the present record, however, judicial intervention is not yet

warranted.

2.      *Monell*

In their opposition brief, Defendants raise a further merits defense, albeit one that does

not turn on the extent to which the Hospital has provided Plaintiffs with acceptable medical and

psychiatric care.  They contend, in particular, that Plaintiffs have not shown a likelihood of

success because their claims cannot clear the hurdle to municipal liability established in *Monell*

*v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978).  *See* Dkt. 90 at 39–41.  In *Monell*, the

Supreme Court held that "a municipality cannot be held liable solely because it employs a

tortfeasor"—in other words, under § 1983, a municipality cannot be held liable on a *respondeat*

*superior* theory.  436 U.S. at 691.  "Instead, it is [only] when execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy,  . . . that the government . . . is responsible under § 1983."  *Williams v.*

*Johnson*, 537 F. Supp. 2d 141, 154 (D.D.C. 2008) (citing *Monell*, 436 U.S. at 694).  "[C]ourts have identified a variety of ways that a municipality may adopt a 'policy or custom' sufficient to support municipal liability."  *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 320 (D.D.C. 2011).

In their reply brief, Plaintiffs argue that a municipality may be liable "where the constitutional harm [can] be tied to the actions of a municipal 'policymaker,' a category confined to those 'persons who have 'final policymaking authority [under] state law.'"  *Id.* (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003), and then *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997)); *see also Thompson v. District of Columbia*, 832 F.3d 339, 347–48 (D.C. Cir. 2016) (noting that a "single action can represent municipal policy where the acting official has final policymaking authority over the 'particular area, or . . . particular issue'" (quotation omitted)).  Here, Plaintiffs continue, Director Bazron is "a final policy maker for responding to emergencies at Saint Elizabeths," and the "record reflects Director Bazron's personal involvement in the Hospital's response to COVID crisis."  Dkt. 92 at 21–22.  In support of those contentions, Plaintiffs point to several provisions of the D.C. Code that give Director Bazron final policymaking authority over Saint Elizabeths and to evidence that Director Bazron has been personally involved in the Hospital's response to COVID-19 crisis.  Dkt. 92 at 21–22.

At oral argument, Defendants did not dispute that Director Bazron has final policy making authority over the Hospital or that she has been personally involved in overseeing the pandemic response.  Instead, they argued only that Plaintiffs cannot succeed because Plaintiffs "raised their *Monell* arguments for the first time in reply."  May 22, 2020 Hrg. Tr. (Rough at 50–51).  That contention is unavailing for two reasons.  First, in their amended complaint, Plaintiffs

have alleged facts that, if true, plausibly satisfy the *Monell* standard.  *See* Dkt. 50 at 40–41(Am. Compl. ¶¶ 202–211) (alleging that Director Bazron has "final policymaking authority" and has demonstrated her responsibility for conditions at the Hospital).  Second, although Defendants raised the issue in their pending motion to dismiss the *original* complaint, they have not even mentioned the issue since then, despite multiple hearings and rounds of briefing since Plaintiffs amended their complaint.  Because Defendants did not invoke *Monell* as it relates to the operative complaint and the facts currently at issue until they filed their opposition brief, the Court is unsympathetic to their objection that Plaintiffs only responded in their reply brief. Moreover, and more importantly, the Court is persuaded that Plaintiffs have offered sufficient evidence to show "an 'affirmative link,' such that a municipal policy was the 'moving force' behind the constitutional violation[s]" at issue here.  *Baker*, 326 F.3d at 1306 (quotations omitted).  The existing record supports the inference that Director Bazron "knew or should have known of the risk of constitutional violations."  *Id.*

> 3.      *ADA*

The final merits issue to address is Plaintiffs contention that Defendants' "continued hospitalization of patients [that are] ready for release" violates the Americans with Disabilities Act.  Dkt. 87-1 at 35.  Defendants respond, once more, that Plaintiffs lack standing to assert a claim of unlawful segregation and the failure to accommodate disability under the ADA.  Dkt. 90 at 42–43.  Defendants are partially right.  To the extent Plaintiffs seek to invoke the rights of other patients at the Hospital, they lack standing.  In other respects, they have standing.  But those claims lack sufficient merit or immediacy to support Plaintiffs' request for preliminary injunctive relief.

First, to the extent Plaintiffs argue that they have standing to press an ADA claim because the failure to discharge patients is relevant to reducing their risk of infection, the Court has already concluded that Defendants efforts to reduce the census are not violative of Plaintiffs' constitutional rights.  Second, to the extent Plaintiffs press this claim on behalf of non-party patients, that fails for lack of standing.  Plaintiffs have offered no plausible theory, other than infection reduction, for how they might have standing to press this claim on behalf of others.  This leaves only the question whether Defendants have violated the named Plaintiffs' ADA rights.  But, as explained below, even if Plaintiffs' individual ADA claims were meritorious, which is doubtful on the present record, Plaintiffs have failed to show that they are likely to suffer an irreparable injury if denied preliminary relief.  *See Jubilant DraxImage Inc. v. United States ITC*, 396 F. Supp. 3d 113 (D.D.C. 2019) (noting that an irreparable injury is "the *sine qua non* for obtaining a preliminary injunction").

*      *      *

In sum, the Court concludes that Plaintiffs are likely to succeed only with respect to three measures (1) the isolation of exposed patients, (2) PPS testing, and (2) restrictions on cross-unit staffing.

## B.      Irreparable Harm

As to irreparable injury, the parties press similar arguments to those they raised with respect to the TRO.  Plaintiffs again contend that the deprivation of constitutional rights, even for a minimal period of time, constitutes irreparable injury and also rely on the imminent risk to their physical and mental health.  *See* Dkt. 87-1 at 38–39.  Defendants, as before, do not dispute that a constitutional violation or the risk of contracting COVID-19 would suffice to establish irreparable injury and, instead, argue that Plaintiffs cannot show irreparable injury because they

have failed to show any constitutional violation and because the Hospital is already taking

efforts, including efforts Plaintiffs request, to protect the patients' physical and mental well-

being.  *See* Dkt. 90 at 46–47.  As before, the Court is unpersuaded by Defendants arguments.

      To start, the Court has concluded that Plaintiffs have established a likelihood of success

of portions of their constitutional claims, and they are correct that a Fifth Amendment violation

is itself irreparable.  *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009).

With respect to those claims, moreover, Plaintiffs have also shown an imminent risk to their

health and well-being, and the consequences of contracting the virus are irreparable.  As before,

the Court is unpersuaded by Defendants' contention that there is no imminent risk to Plaintiffs'

health because the Hospital is already implementing or has implemented the measures Plaintiffs

seek.  As discussed above, Defendants have offered no assurances that they will continue to

conduct PPS testing nor can the Court determine whether the Hospital will adequately implement

the restrictions on cross-staffing.  As *amici* emphasized, however, these are core measures

needed to prevent the further spread and reintroduction of COVID-19.  *See* Dkt. 81-1 at 4 ("It is

critically important to understand that in order to stop ongoing transmission of the virus within

St. Elizabeths, the circulation of all patients and staff within the hospital must be curtailed."); *id.*

at 5 ("Voluntary testing is no longer acceptable. All personnel need to adhere to a testing

schedule to be developed between St. Elizabeths leadership and DC health authorities in

accordance with the recommended stipulations below.").  And, although Defendants may now be

isolating all units, *amici* also explained that, if possible, they must not integrate newly admitted

patients with those units as there is "the potential of recent exposure."  *Id.* at 1 (emphasizing that,

as possible, new admits should "be housed as separately from both COVID units (where they

34

could be at risk of becoming infected if they are negative) and non-COVID units (where they might transmit virus if they are positive)").

Defendants are correct, however, that Plaintiffs have not established irreparable injury with respect to their ADA claim.  To begin, unlike with their due process claim, Plaintiffs cannot rely on the mere possibility that an ADA violation has occurred (and it is doubtful that one has). More importantly, Plaintiffs have offered little, if any, evidence that were Saint Elizabeths to evaluate their discharge eligibility, they would in-fact be released to a less-restrictive setting at this time or even in the reasonably foreseeable future.  If anything, the current record suggests that Plaintiffs are, for the time being, unlikely candidates for release into a less-restrictive setting. As Dr. Gontang explained, the Hospital keeps "a ready-for-discharge list that identifies those patients who meet the clinical standard for discharge," and "[n]one of the [P]laintiffs . . . is on [that] list at this time."  Dkt. 90-4 at 10–11 (Gontang Supp. Decl. ¶¶ 24–25).  Moreover, as counsel for Defendants noted at oral argument (without contradiction by Plaintiffs), many of the plaintiffs have been patients at the Hospital for years and, to the extent Plaintiffs were involuntarily committed following a verdict of not guilty by reason of insanity, they can be released only with the approval of the trial court.  *See* May 22, 2020 Hrg. Tr. (Rough at 46).

## C.      Balance of Hardships and Public Interest

When the government is a party to the suit, the final factors to be considered in granting a preliminary injunction—the balance of the equities and the public interest—"are one and the same, because the government's interest is the public interest."  *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).  The Court finds that the public interest weighs in favor of granting temporary injunctive relief.

Defendants contend that further injunctive relief weighs against the public interest because the burdens it would impose are significant and because there is a "public interest in permitting the government to carry out its authorized functions where doing otherwise would needlessly upend its operations."  Dkt. 90 at 50 (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018)).  These arguments might carry more weight were the Court ordering the full scope of relief requested by Plaintiffs.  But the injunctive relief that the Court will enter is substantially narrower and, for the most part, will require measures that Defendants are already implementing. Moreover, the Court will tailor its order to ensure that it does not interfere with the ability of medical and psychiatric professionals to make decisions on-the-spot about the health and well-being of their patients.  Most importantly, by mitigating the spread of infection, "Defendants actually lessen the healthcare burden that they will be facing in the weeks and months to come." *Bank*s, 2020 U.S. Dist. LEXIS 68287, at *48.  Finally, of course, it is always in the public interest to vindicate constitutional rights.  *See Montgomery v. Comey*, 300 F. Supp. 3d 158, 175 (D.D.C. 2018)

The Court, accordingly, finds that the balance of the equities and the public interest weigh in favor of granting injunctive relief.

## CONCLUSION

For the reasons explained above, the Court will **GRANT** in part and **DENY** in part Plaintiffs' motion for a preliminary injunction.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 24, 2020