# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENZO COSTA, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>BARBARA BAZRON, *et al.*,<br><br>　　　　　　Defendants. | Civil Action No. 19-3185 (RDM) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION .................................................................................................. 1

BACKGROUND ..................................................................................................... 2

    I.    Saint Elizabeths Hospital ............................................................... 2

    II.   Temporary Water Outage Allegations............................................. 3

    III.  COVID-19 Response ......................................................................... 5

    IV.  Procedural History .......................................................................... 9

LEGAL STANDARD ........................................................................................... 11

    I.    Motion to Dismiss......................................................................... 11

    II.   Summary Judgment ...................................................................... 12

ARGUMENT ........................................................................................................ 13

    I.    Plaintiffs' Claims Are Moot to the Extent They Are Based on the Water Outage.................................................................................. 13

    II.   Plaintiffs Cannot Succeed on the Merits of Their Claims and Dismissal or Summary Judgment Is Warranted................................................ 14

        A.   Plaintiffs' Substantive Due Process Claim Cannot Be Sustained. ............ 14

            1.   Plaintiffs Have Not Pled a Due Process Violation from the Water Outage........................................................................ 16

                a.   Plaintiffs Do Not Allege Deprivations of Reasonable Care and Safety or Allege the Absence of Professional Judgment in Any Decision During the Water Outage................................................. 16

                b.   Plaintiffs Fail To Plead a Plausible Basis for Municipal or Supervisory Liability. ...................................................................... 18

            2.   The District Is Entitled to Dismissal or Summary Judgment on Plaintiffs' Due Process Claim Arising from the Pandemic. ............. 23

                a.   Plaintiffs Cannot Show They Were Deprived of Reasonable Care and Safety or that Anyone Failed to Exercise Professional Judgment in Responding to the Pandemic. .................................... 23

                b.   Plaintiffs Lack Standing To Seek Facility-Wide Injunctions Related to Mental Health Care. ....................................................... 28

                c.   Plaintiffs Cannot Establish Municipal or Supervisory Liability Under Section 1983. ......................................................................... 29

3.     Plaintiffs Cannot Establish a Due Process Violation Based on the Hospital's Emergency Plan. ................................................................ 30

B.  Plaintiffs Cannot Succeed on Their ADA Claim. ........................................ 31

1.     Plaintiffs Have Not Pled an ADA Violation from the Water Outage. 32

a.    The ADA Does Not Forbid Temporary Interruptions in Services Necessitated by an Emergency. ........................................ 32

b.    Plaintiffs Have Not Alleged that Treatment Professionals Determined Community Placement Was Appropriate or that Placement Could Have Been Reasonably Accommodated During the Water Outage. .......................................................... 36

2.     The District Is Entitled to Summary Judgment as to Any ADA Claim Arising from the Pandemic. ............................................................... 37

III.  Plaintiffs' Claims Against Mark Chastang in His Official Capacity Should Be Dismissed. ................................................................................ 40

CONCLUSION ............................................................................................. 41

# TABLE OF AUTHORITIES

## Cases

*Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44 (D.C. Cir. 2016) ............................... 12

*Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) .............. 39

*Anderson v. Duncan*, 20 F. Supp. 3d 42 (D.D.C. 2013) ............................................... 33

*Armstead v. Nagin*, Civil Action No. 05-6438, 2006 WL 3861769 (E.D. La. Dec. 29, 2006) ................................................................................................................................ 30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................... 11, 12, 35

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003) ................................. 19

*Bd. of Cnty. Comm'rs. v. Brown*, 520 U.S. 397 (1997) ......................................... 19, 29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 11

*Berthelot v. Boh Bros. Construction Co., L.L.C.*, Civil Action No. 05-4182, 2006 WL 2256995 (E.D. La. July 19, 2006) ............................................................................. 30

*Blue v. District of Columbia*, 811 F.3d 14 (D.C. Cir. 2015) .................................. 19, 29

*Brehm v. Dep't of Defense*, 577 F. Supp. 2d 446 (D.D.C. 2008) ........................... 12, 13

*Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019) .................... 36, 37, 40

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 13

*Chenari v. George Washington Univ.*, 847 F.3d 740 (D.C. Cir. 2017) ...................... 34

*City of Canton v. Harris*, 489 U.S. 378 (1989) ............................................... 20, 21, 30

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ................................................. 20

*Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990) ............................................ 13

*Columbian Rope Co. v. West*, 142 F.3d 1313 (D.C. Cir. 1998) .................................. 13

*Comm. In Solidarity with the People of El Salvador (CISPES) v. Session*, 929 F.2d 742 (D.C. Cir. 1991) .............................................................................................. 12, 14

*Connick v. Thompson*, 563 U.S. 51 (2011) ........................................................... 18, 21

*Conyers v. Reagan*, 765 F.2d 1124 (D.C. Cir. 1985) .................................................. 31

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) .............................................. 29

*Davis v. FEC*, 554 U.S. 724 (2008) ............................................................................. 29

*Dial v. Kane*, 315 F. Supp. 3d 556 (D.D.C. 2018) ..................................................... 22

*Doe v. Pfrommer*, 148 F.3d 73 (2d Cir. 1998) ................................................ 34, 35, 37

*Elkins v. District of Columbia*, 690 F.3d 554 (D.C. Cir. 2012) ................................... 22

*Foley v. City of Lafayette, Ind.*, 359 F.3d 925 (7th Cir. 2004) ................................... 35

*Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521 (6th Cir. 2018) ..................... 17

*Hargett v. Adams*, Civil Action No. 02-1456, 2005 WL 399300 (N.D. Ill. Jan. 14, 2005) ........................................................................................................................ 15

*Harvey v. District of Columbia*, 798 F.3d 1042 (D.C. Cir. 2015) ............................. 15

*Hodges v. District of Columbia*, 975 F. Supp. 2d 33 (D.D.C. 2013) ........................... 19

*Ingraham v. Wright*, 430 U.S. 651 (1977).................................................................... 14

*Jackson v. District of Columbia*, 826 F. Supp. 2d 109 (D.D.C. 2011) ................. 11, 32

*Jeffries v. District of Columbia*, 917 F. Supp. 2d 10 (D.D.C. 2013) .......................... 22

*Jordan v. District of Columbia*, 161 F. Supp. 3d 45 (D.D.C. 2016)............................ 15

*Kent v. Sziebert*, Civil Action No. 15-05553, 2016 WL 3248077 (W.D. Wash. Apr. 19. 2016) ........................................................................................................................ 17

*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) ....................................................... 15

*Kowal v. MCI Comms. Corp., Inc.*, 16 F.3d 1271 (D.C. Cir. 1994)............................. 12

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)........................................................... 28

*M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 175 (D. Conn. 2008) ......................... 36

*Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of the Commonwealth of Mass.*, 649 F.2d 71 (1st Cir. 1981) ........................................................................................................................ 30

*Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978)............................... 18

*Mykonos v. United States*, 59 F. Supp. 3d 100 (D.D.C. 2014) ................................... 12

*Nurriddin v. Bolden*, 818 F.3d 751 (D.C. Cir. 2016).................................................... 12

*O'Shea v. Littleton*, 414 U.S. 488 (1974)...................................................................... 31

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)............................. 32, 35, 36, 37

*Patten v. Nichols*, 274 F.3d 829 (4th Cir. 2001) ............................................. 15, 18, 25

*Pierce v. District of Columbia,* 128 F. Supp. 3d 250 (D.D.C. 2015) .......................... 35

*Pollard v. District of Columbia*, 698 F. App'x 616 (D.C. Cir. 2017) .......................... 21

*Price v. District of Columbia*, 545 F. Supp. 2d 89 (D.D.C. 2008)............................... 41

*Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) ........................................................ 33

*Rumber v. District of Columbia*, 595 F.3d 1298 (D.C. Cir. 2010) ....................... 37, 39

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) ............. 15, 28

*Seth v. District of Columbia*, Civil Action No. 18-1034 (BAH), 2018 WL 4682023
    (D.D.C. Sept. 28, 2018) .................................................................................. 32, 34

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ....................................... 29

*Toth v. Wells Fargo Bank, N.A.*, 82 F. Supp. 3d 373 (D.D.C. 2015) ......................... 12

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ............................................. 40

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ......................................................... passim

## Statutes

42 U.S.C. § 12132 ................................................................................................... 32

42 U.S.C. § 1983 ....................................................................................................... 1

## Rules

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 12

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 11

Fed. R. Civ. P. 56(c) ................................................................................................. 12

## Constitutional Provisions

U.S. Const. Art. III, § 2 ............................................................................................ 13

## Regulations

28 C.F.R. § 35.130(b)(7) ........................................................................................... 37

28 C.F.R. § 35.130(h) ............................................................................................... 35

28 C.F.R. § 35.133(b) ............................................................................................... 34

49 C.F.R. § 37.161 ................................................................................................... 34

## INTRODUCTION

Plaintiffs, three patients at Saint Elizabeths Hospital, filed this putative class action against the District of Columbia, Barbara Bazron (in her individual capacity), and Mark Chastang (in his official and individual capacities) (collectively, the District), alleging violations of substantive due process and the Americans with Disabilities Act (ADA) based on the Hospital's responses to a temporary water outage in the Fall of 2019 and the COVID-19 pandemic.

Plaintiffs' claims related to the water outage should be dismissed because even if the Court finds that the claims are not moot—water was restored more than eight months ago—the Amended Complaint (Complaint) fails to state any claim for relief. The Complaint also fails to state a due process claim under 42 U.S.C. § 1983 (Section 1983). The District's actions in responding to the water outage and the COVID-19 pandemic did not deprive plaintiffs of reasonable care or safety, did not fail to exhibit professional judgment, do not implicate municipal liability for the District or Mr. Chastang in his official capacity, and do not implicate supervisory liability for Director Bazron or Mr. Chastang in their individual capacities. Plaintiffs' claim under the ADA also cannot be sustained, because plaintiffs fail to allege disability discrimination or unjustified isolation.

Alternatively, the District is entitled to summary judgment based on plaintiffs' inability to show a due process or an ADA violation. Throughout the health emergency, officials at Saint Elizabeths have provided adequate care and services to patients and have exercised professional judgment in the implementation of infection

control measures and the provision of mental health treatment. Finally, if the Complaint survives the District's motion to dismiss, any claims against Mr. Chastang in his official capacity should be dismissed as redundant, because the District of Columbia is the real party in interest.

BACKGROUND

## I.   <u>Saint Elizabeths Hospital</u>

Saint Elizabeths Hospital (Saint Elizabeths, or the Hospital) is the District of Columbia's only public psychiatric facility for individuals with serious and persistent mental illness requiring intensive inpatient care to support their recovery. Am. Compl. [50] ¶ 30; Decl. of Philip Candilis (Candilis Decl.) [42-1] ¶ 2. The Hospital is overseen by the D.C. Department of Behavioral Health (DBH). Decl. of Richard Gontang (Gontang Decl.) [42-2] ¶ 2. Before March 2020, the Hospital's roughly 760 staff members would provide care to approximately 275 patients on any given day. Decl. of Martha Pontes (Pontes Decl.) [42-4] ¶ 4; Gontang Decl. ¶ 6. Each unit at the Hospital generally houses no more than 27 patients, and has bedrooms, common living areas, bathrooms and showering facilities, and dining areas. Gontang Decl. ¶ 6.

A designated treatment team is assigned to each unit and consists of a variety of professionals devoted to the care of each patient in that unit. Gontang Decl. ¶ 11. Each treatment team includes a clinical administrator responsible for coordinating all care, a psychiatrist responsible for psychiatric treatment and medication, a social worker responsible for discharge planning, and a registered nurse responsible for

2

daily nursing care. *Id.* Each unit also has a general medical officer or nurse practitioner to assist with medical issues, and a psychologist. *Id.* Other specialists such as neurologists are available throughout the Hospital as needed. *Id.*

Saint Elizabeths generally admits three categories of patients: (1) pre-trial patients; (2) post-trial patients adjudicated not guilty by reason of insanity (NGBRI) in criminal court proceedings; and (3) civilly committed patients admitted through the civil commitment process. Am. Compl. ¶ 34; Candilis Decl. ¶ 6. Saint Elizabeths regularly conducts individualized assessments of all patients, "identifying potential for treatment in the least restrictive environment." Gontang Decl. ¶ 7; *see also* Report of Dr. Patrick Canavan (Canavan Report) [78] at 6.

## II.    <u>Temporary Water Outage Allegations</u>

On September 26, 2019, DBH received test results showing possible evidence of pseudomonas and legionella bacteria in the Hospital's water supply. Am. Compl. ¶ 136. DBH "implemented its 'water emergency protocol,'" *id.* ¶ 139, promptly discontinued the use of running water at Saint Elizabeths, *id.*, and hired contractors to treat the water supply with chlorine, *id.* ¶ 141. Officials provided staff and patients with bottled water, hand sanitizer, and personal care body wipes for basic hygienic needs. *Id.* ¶ 162. While some toilets could be manually flushed, plaintiffs allege they were not flushed after every use, leading to the accumulation of human waste. *Id.* ¶ 163. Patients were able to use portable toilets and portable showers while the use of running water was discontinued. *Id.* ¶ 162. Laundry was sent off-site for cleaning. *Id.*  Plaintiffs allege that contamination concerns also required the curtailment of

some medical care, psychiatric care and therapy services. *Id.* ¶¶ 156-61. Plaintiffs also allege the Hospital cut back dentistry and podiatry services, *id.* ¶ 154, and temporarily closed the Hospital's "treatment mall," a wing of the facility where patients receive group, art and music therapy. *Id.* ¶ 149.

Shortly before plaintiffs filed their original Complaint, on October 23, 2019, officials began lifting the water restrictions at Saint Elizabeths. Decl. of K. Singh Taneja (Taneja Decl.), [21-2] ¶ 8. Lab results received by Hospital officials that day showed that the water had been cleared of harmful bacteria and was safe for consumption.[1] *Id.* ¶ 7. All normal water usage was restored to Saint Elizabeths on October 28, 2019. *Id.* ¶ 9. No patients or staff members fell ill as a result of the water outage. *Id.* ¶ 10.

On March 1, 2020, the Hospital updated its Emergency Management Plan (Emergency Plan). *See* Emergency Plan [44-2].[2] On June 16, 2020, the Hospital activated the Emergency Plan after a water leak was discovered on Saint Elizabeths' West Campus, outside the Hospital grounds. *See* Supp. Decl. of K. Singh Taneja (Taneja Supp. Decl.), Ex. A ¶¶ 5, 7. The Hospital temporarily switched its potable and industrial water to water supplied by a tanker truck. *Id.* ¶ 7. On June 19, 2020, repairs were completed and the Hospital reconnected to the public water supply on

---

[1]     The Complaint notes that shortly before plaintiffs filed their lawsuit, a member of the D.C. Council stated on Twitter that the Hospital had begun the process of lifting its water restrictions. *See* Am. Compl. ¶ 143.

[2]     The District previously filed the Emergency Plan under seal based on the Court's order. *See* Defs.' Mot. for Leave To File Document Under Seal, Exs. A-1 through A-4 [44-2 to 44-5].

June 20, 2020, without any disruption in water service to the Hospital. Taneja Supp. Decl. ¶¶ 8.

## III.   COVID-19 Response

On January 21, 2020, the United States recorded its first confirmed case of COVID-19, a previously unknown illness caused by the novel coronavirus. *See* Erin Schumaker, *Timeline: How Coronavirus Got Started*, ABC News (Apr. 23, 2020), available at https://abcnews.go.com/Health/timeline-coronavirus-started/story?id=69435165. The District of Columbia recorded its first case on March 7, 2020, and a declaration of emergency and declaration of public health emergency from Mayor Muriel Bowser followed on March 11, 2020. *See* Mayor's Order 2020-046, March 11, 2020, available at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release _content/attachments/MO.DeclarationofPublicHealthEmergency03.11.20.pdf.

On January 29, 2020, more than one month earlier, Saint Elizabeths had begun providing guidance to its staff on the prevention and management of COVID-19, including requirements for the screening of patients suspected of COVID-19 and the use of personal protective equipment by staff. *See* DBH Admin. Issuance 2020-01 (Jan. 29, 2020), Attach. 1 to Decl. of Elaine Tu (Tu Decl.) [42-5]; *see also* Tr. of *Amici Curiae* Oral Report (*Amici* Oral Report Tr.) [90-3] at 22-23 (noting the Hospital began implementing infection control measures before having any suspected cases). In February, the Hospital's Infection Control Coordinator began training staff on COVID-19 prevention measures based on then-current guidance from the Centers for Disease Control and Prevention (CDC) and the D.C. Department of Health (DOH).

Supp. Decl. of Elaine Tu (Tu Supp. Decl.) [90-1] ¶ 4. Before having any confirmed cases, the Hospital implemented requirements for staff screening upon entry and suspended social visitation. *See* DBH Admin. Issuance 2020-01 (Apr. 3, 2020), Attach. 3 to Tu Decl.; Report of Joan Hebden, RN and Dr. Ronald Waldman (Hebden and Waldman Report) [81] at 5 (in-person visitations suspended on March 16, 2020).

On March 12, 2020, immediately after Mayor Bowser declared a public health emergency and nearly three weeks before its first confirmed case, Saint Elizabeths activated its Emergency Plan. March 18, 2020 DBH Letter [92-1] at 1; *see also* Tu Decl. ¶ 6; Hebden and Waldman Report at 3. On March 30, 2020, two days before its first confirmed case of COVID-19, the Hospital established a dedicated housing unit for patients under investigation (PUI)—those suspected of having COVID-19 based on symptoms—with private bedrooms and bathrooms away from all other patients, and then began "cohorting" COVID-positive patients together on the same unit. Tu Supp. Decl. ¶ 8. Patients who tested positive were placed into dedicated COVID-positive units. Hebden and Waldman Report at 4; Gontang Supp. Decl. ¶ 4. Patients exhibiting symptoms consistent with COVID-19 who had not yet tested positive were designated as PUIs and moved to isolated, individual spaces while they would await test results. Gontang Supp. Decl. ¶ 11. When a patient or staff member tested positive for COVID-19, any unit to which he or she had exposure was considered "exposed" and placed under quarantine for 14 days. Hebden and Waldman Report, App'x A [81-1] at 3 (recommending that Hospital's then-current quarantine practices should be maintained); *see* Hebden and Waldman Report at 4 (commending the Hospital's

6

"remarkable effort" to cohort patients), *Amici* Oral Report Tr. at 42 (finding "appropriate cohorting of ... patients").

Since its first suspected case of COVID-19, Saint Elizabeths has followed the CDC and DOH guidance regarding the testing of patients with symptoms consistent with COVID-19 and has regularly updated its internal policies accordingly. *See* Tu Decl. ¶ 11; Tu Supp. Decl. ¶ 7; *see also* DBH Admin. Issuance 2020-01 (Jan. 20, 2020); DBH Admin. Issuance 2020-01 (Mar. 4, 2020), Attach. 2 to Tu Decl.; DBH Admin. Issuance 2020-0 (Apr. 3, 2020), Attach. 3 to Tu Decl. The Hospital, however, was constrained early in the pandemic from doing broader testing—for example, of exposed but asymptomatic patients—by the limited availability of testing kits and by the limits of local laboratories to analyze test results. Tu Supp. Decl. ¶ 7; Decl. of Dr. Joel Selanikio (Selanikio Decl.) [90-2] ¶ 8. The Hospital conducted its first facility-wide test of patients in early May. *See* Tu Supp. Decl. ¶ 15; Apr. 25, 2020 Notice of Compliance [76]. The Hospital has continued regular facility-wide testing, and to date no patient has tested positive since May 30, 2020. *See* Government of the District of Columbia, Human Services Agency COVID-19 Case Data, available at https://coronavirus.dc.gov/page/human-services-agency-covid-19-case-data.

Since the pandemic began, Saint Elizabeths has worked to reduce its patient census to the extent possible through the reduction of patient admissions and the discharge of patients to the community where safe and appropriate. *See* Candilis Decl. ¶ 7; Gontang Decl. ¶¶ 7-9; *see also Amici* Oral Report Tr. at 8 (census reduction "accomplished very, very well"); Report of Dr. Patrick Canavan (Canavan Report) [78]

at 4 (patient census at "historic lows"). This was an important early step in combatting the virus. *See Amici* Oral Report Tr. at 18, 47-48; Canavan Report at 4. The current patient population stands at 194, down from 221 on April 21, 2020 and 277 on February 1, 2020. Tu Supp. Decl. ¶ 15; Taneja Supp. Decl. ¶ 9. The Hospital maintains a "ready-for-discharge" list tracking patients in care who "ha[ve] progressed sufficiently such that the treatment team could identify the level of care and housing needs for the individual when discharged." Canavan Report at 7. The Hospital regularly updates this list and implements discharge plans for patients when appropriate and possible. *See* Gontang Supp. Decl. ¶¶ 24, 26-29. Discharges have continued throughout the COVID-19 emergency. Gontang Supp. Decl. ¶¶ 22, 27-29; Canavan Report at 9.

The Hospital continued most components of mental health care during the pandemic. Individual treatment has continued in the form of "frequent 'check-ins'" by nursing and clinical staff, individualized competency restoration, and individual therapy. Canavan Report at 13. Psychiatry, nursing, and social work services have remained available. *Id.*; *see* Supp. Decl. of Dr. Philip Candilis (Candilis Supp. Decl.) [90-5] ¶ 5. The Hospital suspended group therapy temporarily to reduce the risk of spreading the virus. *See* Gontang Supp. Decl. ¶ 4; Canavan Report at 12 (group therapy curtailed during pandemic "due to COVID-19 concerns" and "the risk of cross-contamination"). This was based on then-current public health guidance. *See* CDC, Preparing for COVID-19: Long-term Care Facilities, Nursing Homes (CDC LTCF Guidance) (April 24, 2020) [55-1] at 6; *see also* SAMHSA Guidance [87-3] at 2. The

8

Hospital immediately began working to implement telehealth technology that would facilitate some small-group therapy with adequate social distancing. Canavan Report at 17. Delays in implementing the Hospital's telehealth program arose from the need to prioritize infection control measures. *See* PI Mem. Op. at 29-30. Group therapy has now resumed to a limited extent, with measures such as social distancing and the use of telehealth capabilities to ensure patient and staff safety. *See* June 12, 2020 Status Report [102] at 15 (53 groups held the week of June 4-10, 2020).

## IV.    Procedural History

Plaintiffs Enzo Costa, Vinita Smith and William Dunbar filed this putative class action on October 23, 2019.[3] They originally asserted two counts based solely on the Fall 2019 water outage. Compl. [1] ¶¶ 1-4. They raised a substantive due process claim under Section 1983 and a disability discrimination claim under the ADA, 42 U.S.C. § 12131, *et seq.*, *id.* ¶¶ 97-110, and sought declaratory and injunctive relief, *id.* ¶¶ 111-17. The District later moved to dismiss the case. *See* Mot. to Dismiss [21].

On April 16, 2020, plaintiffs moved to amend their pleadings, adding allegations that the District had not been taking proper measures at Saint Elizabeths to mitigate the risks of COVID-19 to patients.[4] *See* Pls.' Mot. For Emergency Hr'g [36]; Proposed Am. Compl. [36-1] ¶¶ 37-122. Over the District's objection, the Court granted the motion. *See* Mem. Op. and Order on Pls.' Mot. [48].

---

[3]    On April 22, 2020, the Court dismissed plaintiff Stefon Kirkpatrick based on the Parties' joint stipulation of voluntary dismissal. *See* Apr. 22, 2020 Minute Order.

[4]    The Court interpreted plaintiffs' motion to be a motion to supplement their Complaint under Federal Rule of Civil Procedure 15(d). *See* Mem. Op. and Order [48].

Plaintiffs also moved for a temporary restraining order (TRO), which this Court granted in part on April 25, 2020. *See* Mem. Op. on Mot. for TRO [59]; TRO [60]. The Court ordered that Saint Elizabeths implement specific measures involving the quarantine of patients exposed to COVID-19 and specific testing protocols for symptomatic patients, and that the District file semi-weekly reports detailing its compliance. *See* TRO ¶¶ 1-3. The TRO was initially set to expire on May 8, 2020. *Id.* ¶ 4.

On May 1, 2020, the Court appointed three *amici curiae* proposed by the Parties to inspect Saint Elizabeths, provide factual findings on disputed issues of fact surrounding infection control measures and the provision of mental health care, and issue recommendations to the Court. *See* May 1, 2020 Minute Order. *Amici* provided a preliminary oral report on May 7, 2020. *See Amici* Oral Report Tr. The Parties agreed to extend the TRO through May 11, 2020. *See* May 7, 2020 Minute Order.[5] *Amici* then submitted written reports on May 11, 2020. *See* Canavan Report; Hebden and Waldman Report.

That same day, the Court extended the TRO through May 22, 2020, and added two additional requirements restricting Hospital staff to designated units and requiring the completion of "point prevalence surveys" to test all Hospital patients

---

[5]      As the District noted in the Parties' May 8, 2020 Joint Status Report, the District agreed to extend the TRO through May 11, 2020 "only to allow the *amici* to complete their written report before any further proceedings—not because there is any need for oversight of the Hospital's work." *See* May 8, 2020 Joint Status Report [74] at 11.

and staff for COVID-19. Modified TRO [83]. The Court also recommended, but did not require, that DOH assign an individual to oversee and analyze the Hospital's infection control data. *Id.*

On May 14, 2020, plaintiffs moved for a preliminary injunction (PI), *see* Pls.' Mot. for PI [87], which this Court granted in part on May 24, 2020, *see* PI Order [96]. The Court ordered the District to continue isolating exposed patients to the extent medically practicable, to continue regular point prevalence surveys of patients and staff, and to minimize the movement of staff across units. *See* PI Order at 1-2. The Court denied plaintiffs' requests for relief related to the provision of mental health services. *See* Mem. Op. on Mot. for PI (PI Mem. Op.) [95] at 26-30. The District has since appealed the preliminary injunction. *See* Notice of Appeal [96].

## LEGAL STANDARD

### I.  <u>Motion to Dismiss</u>

A case must be dismissed when a party has failed to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the well-pleaded factual allegations must be taken as true, a plaintiff must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 120 (D.D.C. 2011). Courts need not accept as true conclusory "assertions devoid

of further factual enhancement." *Iqbal*, 556 U.S. at 679. The Court "need not … accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations adopted) (internal quotation marks omitted).

Dismissal is also appropriate any time a court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); *Mykonos v. United States*, 59 F. Supp. 3d 100, 103 (D.D.C. 2014). This is so where the underlying controversy has become moot, *see Comm. in Solidarity with the People of El Salvador (CISPES) v. Session*, 929 F.2d 742, 744 (D.C. Cir. 1991), and where the plaintiff lacks standing, *see Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016). "[I]n deciding a 12(b)(1) motion, a court need not limit itself to the complaint; rather, it may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction in the case." *Toth v. Wells Fargo Bank, N.A.*, 82 F. Supp. 3d 373, 376 (D.D.C. 2015) (citations and internal quotation marks omitted).

## II.   **Summary Judgment**

Summary judgment is appropriate where the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Brehm v. Dep't of Defense*, 577 F. Supp. 2d 446, 448 (D.D.C. 2008). "[C]ourt[s] must look to the substantive law on which each claim rests" in determining which facts are material. *Brehm*, 577 F. Supp. 2d at 448 (citation omitted). "A genuine issue is one whose resolution could

establish an element of a claim or defense and, therefore, affect the outcome of the action." *Id.* (citation and internal quotation marks omitted).

To survive summary judgment, the nonmoving party must present evidence to support each essential element of his or her claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). It "may not rely solely on allegations or conclusory statements" and must instead "present specific facts that would enable a reasonable jury to find in its favor." *Brehm*, 577 F. Supp. 2d at 448 (citations omitted).

## ARGUMENT

## I.   Plaintiffs' Claims Are Moot to the Extent They Are Based on the Water Outage.

Whether or not plaintiffs have stated a claim based on the water outage, Saint Elizabeths lifted all water restrictions nine months ago. *See* Taneja Decl. ¶ 9.  Federal courts may only hear "cases" or "controversies," U.S. Const. Art. III, § 2, and must "refrain from deciding [a case] if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future,'" *Columbian Rope Co. v. West*, 142 F.3d 1313, 1316 (D.C. Cir. 1998) (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990)).

The District began lifting restrictions on water usage on October 23, 2019, shortly before plaintiffs filed their initial Complaint, and normal water usage was restored on October 28, 2019. Taneja Decl. ¶¶ 8-9. There have been no new restrictions on water usage at Saint Elizabeths since then. Taneja Decl. ¶ 9; *see also* Taneja Supp. Decl. ¶ 7 (no interruption in water usage during recent pipe rupture). Because they seek only prospective relief, plaintiffs' requests with respect to the

13

water outage are therefore moot. *See CISPES*, 929 F.2d at 744 ("If the possibility of continuing injury disappears while the lawsuit is pending, the complaint ordinarily should be dismissed as moot.").

## II. Plaintiffs Cannot Succeed on the Merits of Their Claims and Dismissal or Summary Judgment Is Warranted.

### A. Plaintiffs' Substantive Due Process Claim Cannot Be Sustained.

Plaintiffs cannot succeed on their first claim for relief under the Fifth Amendment Due Process Clause. The Fifth Amendment's guarantee of substantive due process protects individuals from "unjustified intrusions on personal security." *Ingraham v. Wright*, 430 U.S. 651, 673 (1977). Because this case involves the provision of care in a public psychiatric facility, the standard for constitutional due process comes from *Youngberg v. Romeo*, 457 U.S. 307 (1982). *See* PI Mem. Op. at 6. Although the government has the duty "to provide adequate food, shelter, clothing, and medical care," and ensure "reasonable safety for all residents and personnel within the institution," *Youngberg*, 457 U.S. at 324, the Court "must show deference to the judgment exercised by a qualified professional," *id.* at 322.

Plaintiffs therefore cannot establish a due process violation unless they can show the District failed to provide adequate care, and point to a decision by a professional charged with their care that was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.* at 323.[6]

---

[6]   Were it the applicable standard, plaintiffs could not establish a due process violation under the deliberate indifference standard, either. Both the pleadings and

By this standard, due process "only requires that the courts make certain that professional judgment in fact was exercised" by appropriate staff, without mandating that any specific judgment should have been made. *Id.* at 321.

The inquiry "is whether the decision was so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one." *Patten v. Nichols*, 274 F.3d 829, 845 (4th Cir. 2001) (citation and internal quotation marks omitted). "[M]ere departures from the applicable standard of care" cannot establish constitutional liability. *Id.*; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015) ("[L]iability for *negligently* inflected harm is categorically beneath the threshold of constitutional due process" (Court's emphasis)); *Jordan v. District of Columbia*, 161 F. Supp. 3d 45, 54 (D.D.C. 2016) ("[T]he Constitution does not, of its own accord, 'guarantee due care on the part of state officials.'"); *Hargett v. Adams*, Civil Action No. 02-1456, 2005 WL 399300, at *17 (N.D. Ill. Jan. 14, 2005) (observing due process action under *Youngberg* "not a negligence case where any deviation from the standard of care could impose liability").

Rather, any given decision, "if made by a professional, is presumptively valid." *Youngberg*, 457 U.S. at 323. "By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized." *Id.*; *see also S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring)

---

the record make clear that the District did not recklessly disregard any known risk to plaintiffs. *See Harvey v. District of Columbia*, 798 F.3d 1042, 1052 (D.C. Cir. 2015).

(deference to local public officials during COVID-19 "must be especially broad" because they "are actively shaping their response to changing facts on the ground" in "areas fraught with medical and scientific uncertainties").

As discussed below, plaintiffs cannot establish that they were deprived of adequate care or that their due process claims are based on any failure to exercise professional judgment. The District is therefore entitled to dismissal or, in the alternative, judgment as a matter of law on plaintiffs' due process claims.

### 1. Plaintiffs Have Not Pled a Due Process Violation from the Water Outage.

#### a. Plaintiffs Do Not Allege Deprivations of Reasonable Care and Safety or Allege the Absence of Professional Judgment in Any Decision During the Water Outage.

Plaintiffs have not pled that they were denied "adequate" care or "reasonable safety" amid the water outage. *See Youngberg*, 457 U.S. at 324. Plaintiffs allege that they did not have access to running water during the outage, Am. Compl. ¶ 11, but also acknowledge that while potable water restrictions were in place, the Hospital provided them with bottled water, hand sanitizer, personal care body wipes, portable showers and toilets, and off-site laundry services, *id.* ¶ 162. Plaintiffs allege a period of several days in which staff flushed indoor toilets manually. *Id.* ¶¶ 164, 166. Although they allege some deficiencies with the portable showers, they concede that the Hospital provided sanitary wipes as an alternative. *Id.* ¶¶ 170-79. Plaintiffs similarly allege that the Treatment Mall was temporarily closed for group therapy and activities during the outage. *Id.* ¶ 9. Plaintiffs, in other words, allege some short-

term discomfort amid an emergency situation. But they do not allege a scenario in which the Hospital deprived them of reasonable care and security.

On top of that, plaintiffs have not alleged that the conditions during the outage and the Hospital's alleged deficiencies in the provision of care were the result of any official's failure to exercise professional judgment. Plaintiffs allege only that "[t]he conditions at Saint Elizabeths Hospital during the 2019 water outage … violated professional standards of care and treatment." Am. Compl. ¶ 129; *see also id.* ¶ 135. Even if assumed to be true, this does not state a substantive due process claim for two reasons.

First, plaintiffs point merely to "conditions." *Id.* The constitutional standard, however, requires the Court to determine whether a "decision by [a] professional" failed to meet the relevant threshold, not whether conditions on the ground left anything to be desired. *See Youngberg*, 457 U.S. at 323. A due process violation cannot be inferred from undesirable circumstances alone. *See Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 539 (6th Cir. 2018) ("There is no *res ipsa loquitur* principle for constitutional torts."); *Kent v. Sziebert*, Civil Action No. 15-05553, 2016 WL 3248077, at *4 n.3 (W.D. Wash. Apr. 19. 2016) ("*Res ipsa loquitur*, if applicable, allows only for an inference of negligence, which cannot constitute a violation of the stricter standards of deliberate indifference or *Youngberg*'s professional judgment standard.").

Second, the correct legal inquiry is not whether the officials in question "violated professional standards of care and treatment." Am. Compl. ¶ 129; *see*

17

*Patten*, 274 F.3d at 845 ("[E]vidence establishing mere departures from the applicable standard of care is insufficient to show a constitutional violation … ."). Rather, plaintiffs must allege that in the course of responding to the water outage, any given decision was "such a *substantial* departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible *actually did not base the decision on such judgment.*" *Youngberg*, 457 U.S. at 323 (emphasis added). Without raising plausible allegations of this kind, plaintiffs have not stated a due process claim based on the water outage.

### b. Plaintiffs Fail To Plead a Plausible Basis for Municipal or Supervisory Liability.

Plaintiffs cannot establish municipal liability against the District or Mr. Chastang in his official capacity, or supervisory liability against Director Bazron or Mr. Chastang in their individual capacities.[7] Municipal liability under Section 1983 cannot be predicated on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690-91 (1978). Rather, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (*quoting Monell*, 436 U.S. at 691).

The D.C. Circuit has identified four ways official municipal policy can be demonstrated:   (1) express municipal policy;  (2) actions of a final municipal "policymaker"; (3) persistent conduct by non-policymakers (*i.e.*, "custom" with force

---

[7]     As discussed below, plaintiffs' claim against Mr. Chastang in his official capacity should be dismissed as duplicative of their claim against the District. *See* Section III below.

of law); and (4) "deliberate indifference" to a risk of constitutional injury. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003) (citations omitted). Each theory has its own "elements," which a Section 1983 plaintiff bears the burden of pleading. *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015); *accord Hodges v. District of Columbia*, 975 F. Supp. 2d 33, 54 (D.D.C. 2013) ("The fact that [a] claim arises under section 1983 does not relieve [plaintiff] of the obligation to satisfy the criteria established in *Iqbal* and *Twombly*."). The Complaint posits two theories of municipal liability:  the actions of a final policymaker, and deliberate indifference. Plaintiffs fail to state a claim for relief on either theory.

First, plaintiffs allege that defendant Barbara Bazron is a final policymaker based on her position as director of DBH, *see* Am. Compl. ¶¶ 202-03, and point to various decisions they allege she was responsible for, *id.* ¶¶ 204-08. Plaintiffs contend, for instance, that Director Bazron is responsible for the Hospital's "decision to keep patients in dangerous conditions without adequate protections." *Id.* ¶ 206. But as discussed above, plaintiffs' allegations do not describe an absence of adequate protections. Even if they did, to establish municipal liability based on "the single decision of a final policymaker," plaintiffs would have to show the official "demonstrated 'deliberate indifference to the risk that a violation of a particular constitutional or statutory right [would] follow the decision.'" *Blue*, 811 F.3d at 19 (quoting *Bd. of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 411 (1997)). The Complaint, however, merely alleges that Director Bazron "is responsible for the fact that" Saint Elizabeths continued housing patients during the water outage, *see id.* ¶ 204, that

she was "involved in making sure that [the District] got the [water] problem solved," *see id.* ¶ 205 (internal quotation marks omitted), that she "demonstrated her responsibility" by defending the District's actions to the public, *see id.* ¶ 206, and that she "endorsed DBH's response to the water outage, *see id.* ¶ 207. None of these allegations posits a decision or policy that Director Bazron promulgated; instead, plaintiffs rely on the abstract notions that she was "responsible for" and "involved in" the water outage. That is not enough. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 128 (1988) (city not liable when former municipal employee failed to "contend that anyone in city government ever promulgated, or even articulated" an "unconstitutional municipal policy").

Second, plaintiffs allege that the District's "inactions and specifically their failures to train and/or supervise Hospital staff … amounted to deliberate indifference" because the harms alleged "were the obvious and likely consequence of Defendants' inactions." Am. Compl. ¶ 209. Under Section 1983, a municipality may be held liable for the failure to train its employees "only where the failure to train amounts to deliberate indifference to the rights of persons with whom [officials] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). But for this to be so, the failure to train must "reflect[] a 'deliberate' or 'conscious' choice by a municipality." *Id.* at 389. It is insufficient for plaintiffs to merely allege that an injury or accident occurred that "could have been avoided if an officer had had better or more training," because such a claim "could be made about almost any encounter resulting in injury." *Id.* at 391. Rather, plaintiffs must allege an "identified deficiency in a city's

20

training program." *Id.* That is why "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks omitted).

Plaintiffs have not identified any aspect in which Saint Elizabeths staff were insufficiently trained, let alone that the District was on notice of repeated problems from insufficient training. *Cf. Pollard v. District of Columbia*, 698 F. App'x 616, 621 (D.C. Cir. 2017) (finding no municipal liability when plaintiffs failed to plead official policy of insufficiently training officers to engage individuals with intellectual disabilities, failed to plead that officers had previously injured an intellectually disabled person in a drug "buy and bust" operation, and failed to plead a pattern or custom of officers engaging in such practices). Plaintiffs' allegations merely state in conclusory fashion that the District failed "to train and/or supervise Hospital staff to ensure that the harms to Plaintiffs … were prevented or ameliorated." Am. Compl. ¶ 209. But that is little more than a claim "that an injury or accident could have been avoided if an officer had had better or more training," a claim that "could be made about almost any encounter resulting in injury." *Harris*, 489 U.S. at 391. Without identifying what these supposed training deficiencies amounted to, which Hospital staff were not properly trained, or that the District somehow should have known further training was needed, plaintiffs have not plausibly pled the failure-to-train.

Similarly, none of the allegations in the Complaint nor any evidence in the record identifies any discrete actions Director Bazron or Mr. Chastang took, as

supervisors or otherwise, let alone actions that could give rise to liability. As with *Monell* liability, supervisory liability is likewise "limited." *Elkins v. District of Columbia*, 690 F.3d 554, 565 (D.C. Cir. 2012). For an official to be liable in his or her individual capacity, a plaintiff must produce evidence "that each [one], through the official's own individual actions, has violated the Constitution." *Id.* at 564. In this regard, it is not enough to show "mere negligence," by an individual supervisor, but an "affirmative link" between the supervisor's conduct and the constitutional injury that is "strong enough that, from [the supervisor's] perspective, the possibility of a constitutional violation occurring [by a subordinate] would have been highly likely, not simply foreseeable." *Id.* at 566.

The Complaint does not mention Mr. Chastang at all beyond identifying him as the Saint Elizabeths CEO and plaintiffs' custodian. *See* Am. Compl. ¶¶ 28-29. This is not sufficient to establish individual liability. *See Dial v. Kane*, 315 F. Supp. 3d 556, 559 (D.D.C. 2018) (no individual liability for federal officials sued for constitutional violations where plaintiff "br[ought] no such allegations against any of the individual Defendants"). As noted above, plaintiffs allege that Director Bazron has supervisory authority over Saint Elizabeths by virtue of her position as Director of DBH, but they do not allege that she had any personal involvement in any of the relevant decisions at issue in this case. Director Bazron is therefore entitled to judgment as a matter of law. *See Jeffries v. District of Columbia*, 917 F. Supp. 2d 10, 25 (D.D.C. 2013) ("Where a complaint against an official in her individual capacity does not establish the official's personal involvement in the alleged wrongdoing,

22

judgment as a matter of law is appropriate." (internal quotation marks and alterations omitted)).

Plaintiffs' claims against each defendant should thus be dismissed for the failure to plead municipal or supervisory liability.

### 2. The District Is Entitled to Dismissal or Summary Judgment on Plaintiffs' Due Process Claim Arising from the Pandemic.

Plaintiffs' due process claim arising from the pandemic should be dismissed because the Complaint does not allege that Hospital staff failed to exercise professional judgment in responding to COVID-19; it alleges only that the District failed to exercise the correct judgment, *see* Am. Compl. ¶¶ 4, 221, which is insufficient to state a claim. In the alternative, the District is entitled to summary judgment because the record shows that plaintiffs were not deprived of reasonable care and safety, and Hospital staff did in fact exercise professional judgment in responding to the pandemic.

### a. Plaintiffs Cannot Show They Were Deprived of Reasonable Care and Safety or that Anyone Failed to Exercise Professional Judgment in Responding to the Pandemic.

The record shows that plaintiffs were not denied adequate care or reasonable safety during the COVID-19 pandemic, nor did Hospital staff fail to exercise professional judgment in managing their care. As far back as January 2020, Saint Elizabeths's leadership began taking measures to guard against the spread of COVID-19 in accordance with public health guidelines. *See* App'x 1 to Tu Decl; *Amici*

Oral Report Tr. at 22-23.[8] Visitation to the facility was suspended in March 2020, before the Hospital's first case of COVID-19, and the Hospital implemented a universal masking policy on April 15, 2020. Hebden and Waldman Report at 5. Patients and staff also received training on proper hand-hygiene, social distancing and the use of personal protective equipment. *Amici* Oral Report Tr. at 11, 39. Plaintiffs' own evidence makes clear that even in mid-April when plaintiffs moved to amend their Complaint, the Hospital was providing patients with what they needed to stay safe during the pandemic. *See* Guzman Decl. [39-9] ¶ 3 (residents receiving face masks, hand sanitizer, room cleaning and sanitation from staff); Rose Decl. [39-10] ¶ 5 (anonymous patient reported adequate cleaning and availability of soap and hand sanitizer in early April). The Hospital has also properly cohorted patients based on their COVID status since at least early April. *See* Selanikio Decl. ¶ 11; *Amici* Oral Report Tr. at 8, 42; Hebden and Waldman Report at 4. And patients are wearing masks and practicing social distancing. *See Amici* Oral Report Tr. at 40, 43.

Additionally, treatment teams have continuously provided patients with individualized care throughout the emergency, including psychiatric and medical care. *Amici* Oral Report Tr. at 59; Canavan Report at 13-14. Most group therapy services were temporarily suspended based on CDC guidance to minimize in-person gatherings, although some services continued with modifications to ensure patient safety. *Amici* Oral Report Tr. at 61 (Dr. Canavan describing staff's "Herculean efforts"

---

[8]      Citations to the *Amici* Oral Report Transcript reference the official transcript page numbers, not the ECF page numbers.

to continue competency restoration simulations "on a one-to-one basis"); Supp. Decl. of Enzo Costa (Costa Supp. Decl.) [87-5] ¶ 13 (participating in music group therapy "every day in my unit"). Hospital staff began deploying digital technology to facilitate virtual individualized therapy sessions weeks before the Amended Complaint was filed, which allowed individual therapy to continue at the same rate. *Amici* Oral Report Tr. at 62; Decl. of Vinita Smith (Smith Decl.) [38-9] ¶ 10.[9] Plaintiffs' own evidence shows they have not been subjected to inadequate care, an unreasonable risk to their health and safety, or a deficiency of any other rights.

Even if plaintiffs suffered deprivations of reasonable care and safety, they cannot show that any such deprivations arose from the failure of any Hospital staff to exercise professional judgment. As discussed above, the standard is whether relevant officials failed to exercise any professional judgment in the decisions they made. *Youngberg*, 457 U.S. at 321; *see Patten*, 274 F.3d at 843 ("[T]he professional judgment standard makes inappropriate any attempt by the court to determine the correct or most appropriate medical decision." (internal quotation marks omitted)).

The Hospital's protocols implemented in response to COVID-19 were implemented based on professional judgment. Since this amended lawsuit was filed, the Hospital has been evaluating and testing symptomatic patients where

---

[9]     Consistent with plaintiff Vinita Smith's declaration from the middle of April, all three plaintiffs now attest they are receiving individual therapy once per week. *See* Supp. Decl. of Vinita Smith (Smith Supp. Decl.) [87-4] ¶ 6; Costa Supp. Decl. ¶ 11; Supp. Decl. of William Dunbar (Dunbar Supp. Decl.) [87-6] ¶ 15. Dr. Canavan noted that even before the pandemic, those patients who received individual therapy did so "generally once per week." *See* Canavan Report at 11.

appropriate based on available guidance. *See* Tu Decl. ¶ 11 ("Hospital staff evaluate patients exhibiting possible COVID-19 symptoms, and when appropriate, collect a nasal swab sample for testing."); DBH Admin. Issuance #2020-001 (Apr. 3, 2020) at 17 (showing DOH guidance advising that symptomatic patients be tested under limited circumstances); *Amici* Oral Report Tr. at 42 (patients being cohorted "based on testing results"). The Hospital has been appropriately cohorting and isolating patients according to how likely it is they are COVID-positive. *See* Hebden and Waldman Report at 4. The Hospital also put in place protocols to limit staff movement across units where possible. *Amici* found that "[n]ursing staff are not being moved to another unit within the same shift unless testing results on their assigned patients require movement to another unit." Hebden and Waldman Report at 8. The Hospital's Chief Nurse concluded in her own professional judgment that in some cases it may be necessary to allow cross-unit movement for the Hospital to ensure adequate staffing levels. Supp. Decl. of Martha Pontes (Pontes Supp. Decl.) [90-7] ¶ 5; *see Youngberg*, 457 U.S. at 322 ("[C]ourts must show deference to the judgment exercised by a qualified professional.").

The Hospital has also conducted testing across the patient population, where appropriate and available, based on the prevailing public health advice at each juncture over time. At the time they filed their Amended Complaint, plaintiffs alleged that the Hospital was testing symptomatic patients but not exposed, asymptomatic patients. Am. Compl. ¶ 96. However, given the limited availability of testing early on in the pandemic, the Hospital's decision to prioritize symptomatic patients for testing

was consistent with DOH guidance at the time. *See* DBH Admin. Issuance 2020-001 (Apr. 3, 2020) at 17; PI Mem. Op. at 22 ("Plaintiffs have offered no evidence that the shortage in tests [early on in the pandemic] was the result of a decision attributable to Defendants rather than a result of the nation-wide shortage in testing capacity."); *see also Amici* Oral Report Tr. at 19 ("[Hospital staff] were very limited in the ability to acquire testing early on."); App'x to Hebden and Waldman Report at 5 (shortage of testing supplies to blame for no routine testing schedule early on).[10] The CDC did not begin recommending that long-term care facilities perform point prevalence surveys of patients and staff in their facilities until May 2, 2020. Selanikio Decl. ¶ 14.

Plaintiffs also cannot show that Hospital staff failed to exercise professional judgment in the provision of mental health services. The Hospital's Chief Clinical Officer decided to suspend group therapy based on his judgment that doing so was necessary to protect patients and staff from COVID-19. *See* Gontang Supp. Decl. ¶ 4; Canavan Report at 12 (group therapy curtailed during pandemic "due to COVID-19 concerns" and "the risk of cross-contamination"). This decision comported with then-current public health guidance. *See* CDC, Preparing for COVID-19: Long-term Care Facilities, Nursing Homes (CDC LTCF Guidance) (April 24, 2020) [55-1] at 6; *see also* SAMHSA Guidance [87-3] at 2. The decision to suspend group therapy amounted to sound professional judgment in light of the pandemic. *See* PI Mem. Op. at 28

---

[10]     As the Court has previously observed, the Hospital adequately worked to reduce the patient census, *see* PI Mem. Op. at 16-17, and to educate and train staff on infection control practices, *id.* at 25.

("Plaintiffs do not dispute that Defendants' decision to shut down in-person group therapy was a sound professional decision ..., nor could they.").

Despite the barriers to conducting group therapy, most components of patient mental health care continued without significant interruption. *Amici* found "only a slight decline" in individual therapy, Canavan Report at 16, and that the Hospital had worked to implement telehealth technology that would facilitate some small-group therapy with adequate social distancing, *id.* at 17. Delays in implementing the Hospital's telehealth program arose from the need to prioritize infection control measures. *See* PI Mem. Op. at 29-30.

In short, the record shows that Hospital staff exhibited professional judgment amid the extraordinary circumstances presented by the pandemic. The District is entitled to summary judgment. *See Youngberg*, 457 U.S. at 321; *cf. S. Bay United Pentecostal*, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring) ("When [state and local] officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'").

### b. Plaintiffs Lack Standing To Seek Facility-Wide Injunctions Related to Mental Health Care.

In addition, plaintiffs do not have standing to seek facility-wide changes to the provision of mental health care. Every plaintiff in federal court must meet the constitutional minimum for Article III standing by showing an injury, causation and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The third of these, redressability, requires showing "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103

(1998). The named plaintiffs must have standing both for each claim that they are raising with this Court "and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

This Court has already rejected plaintiffs' standing to seek "sweeping, Hospital-wide relief" that does not directly affect them. *See* PI Mem. Op. at 27-28. Plaintiffs do not have standing to seek individual assessments of other patients, *see* Am. Compl. ¶ 236(d), (j), or changes to the Hospital-wide provision of mental health care, *id.* ¶ 236(i). Providing these for other patients would not redress any cognizable injury that plaintiffs themselves complain of. *See Steel Co.*, 523 U.S. at 103.

### c. Plaintiffs Cannot Establish Municipal or Supervisory Liability Under Section 1983.

Summary judgment should also be granted for the District because plaintiffs cannot establish municipal liability against the District or Mr. Chastang in his official capacity, or supervisory liability against Director Bazron or Mr. Chastang in their individual capacities. Whether their theory of municipal liability is one of a decision by Director Bazron as a final policymaker, or the failure to train, *see Baker*, 326 F.3d at 1306-07, plaintiffs must show deliberate indifference, *see Blue*, 811 F.3d at 19 (quoting *Brown*, 520 U.S. at 411). As described in detail above, the Hospital, DBH and the District took extensive measures since the beginning of the pandemic to follow the prevailing public health guidance current at the time. *See* Section II.A.2.a above. Plaintiffs cannot point to any decision by any final policymaker that demonstrates otherwise. Similarly, plaintiffs cannot point to any "identified

deficiency" in the District's protocols for training Hospital staff. *See Harris*, 489 U.S. at 391. The record is clear that any imperfections aside, Hospital staff went to great lengths since the start of the pandemic to implement thorough infection control measures and adjust various aspects of mental health care to minimize the spread of COVID-19. *See* Section II.A.2.a above. Any claim based on the failure to train Hospital staff would amount to nothing more than a claim "that an injury or accident could have been avoided if an officer had had better or more training." *Harris*, 489 U.S. at 391. That will not suffice.

In addition, nothing in the record identifies either Director Bazron or Mr. Chastang as having made any of the decisions in question. Their supervisory authority does not alone suffice without challenging specific decisions they made. The District is entitled to summary judgment.

### 3. Plaintiffs Cannot Establish a Due Process Violation Based on the Hospital's Emergency Plan.

Plaintiffs also allege that they remain "at a continuous risk due to the lack of appropriate emergency plans." Am. Compl. ¶¶ 124-25. Although the D.C. Circuit has not decided the issue, other courts have concluded that substantive due process does not entail the right to the existence of government emergency plans with any particular contents. *See Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of the Commonwealth of Mass.*, 649 F.2d 71, 77 (1st Cir. 1981); *Armstead v. Nagin*, Civil Action No. 05-6438, 2006 WL 3861769, at *12-13 (E.D. La. Dec. 29, 2006); *Berthelot v. Boh Bros. Construction Co., L.L.C.*, Civil Action No. 05-4182, 2006 WL 2256995, at *12-13 (E.D. La. July 19, 2006).

Even if the law were otherwise, the District updated its Emergency Plan on March 1, 2020, more than a month before plaintiffs moved to amend their Complaint. The current plan contains robust protocols for a variety of possible emergency scenarios, including water supply disruptions and infectious disease outbreaks. *See* Emergency Plan [44-2 to 44-5] at 17-18, 57, 65-66. The Hospital activated the plan for COVID-19 on March 12, 2020. *See* March 18, 2020 DBH Letter [92-1] at 1. Saint Elizabeths also activated the plan during a recent incident in which a pipe ruptured near the Hospital, requiring the Hospital to provide potable and industrial water from an external supply. Taneja Supp. Decl. ¶ 7. Patients and staff experienced no interruption in water use throughout the facility. *Id.* Even if plaintiffs contend that inadequacies in the Hospital's emergency plan violated or continue to violate their due process rights, any such claims—and related requests for relief—are now moot in light of these developments. *See O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects."); *Conyers v. Reagan*, 765 F.2d 1124, 1127 (D.C. Cir. 1985) ("The Article III case or controversy requirement is as applicable to declaratory judgments as it is to other forms of relief.").

## B. Plaintiffs Cannot Succeed on Their ADA Claim.

Plaintiffs likewise cannot succeed on their ADA claims arising out of either the water outage or the pandemic. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. An ADA claim requires a showing of three elements:  "(1) that the plaintiff is a qualified individual with a disability; (2) that the public entity denied him the benefits of or prohibited him from participating in the entity's services, programs or activities; and (3) that denial or prohibition was 'by reason of' his disability." *Jackson*, 826 F. Supp. 2d at 125-26 (quoting 42 U.S.C. § 12132). An ADA claim is typically based on one of three theories of liability:  disparate treatment, disparate impact, or failure to make a reasonable accommodation. *Seth v. District of Columbia*, Civil Action No. 18-1034 (BAH), 2018 WL 4682023, at \*10 (D.D.C. Sept. 28, 2018). In addition, the Supreme Court has recognized as a fourth theory the "[u]njustified isolation" of those with disabilities in institutional settings. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999).

Plaintiffs allege two theories of ADA discrimination in the Complaint:  their unjustified isolation in an institutional setting, *see* Am. Compl. ¶ 228, and the denial of equal access to mental health benefits, *see id.* ¶ 229. On either theory, however, plaintiffs have not stated a claim for relief as to the water outage, and they cannot succeed on their claim as to the COVID-19 pandemic.

### 1. Plaintiffs Have Not Pled an ADA Violation from the Water Outage.

#### a. The ADA Does Not Forbid Temporary Interruptions in Services Necessitated by an Emergency.

Plaintiffs allege that as to the water outage, the District has "utiliz[ed] methods of administration that deprive[d] Plaintiffs of equal access to the benefits of

the mental health services provided by Defendants that other individuals in the community are receiving." Am. Compl. ¶ 229. Whether an allegation of disparate treatment, disparate impact discrimination, or the failure to provide a reasonable accommodation, the record—and plaintiffs' own allegations—make clear they cannot succeed on this claim.

To begin with, plaintiffs do not allege any facts suggesting that the District intentionally discriminated against them, leaving them no grounds to allege disparate treatment. On the contrary, plaintiffs merely point to changes the Hospital made to its operations during the temporary water outage, alleging that "[t]here is no reasonable justification for these failures." *Id.* ¶ 229. Thus, on the face of their pleadings, they have not alleged disparate treatment.

Plaintiffs also cannot succeed on a claim of disparate impact discrimination. Disparate impact claims involve practices that are facially neutral in their treatment of different groups but fall more harshly on one group than another in practice. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). Such a claim "requires the identification of a specific practice that, while facially neutral, nonetheless had a disproportionate adverse effect on a protected class of individuals." *Anderson v. Duncan*, 20 F. Supp. 3d 42, 54 (D.D.C. 2013). A disparate impact is shown by drawing a comparison to the treatment of those who are not qualified individuals under the ADA. *See Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 922 (10th Cir. 2012) (Gorsuch, J.) (noting that disparate impact is often shown "by statistical evidence … involv[ing] the appropriate comparables"); *Doe v. Pfrommer*,

148 F.3d 73, 82 (2d Cir. 1998) (dismissing as "beyond tenuous" theory that ADA discrimination claims against state disability services administration would be alleging disparate treatment or disparate impact given agency's "sole purpose in assisting the disabled"). A complaint cannot adequately allege government actions that cause a disparate impact without alleging "how [the actions] affected different classes of individuals." *Seth*, 2018 WL 4682023, at *12. Plaintiffs raise no allegations here of a specific practice causing a disparate impact.

And, finally, a reasonable accommodation claim would fare no better. A reasonable accommodation claim would require plaintiffs to demonstrate that the District denied their request for a reasonable accommodation of a disability. *See Chenari v. George Washington Univ.*, 847 F.3d 740, 746-47 (D.C. Cir. 2017). Plaintiffs have not alleged any express accommodation request followed by a denial. They simply allege that they temporarily stopped receiving certain services during an emergency situation. The ADA, however, does not prohibit temporary deprivations of services when necessitated by an emergency—especially when providing the services would pose an imminent health and safety risk to patients. Numerous federal agencies have adopted regulations implementing the ADA that reflect this fact. *See, e.g.*, 28 C.F.R. § 35.133(b) (Department of Justice regulations implementing ADA for buildings and facilities exempting "isolated or temporary interruptions in service or access due to maintenance or repairs"); 49 C.F.R. § 37.161 (Department of Transportation regulation imposing same exemption for public transit vehicles). Indeed, a portion of the DOJ regulation plaintiffs cite throughout their Complaint

expressly permits public entities to "impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities." *See* 28 C.F.R. § 35.130(h); *see also Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 930-31 (7th Cir. 2004) (five-day temporary disruption of elevator service did not violate ADA).

At most, plaintiffs allege inadequate services provided during the water outage. The ADA, however, does not "impose[] on the States a standard of care for whatever medical services they render," nor does it "require[] States to provide a certain level of benefits to individuals with disabilities." *Olmstead*, 527 U.S. at 603 n.14 (internal quotation marks omitted). All the ADA requires is that states "adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id.*; *see Pierce v. District of Columbia,* 128 F. Supp. 3d 250, 265 (D.D.C. 2015) (the purpose of the ADA is to secure for disabled persons the same rights and privileges afforded to able-bodied persons); *Pfrommer*, 148 F.3d at 84 (holding plaintiff had no ADA cause of action over expulsion from vocational education program where central grievance was "not illegal discrimination against the disabled, but the substance of the services provided to him through [the program]").

Plaintiffs cannot rely on conclusory assertions of disability discrimination while alleging nothing more than deficient services. *See Iqbal*, 556 U.S. at 678 (complaint must be dismissed under Rule 12(b)(6) "if it tenders 'naked assertions' devoid of 'further factual enhancement'"). They also cannot invoke the ADA's anti-discrimination provisions to challenge the adequacy of services at Saint Elizabeths. *See Buchanan v. Maine*, 469 F.3d 158, 175 (1st Cir. 2006) (individual shot by police

could not sue state under ADA despite years of state-sponsored mental health treatment where "claim was not about discriminatory denial of services, but rather about the adequacy of treatment"); *M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 175, 198 (D. Conn. 2008) (rejecting plaintiffs' ADA challenge to state child services agency's "arbitrary time limits" for various family services where plaintiffs were "attempting to invoke the anti-discrimination provisions of the ADA … to challenge the adequacy of the services provided by [the agency], not illegal disability discrimination"). Adequacy of services is not a cognizable ADA claim and should be dismissed.

### b. Plaintiffs Have Not Alleged that Treatment Professionals Determined Community Placement Was Appropriate or that Placement Could Have Been Reasonably Accommodated During the Water Outage.

Plaintiffs have failed to state an ADA claim under an unjustified isolation theory. The ADA requires institutionalized individuals to be placed in community settings "when (1) the State's treatment professionals have determined that community placement is appropriate, (2) the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and (3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Brown v. District of Columbia*, 928 F.3d 1070, 1077 (D.C. Cir. 2019) (quoting *Olmstead*, 527 U.S. at 587).

As an initial matter, the Court has not certified this case as a class action. Plaintiffs do not have standing to challenge the unjustified isolation of other Saint Elizabeths patients or to seek relief on their behalf. *See* Section II.A.2.b above;

*Rumber v. District of Columbia*, 595 F.3d 1298, 1301 (D.C. Cir. 2010) (no standing to assert rights of a third party unless there is "some hindrance to the third party's ability to protect his or her own interests"). But even insofar as they raise their own individual claims, plaintiffs cannot simply rely on the conclusory allegation that the District should have been placing them into the community during a temporary water outage. Plaintiffs cite generally to a DOJ regulation requiring public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." Am. Compl. ¶ 228(b) (citing 28 C.F.R. § 35.130(b)(7)). But plaintiffs do not allege that during the water outage any "treatment professionals ha[d] determined that community placement [was] appropriate," or that community placements could have been "reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *See Brown*, 928 F.3d at 1077. They thus cannot succeed on an unjustified isolation ADA claim related to the water outage.

### 2. The District Is Entitled to Summary Judgment as to Any ADA Claim Arising from the Pandemic.

As discussed above, plaintiffs ultimately allege inadequate services provided during the pandemic. *See* Am. Compl. ¶ 229(a) (alleging the Hospital "failed to provide for alternative treatment, such as teletherapy, virtual therapy, telephonic therapy or another remote substitute"). That is not cognizable under the ADA. *See Olmstead*, 527 U.S. at 603 n.14; *Pfrommer*, 148 F.3d at 84. Even if it were, plaintiffs

cannot prevail on the record here. The vast majority of individual therapy services continued during the pandemic. Individual treatment has continued in the form of "frequent 'check-ins'" by nursing and clinical staff, individualized competency restoration, and individual therapy. Canavan Report at 13. Psychiatry, nursing, and social work services have remained available. *Id.*; *see* Supp. Decl. of Dr. Philip Candilis (Candilis Supp. Decl.) [90-5] ¶ 5. Individual therapy sessions are "continuing either through in-person, phone or through video/teleconferencing." Canavan Report at 13. And, as plaintiffs' own declarations show, Hospital staff deployed digital technology to facilitate virtual individualized therapy sessions weeks before the Amended Complaint was filed, which has allowed individual therapy to continue at the same rate. Gontang Decl. ¶¶ 12-13; *Amici* Oral Report Tr. at 62; Smith Decl. [38-9] ¶ 10.[11]

Although most group therapy services were initially suspended based on CDC guidance to minimize in-person gatherings, some services continued with modifications to ensure patient safety. *Amici* Oral Report Tr. at 61 (describing staff's "Herculean efforts" to continue competency restoration simulations "on a one-to-one basis"); Costa Supp. Decl. ¶ 13 (participating in music group therapy "every day in my unit"). Some activities typically conducted through group therapy, such as

---

[11]    As noted above, consistent with plaintiff Vinita Smith's declaration from the middle of April, all three plaintiffs now attest they are receiving individual therapy once per week. *See* Smith Supp. Decl. ¶ 6; Costa Supp. Decl. ¶ 11; Dunbar Supp. Decl. ¶ 15. Dr. Canavan noted that even before the pandemic, those patients who received individual therapy did so "generally once per week." *See* Canavan Report at 11.

competency restoration, continued occurring "on a one-to-one basis with psychology staff." Canavan Report at 13. The Hospital continues moving forward with its plan to expand teletherapy and resume some groups remotely. *See* Gontang Supp. Decl. ¶¶ 12-13. On the record here, plaintiffs cannot prevail on a claim that the Hospital's prudent choice to modify some services in light of the pandemic amounts to disability discrimination.

The same is true of any unjustified isolation claim related to the pandemic. As Dr. Canavan observed, Saint Elizabeths maintains a "ready for discharge" list tracking patients in care who "ha[ve] progressed sufficiently such that the treatment team could identify the level of care and housing needs for the individual when discharged." Canavan Report at 7. Plaintiffs, first and foremost, are not on that list and do not have standing to raise a claim that patients are not being moved off the list quickly enough. Gontang Supp. Decl. ¶ 25; *see Rumber*, 595 F.3d at 1301.[12] The record nevertheless makes clear the many barriers to placing patients in the community during a pandemic. These include a reluctance by housing providers to take on new residents, *Amici* Oral Report Tr. at 50, a general shortage of appropriate community housing, Canavan Report at 8, a lack of available bed space, *id.*, pandemic restrictions on travel and face-to-face interactions, *Amici* Oral Report Tr. at 50, and the hesitation by some landlords to accept Saint Elizabeths patients despite DBH's

---

[12]     To the extent plaintiffs are alleging their own interests in the reduction of the Hospital's patient population, those interests are not within the zone protected by the ADA. *See Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000).

best efforts to ensure compliance with applicable laws and regulations, *see* Decl. of Atiya Jackson [90-6] ¶ 5.

All of these barriers aside, the Hospital has still managed to place individuals into the community where possible. *See* Canavan Report at 9 n.16 (noting numerous discharges, including one "extremely difficult" DDS placement). That plaintiffs remain in the Hospital's care is not the product of ADA discrimination or the District's failure to make appropriate efforts towards placement. Despite the obstacles to placement amid COVID-19, between March 15, 2020, and May 2, 2020, Saint Elizabeths discharged 57 patients into the community.[13] Canavan Report at 9. As a result, given all the challenges presented by the pandemic, the Hospital is moving patients into the community at a "reasonable pace" as the law requires. *See Brown*, 928 F.3d at 1077. The District is entitled to summary judgment on plaintiffs' ADA claims arising from the pandemic.

## III.   Plaintiffs' Claims Against Mark Chastang in His Official Capacity Should Be Dismissed.

Finally, plaintiffs' claim against Mr. Chastang in his official capacity should be dismissed as redundant of the claim against the District. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and therefore "is no different from a suit against the [government] itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see*

---

[13]    This includes the discharge of four patients to group homes in March 2020, and three patients to group homes in April 2020. That is consistent with the Hospital's average of three discharges to group homes per month since March 2019. *See* Gontang Supp. Decl. ¶ 27.

*Price v. District of Columbia*, 545 F. Supp. 2d 89, 93 and n.7 (D.D.C. 2008) (the principle that Section 1983 suits for damages against municipal government officials in their official capacities are the equivalent to a suit against the municipality itself "would seemingly apply" to cases for declaratory and injunctive relief).

## CONCLUSION

For the foregoing reasons, the Court should grant defendants' motion and dismiss the Amended Complaint with prejudice. In the alternative, summary judgment should be entered in favor of defendants.

Dated:  July 10, 2020.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Micah Bluming*
MICAH BLUMING [1618961]
HONEY MORTON [1019878]
GAVIN N. PALMER [1619264]
Assistant Attorneys General
ROBERT A. DEBERARDINIS, JR. [335976]
Senior Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C.  20001
(202) 724-7272
(202) 730-1833 (fax)
micah.bluming@dc.gov
honey.morton@dc.gov
gavin.palmer@dc.gov
robert.deberardinis@dc.gov

*Counsel for Defendants*